# EXHIBIT A-55

TERRAINE ABDULLAH, on her own behalf   :   COURT OF COMMON PLEAS
and as Parent and Natural Guardian of H.S., a   :   PHILADELPHIA COUNTY
Minor,

        :   CIVIL ACTION

       Plaintiffs,   :  

  :  

       v.   :   MARCH TERM 2022

  :   NO. 2583

MEAD JOHNSON & COMPANY, LLC, et al.,   :  

       Defendants.  

Filed and Attested by the
Office of Judicial Records
08 MAR 2024 03:41 pm
S. GILLIAM

## ORDER

**AND NOW**, this _____ day of _____ 2024, upon consideration of the Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.

 

 

                                   **BY THE COURT:**

 

 

                                   _____
                                            J.

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>: |
| Plaintiffs, | : CIVIL ACTION<br>: |
| v. | : MARCH TERM 2022<br>: NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : |

## ALTERNATIVE ORDER

**AND NOW**, this          day of                        2024, upon consideration of the

Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby

**ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1.  Count VI of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

2.  Count VII of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

3.  Plaintiffs' claims for punitive damages as to Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct; and

4.  Plaintiff Terraine Abdullah's claims in her own right are **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                        J.

Case ID: 220302583
Control No.: 24052736

BURNS WHITE LLC
By:     James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire
Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Suite 2700
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | MARCH TERM 2022 |
| | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | | |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter "Moving Defendants") hereby preliminarily object to Plaintiffs' Amended Complaint, and, in support thereof, aver as follows:

I.      **FACTUAL AND PROCEDURAL HISTORY**

1.      Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). *See* Plaintiff's Complaint, attached as Exhibit "A."

1

2.      On June 9, 2023, Moving Defendants filed preliminary objections to Plaintiffs'
Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike
Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3)
strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike
Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes
of action, and based on the applicable statute of limitations.

3.      On March 22, 2024, the Court sustained Moving Defendants' preliminary
objections, and ordered Plaintiffs to file an Amended Complaint "stating with specificity the
factual bases for the professional negligence claim at issue." *See* Court Order, attached as Exhibit
"B."

4.      On April 23, 2024, Plaintiffs filed an Amended Complaint, which still contains
substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary
Objections.  *See* Plaintiff's Amended Complaint, attached as Exhibit "C."

5.      Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania
Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's
milk-based infant formula by premature infants following their birth.[1]

6.      Plaintiffs allege that "upon information and belief" the Plaintiff-minor, H.S., was
diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants
are at increased risk to develop. *See* Plaintiffs' Amended Complaint, attached as Exhibit "C," ¶
13, 15. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple
University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

Case ID: 220302583
Control No.: 24052736

milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula.[2]

7.       In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. [3]

8.       The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four paragraphs in the Amended Complaint.

9.       Plaintiffs aver that H.S. was born prematurely on September 12, 2006 and that "upon information and belief" she "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12.

10.     Plaintiffs further allege that "upon information and belief" H.S. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

11.     Plaintiffs generally allege that H.S. underwent a colonic resection after being diagnosed with NEC, and that she "continues to suffer long term gastrointestinal health effects" as a result. *Id.*, ¶ 14.

12.     Moving Defendants Preliminarily Object to Plaintiffs' Amended Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

---

[2] Although Plaintiffs aver in the Amended Complaint that NEC is caused by cow's milk-based infant formula, as discussed infra and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates NEC is caused by cow's milk-based infant formula.

[3] As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United States Food and Drug Administration and require to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA permits does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302583
Control No.: 24052736

## II.   ARGUMENT

### A.   DEMURRER TO COUNT VI: FAILURE TO WARN

      ***i.   Plaintiffs failed to aver sufficient facts demonstrating that the Defendant Manufacturers' products are unreasonably dangerous for their intended use.***

13.    Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm.

14.    Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers caused NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

15.    In Plaintiffs' original Complaint, in support of this theory, Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics.  *See* Exhibit "A," ¶¶ 17-23.

16.    As Moving Defendants argued in their Preliminary Objections filed on June 9, 2023 (which the Court sustained on March 22, 2024), the studies cited by Plaintiffs in paragraphs 17 through 23 in their original Complaint demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

17.    Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint.

18.    In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Amended Complaint that "scientific evidence" exists

Case ID: 220302583
Control No.: 24052736

demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit "C," ¶¶ 21-24. However, Plaintiffs do not plead any additional facts to support their basis that such "scientific evidence" exists.

19.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

20.     To the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

21.     "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

22.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

5

Case ID: 220302583
Control No.: 24052736

23.     "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.

24.     Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

25.     At the outset of their Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit "C" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.*

26.     However, as stated above, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant.  Indeed, Plaintiffs appear to base their core claim on the flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in the Amended Complaint.

27.     Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

Case ID: 220302583
Control No.: 24052736

> ***ii.*** ***Plaintiffs' "failure to warn" theory is legally flawed because medical providers did not have a "duty to warn", Plaintiff-parent's informed consent was not required, and hospitals cannot be held liable for a physician's failure to obtain proper informed consent.***

28.     Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

29.     Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

30.     The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent.

31.     Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.

7

Case ID: 220302583
Control No.: 24052736

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

32.     Since the use of infant formula in feeding premature infants is not a "procedure," there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same.

33.     Further, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

34.     Thus, a hospital cannot be held liable for a physician's failure to obtain proper informed consent. *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002).

**B.      DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER**

> ***i.      Moving Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.***

35.     In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice

8

medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

36.     Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula.

37.     Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants.

38.     Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

39.     Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is an unreasonably dangerous product.

40.     Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

>      ii.    *Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.*

41.     Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

42.     In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires

Case ID: 220302583
Control No.: 24052736

a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

43.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

44.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Amended Complaint, such evidence cannot support a finding of corporate liability.

> ### iii.   *Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.*

45.     Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

46.     The *Thompson* holding has been extended to HMOs and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania*, *Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

47.     However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D.

Case ID: 220302583
Control No.: 24052736

& C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

48.     There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

49.     Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

### C.     MOTION TO STRIKE PLAINTIFFS' AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

50.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

51.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

52.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain**

11

Case ID: 220302583
Control No.: 24052736

> **averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

53.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

54.     Plaintiffs' Amended Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

55.     Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "C," ¶¶ 11-14.

56.     Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

Case ID: 220302583
Control No.: 24052736

57.    Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 50-51.

58.    Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, what treatment was provided after H.S. developed NEC, and where H.S. received treatment for NEC.

59.    The Amended Complaint further fails to state sufficient facts concerning the nature of the injuries and the "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection.

60.    Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

61.    These omissions are fatal defects in Plaintiff's Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

**D.    MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES**

62.    In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in outrageous, oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "C," Counts VI & VII.

63.    However, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

64.    Rather, Plaintiffs merely allege that "upon information and belief" H.S. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that

13

such an action was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth.

65.     For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

66.     Plaintiff's allegations of oppressive, outrageous, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

67.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

68.     Absent specific factual allegations to justify the claim that the use of infant formula in H.S.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

69.      Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

70.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an

Case ID: 220302583
Control No.: 24052736

'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

71.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

72.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40  P.S. §1303.505.

73.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk

15

Case ID: 220302583
Control No.: 24052736

is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

74.     Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

75.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

76.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death.  *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa.

16

Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

77.     Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v.*

Case ID: 220302583
Control No.: 24052736

*Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

78.     The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

79.     Pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c).

80.     Plaintiffs allege in this action that unidentified "staff" fed H.S. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. *See* Exhibit "C," ¶ 12.

81.     Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

18

82.     In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

83.     For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

### E.     MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS

#### i.     *Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).*

84.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of H.S.

85.     Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "C," ¶¶ 97, 105, 123, 133, 147, 165, 173.

86.     However, no specific cause of action is asserted as to any damages sought by behalf of Plaintiff-parent, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

87.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Amended Complaint to allow her to recover damages in her own right, the Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

19

Case ID: 220302583
Control No.: 24052736

88.     Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

> ii.     *Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.*

89.     Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

90.     Plaintiffs allege that H.S. was born on September 12, 2006, was fed the Defendant Manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "C," ¶¶ 11-13.

91.     Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

92.     In an attempt to save Plaintiff-parent's claim from being time-barred, Plaintiffs allege in their Amended Complaint that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims "until a later time." *See* Exhibit "C," ¶ 43.

93.     The discovery rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here.

94.     The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed

Case ID: 220302583
Control No.: 24052736

period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds).

95.     Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. Ct. 1989).

96.     The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995).

97.     "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 649 Pa. 227, 249, 195 A.3d 880, 893 (2018) (citations omitted).

98.     Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of H.S.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC" from Plaintiff-parent (*see* Exhibit "C," ¶¶ 27-35) and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products (*see* Exhibit "C," ¶¶ 36-43).

99.     Plaintiffs do not allege *any* facts to support the claim that Moving Defendant "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her.

100.     Plaintiffs allege that Moving Defendants' "response" at the time H.S. was diagnosed with NEC "did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of Defendants." *See* Exhibit "C," ¶ 28. Plaintiffs further allege that, as a layperson with no

Case ID: 220302583
Control No.: 24052736

medical background, Plaintiff-parent had no reason to doubt said "response" she received from H.S.'s health care providers at Penn Medicine. *See id.* ¶ 29-30.

101.    However, Plaintiffs do not allege any facts concerning the nature of the Moving Defendants' "response" that Plaintiffs contend Plaintiff-parent relied upon.

102.    Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

**WHEREFORE**, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted:

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
MEREDITH A. LOWRY, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Dated: May 13, 2024

22

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire
Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Suite 2700
Philadelphia, PA 19103
(215) 587-1600
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,<br><br>                    Plaintiffs,<br><br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>               Defendants. | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: CIVIL ACTION<br>:<br>: MARCH TERM 2022<br>: NO. 2583<br>: |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

**I.    MATTER BEFORE THE COURT**

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Amended Complaint.

**II.    STATEMENT OF QUESTIONS PRESENTED**

1.    Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because Plaintiffs' Amended Complaint does not support the claim that cow's milk-based products are unreasonably dangerous?

*Suggested answer in the affirmative.*

Case ID: 220302583
Control No.: 24052736

2.       Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative.*

3.       Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because it improperly alleges that Moving Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative.*

4.       Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint with prejudice because Moving Defendants cannot be held liable on a corporate negligence theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative.*

5.       Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative.*

6.       Whether this Honorable Court should strike Plaintiffs' Amended Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative.*

Case ID: 220302583
Control No.: 24052736

7.    Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Amended Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative.*

8.    Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020?

*Suggested answer in the affirmative.*

9.    Whether this Honorable Court should strike Plaintiff-parent's claims because they are time-barred and Plaintiff-parent has failed to allege sufficient facts to demonstrate that the limitations period should be tolled?

*Suggested answer in the affirmative.*

## III.    <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). *See* Plaintiff's Complaint, attached as Exhibit "A."

On June 9, 2023, Moving Defendants filed preliminary objections to Plaintiffs' Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3)  strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes of action, and based on the applicable statute of limitations.  On March 22, 2024, the Court sustained Moving Defendants' preliminary objections, and ordered Plaintiffs to file an Amended Complaint "stating

Case ID: 220302583
Control No.: 24052736

with specificity the factual bases for the professional negligence claim at issue." *See* Court Order, attached as Exhibit "B." On April 23, 2024, Plaintiffs filed an Amended Complaint, which still contains substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary Objections. *See* Plaintiff's Amended Complaint, attached as Exhibit "C."

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1] Plaintiffs allege that the Plaintiff-minors, including H.S., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Exhibit "C" at ¶ 13. Plaintiffs aver that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based products (infant formula). Many of the allegations of the Amended Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors received infant formula and that they developed NEC shortly after being fed with infant formula.

In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott")[2], Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. *See* Exhibit "C" at Counts VI and VII. As is discussed in detail below, Plaintiffs' claims against Moving Defendants are legally and factually deficient.

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[2] Mead Johnson and Abbott have been the subject of similar lawsuits in other states, including Connecticut, Illinois and California.

Case ID: 220302583
Control No.: 24052736

Although Plaintiffs aver in the Amended Complaint that NEC is caused by cow's milk-based infant formula, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates NEC is caused by cow's milk-based infant formula. As such, there is no basis to contend that cow's milk-based products are dangerous for premature infants, such that Moving Defendants had a duty to warn Plaintiff-parents of any risks or alternatives related to infant formula.

Plaintiffs' Amended Complaint provides scant information regarding the factual background of this case. Plaintiffs aver that H.S. was born prematurely on September 12, 2006 and that "upon information and belief" she "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12. Plaintiffs further allege that "upon information and belief" H.S. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13. Plaintiffs generally allege that H.S. underwent a colonic resection after being diagnosed with NEC, and that she "continues to suffer long term gastrointestinal health effects" as a result. *Id.*, ¶ 14. Further, no facts are provided by Plaintiffs as to any medical care H.S. received, other than the colonic resection she underwent, for what period of time H.S. allegedly ingested cow's milk-based products, and which product(s) she allegedly ingested.[3] Finally, the Amended Complaint is silent as to the nature and extent of H.S.'s alleged injuries other than a vague reference to "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection. *Id.* ¶ 14. Moving Defendants Preliminarily Object to Plaintiffs' Amended Complaint for the reasons stated below.

---

[3] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id.*, ¶¶ 50-51.

Case ID: 220302583
Control No.: 24052736

## IV.   ARGUMENT

### A.   DEMURRER TO COUNT VI: FAILURE TO WARN

#### 1.   *Plaintiffs failed to aver sufficient facts demonstrating that the Defendant Manufacturers' products are unreasonably dangerous for their intended use.*

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers caused NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

In Plaintiffs' original Complaint, in support of this theory, Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics.  *See* Exhibit "A," ¶¶ 17-23. As Moving Defendants argued in their Preliminary Objections filed on June 9, 2023 (which the Court sustained on March 22, 2024), the studies cited by Plaintiffs in paragraphs 17 through 23 in their original Complaint demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

6

Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint. In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Amended Complaint that "scientific evidence" exists demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit "C," ¶¶ 21-24. However, Plaintiffs do not plead any additional facts to support their basis that such "scientific evidence" exists. Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

Plaintiffs further fail to disclose in their Amended Complaint that infant formula is regulated by the United States Food and Drug Administration (FDA) and that there is no restriction on the use of cow's milk-based products for premature infants. The federal Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas for sale include cow milk. 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA, and (2) submit a notice to the FDA at least 90 days before marketing such formula. The notice must also state that the formula contains the required vitamins and nutrients, as

Case ID: 220302583
Control No.: 24052736

demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(a). For those formulas – known as "exempt" formulas because they may be exempted from certain requirements – the required 90-day notice must include "the label and other labeling of the infant formula, a complete quantitative formulation for the infant formula, and a detailed description of the medical conditions for which the infant formula is represented." 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for infant formulas intended for use by an infant with a low birth weight.

Thus, since Plaintiffs do not allege that the product did not meet federal requirements, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

To the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn. "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

Case ID: 220302583
Control No.: 24052736

      (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

      (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

      (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308. Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

At the outset of their Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit "C" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* However, as stated above, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant. Indeed, Plaintiffs appear to base their core claim on the flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in the Amended Complaint. Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving

Case ID: 220302583
Control No.: 24052736

Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

> ### 2. Plaintiffs' "failure to warn" theory is legally flawed because medical providers did not have a "duty to warn", Plaintiff-parent's informed consent was not required, and hospitals cannot be held liable for a physician's failure to obtain proper informed consent.

Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

Further, Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products. The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based infant formula to feed her child as opposed to breastfeeding or using breast donor milk, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law. Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

Case ID: 220302583
Control No.: 24052736

(1) Performing surgery, including the related administration of anesthesia.

(2) Administering radiation or chemotherapy.

(3) Administering a blood transfusion.

(4) Inserting a surgical device or appliance.

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

The clear language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of infant formula in feeding premature infants, since that is not a "procedure." Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same. Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 345 Pa. Super. 66, 71, 497 A.2d 646, 648 (1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical

Case ID: 220302583
Control No.: 24052736

procedure without a patient's informed consent constitutes a technical assault or battery and that merely prescribing an oral medication does not involve a touching so not battery can occur and no informed consent is needed. *Id.* at 649. The same principles clearly apply to administration of infant formula to a newborn.

Further, an informed consent claim is only applicable to a physician and not the hospital and/or other health care entities. *See* 40 P.S. § 1303.504; *see also Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure). The Pennsylvania Supreme Court has held that informed consent involves the relationship between a physician and the patient and that the failure to obtain proper informed consent is deemed a battery, and the institution plays no role in the communications involved in obtaining the same. *See Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002). In *Valles*, the Court decisively ruled that:

> We find that a battery which results from a lack of informed consent is not the type of action that occurs within the scope of employment. In our view, a medical facility cannot maintain control over this aspect of the physician-patient relationship. Our lower courts have recognized that the duty to obtain informed consent belongs solely to the physician. (Citations omitted). Informed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents. We decline to interject an element of a hospital's control into this highly individualized and dynamic relationship. We agree with the lower court that to do so would be both improvident and unworkable. Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable.

*Id.*, 805 A.2d at 1239 (emphasis added). The *Valles* case remains the prevailing law in Pennsylvania. Pennsylvania courts have repeatedly applied this doctrine, recognizing and acknowledging that "[i]n a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort." *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (*citing Moure v. Raeuchle*, 604 A.2d 1003, 1008 (Pa. Super. 1992). Further,

Case ID: 220302583
Control No.: 24052736

"[g]iven the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'" *Isaac*, 932 A.2d at 930. As such, it is clear that the instant cause of action cannot be sustained against Moving Defendants as a matter of law.

For the foregoing reasons, Plaintiffs have not pleaded sufficient facts to aver the Defendant Manufacturers' products are unreasonably dangerous for their intended use and thus have not established Moving Defendants had a duty to warn. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI: Failure to Warn of Plaintiffs' Amended Complaint.

## B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

### 1. Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

Case ID: 220302583
Control No.: 24052736

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn. Both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula. As noted above, infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is a dangerous product. Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to preclude the use of cow's milk-based products in the feeding of premature infants in the hospital.

### 2. Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.

Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

<u>Id.</u> at 1386-87 (citations omitted and emphasis added). Thus, corporate liability requires "more than individual acts of negligence." *Id*. As noted by the court in *Edwards*, this reading of the Court's

14

opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "Thompson requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Amended Complaint, such evidence cannot support a finding of corporate liability.

For the reasons stated above, Count VII of Plaintiffs' Amended Complaint should be dismissed with prejudice.

### 3. Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.

Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused

Case ID: 220302583
Control No.: 24052736

to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4[th] 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4[th] 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4[th] 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5[th] 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital can be held liable under a theory of corporate negligence. The Trustees of the University of Pennsylvania is not a hospital and cannot be held liable under a theory of corporate liability, regardless of its relationship with Pennsylvania Hospital. Moreover, as Pennsylvania Courts have consistently held, corporate negligence duties are "non-delegable," i.e., only one entity can be held liable for a breach of these duties. The *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07. Thus, even if a corporate negligence claim were permissible as to Pennsylvania Hospital, which is denied for the reasons stated above, The Trustees of the University of Pennsylvania, which is not a hospital, cannot also be exposed to liability for an alleged breach of the same, non-delegable duties arising out of the same factual allegations. Accordingly, even accepting as true all well pled facts in Plaintiffs' Amended Complaint, the corporate negligence claims as to the non-hospital Defendant, the Trustees of the University of Pennsylvania, are legally insufficient and must therefore be dismissed.

Case ID: 220302583
Control No.: 24052736

### C. MOTION TO STRIKE PLAINTIFFS' AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Amended Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa.

Case ID: 220302583
Control No.: 24052736

Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Amended Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "C," ¶¶ 11-14. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 50-51. Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, what treatment was provided after H.S. developed NEC, and where H.S. received treatment for NEC. The Amended Complaint further fails to state sufficient facts concerning the nature of the injuries and the "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

Case ID: 220302583
Control No.: 24052736

In short, Plaintiffs' Amended Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Amended Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

## D. <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "C," Counts VI & VII. However, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" H.S. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth. For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants

Case ID: 220302583
Control No.: 24052736

engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in H.S.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

Case ID: 220302583
Control No.: 24052736

      (a)    Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

      (b)    Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40 P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

  Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion

Case ID: 220302583
Control No.: 24052736

surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from

Case ID: 220302583
Control No.: 24052736

neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Even assuming the allegations in the Amended Complaint were true for the purposes of this argument only, the outcome in this case was not the result of any intentional wrongdoing or deliberate misconduct on the part of Moving Defendants or any medical provider at Pennsylvania Hospital, nor does the Amended Complaint contain any such allegations.

Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c) Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that

Case ID: 220302583
Control No.: 24052736

the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c). Plaintiffs allege in this action that unidentified "staff" fed H.S. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. *See* Exhibit "C," ¶ 12. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985). In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

### E. <u>MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS</u>

> #### 1. *Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).*

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of H.S. Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "C," ¶¶ 97, 105, 123, 133, 147, 165, 173. However, no specific cause of action is asserted as to any damages sought by Plaintiff-parent in her own right, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged

Case ID: 220302583
Control No.: 24052736

negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

Further, even if Plaintiff-parent had properly articulated a cause of action in the Amended Complaint to allow her to recover damages in her own right, the Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### 2. *Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.*

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that H.S. was born on September 12, 2006, was fed the Defendant Manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "C," ¶¶ 11-13. Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations. In an attempt to save Plaintiff-parent's claim from being time-barred, Plaintiffs allege in their Amended Complaint that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims "until a later time." *See* Exhibit "C," ¶ 43. However, the discovery

Case ID: 220302583
Control No.: 24052736

rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here.

The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds). Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. Ct. 1989). The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995). "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 649 Pa. 227, 249, 195 A.3d 880, 893 (2018) (citations omitted).

Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of H.S.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC" from Plaintiff-parent (*see* Exhibit "C," ¶¶ 27-35) and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products (*see* Exhibit "C," ¶¶ 36-43). Plaintiffs do not allege *any* facts to support the claim that Moving Defendant "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her. Plaintiffs allege that Moving Defendants' "response" at the time H.S. was diagnosed with NEC "did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of Defendants." *See*

Case ID: 220302583
Control No.: 24052736

Exhibit "C," ¶ 28. Plaintiffs further allege that, as a layperson with no medical background, Plaintiff-parent had no reason to doubt said "response" she received from H.S.'s health care providers at Penn Medicine. *See id.* at ¶ 29-30. However, Plaintiffs do not allege any facts concerning the nature of the Moving Defendants' "response" that Plaintiffs contend Plaintiff-parent relied upon. Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

## V.  **REQUESTED RELIEF**

For the foregoing reasons, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
MEREDITH A. LOWRY, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Dated: May 13, 2024

Case ID: 220302583
Control No.: 24052736

## <u>CERTIFICATE OF SERVICE</u>

I, Richard S. Margulies, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiff's Amended Complaint, to be served via the electronic filing system to all counsel of record.


BY: _____

RICHARD S. MARGULIES, ESQ.

Dated: May 13, 2024

# EXHIBIT A

Case ID: 220302583
Control No.: 24052736

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
**Identification Number: 82258**
**One Logan Square**
**130 N. 18th Street, Suite 1600**
**Philadelphia, PA 19103**
**(215) 735-0773**
tfinken@anapolweiss.com

Filed and Attested by the
Office of Judicial Records
24 MAR 2022 01:57 pm
S. RICE

**ATTORNEY FOR PLAINTIFFS**

**KELLER LENKNER LLC**
**BY: Ashley Keller (*pro hac vice forthcoming*)**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**
**Telephone: (312) 741-5220**
**Fax: (312) 971-3502**
**Email:** ack@kellerlenkner.com

**ATTORNEY FOR PLAINTIFFS**

**WALSH LAW PLLC**
**BY: Alex Walsh (*pro hac vice forthcoming*)**
**1050 Connecticut Ave, NW, Suite 500**
**Washington, D.C. 20036**
**Telephone: (202) 780-4127**
**Fax: (202) 780-3678**
**Email:** awalsh@alexwalshlaw.com

**ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own** | : | **COURT OF COMMON PLEAS** |
| **Behalf and as Parent and Natural Guardian** | : | **PHILADELPHIA COUNTY** |
| **of H.S., a Minor** | : | |
| **335 Passmore Street** | : | |
| **Philadelphia, PA 19111** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO.** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

1

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

CT Corporation System  :
208 So. Lasalle Street, Suite 814  :
Chicago, IL 60604  :
   :
   :
THE PENNSYLVANIA HOSPITAL OF  :
THE UNIVERSITY OF PENNSYLVANIA  :
HEALTH SYSTEM d/b/a PENNSYLVANIA  :
HOSPITAL  :
3400 Civic Center Blvd.  :
Philadelphia, PA 19104  :
   :
   :
THE TRUSTEES OF THE UNIVERSITY OF  :
PENNSYLVANIA d/b/a PENN MEDICINE  :
133 South 36th Street  :
Philadelphia, PA 19104  :
   :
   :

|  | | |
|---|---|---|
| **Defendants** | : | **JURY TRIAL DEMANDED** |

## COMPLAINT IN CIVIL ACTION

### NOTICE TO DEFEND

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701

2

Case ID: 220302583

Case ID: 220302583
Control No.: 24052736

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
**IDENTIFICATION NUMBER: 82258**
**ONE LOGAN SQUARE**
**130 N. 18TH STREET, SUITE 1600**
**PHILADELPHIA, PA 19103**
**(215) 735-0773**
**TFINKEN@ANAPOLWEISS.COM**                      **ATTORNEY FOR PLAINTIFFS**

**KELLER LENKNER LLC**
**BY: ASHLEY KELLER (*PRO HAC VICE FORTHCOMING*)**
**150 N. RIVERSIDE PLAZA, SUITE 4100**
**CHICAGO, ILLINOIS 60606**
**TELEPHONE: (312) 741-5220**
**FAX: (312) 971-3502**
**EMAIL: ACK@KELLERLENKNER.COM**                 **ATTORNEY FOR PLAINTIFFS**

**WALSH LAW PLLC**
**BY: ALEX WALSH (*PRO HAC VICE FORTHCOMING*)**
**1050 CONNECTICUT AVE, NW, SUITE 500**
**WASHINGTON, D.C. 20036**
**TELEPHONE: (202) 780-4127**
**FAX: (202) 780-3678**
**EMAIL: AWALSH@ALEXWALSHLAW.COM**               **ATTORNEY FOR PLAINTIFFS**

| | |
|---|---|
| **TERRAINE ABDULLAH**, ON HER OWN : | **COURT OF COMMON PLEAS** |
| **BEHALF AND AS PARENT AND NATURAL GUARDIAN** : | **PHILADELPHIA COUNTY** |
| **OF H.S., A MINOR** : | |
| **335 PASSMORE STREET** : | |
| **PHILADELPHIA, PA 19111** : | |
| **PLAINTIFFS** : | |
| **V.** : | **CIVIL ACTION** |
| : | |
| **MEAD JOHNSON & COMPANY, LLC** : | |
| **ILLINOIS CORPORATION SERVICE CO.** : | |
| **801 ADLAI STEVENSON DRIVE** : | |
| **SPRINGFIELD, IL 62703** : | |
| : | **NO.** |
| : | |
| **MEAD JOHNSON NUTRITION COMPANY** : | |
| **ILLINOIS CORPORATION SERVICE CO.** : | |
| **801 ADLAI STEVENSON DRIVE** : | |
| **SPRINGFIELD, IL 62703** : | |
| : | |
| : | |
| **ABBOTT LABORATORIES** : | |
| **CT CORPORATION SYSTEM** : | |
| **208 SO. LASALLE STREET, SUITE 814** : | |
| **CHICAGO, IL 60604** : | |
| : | |
| : | |
| **THE PENNSYLVANIA HOSPITAL OF** : | |
| **THE UNIVERSITY OF PENNSYLVANIA** : | |
| **HEALTH SYSTEM D/B/A PENNSYLVANIA** : | |

3

| | |
|---|---|
| HOSPITAL<br>3400 CIVIC CENTER BLVD.<br>PHILADELPHIA, PA 19104 | : <br> : <br> : <br> : |
| THE TRUSTEES OF THE UNIVERSITY OF<br>PENNSYLVANIA D/B/A PENN MEDICINE<br>133 SOUTH 36TH STREET<br>PHILADELPHIA, PA 19104 | : <br> : <br> : <br> : <br> : |
| DEFENDANTS | :    JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I.    INTRODUCTION

1. This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

4

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.       Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.       Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania. Ms. Abdullah is the parent and natural guardian of H.S., a minor. Ms. Abdullah's address is 335 Passmore Street, Philadelphia, Pennsylvania 19111.

4.       Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.       Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

5

6. Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7. Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.  JURISDICTION AND VENUE

8. This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9. Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common

Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is

in excess of $50,000.

### IV.     FACTUAL ALLEGATIONS

#### *H.S.'s NEC Diagnosis*

11.     H.S. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on

September 12, 2006.

12.     Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based

products by staff at Pennsylvania Hospital from shortly after her birth.

13.     Upon information and belief shortly after H.S. first ingested the Defendant Manufacturers'

products, she developed NEC.

14.     H.S. was forced to undergo surgery and has continued to suffer long term health effects.

#### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder

affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine,

causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the

condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to

30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their

underdeveloped digestive systems.  Extensive scientific research, including numerous randomized

controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and

low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-

term health problems, and death.

Case ID: 220302583

17.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was six to ten times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk.  For babies born at more than 30 weeks gestation, NEC was 20 times more common in those only fed cow's milk formula than in those fed breast milk.

18.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

19.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

20.     A Surgeon General report, The Surgeon General's Call to Action to Support Breastfeeding, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis." The report also states that premature infants who are not breastfed are 138% more likely to develop NEC.

21.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk.  This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

22.    A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time.

23.    Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

### Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist

24.    A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.    A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

26. The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

27. For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28. At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29. Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.

### The Defendant Manufacturers' False And Misleading Marketing Regarding Cow's Milk-Based Infant Products

30. Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

31.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

32.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

33.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

34.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

35.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

36.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding.  We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs."  This statement ignores the existence of donor milk, as well as human milk-based formula.

37.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30.  In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets.  For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up.  During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development."  Yet, no mention was made of the accompanying significantly increased risk of NEC.  At some point, the website was edited to remove this statement.  However, upon information and belief, the statement remained on the website until at least December 2020.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

38.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

39.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

40.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk.  They offer free or reduced-cost formula to hospitals for use with infants before discharge.  And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

41.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

42.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.  One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product.  The packaging appears as:

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736





43.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.  This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

Case ID: 220302583

Case ID: 220302583
Control No.: 24052736

*The Defendant Manufacturers' Inadequate Warnings*

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

50.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

51. Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52. The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

53. Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54. Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55. Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

56. On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients. It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. However, instead of warning of those

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

57. To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates. The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants. It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

58. Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

59. Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition. In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

60. These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

61. Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

62. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

*Safer Alternative Designs*

63.    The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.  The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

64.    Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

65.    On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION

### COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
**(Against Abbott and Mead)**

66.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

68.    Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

69.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.  Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

70.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

71.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

72.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

73.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

74.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

75.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

**COUNT II: STRICT LIABILITY FOR FAILURE TO WARN**
**(Against Abbott and Mead)**

76.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

78.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

79.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

a.   Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.   Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.   Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

d.  Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

80.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

81.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

82.  The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

83.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

     a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

     b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

     c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

     d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

     e.  For interest as permitted by law;

     f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

     g.  For such other and further relief as the Court deems proper.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

84.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

86.     At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

87.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

88.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

      a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

26

c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

89.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

90.     As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

91.     Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

92.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

g.  For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

93.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

94.     At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

95.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

96.     Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

97.     Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

    c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.   That cow's milk-based products were safe for premature infants; and/or

    e.   That cow's milk-based products were necessary for optimum growth; and/or

    f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

98. Abbott and Mead knew or reasonably should have known those misrepresentations to be false.

99. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

100. The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

101.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

102.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

## COUNT V: NEGLIGENT MISREPRESENTATION
### (Against Abbott and Mead)

103.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

105.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

106.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

107.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

      a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

      b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

32

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

    c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.   That cow's milk-based products were safe for premature infants; and/or

    e.   That cow's milk-based products were necessary for optimum growth; and/or

    f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

108.    Abbott and Mead were negligent or careless in not determining those representations to be false.

109.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

110.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

111.   As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

112.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

      a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

      c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

      d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

      e.  For interest as permitted by law;

      f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

      g.  For such other and further relief as the Court deems proper.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

## COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

113. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

114. Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

115. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

116. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

117. Penn Medicine and Pennsylvania Hospital negligently and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

118. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

119.    Penn Medicine and Pennsylvania also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

120.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

121.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

   a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

d. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

122. Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

123. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

124. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

125.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

126.    As a further direct and proximate result of Penn Medicine and Pennsylvania failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

   a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

   c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

   d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, reckless, and/or malicious conduct, as permitted by law;

   e.   For interest as permitted by law;

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

127.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

128.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

129.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

130.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

131.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute,

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

132. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

133. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

134. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

135. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

a.  Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.  Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.  Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to

41

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

136. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

137. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

138. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

139. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent and reckless conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

140. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

141. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

142. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

43

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

143. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

144.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, , the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

148.   Plaintiff hereby demands a jury trial for all claims triable.


Dated: March 24, 2022

                         Respectfully submitted,

                         **ANAPOL WEISS**

                         *[signature]*

                         Tracy Finken
                         130 N. 18th Street, Suite 1600
                         Philadelphia, PA 19103
                         Phone: (215) 735-1130
                         Email: tfinken@anapolweiss.com

                         **KELLER LENKNER LLC**
                         Ashley Keller (*pro hac vice forthcoming*)
                         150 N. Riverside Plaza, Suite 4100
                         Chicago, Illinois 60606

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

Telephone: (312) 741-5220
Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**WALSH LAW PLLC**
Alex Walsh (*pro hac vice forthcoming*)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

*Attorneys for Plaintiffs*

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

_Tracy Finken_
Tracy Finken

48

Case ID: 220302583
Case ID: 220302583
Control No.: 24052736

## <u>VERIFICATION</u>

I, the undersigned, Tracy Finken, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Date:   March 24, 2022                                       Tracy Finken

Case ID: 220302583
Control No.: 24052736

# EXHIBIT B

Case ID: 220302583
Control No.: 24052736

TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,

               Plaintiffs,

v.

MEAD JOHNSON & COMPANY, LLC, et al.,
               Defendants.

: COURT OF COMMON PLEAS
: PHILADELPHIA COUNTY
:
: CIVIL ACTION
:
: MARCH TERM 2022
: NO. 2583
:
:

Filed and Attested by the Office of Judicial Records 02 MAR 2023 03:55 pm C. PERRY

## ORDER

**AND NOW**, this ___ day of March 2024, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, and any Response thereto, it is hereby

**ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that ~~all~~ *Plaintiff Shall file an Amended Complaint* ~~claims~~ against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine ~~are hereby~~ **DISMISSED** with prejudice. *Stating with specificity the factual basis for the professional negligence claim at issue.*

                            **BY THE COURT:**

                                              _____ J.

220302583-Abdullah Etal Vs Mead Johnson

22030258300095

Case ID: 220302583
Control No.: 23063116

Case ID: 220302583
Control No.: 24052736

# EXHIBIT C

Case ID: 220302583
Control No.: 24052736

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com



*Filed and Attested by the Office of Judicial Records 23 APR 2024 02:41 pm B. MERCEDES*

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own** | : | **COURT OF COMMON PLEAS** |
| **Behalf and as Parent and Natural Guardian** | : | **PHILADELPHIA COUNTY** |
| **of H.S., a Minor** | : | |
| **335 Passmore Street** | : | |
| **Philadelphia, PA 19111** | : | |
|         **Plaintiffs** | : | |
|     **v.** | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO. 220902583** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

1

Case ID: 220302583
Control No.: 24052736

CT Corporation System                           :
208 So. Lasalle Street, Suite 814               :
Chicago, IL 60604                               :
                                                :
                                                :
THE PENNSYLVANIA HOSPITAL OF                    :
THE UNIVERSITY OF PENNSYLVANIA                  :
HEALTH SYSTEM d/b/a PENNSYLVANIA                :
HOSPITAL                                        :
3400 Civic Center Blvd.                         :
Philadelphia, PA 19104                          :
                                                :
                                                :
THE TRUSTEES OF THE UNIVERSITY OF               :
PENNSYLVANIA d/b/a PENN MEDICINE                :
133 South 36th Street                           :
Philadelphia, PA 19104                          :
                                                :
          **Defendants**                        :          **JURY TRIAL DEMANDED**

## AMENDED COMPLAINT IN CIVIL
## ACTION NOTICE TO DEFEND

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701

2

Case ID: 220302583
Control No.: 24052736

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com

| | |
|---|---|
| **TERRAINE ABDULLAH, ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARDIAN OF H.S., A MINOR** <br> **335 PASSMORE STREET** <br> **PHILADELPHIA, PA 19111** <br>       **PLAINTIFFS** | **COURT OF COMMON PLEAS** <br> **PHILADELPHIA COUNTY** |
| **V.** | **CIVIL ACTION** |
| **MEAD JOHNSON & COMPANY, LLC** <br> **ILLINOIS CORPORATION SERVICE CO.** <br> **801 ADLAI STEVENSON DRIVE** <br> **SPRINGFIELD, IL 62703** | **NO. 220902583** |
| **MEAD JOHNSON NUTRITION COMPANY** <br> **ILLINOIS CORPORATION SERVICE CO.** <br> **801 ADLAI STEVENSON DRIVE** <br> **SPRINGFIELD, IL 62703** | |
| **ABBOTT LABORATORIES** <br> **CT CORPORATION SYSTEM** <br> **208 SO. LASALLE STREET, SUITE 814** <br> **CHICAGO, IL 60604** | |
| **THE PENNSYLVANIA HOSPITAL OF** <br> **THE UNIVERSITY OF PENNSYLVANIA** <br> **HEALTH SYSTEM D/B/A PENNSYLVANIA** | |

Case ID: 220302583
Control No.: 24052736

| | |
|---|---|
| **HOSPITAL**<br>**3400 CIVIC CENTER BLVD.**<br>**PHILADELPHIA, PA 19104** | : <br> : <br> : <br> : <br> : |
| **THE TRUSTEES OF THE UNIVERSITY OF**<br>**PENNSYLVANIA D/B/A PENN MEDICINE**<br>**133 SOUTH 36TH STREET**<br>**PHILADELPHIA, PA 19104** | : <br> : <br> : <br> : <br> : |
| **DEFENDANTS** : | **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I.     INTRODUCTION

1.     This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

4

Case ID: 220302583<br>Control No.: 24052736

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

3.      Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania. Ms. Abdullah is the parent and natural guardian of H.S., a minor. Ms. Abdullah's address is 335 Passmore Street, Philadelphia, Pennsylvania 19111.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302583
Control No.: 24052736

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.  Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

Case ID: 220302583
Control No.: 24052736

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *H.S.'s NEC Diagnosis*

11.     H.S. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on September 12, 2006.

12.     At birth H.S.'s gestational ages was approximately 25 weeks and she weighed 847 grams. Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk decreases the risk of NEC.

13.     Upon information and belief shortly after H.S. first ingested the Defendant Manufacturers' products, she developed NEC.

14.     H.S. was diagnosed in the NIC-U with NEC on November 10, 2006, and thereafter was forced to undergo a colonic resection, permanently removing part of the infant's colon as a result of her NEC diagnosis. Infant plaintiff continues to suffer long term gastrointestinal health effects as a result of this surgical removal of part of her colon.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.     NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.     Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.     Up to 30 percent of NEC-diagnosed infants die from the disease.

Case ID: 220302583
Control No.: 24052736

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.     Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long- term health problems, and death.

### *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.     For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.     Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.     This displacement only increases infants' vulnerability to NEC.

20.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.     Instead, they have continued to sell their unreasonably dangerous products.     In addition,

Case ID: 220302583
Control No.: 24052736

they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

23.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

24.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Abdullah of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Abdullah Discovers Her Claim*

25.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Abdullah did not know, and had no reason to know or suspect, that H.S.'s NEC could have been caused by the Defendant Manufacturers' products.

26.     Once Ms. Abdullah learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

Case ID: 220302583
Control No.: 24052736

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and
Would Not Have Revealed a Factual Basis Earlier
Because Defendants Hid the Cause of NEC from Ms. Abdullah***

27.     Despite exercising reasonable diligence, Ms. Abdullah was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of H.S.'s injuries.

28.     Not one person at Penn Medicine informed Ms. Abdullah that the Defendant Manufacturers' formula products could have caused H.S.'s injuries.  Penn Medicine's response at the time did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of the Defendants.

29.     Ms. Abdullah is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

30.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Abdullah had no reason to doubt their word.

31.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

32.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

33.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the

10

Case ID: 220302583
Control No.: 24052736

first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

34.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Abdullah immediately after H.S.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused H.S.'s injuries.

35.     Ms. Abdullah also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to H.S.  Not only was Ms. Abdullah unaware that the Defendant Manufacturers' products caused H.S.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Abdullah, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302583
Control No.: 24052736

36.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

37.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

38.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

39.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

40.     Additionally, Defendant Hospital failed to inform Ms. Abdullah that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

41.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Abdullah of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Abdullah that it would do everything it could possibly do to keep her infant safe.  Though this

Case ID: 220302583
Control No.: 24052736

was clearly not true given the known risks of preterm formula for babies like H.S., it was enough for Ms. Abdullah to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

42.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

43.     Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

### The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products

44.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

45.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

46.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

47.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing

Case ID: 220302583
Control No.: 24052736

partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

48. While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

49. For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

50. Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC.

14

Case ID: 220302583
Control No.: 24052736

At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

51.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

52.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

53.     Formula manufacturers have long used their relationships with hospitals and the discharge

Case ID: 220302583
Control No.: 24052736

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

54.      Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

55.      Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 220302583
Control No.: 24052736





56.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

57.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.  The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left

17

Case ID: 220302583
Control No.: 24052736

the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

58.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

59.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

60.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients— the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

61.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other

18

Case ID: 220302583
Control No.: 24052736

staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

62.    Prior to H.S.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like H.S. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

63.    Prior to H.S.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like H.S. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

64.    Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like H.S.

### The Defendant Manufacturers' Inadequate Warnings

65.    Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

19

Case ID: 220302583
Control No.: 24052736

66.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

67.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead cites no medical literature or research to guide the use of its products.

69.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

70.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

71.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

72.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

Case ID: 220302583
Control No.: 24052736

73.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

74.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

75.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

76.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

***Penn Medicine's Failure to Warn***

77.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human link decreases the risk of NEC in premature infants. However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

Case ID: 220302583
Control No.: 24052736

78.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.   The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

79.     Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

80.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.   The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers.   Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

81.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on

22

Case ID: 220302583
Control No.: 24052736

investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

82.    These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

83.    Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

84.    Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.   This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

85.    The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used

Case ID: 220302583
Control No.: 24052736

pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

86.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

87.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
## COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

88.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

89.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

90.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

91.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.    Nonetheless, they

Case ID: 220302583
Control No.: 24052736

continued to sell and market their defective products as appropriate for premature infants.

92.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk- based products.  The risks of feeding those products to the Injured Infant outweighed the benefits.  An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

93.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

94.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

95.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

96.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

97.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

   a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

Case ID: 220302583
Control No.: 24052736

sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

98.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

99.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

100.  Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.   By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.   The failure to warn makes the products at issue in this litigation

26

Case ID: 220302583
Control No.: 24052736

unreasonably dangerous.

101.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

Case ID: 220302583
Control No.: 24052736

      g.      Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

      h.      Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

103.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

104.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

105.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

    WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

Case ID: 220302583
Control No.: 24052736

sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

### COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

106.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

108.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

109.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk- based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

Case ID: 220302583
Control No.: 24052736

110.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.    Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.    Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.    Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.    Failing to provide statistical evidence showing the magnitude of increased risk

Case ID: 220302583
Control No.: 24052736

of NEC in premature infants associated with cow's milk-based products.

111. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

112. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

113. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

114. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

Case ID: 220302583
Control No.: 24052736

     d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

     e.      For interest as permitted by law;

     f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

     g.      For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

115.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

116.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

117.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

118.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

119.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

     a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

Case ID: 220302583
Control No.: 24052736

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

120.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

121.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably

Case ID: 220302583
Control No.: 24052736

relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

122. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

123. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

Case ID: 220302583
Control No.: 24052736

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

**COUNT V:  NEGLIGENT MISREPRESENTATIONS**
**(Against Abbott and Mead)**

124.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

125.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

126.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

127.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

128.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.    That their cow's milk-based products were necessary to the growth and nutrition

35

Case ID: 220302583
Control No.: 24052736

of premature infants, when they knew or should have known that their products
were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have
known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk;
and/or

g.    That their products were safe and more like breast milk than other infant
products and that they had removed the harmful ingredients of cow's milk when,
in fact, the cow's milk in their products was still capable of causing NEC,
serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe
for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of
NEC in premature infants.

129.    Abbott and Mead were negligent or careless in not determining those representations to be false.

130.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce
physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their
products to babies, including the Injured Infant.

131.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the
Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance
on all the messaging they received about formula feeding, including, directly or indirectly, the
Defendant Manufacturers' messaging.    Had Abbott and Mead not committed these negligent

Case ID: 220302583
Control No.: 24052736

misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

132.     As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

133.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302583
Control No.: 24052736

g.  For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

134.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.  Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

136.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

137.  Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

138.  Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

139.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous

38

Case ID: 220302583
Control No.: 24052736

products to consumers, such as the Plaintiff Parent.

140.    Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

141.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

142.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d.    Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e.    Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

Case ID: 220302583
Control No.: 24052736

f.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.      Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

143.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

144.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure

40

Case ID: 220302583
Control No.: 24052736

to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

**COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER**
**(Against Penn Medicine and Pennsylvania Hospital)**

148.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

149.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the

Case ID: 220302583
Control No.: 24052736

Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

150.   Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

151.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

152.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

153.   Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the

Case ID: 220302583
Control No.: 24052736

misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

154. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

155. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are at increased risk for NEC.

156. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

157. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

158. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

159. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

160. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

161. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 220302583
Control No.: 24052736

a.   Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

b.   Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

c.   Failing to formulate, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d.   Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e.   Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f.   Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g.   Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be

Case ID: 220302583
Control No.: 24052736

provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h.  Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i.  Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant;

l.  Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits;

m.  Allowing parental preference to be the standard for feeding premature infants;

n.  Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

Case ID: 220302583
Control No.: 24052736

o.　Failing to follow the American Academy of Pediatrics recommendation to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.　Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.　Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

162.　A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

163.　Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

164.　As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

165.　As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302583
Control No.: 24052736

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

166. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

167. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

168. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

47

Case ID: 220302583
Control No.: 24052736

f.    Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.    Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.    Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.    Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

169.   A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

170.   A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

171.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant

Case ID: 220302583
Control No.: 24052736

would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

172.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

173.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

Case ID: 220302583
Control No.: 24052736

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

174.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: April 23, 2024

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Tobias L. Millrood         
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.

**KELLER POSTMAN**
Ben Whiting, Esq.
Zachary Clark, Esq.
*Attorneys for Plaintiffs*

50

Case ID: 220302583
Control No.: 24052736

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2024, I caused a true and correct copy of the foregoing document to be served by electronic filing to all counsel of record.

/s/ Tobias L. Millrood
TOBIAS L. MILLROOD

51

Case ID: 220302583
Control No.: 24052736

## <u>VERIFICATION</u>

I, the undersigned, Tobias L. Millrood, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

/s/ Tobias L. Millrood

Date:   April 23, 2024                                 Tobias L. Millrood

52

Case ID: 220302583
Control No.: 24052736

# EXHIBIT A-56

BURNS WHITE LLC
By:    James A. Young, Esquire
       Richard S. Margulies, Esquire
       Douglas A. Brockman, Esquire
       Meredith A. Lowry, Esquire
Attorney ID Nos. 00213/62306/67185/321131
1835 Market Street, Suite 2700
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com;
rsmargulies@burnswhite.com
dabrockman@burnswhite.com;
malowry@burnswhite.com

*Attorneys for Defendants*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

Filed and Attested by the
Office of Judicial Records
13 MAR 2024 04:45 am
E. HAURYLAK

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on his own behalf and as Parent and Natural Guardian of H.S., a Minor, Plaintiffs, | : : : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | CIVIL ACTION |
| v. | : | |
| | : | MARCH TERM 2022 |
| MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : : | NO. 2583 |

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

Kindly enter the appearance of Meredith A. Lowry, Esquire as co-counsel on behalf of

Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a

Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine,

in the above-captioned matter.

                                        **BURNS WHITE LLC**
Date: May 13, 2024                      BY: */s/ Meredith A. Lowry*
                                        Meredith A. Lowry, Esquire

## <u>CERTIFICATE OF SERVICE</u>

I, Meredith A. Lowry, Esquire, hereby certify that a true and correct copy of the foregoing

*Entry of Appearance* was served via the Court's electronic filing on all counsel of record.

<u>*/s/ Meredith A. Lowry*</u>
Meredith A. Lowry, Esquire

Date: <u>May 13, 2024</u>

# EXHIBIT A-57

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*, | **MARCH TERM 2022** |
| | **NO. 220302583** |
| Plaintiffs, | |
| v. | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | |
| Defendants. | |

*Filed and Attested by the Office of Judicial Records 13 MAY 2024 04:41 pm S. GILLIAM*

## ORDER OF THE COURT

On this _____ day of _____, 2024, upon consideration of defendant Abbott Laboratories' preliminary objections to plaintiffs' amended complaint, its brief in support, and any response thereto, it is hereby ORDERED that defendant Abbott Laboratories' preliminary objections to plaintiffs' amended complaint are SUSTAINED. It is further ORDERED that Counts I through V of plaintiffs' amended complaint are DISMISSED as to Abbott Laboratories.

BY THE COURT:

_____

**<u>NOTICE TO PLEAD</u>**

To: Plaintiffs

You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgment may be entered against you.

/s/ *Sean P. Fahey*

*Counsel for Defendant Abbott Laboratories*

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

---

TERRAINE ABDULLAH, *on her own behalf*
*and as Parent and Natural Guardian of H.S., a*
*Minor*,

                                      Plaintiffs,

        v.

MEAD JOHNSON & COMPANY LLC;
MEAD JOHNSON NUTRITION COMPANY;
ABBOTT LABORATORIES; THE
PENNSYLVANIA HOSPITAL OF THE
UNIVERSITY OF PENNSYLVANIA
HEALTH SYSTEM, *d/b/a* PENNSYLVANIA
HOSPITAL; and THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a*
PENN MEDICINE,

                                   Defendants.

---

**MARCH TERM 2022**

**NO. 220302583**

---

## <u>DEFENDANT ABBOTT LABORATORIES' PRELIMINARY OBJECTIONS</u><br><u>TO PLAINTIFFS' AMENDED COMPLAINT</u>

The instant action is one of 29 nearly identical actions filed by Plaintiffs in March and

April of 2022 in this Court, alleging their infants, born prematurely and at low birthweights, were

injured after they were administered preterm infant nutrition products manufactured by Abbott

Laboratories ("Abbott") or Mead Johnson & Company LLC, Mead Johnson Nutrition Company

(together, "Mead Johnson") shortly after their birth. During a case management conference in

these 29 cases held before the Honorable Linda Carpenter on July 24, 2023, the Court recognized

patent deficiencies in the original complaints. In response, on September 8, 2023, plaintiffs filed

2

Case ID: 220302583
Control No.: 24052816

amended complaints in 21 of these 29 initial cases. Plaintiffs neglected to do so in the remaining 8 cases, including this one.

Now, eight months later, plaintiffs have filed an amended complaint in the above-captioned action, asserting claims against Abbott that are substantially similar to those asserted in the initial complaint. Pursuant to Rules 1028(a)(3) and 1028(a)(4) of the Pennsylvania Rules of Civil Procedure, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed. In support of its preliminary objections, Abbott states the following:

1. In the above-captioned lawsuit, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed this action against defendants Mead Johnson, Abbott, and the infant's hospital of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendant administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to plaintiff, and that plaintiff was injured as a result.

2. Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. The complaint was filed by parent ("plaintiff-parent") on her own behalf, and also as a parent and natural guardian of the infant plaintiff ("plaintiff") (together "plaintiffs").

3. Plaintiffs' complaint is subject to dismissal, in whole or in part, for the reasons set forth below.

## I.   PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF ALL CLAIMS.

4. Abbott incorporates the foregoing paragraphs as if set forth herein.

Case ID: 220302583
Control No.: 24052816

5.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

6.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). Plaintiffs must allege sufficient facts demonstrating that Abbott's products were unreasonably dangerous for their intended use, triggering a duty to warn.

7.     Plaintiffs' complaint is devoid of any ***facts*** showing that Abbott's preterm infant nutrition products are "unreasonably dangerous" when administered to premature and low birth weight infants.

8.     Accordingly, this preliminary objection should be sustained, and all Counts against Abbott should be dismissed.

## II. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' STRICT LIABILITY CLAIMS.

9.     Abbott incorporates the foregoing paragraphs as if set forth herein.

10.    Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

11.    Counts I and II are strict liability claims that require plaintiffs to identify the specific product that allegedly caused plaintiff's injury. *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968 (Pa. Super. Ct. 1985) (Pennsylvania "imposes liability for physical harm caused to the user only upon that person who sold a product in a defective condition. A plaintiff must therefore at least *designate* the product alleged to be defective in order to recover from the one who sells it.") (emphasis added).

Case ID: 220302583
Control No.: 24052816

12.     Plaintiffs fail to do so. Instead, they simply allege, without referring to any medical records containing product identification information, that "Abbott's and/or Mead [Johnson]'s products" were administered to plaintiff and caused plaintiff's injuries. *See* Compl. ¶ 96.

13.     Accordingly, this preliminary objection should be sustained, and Counts I and II against Abbott should be dismissed.

## III. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' NEGLIGENCE CLAIM.

14.     Abbott incorporates the foregoing paragraphs as if set forth herein.

15.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

16.     Count III is a claim for negligence, requiring plaintiffs to identify the product that injured them and to allege a reasonably close causal connection between Abbott's conduct with respect to that product and the resulting injuries to plaintiffs. *See Cummins*, 495 A.2d at 968. Because plaintiffs fail to identify the specific product giving rise to their claims, they also fail to establish a causal connection between Abbott's conduct and their injuries.

17.     Accordingly, this preliminary objection should be sustained, and Count III against Abbott should be dismissed.

## IV. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN PLEADING PLAINTIFFS' MISREPRESENTATION CLAIMS.

18.     Abbott incorporates the foregoing paragraphs as if set forth herein.

19.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

20.     Counts IV and V are claims for intentional and negligent misrepresentation; these fraud-based claims are subject to heightened pleading requirements under Pa. R. Civ. P. 1019(b). Plaintiffs fail to allege with particularity that they saw, heard, or were otherwise exposed to any

Case ID: 220302583
Control No.: 24052816

purported misrepresentations made by Abbott. They also do not specifically allege who made the supposed misrepresentations, or when they supposedly did so. Moreover, plaintiffs cannot plausibly allege reliance on misrepresentations to which they were not exposed.

21.     Accordingly, this preliminary objection should be sustained, and Counts IV and V against Abbott should be dismissed.

## V. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN DIFFERENTIATING BETWEEN DEFENDANTS THROUGHOUT COMPLAINT.

22.     Abbott incorporates the foregoing paragraphs as if set forth herein.

23.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

24.     In the unnumbered paragraph of the complaint appearing before paragraph 1, plaintiffs collectively refer to Abbott and Mead Johnson as "the Defendant Manufacturers" without explaining what relationship, if any, exists between these corporations, or why the acts of Mead Johnson should be attributed to Abbott, or vice versa. *See* Compl. 1.

25.     Paragraphs 1 and 13 of the complaint generally allege that plaintiff was given "the Defendant Manufacturers' cow's milk-based" products, without specifying which product from which manufacturer was administered to plaintiff. *Id.* ¶¶ 1, 13.

26.     Paragraph 13 of the complaint generally alleges that plaintiff developed necrotizing enterocolitis ("NEC") after being administered the Defendant Manufacturers' products, again without specifying which product from which manufacturer was administered. *Id.* ¶ 13.

27.     Paragraph 56 of the complaint alleges that "Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents," without specifying any particular act of deception by any individual defendant, and without providing any details surrounding when plaintiffs saw the allegedly misleading marketing campaigns. *Id.* ¶ 56.

Case ID: 220302583
Control No.: 24052816

28.     Across Counts I through V of the complaint, plaintiffs allege wrongful conduct by Abbott and/or Mead Johnson without differentiating between the defendants, or specifying each defendant's distinct role in each claim. *See* Compl., Counts I-V.

29.     Because plaintiffs have lumped Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, Abbott lacks clarity regarding its alleged role in these cases. Plaintiffs' allegations are thus insufficiently pled under Rule 1028(a)(3).

30.     Accordingly, all claims against Abbott should be dismissed, or in the alternative, all paragraphs in which plaintiffs fail to differentiate between defendants should be stricken,[1] and this preliminary objection should be sustained.

## VI. PRELIMINARY OBJECTION REGARDING PLAINTIFF-PARENT'S TIME-BARRED CLAIMS

31.     Abbott incorporates the foregoing paragraphs as if set forth herein.

32.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

33.     Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. See 42 Pa. Cons. Stat. § 5524(2) & (7).

34.     While the statute of limitations began running on plaintiff-parent's claims on or around the date of the infant-plaintiffs' birth, September 12, 2006, plaintiff-parent did not file a complaint until March 24, 2022—almost 14 years after the statute of limitations period had expired.

---

[1] For example, in the complaint, plaintiffs fail to differentiate between defendants in each of the following paragraphs: 1–2, 12–13, 19, 21–26, 31–32, 34–46, 48, 54–61, 85, and 89–133.

Case ID: 220302583
Control No.: 24052816

35.     Plaintiff-parent's claims in this case are thus time-barred. Moreover, plaintiffs have not alleged sufficient facts to support any application of the discovery rule.

36.     Accordingly, plaintiff-parent's claims should be dismissed, and this preliminary objection should be sustained.

## VII. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES.

37.     Abbott incorporates the foregoing paragraphs as if set forth herein.

38.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

39.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

40.     Without sufficient basis, plaintiffs demand punitive damages from Abbott in the *ad damnum* clause of each of Counts I through V.

41.     Plaintiffs' demands for punitive damages in Counts III and V are legally insufficient because these Counts plainly sound in negligence and punitive damages are not available for claims of "ordinary negligence" under Pennsylvania law. *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e).

42.     Additionally, plaintiffs' demands for punitive damages in Counts I through V are insufficiently specific. Plaintiffs make bare allegations that Abbott's conduct was "malicious" without providing any factual support for the same. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking").

8

Case ID: 220302583
Control No.: 24052816

43.     Accordingly, Abbott respectfully requests that plaintiffs' demands for punitive damages in each of Counts I through V be stricken.

WHEREFORE, pursuant to Pa. R. Civ. P. 1028(a)(3) and (a)(4), Abbott respectfully requests that this Court sustain these preliminary objections and dismiss Counts I, II, III, IV, and V against Abbott.

Dated: May 13, 2024

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

Respectfully Submitted:

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

9

Case ID: 220302583
Control No.: 24052816

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*, | **MARCH TERM 2022** |
| Plaintiffs, | **NO. 220302583** |
| v. | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | |
| Defendants. | |

**DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF**
**PRELIMINARY OBJECTIONS TO PLAINTIFFS' AMENDED COMPLAINT**

**MATTER BEFORE THE COURT**

The preliminary objections of Abbott Laboratories ("Abbott") to plaintiffs' amended complaint are before this Court. Under Pennsylvania Rules of Civil Procedure 1028(a)(3) and 1028(a)(4), Abbott respectfully requests that this Court dismiss Counts I, II, III, IV, and V of the amended complaint ("complaint") for insufficient specificity, legal insufficiency of pleading, and/or failure to conform to a rule of court.

## STATEMENT OF QUESTIONS INVOLVED

1.  Should the Court sustain Abbott's preliminary objections to the complaint and dismiss all claims against Abbott (Counts I-V) as legally insufficient for failure to properly plead the product at issue is unreasonably dangerous? Answer: Yes.

2.  Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the strict liability claims (Counts I and II) as legally insufficient? Answer: Yes.

3.  Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the negligence claim (Count III) as legally insufficient? Answer: Yes.

4.  Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the intentional and negligent misrepresentation claims (Counts IV and V) as insufficiently pled? Answer: Yes.

5.  Should the Court sustain Abbott's preliminary objections and dismiss the complaint as insufficiently pled for failure to properly differentiate between the manufacturer defendants, or alternatively, strike all paragraphs in which plaintiffs fail to differentiate between those defendants? Answer: Yes.

6.  Should the Court sustain Abbott's preliminary objections to the complaint and strike plaintiffs' requests for punitive damages in Counts I through V as both legally insufficient and lacking sufficient specificity? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture infant nutrition products, including products

2

tailored to address the distinct nutritional needs of premature, low birthweight infants.[2] These infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these infants need. This poses a serious challenge for NICU specialists caring for the infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is no longer possible, everything else falls short. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

The infant in this case allegedly developed necrotizing enterocolitis ("NEC"), a leading cause of death in premature infants in NICUs. NEC is an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Plaintiffs admit that premature infants' underdevelopment makes them "especially susceptible to NEC." *See* Compl. ¶ 16. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

---

[2] Abbott manufactures infant nutrition products under the "Similac" brand name. Compl. ¶ 5. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name. *Id.* ¶ 4.

Case ID: 220302583
Control No.: 24052816

Plaintiff-parent alleges that her infant was born prematurely at Pennsylvania Hospital. *See id.* ¶ 11. The complaint alleges "upon information and belief" that infant was administered "Similac and/or Enfamil cow's milk-based products" by medical professionals at the respective hospital after birth. *Id.* ¶ 12. Plaintiffs further claim that infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's product and experienced long-term health effects. *Id.* ¶¶ 13-14.

Plaintiffs allege that Abbott and/or Mead Johnson manufactured and sold their products knowing they were unreasonably dangerous and not suited for their intended use because they purportedly cause NEC, and that Abbott and/or Mead Johnson failed to warn plaintiffs and the public of this potential harm. *See, e.g. id.* ¶ 24. According to plaintiffs, Abbott and Mead Johnson also made false statements of material fact "on an ongoing and repeated basis" to consumers, physicians, and medical staff in their advertising and marketing materials prior to the time their infants were administered preterm infant nutrition products. *Id.* ¶ 119.

Plaintiffs brought five claims against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). Plaintiffs also bring failure to warn (Count VI) and corporate liability (Count VII) claims against the hospital at which their infant was born.

During a case management conference in these 29 cases held before the Honorable Linda Carpenter on July 24, 2023, the Court recognized patent deficiencies in the original complaints. In particular, the Court recognized during the conference that the original 29 plaintiffs had all failed to identify which manufacturers' product was administered to each infant. In response, on

Case ID: 220302583
Control No.: 24052816

September 8, 2023, plaintiffs filed amended complaints in 21 of these 29 initial cases. Plaintiffs neglected to do so in the remaining 8 cases, including this case.

Now, eight months later, plaintiffs have filed an amended complaint in the above-captioned action, asserting claims against Abbott that are substantially similar to those asserted in the initial complaint. Notwithstanding, the same deficiencies remain in the instant complaint.[3] Although plaintiffs acknowledge that Abbott and Mead Johnson sell many different products, there are no allegations in the complaint identifying any product sold by Abbott as the specific product that was administered to any specific infant. Further, there are no allegations indicating that plaintiffs saw, heard, or were otherwise exposed to the allegedly false representations made by Abbott and/or Mead Johnson about their products. These pleading deficiencies, among others, are fatal to their claims.

## ARGUMENT

Plaintiffs' claims are legally insufficient, lack sufficient specificity, and/or fail to conform to a rule of court because:

- plaintiffs do not sufficiently allege that the product(s) at issue are unreasonably dangerous;

- plaintiffs never identify the product administered to their infant;

- plaintiffs do not plead with specificity that any misrepresentations were made to them;

- plaintiffs impermissibly lump Abbott and Mead Johnson together without distinguishing the conduct purportedly attributable to each; and

---

[3] Indeed, the overwhelming majority of the amendments that plaintiffs made involved the alleged conduct of the named hospital defendant.

5

Case ID: 220302583
Control No.: 24052816

- plaintiffs fail to plead their requests for punitive damages with the requisite legal sufficiency and factual specificity.

Accordingly, all claims against Abbott should be dismissed.

## **Legal Standard**

Pennsylvania is a fact-pleading jurisdiction. *See generally* Pa. R. Civ. P. 1019. A complaint must therefore set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). Indeed, "[t]he purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend." *Carlson v. Cmty. Ambulance Servs.*, 824 A.2d 1228 (Pa. Super. Ct. 2003) (quoting *Yacoub v. Lehigh Valley Med.*, 805 A.2d 579, 588 (Pa. Super. 2002)). So the "complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims." *Carlson*, 824 A.2d at 1228.

To that end, Rule 1028 of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that a pleading is insufficiently specific. Pa. R. Civ. P. 1028(a)(3). When assessing whether a pleading is sufficiently specific, the relevant question is "whether the complaint is sufficiently clear to enable the defendant to prepare [its] defense, or whether the plaintiff[']s complaint informs the defendant with accuracy and completeness of the specific basis on which recovery is sought so that [the defendant] may know without question upon what grounds to make [its] defense." *Rambo v. Greene*, 906 A.2d 1232 (Pa. Super. Ct. 2006).

Rule 1028 of the Pennsylvania Rules of Civil Procedure also provides that a party may file preliminary objections asserting that the pleading is legally deficient. Pa. R. Civ. P. 1028(a)(4). Generally, where a legal deficiency is "apparent on the face of the complaint," it "is needless to prolong proceedings when the matter can be correctly and quickly decided on preliminary objections in the nature of a demurrer." *Wurth v. City of Phila.*, 584 A.2d 403, 407 (Pa. Commw. Ct. 1990).

Case ID: 220302583
Control No.: 24052816

"Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." *Sexton v. PNC Bank*, 792 A.2d 602, 604 (Pa. Super. Ct. 2002). The question presented by the demurrer is whether, on the facts alleged, no recovery is possible. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003) (citation omitted). In answering this question, the court is "precluded from considering any conclusions of law or inferences which are not supported by the factual allegations contained in the complaint." *Hart v. O'Malley*, 647 A.2d 542, 553 (Pa. Super. Ct. 1994). Thus, a plaintiff cannot maintain a cause of action by stating conclusions of law, argumentative allegations, and expressions of opinion. *Neill v. Eberle*, 620 A.2d 673, 675 (Pa. Commw. Ct. 1993). And a court "may not supply a fact missing [from] the complaint" in order to cure a defective pleading. *Hart*, 647 A.2d at 553.

## I. PLAINTIFFS FAIL TO PLEAD FACTS SUFFICIENT TO SHOW AN UNREASONABLY DANGEROUS DEFECT, AS REQUIRED FOR COUNTS I-V.

Pursuant to Pa. R. Civ. P. 1028(a)(4), Abbott demurs to Counts I-V of plaintiffs' complaint. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.[4] Plaintiffs' complaint fails to allege sufficient facts demonstrating that Abbott's cow's milk-based products were unreasonably dangerous for their intended use.

---

[4] The law of product liability within Pennsylvania has developed under the principles outlined in Section 402A of the Second Restatement of Torts. *High v. Penn. Supply, Inc.*, 154 A.3d 341 (Pa. Super. Ct. 2017). Specifically, Section 402(A) provides: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The rule stated in Subsection (1) applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." RESTATEMENT OF TORTS (SECOND) § 402(A).

Case ID: 220302583
Control No.: 24052816

Plaintiffs merely allege that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants," without any *facts* to support this bald assertion. Compl. ¶ 16. Indeed, whereas plaintiffs previously alleged – without support – that there existed a "scientific consensus that . . . cow's milk-based products present a dire threat to the health and development of preterm infants" or that cow's milk-based products "cause NEC and greatly increase the likelihood that a baby will develop NEC," plaintiffs now suggest only that "scientific evidence" of the same exists. *Id.* ¶¶ 21-22. *See Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (holding that "[b]lind suspicions and unsupported accusations simply do not state a cause of action pursuant to any theory of tort recovery" under Pennsylvania law).

Yet plaintiffs simply allege that "[h]uman milk-based nutrition nourishes infants while creating a significantly lower risk of NEC." Compl. ¶ 20. The mere fact that human breast milk may lower the risk of NEC is not equivalent to a showing that cow's milk-based products ***cause*** NEC. As plaintiffs acknowledge, all premature, low birth weight infants, including those who are administered human breast milk exclusively, are especially susceptible and at high risk of developing NEC. *Id.* ¶ 16.

Thus, plaintiffs' complaint is devoid of facts sufficient to show that Abbott's products are unreasonably dangerous, and their claims against Abbott are insufficient as a matter of law.

## II. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THEIR STRICT LIABILITY CLAIMS (COUNTS I–II)

### A. Plaintiffs' Complaint Fails to Identify the Specific Product That Allegedly Caused the Infants' Injuries

Plaintiffs fail to allege sufficient facts to support their strict liability claims (Counts I and II) because plaintiffs' complaint fails to identify the specific product that caused their injuries. *See* Pa. R. Civ. P. 1028(a)(4). It is well-settled that, in order to plead a strict liability claim in

8

Pennsylvania, the "plaintiff must [] at least designate the product alleged to be defective[.]" *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985). "Absent such identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191–92 (Pa. Super. Ct. 1993).

Plaintiffs' complaint fails to identify the specific product they maintain caused their alleged injuries. Instead, plaintiffs broadly allege that Abbott and Mead Johnson manufacture and sell cow's milk-based infant feeding products under the Similac or Enfamil brand names, Compl. ¶¶ 4-5, and surmise "upon information and belief" that their infant was administered "Similac and/or Enfamil" products. *Id.* ¶ 12. These allegations are plainly insufficient. As plaintiffs acknowledge, Abbott and Mead Johnson manufacture, sell, and market different products under different brands names. *See, e.g.*, *id.* ¶¶ 4-5; *id.* ¶¶ 50-51 (describing multiple Abbott products and multiple Mead Johnson products). They also acknowledge that, similar to a restaurant offering Coke or Pepsi, the hospital defendants use either Similac **or** Enfamil in their respective NICUs. *Id.* ¶ 22; *id.* ¶ 60. Yet, plaintiffs fail to identify which product from which manufacturer was allegedly administered to their infant. As such, even viewing the complaint in the light most favorable to plaintiffs, their strict liability claims fail for lack of product identification. *See Cummins*, 495 A.2d at 968–69 (holding that the plaintiff's failure to identify the offending product was "a fatal deficiency to his [strict liability] claim" and that "the complaint [could] not adequately aver the requisite connection between the [defendants] and the defective product"); *Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

Case ID: 220302583
Control No.: 24052816

**B.    Plaintiffs Are Not Excused from Satisfying the Product Identification Requirement**

In an effort to evade their pleading obligations, plaintiffs' complaint seeks to hold Abbott and Mead Johnson "jointly and severally" liable for their claims alleged in Counts I-V. No Pennsylvania court has applied any such theory of alternative liability to excuse a product liability plaintiff from identifying the specific product they claim caused their alleged harm. *See, e.g.*, *Cummins*, 495 A.2d at 970 (affirming an order sustaining preliminary objections to a complaint that sought to allege a theory of enterprise liability premised on a bald averment that members of the tire and rim assembly industry collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer [] device was available"); *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174–75 (Pa. 1997) (holding that plaintiffs failed to establish a concert of action where they were unable to identify the manufacturer of the lead pigment that caused alleged injuries); *Burnside v. Abbott Lab.*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (holding Pennsylvania law forecloses cause of action for concerted action where plaintiff is "unable to isolate a particular manufacturer as the causative agent of his injuries").

Abbott and Mead Johnson likewise cannot be held jointly and severally liable as a matter of law. "While there is some authority that a single cause of action may be pled against two or more defendants who are alleged to be jointly and severally liable, that cannot be the case where the factual background underlying each defendant's liability is different." *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 258 (Pa. Super. Ct. 2017) (citing *Gen. State Auth'y v. Lawrie and Green*, 356 A.2d 851, 854 (Pa. Commw. Ct. 1976)). Here, because Abbott and Mead Johnson manufacture different products at different locations, with different manufacturing processes, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability. *See Cummins*, 495 A.2d at 972 (preliminary

10

Case ID: 220302583
Control No.: 24052816

objections properly sustained as to complaint seeking to impose industry-wide liability where plaintiffs failed to allege that manufacturers placed fungible products with "identical" qualities on the market).  For all these reasons, plaintiffs cannot be excused from satisfying their requirement to identify the specific product that allegedly caused harm.

## III.  PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A NEGLIGENCE CLAIM (COUNT III).

Plaintiffs' negligence claim fails for the same reason as their strict-liability claims do: they simply fail to identify the product that allegedly caused their injuries. To state a negligence-based products liability claim, "the plaintiff must identify the defendant as the manufacturer or seller of *the offending product* before a plaintiff's injuries may be found to be proximately caused by the negligence of the defendant." *Long v. Krueger, Inc.*, 686 F. Supp. 514, 517 (E.D. Pa. 1988) (citing *Cummins*, 495 A.2d at 967). "Absent such identification, there can be no allegations of duty, breach of duty or legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 967–68.

As noted above, plaintiffs allege only "upon information and belief" that their infant was administered "Similac and/or Enfamil" products and developed NEC shortly thereafter. *See, e.g.*, Compl. ¶¶ 12-13. Plaintiffs do not, however, identify the exact product (if any) made by Abbott giving rise to their claims. Accordingly, they "cannot allege a casual [sic] connection between conduct of the defendants and [plaintiff's] injuries." *Klein*, 587 F. Supp. at 223; *see also Cummins*, 495 A.2d at 967 (affirming dismissal of negligence claim where plaintiff failed to identify a specific product and the identity of the manufacturer, supplier, or seller of the product; and therefore did not establish a causal connection between his injury and the defendants' conduct).

Case ID: 220302583
Control No.: 24052816

## IV. PLAINTIFFS FAIL TO PLEAD THEIR INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS IV–V) WITH SUFFICIENT PARTICULARITY.

Plaintiffs' complaint lacks sufficient specificity regarding their misrepresentation claims. In particular, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

"Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Philadelphia*, 224 A.2d 174, 179 (Pa. 1966). To protect against generalized and unsupported accusations of fraud, the Pennsylvania Rules of Civil Procedure requires each element of fraud be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P. 1019(b)). "Merely alleging fraud as a legal conclusion adds nothing if it is not based upon facts clearly and explicitly set forth as constituting such fraud." *Dwyer v. Rothman*, 431 A.2d 1035, 1037 (Pa. Super. Ct. 1981) (citing *Hornsby v. Lohmeyer*, 72 A.2d 294 (Pa. 1950)).

To state a claim for intentional misrepresentation, plaintiffs must plead: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (internal citation omitted). Similarly, to state a claim for negligent misrepresentation, plaintiffs must plead facts showing (1) a misrepresentation of a material fact; (2) that the representor either knew or should have known of the misrepresentation; (3) that the representor intended the representation to induce another to act; and (4) that injury resulted to the party acting in justifiable reliance on the

12

Case ID: 220302583
Control No.: 24052816

misrepresentation. *See id.* at 561. The complaint fails in multiple ways to plead these elements with specificity.

  ***First***, "at the very least, a plaintiff must set forth the *exact* statements or actions plaintiff alleges constitute the fraudulent misrepresentations." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (internal citations and quotations omitted) (emphasis added). While plaintiffs generally allege that Abbott made false representations in its marketing materials, plaintiffs do not allege that Abbott made any of these representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. Accordingly, plaintiffs fail to plead facts showing that their infants' injuries were caused by their reliance on Abbott's representations. *See, e.g.*, *Rivello v. N.J. Auto. Full Ins. Underwriting Ass'n*, 638 A.2d 253, 257 (Pa. Super. Ct. 1994) (affirming dismissal of misrepresentation claim where plaintiff failed to sufficiently allege justifiable reliance on the alleged misrepresentation or that his injury was proximately caused by the alleged misrepresentation); *Youndt*, 868 A.2d 539 (holding that fraud claim failed where plaintiff did not plead all elements with particularity); *Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff had failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]"); *Feingold v. Unitrin Direct*, Civ. A. No. 12-1250, 2012 WL 3866945, at *6 (E.D. Pa. Sept. 6, 2012) (dismissing negligent misrepresentation claim where plaintiff could not allege that he justifiably relied on the defendants' promises).

  ***Second***, plaintiffs do not identify when the alleged misrepresentations were made, who made them, or how they were communicated. As such, the allegations in the complaint cannot

Case ID: 220302583
Control No.: 24052816

plausibly support plaintiffs' intentional or negligent misrepresentation claims. *See, e.g.*, *Dwyer*, 431 A.2d at 1037 (affirming lower court's decision sustaining preliminary objections to plaintiff's intentional misrepresentation claim where plaintiff did not allege what facts were misrepresented, what false information was given, nor in what way he was "tricked"); *Presbyterian Med. Ctr.*, 832 A.2d at 1073 (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity"); *Bethpage Fed. Credit Union*, 2019 WL 5303904, at *2 (sustaining preliminary objections to fraud and negligent misrepresentation claims due to plaintiff's failure to satisfy Rule 1019(b)'s particularity requirements); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (finding plaintiff's claims of misrepresentation and fraud failed because she did not allege the instances of mischaracterization with specificity); *Scott v. Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing negligent misrepresentation claim where plaintiffs did not "allege when these alleged misrepresentations were made, who made them, or how they were communicated").

## V. PLAINTIFFS' FAILURE TO DIFFERENTIATE CLAIMS BETWEEN ABBOTT AND MEAD JOHNSON WARRANTS DISMISSAL OF COUNTS I–V.

Plaintiffs' complaint fails to differentiate between Abbott and Mead Johnson. Rule 1019(a) of the Pennsylvania Rules of Civil Procedure provides that a complaint must set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). And "even under the most liberal notice pleading requirements," that means that "a plaintiff must differentiate between defendants." *Coyne v. Holy Fam. Apartments*, Civ. A. No. 19-4583, 2020 WL 2063475, at *4 (E.D. Pa. Apr. 29, 2020); *see also Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260 (Pa. Super. Ct. 2017) (affirming dismissal of complaint where several paragraphs of the complaint did not differentiate between the defendants in averring the conduct and claims).

14

Case ID: 220302583
Control No.: 24052816

Ignoring this clear law, plaintiffs' complaint is riddled with allegations about the conduct of "Defendant Manufacturers," or "Abbott and/or Mead Johnson." *See, e.g.,* Compl. ¶¶ 1–2, 12–13, 19, 21–26, 31–32, 34–46, 48, 54–61, 85, and 89–133. But the complaint does not allege any facts establishing which specific product from which specific manufacturer gave rise to plaintiffs' claims. Abbott is left to guess what role plaintiffs believe it played in the events at issue, placing a burden on Abbott that is not contemplated or condoned by Pennsylvania's fact pleading rules. Because plaintiffs fail to distinguish between defendants in their complaint, all claims against Abbott should be dismissed, or alternatively, the paragraphs in which plaintiffs fail to differentiate between defendants should be stricken.

## VI. PLAINTIFF-PARENT'S CLAIMS ARE TIME-BARRED AND SHOULD BE DISMISSED

Plaintiff-parent's claims are time-barred by Pennsylvania law, which sets a two-year statute of limitations on actions to recover damages for personal injury based on negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

The statute of limitations on plaintiff-parent's claims began to run shortly after infant's birth date, when the infant allegedly developed NEC. Accordingly, plaintiff-parent's claims are time-barred because, although she alleges an infant birth date of September 12, 2006, and although she alleges that her infant developed NEC shortly thereafter when administered Abbott and/or Mead Johnson's products, this lawsuit was not filed until March 24, 2022—almost 14 years after the limitations period expired. Consequently, plaintiff-parent's claims are time-barred and must be dismissed. *See, e.g.*, *Hathi v. Krewstown Park Apartments*, 561 A.2d 1261, 1263 (Pa. Super. Ct. 1989); *Sayers v. Heritage Valley Md. Grp., Inc.*, 247 A.3d 1155, 1159-63 (Pa. Super. Ct. 2021).

Plaintiffs' invocation of the discovery rule does not save plaintiff-parents' untimely claims. For example, plaintiffs point to a 2020 Abbott article as purported evidence of concealment, in an

Case ID: 220302583
Control No.: 24052816

attempt to explain their delay in filing their complaint, but the article offers them no support. *See* Compl. ¶ 50.

First, the complaint does not allege that plaintiffs actually relied on this Abbott article. Indeed, the complaint does not allege that plaintiffs actually read or were even aware of any specific statement made by Abbott.

Second, the cited article was published on July 22, 2020. That is years after the statute of limitations expired on these plaintiff-parent's claims, which makes it impossible for any plaintiff to have been lulled "into a false sense of security about the use of [Abbott's] products" by the article at the time of the alleged injury. *See, e.g.*, *id.* ¶ 32.

Third, no reasonable person could have been misled by the article. In portions of the article omitted by plaintiffs, Abbott strongly encourages the use of breastmilk with premature infants, for reasons that include protection against NEC:

> If your baby is born prematurely, understanding that mother's own breastmilk is best for your baby is key to delivering not only nutrients, but also HMOs and other immune-protective factors. And since breastmilk protects against NEC, work closely with your baby's physician and dietician to understand how to support a good breastmilk supply, so that your preterm baby gets as much breastmilk as possible.

The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (July 22, 2020). Needless to say, the actual document controls over the misleading excerpts cited in the complaint, neither of which can save plaintiff-parent's untimely claims.

16

Case ID: 220302583
Control No.: 24052816

## VII. PLAINTIFFS' REQUESTS FOR PUNITIVE DAMAGES LACK THE REQUISITE LEGAL SUFFICIENCY AND FACTUAL SPECIFICITY AND FAIL TO PLEAD A LEGALLY SUFFICIENT BASIS FOR PUNITIVE DAMAGES

Plaintiffs' requests for punitive damages should be stricken because their demands are both legally and factually insufficient, and fail to clear the high bar for punitive damages under Pennsylvania law. In Pennsylvania, "'[p]unitive damages' are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." *See Focht v. Rabada*, 268 A.2d 157, 159 (Pa. Super. Ct. 1970) (quoting RESTATEMENT OF TORTS § 908(1)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others.").

To support a request for punitive damages, the plaintiff must sufficiently allege that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Luddy*, 870 A.2d at 772. Conduct is "willful" when "the actor desired to bring about the result that followed, or at least was aware that it was substantially certain to ensue." *Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). Moreover, "reckless indifference," interchangeable with "wanton" misconduct, occurs when "the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."

17

Case ID: 220302583
Control No.: 24052816

*McClellan v. Health Maintenance Org. of Pa.*, 604 A.2d 1053, 1061 (Pa. Super. Ct. 1992); *see also Smith v. Brown*, 423 A.2d 743, 745 (Pa. Super. Ct. 1980) (quoting Evans, 212 A.2d at 443).

To begin, plaintiffs' requests for punitive damages with respect to Count III (negligence) and Count V (negligent misrepresentation) are wholly improper. As Pennsylvania law makes clear, "[p]unitive damages may not be awarded for misconduct which constitutes ordinary negligence . . . ." *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e)). Here, by plaintiffs' own admission, Counts III and V sound plainly in ordinary negligence, and the accompanying demands for punitive damages are thus legally insufficient. *See* Compl. ¶ 109 ("Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiff Parent."); *id.* ¶ 129 ("Abbott and Mead were negligent or careless in not determining those representations to be false.").

Plaintiffs' requests for punitive damages in each of Counts I through V also fail because they are pleaded with insufficient specificity. Plaintiffs make no effort to provide factual support for their requests for punitive damages against Abbott. Instead, plaintiffs baldly and repeatedly demand judgment "[f]or punitive damages . . . resulting from the Defendant' Manufacturers' oppressive, fraudulent, and/or malicious conduct . . . ." *See* Compl. at Count I (prayer for relief); *id.* at Count II (prayer for relief); *id.* at Count III (prayer for relief); *id.* at Count VI (prayer for relief); *id.* at Count V (prayer for relief). Nowhere do plaintiffs support these bald assertions of "malicious" conduct with any allegations of fact.

Case ID: 220302583
Control No.: 24052816

At most, plaintiffs allege that Abbott "knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC," *see, e.g.*, Compl. ¶ 91, but such allegations are woefully insufficient. Plaintiffs cannot merely incant the word "knowledge" and make it so; rather, plaintiffs must provide factual support for their bald assertions. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking"). Plaintiffs fail to do so here.

For all these reasons, Abbott respectfully requests that this Court strike plaintiffs' requests for punitive damages as wholly conclusory, lacking the requisite factual specificity, and legally insufficient.

## CONCLUSION

For the foregoing reasons, Abbott's preliminary objections to plaintiffs' complaint should be sustained, and plaintiffs' claims against Abbott should be dismissed.

Dated: May 13, 2024                          Respectfully Submitted:


*/s/ Sean P. Fahey*                          */s/ Joseph E. O'Neil*
Sean P. Fahey (PA Bar No. 73305)             Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                 Meaghann C. Porth (PA Bar No. 307629)
**SANDERS LLP**                              Ryan J. O'Neil (PA Bar No. 314034)
3000 Two Logan Square                        **CAMPBELL CONROY & O'NEIL, P.C.**
Philadelphia, PA 19103                       1205 Westlakes Drive, Suite 330
215.981.4296                                 Berwyn, PA 19312
Sean.Fahey@troutman.com                      610.964.6388
                                             JONeil@campbell-trial-lawyers.com
*/s/ Ronni E. Fuchs*                         MPorth@campbell-trial-lawyers.com
Ronni E. Fuchs (PA Bar No. 65561)            RONeil@campbell-trial-lawyers.com
**TROUTMAN PEPPER HAMILTON**
**SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

19

Case ID: 220302583
Control No.: 24052816

*/s/ Marques Hillman Richeson*

Marques Hillman Richeson (admitted *pro hac vice*)

**JONES DAY**

901 Lakeside Avenue

Cleveland, OH 44114

216.586.7195

mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

20

Case ID: 220302583
Control No.: 24052816

# EXHIBIT A

Case ID: 220302583
Control No.: 24052816

**KLINE & SPECTER, P.C.**

By:

    Tobias L. Millrood, Esq.

    Elizabeth A. Crawford, Esq.

    John P. O'Neill, Esq.

    Timothy A. Burke, Esq.

Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927

125 Locust Street, 19th Floor

Philadelphia, PA 19102

Telephone: (215) 772-1000

Tobi.millrood@klinespecter.com

Elizabeth.crawford@klinespecter.com

Jack.oneill@klinespecter.com

Timothy.burke@klinespecter.com



*Filed and Attested by the Office of Judicial Records 23 APR 2024 02:41 pm B. MERCEDES*

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own** | : | **COURT OF COMMON PLEAS** |
| **Behalf and as Parent and Natural Guardian** | : | **PHILADELPHIA COUNTY** |
| **of H.S., a Minor** | : | |
| **335 Passmore Street** | : | |
| **Philadelphia, PA 19111** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO. 220902583** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

1

Case ID: 220302583
Control No.: 24052816

CT Corporation System        :
208 So. Lasalle Street, Suite 814   :
Chicago, IL 60604          :
                              :
                              :

THE PENNSYLVANIA HOSPITAL OF  :
THE UNIVERSITY OF PENNSYLVANIA :
HEALTH SYSTEM d/b/a PENNSYLVANIA :
HOSPITAL              :
3400 Civic Center Blvd.       :
Philadelphia, PA 19104       :
                              :
                              :

THE TRUSTEES OF THE UNIVERSITY OF :
PENNSYLVANIA d/b/a PENN MEDICINE :
133 South 36th Street        :
Philadelphia, PA 19104       :
                              :

**Defendants**        :      **JURY TRIAL DEMANDED**

## AMENDED COMPLAINT IN CIVIL

## <u>ACTION NOTICE TO DEFEND</u>

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701

2

Case ID: 220302583
Control No.: 24052816

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com

| | |
|---|---|
| **TERRAINE ABDULLAH,** ON HER OWN **BEHALF AND AS PARENT AND NATURAL GUARDIAN OF H.S., A MINOR** **335 PASSMORE STREET** **PHILADELPHIA, PA 19111** :          **PLAINTIFFS** : | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| **V.** : | **CIVIL ACTION** |
| : **MEAD JOHNSON & COMPANY, LLC** **ILLINOIS CORPORATION SERVICE CO.** **801 ADLAI STEVENSON DRIVE** **SPRINGFIELD, IL 62703** : | |
| : **MEAD JOHNSON NUTRITION COMPANY** **ILLINOIS CORPORATION SERVICE CO.** **801 ADLAI STEVENSON DRIVE** **SPRINGFIELD, IL 62703** : | **NO. 220902583** |
| : **ABBOTT LABORATORIES** **CT CORPORATION SYSTEM** **208 SO. LASALLE STREET, SUITE 814** **CHICAGO, IL 60604** : | |
| : **THE PENNSYLVANIA HOSPITAL OF** **THE UNIVERSITY OF PENNSYLVANIA** **HEALTH SYSTEM D/B/A PENNSYLVANIA** : | |

3

Case ID: 220302583
Control No.: 24052816

| | |
|---|---|
| **HOSPITAL** | : |
| **3400 CIVIC CENTER BLVD.** | : |
| **PHILADELPHIA, PA 19104** | : |
| | : |
| | : |
| **THE TRUSTEES OF THE UNIVERSITY OF** | : |
| **PENNSYLVANIA D/B/A PENN MEDICINE** | : |
| **133 SOUTH 36TH STREET** | : |
| **PHILADELPHIA, PA 19104** | : |
| | : |
| **DEFENDANTS** | :     **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I. INTRODUCTION

1. This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

Case ID: 220302583
Control No.: 24052816

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

3.      Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania.  Ms. Abdullah is the parent and natural guardian of H.S., a minor.  Ms. Abdullah's address is 335 Passmore Street, Philadelphia, Pennsylvania 19111.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware.  Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302583
Control No.: 24052816

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.  Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

Case ID: 220302583
Control No.: 24052816

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *H.S.'s NEC Diagnosis*

11.     H.S. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on September 12, 2006.

12.     At birth H.S.'s gestational ages was approximately 25 weeks and she weighed 847 grams. Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk decreases the risk of NEC.

13.     Upon information and belief shortly after H.S. first ingested the Defendant Manufacturers' products, she developed NEC.

14.     H.S. was diagnosed in the NIC-U with NEC on November 10, 2006, and thereafter was forced to undergo a colonic resection, permanently removing part of the infant's colon as a result of her NEC diagnosis. Infant plaintiff continues to suffer long term gastrointestinal health effects as a result of this surgical removal of part of her colon.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.    NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.    Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.    Up to 30 percent of NEC-diagnosed infants die from the disease.

7

Case ID: 220302583
Control No.: 24052816

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.    Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long- term health problems, and death.

### *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.    For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.    Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.    This displacement only increases infants' vulnerability to NEC.

20.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition,

Case ID: 220302583
Control No.: 24052816

they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

23.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

24.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Abdullah of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Abdullah Discovers Her Claim*

25.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Abdullah did not know, and had no reason to know or suspect, that H.S.'s NEC could have been caused by the Defendant Manufacturers' products.

26.     Once Ms. Abdullah learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

Case ID: 220302583
Control No.: 24052816

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and
Would Not Have Revealed a Factual Basis Earlier
Because Defendants Hid the Cause of NEC from Ms. Abdullah***

27.     Despite exercising reasonable diligence, Ms. Abdullah was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of H.S.'s injuries.

28.     Not one person at Penn Medicine informed Ms. Abdullah that the Defendant Manufacturers' formula products could have caused H.S.'s injuries.  Penn Medicine's response at the time did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of the Defendants.

29.     Ms. Abdullah is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

30.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Abdullah had no reason to doubt their word.

31.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

32.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

33.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the

10

Case ID: 220302583
Control No.: 24052816

first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]   Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

34.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Abdullah immediately after H.S.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused H.S.'s injuries.

35.     Ms. Abdullah also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to H.S.  Not only was Ms. Abdullah unaware that the Defendant Manufacturers' products caused H.S.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Abdullah, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302583
Control No.: 24052816

36.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

37.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

38.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

39.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

40.     Additionally, Defendant Hospital failed to inform Ms. Abdullah that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

41.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Abdullah of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Abdullah that it would do everything it could possibly do to keep her infant safe. Though this

Case ID: 220302583
Control No.: 24052816

was clearly not true given the known risks of preterm formula for babies like H.S., it was enough for Ms. Abdullah to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

42.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

43.     Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

44.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

45.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

46.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

47.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing

13

Case ID: 220302583
Control No.: 24052816

partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

48.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

49.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

50.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC.

Case ID: 220302583
Control No.: 24052816

At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

51.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

52.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

53.     Formula manufacturers have long used their relationships with hospitals and the discharge

Case ID: 220302583
Control No.: 24052816

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

54.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

55.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 220302583
Control No.: 24052816





56.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

57.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left

17

the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

58.    Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

59.    To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

60.    On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients— the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

61.    On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other

Case ID: 220302583
Control No.: 24052816

staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

62. Prior to H.S.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like H.S. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

63. Prior to H.S.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like H.S. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

64. Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like H.S.

### The Defendant Manufacturers' Inadequate Warnings

65. Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

19

Case ID: 220302583
Control No.: 24052816

66.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

67.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead cites no medical literature or research to guide the use of its products.

69.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

70.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

71.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

72.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

Case ID: 220302583
Control No.: 24052816

73.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

74.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

75.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

76.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

77.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human link decreases the risk of NEC in premature infants. However,  instead  of  warning  of  the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

Case ID: 220302583
Control No.: 24052816

78.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

79.     Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

80.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.  The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers.    Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

81.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.    In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on

Case ID: 220302583
Control No.: 24052816

investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

82.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

83.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

84.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.   This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

*Safer Alternative Designs*

85.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used

23

Case ID: 220302583
Control No.: 24052816

pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

86.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

87.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

**CAUSES OF ACTION**
**COUNT I: STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

88.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

89.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

90.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

91.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they

24

Case ID: 220302583
Control No.: 24052816

continued to sell and market their defective products as appropriate for premature infants.

92.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits.  An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

93.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

94.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

95.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

96.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

97.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

       a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

       b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

Case ID: 220302583
Control No.: 24052816

sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

98.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

99.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

100.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.   By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.   The failure to warn makes the products at issue in this litigation

Case ID: 220302583
Control No.: 24052816

unreasonably dangerous.

101.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.   Among other risks, the Defendant Manufacturers:

    a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

Case ID: 220302583
Control No.: 24052816

      g.      Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

      h.      Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

103.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

104.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

105.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

Case ID: 220302583
Control No.: 24052816

sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

106.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

108.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

109.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk- based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

Case ID: 220302583
Control No.: 24052816

110.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.    Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.    Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.    Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.    Failing to provide statistical evidence showing the magnitude of increased risk

Case ID: 220302583
Control No.: 24052816

of NEC in premature infants associated with cow's milk-based products.

111. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

112. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

113. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

114. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

      c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

31

Case ID: 220302583
Control No.: 24052816

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

**COUNT IV: INTENTIONAL MISREPRESENTATION**
**(Against Abbott and Mead)**

115. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

116. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

117. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

118. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

119. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

32

Case ID: 220302583
Control No.: 24052816

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

120.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

121.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably

Case ID: 220302583
Control No.: 24052816

relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.  Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

122.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

123.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

Case ID: 220302583
Control No.: 24052816

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

124.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

125.     At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

126.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

127.     In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

128.     Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.      That their cow's milk-based products were necessary to the growth and nutrition

Case ID: 220302583
Control No.: 24052816

of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

129. Abbott and Mead were negligent or careless in not determining those representations to be false.

130. The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

131. The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent

Case ID: 220302583
Control No.: 24052816

misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

132.     As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

133.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302583
Control No.: 24052816

g. For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

134. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135. Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

136. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

137. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

138. Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

139. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous

Case ID: 220302583
Control No.: 24052816

products to consumers, such as the Plaintiff Parent.

140.   Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

141.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

142.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

   a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

   d.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

   e.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

Case ID: 220302583
Control No.: 24052816

      f.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

      g.      Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

143.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

144.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure

Case ID: 220302583
Control No.: 24052816

to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

148. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

149. At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the

Case ID: 220302583
Control No.: 24052816

Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

150. Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

151. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

152. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

153. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the

Case ID: 220302583
Control No.: 24052816

misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

154. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

155. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are at increased risk for NEC.

156. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

157. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

158. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

159. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

160. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

161. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 220302583
Control No.: 24052816

a.      Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

b.      Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

c.      Failing to formulate, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d.      Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e.      Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f.      Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g.      Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be

Case ID: 220302583
Control No.: 24052816

provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant;

l. Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits;

m. Allowing parental preference to be the standard for feeding premature infants;

n. Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

Case ID: 220302583
Control No.: 24052816

o.  Failing to follow the American Academy of Pediatrics recommendation to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.  Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.  Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

162.  A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

163.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

164.  As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

165.  As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302583
Control No.: 24052816

income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

166.    In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

167.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

168.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d.    Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 220302583
Control No.: 24052816

f.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.   Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.   Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.   Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

169.   A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

170.   A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

171.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant

Case ID: 220302583
Control No.: 24052816

would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

172.     As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

173.     As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

Case ID: 220302583
Control No.: 24052816

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

174.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: April 23, 2024

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Tobias L. Millrood_____
        Tobias L. Millrood, Esq.
        Elizabeth A. Crawford, Esq.
        Timothy A. Burke, Esq.
        John P. O'Neill, Esq.

        **KELLER POSTMAN**
        Ben Whiting, Esq.
        Zachary Clark, Esq.
        *Attorneys for Plaintiffs*

Case ID: 220302583
Control No.: 24052816

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2024, I caused a true and correct copy of the

foregoing document to be served by electronic filing to all counsel of record.


/s/ Tobias L. Millrood
TOBIAS L. MILLROOD

51

Case ID: 220302583
Control No.: 24052816

## **<u>VERIFICATION</u>**

I, the undersigned, Tobias L. Millrood, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

/s/ Tobias L. Millrood

Date:   April 23, 2024

Tobias L. Millrood

52

Case ID: 220302583
Control No.: 24052816

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: May 13, 2024

*/s/ Ronni E. Fuchs*

Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*

# EXHIBIT A-58

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor** | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY** |
| Plaintiff, | : |
| | : **MARCH TERM, 2022** |
| v. | : **No. 220302583** |
| | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| | : |
| | : |
| Defendants. | : |

*Filed and Attested by the Office of Judicial Records 14 MAY 2024 00:42 pm S. GILLIAM*

## ORDER

**AND NOW,** this ____ day of _____ 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____ J.

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor** | **COURT OF COMMON PLEAS** : **PHILADELPHIA COUNTY** : |
| Plaintiff, | : **MARCH TERM, 2022** : **No. 220302583** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| Defendants. | : |

## ORDER

**AND NOW**, this ___ day of _____, 2024, upon consideration of the

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead

Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to

Plaintiffs' First Amended Complaint, and any Response thereto, it is hereby **ORDERED**

that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1.      Count I of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

2.      Count II of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

3.      Count III of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

4.      Count IV of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

5.      Count V of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

6.      Plaintiffs' Amended Complaint is **STRICKEN** for lack of specificity;

7.      Plaintiffs' claims for punitive damages as to Defendants Mead Johnson &

Company, LLC and Mead Johnson Nutrition Company are **DISMISSED** with prejudice,

along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct;

and

Case ID: 220302583
Control No.: 24053109

8.      Plaintiff Terraine Abdullah's claims in her own right are **DISMISSED** with

prejudice;

9.      Plaintiff's Complaint is **STRICKEN** for lack of appropriate Verification;

**BY THE COURT:**

_____
                                                                        J.

Case ID: 220302583
Control No.: 24053109

<u>NOTICE TO PLEAD:</u>

<u>To Plaintiff:</u> **You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgement may be entered against you.**

**/s/ Kenneth A. Murphy__**
**Attorney for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| | : | |
| | : | **MARCH TERM, 2022** |
| Plaintiff, | : | **No. 220302583** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |

**PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

4

Case ID: 220302583
Control No.: 24053109

<u>**TO PLAINTIFF'S FIRST AMENDED COMPLAINT**</u>

Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (hereinafter "Moving Defendants" or "Mead Johnson") hereby preliminarily object to Plaintiff's First Amended Complaint ("Amended Complaint), and, in support thereof, aver as follows:

**I.     INTRODUCTION**

1.     This case involves allegations that minor Plaintiff, H.S., developed a condition known as necrotizing enterocolitis ("NEC") following a hospital's decision to administer "Similac and/or Enfamil cow's milk-based products" while in the neonatal intensive care unit ("NICU").   These products are manufactured and sold by Moving Defendants and/or defendant Abbott Laboratories ("Abbott"). *See* Plaintiffs' Amended Complaint, attached as Exhibit A, at ¶ 12. Notwithstanding their having had nearly a year to correct pleading deficiencies, *see* 7/25/2023 Order Setting Amended Complaint Deadlines, Plaintiffs still fail to identify the particular product that doctors administered to H.S., and the entirety of Plaintiffs' claims rest on their unsubstantiated conclusion that the product or products consumed by H.S. are unreasonably dangerous.

2.     Plaintiffs acknowledge that premature infants such as H.S. have an inherently high risk of developing NEC. *See* Ex. A at ¶ 16 ("Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems."). The Amended Complaint, however, is otherwise devoid of factual support for Plaintiffs' claim that Mead Johnson's product caused H.S. to develop NEC.   Plaintiffs allege only that H.S. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point, developed NEC.   But

5

Case ID: 220302583
Control No.: 24053109

Plaintiffs still fail to identify which Mead Johnson product the infant received, if any; what else the infant was fed; when H.S. ingested the product; when H.S. was diagnosed with NEC; what treatment was provided for that condition; or any detail regarding what purported "long term gastrointestinal injuries" H.S., now 18 years old, allegedly sustained. Nowhere do Plaintiffs allege *how* cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of H.S.'s case square with any mechanism of action. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiffs' Amended Complaint should be dismissed.

3. Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022, against Moving Defendants, Abbott, and The Pennsylvania Hospital of the University of Pennsylvania and the Trustees of the University of Pennsylvania ("HUP").

4. On June 15, 2023, Moving Defendants filed Preliminary Objections to Plaintiffs' Complaint arguing that, among other things, Plaintiffs failed to adequately allege information about the products Plaintiff-minor allegedly ingested, the basis for their belief that those products are unreasonably dangerous, and the injuries they allegedly sustained. At the Court's urging, Plaintiffs amended their Complaint on April 23, 2024, which was subsequently verified on May 2, 2024. *See* Ex. A (Am. Compl.); Ex. B (Praecipe to Attach Verification to Am. Compl.). None of these issues were addressed in the amended pleading.

5. Plaintiffs have filed 23 Amended Complaints, all essentially identical, against Moving Defendants, Abbott, HUP, and other hospitals in Philadelphia based on

Case ID: 220302583
Control No.: 24053109

claims relating to alleged ingestion of cow's milk-based products by premature infants following their birth.

6.     Plaintiffs allege that "upon information and belief," the Plaintiff-minors, including H.S., developed NEC, a gastrointestinal disorder that occurs in premature infants, caused by either Moving Defendants' products "and/or" the products of co-defendant Abbott. *See* Ex. A at ¶ 13.

7.     In addition to asserting product liability claims against Moving Defendants and Abbott, as the infant formula manufacturers, Plaintiffs have brought claims against The Pennsylvania Hospital of the University of Pennsylvania and HUP, alleging liability on theories of failure to warn and corporate liability.

8.     The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four (4) paragraphs in the Amended Complaint.

9.     Plaintiffs aver that H.S. was born prematurely September 12, 2006 and that "[u]pon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.* at ¶¶ 11-12.

10.     Plaintiffs further allege that "upon information and belief," H.S. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.* at ¶ 13.

11.     Plaintiffs further allege that following a NEC diagnosis, H.S. "was forced to undergo a colonic resection, permanently removing part of the infant's colon," and that H.S. continues to suffer from unspecified "long term gastrointestinal health effects." No specific description of those alleged injuries or long-term health effects are identified. *Id.* at ¶ 14.

Case ID: 220302583
Control No.: 24053109

12.     Since filing their original complaint, Plaintiffs have added to the factual background about their own circumstances only information about H.S.'s gestational age and birthweight.  Their amendments do not include product identification or additional specific information about their injuries.

13.     Moving Defendants Preliminarily Object to Plaintiffs' Amended Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.     ARGUMENT

### A.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV, & V

14.     To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).  They have failed to do so with respect to all counts against the Moving Defendants on the issue of whether cow's milk-based products are unreasonably dangerous.

15.     The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.*

16.     Plaintiffs allege in Counts I and II of the Amended Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation,"

8

Case ID: 220302583
Control No.: 24053109

owed Plaintiffs and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. *Id*. at ¶¶ 89 (Count I), 99 (Count II).

17. Plaintiffs similarly allege in Count III (Negligence) that Moving Defendants, owed Plaintiffs and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, *id*. at ¶ 107, and in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) that they owed Plaintiffs and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Ex. A at ¶¶ 107 (Count III), 117 (Count IV), and 126 (Count V).

18. Each count brought against Moving Defendants therefore rests on Plaintiffs' theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

19. In fact, the Moving Defendants' cow's milk-based products are regulated by the FDA and legally marketed for use in preterm infants. Moreover, in Plaintiffs' own Amended Complaint, they acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Ex. A at ¶ 16 (emphasis added).

20. In support of their theories and claims, Plaintiffs offer only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Moving Defendants' cow's milk-based products cause NEC in preterm and low-birth-weight infants. Plaintiffs neither cite specifically to any randomized trial or consensus statement, nor do they explain the purported method of action by which cow's milk-based formula products allegedly cause NEC.

Case ID: 220302583
Control No.: 24053109

21.     In their original complaint, Plaintiffs did specifically cite five studies comparing cow's milk-based products to breast milk, Compl. at ¶¶ 17-19, 22-23, a Surgeon General report on the subject, *id*. at ¶ 20, and a statement by the American Academy of Pediatrics.  *Id*. at ¶ 21.  Those studies, the report and the statement purportedly reference higher rates of NEC in preterm and low birth weight infants fed cow's milk-based diets than those fed breast milk.  They do not establish or prove causation.  At most, they reaffirm what is well-known in the medical and scientific community:  that breast milk may be protective against the risk of NEC.  Having abandoned reliance on these scientific authorities, Plaintiffs' Amended Complaint is even more deficient in establishing that Defendants' cow's milk-based products are unreasonably dangerous under Pennsylvania law.

22.     Given that Plaintiffs have offered nothing but the bald assertion that there is "extensive scientific research" that Moving Defendants' products cause NEC, Plaintiffs have failed to adequately allege that the products are unreasonably dangerous.  Ex. A at ¶ 16.  Accordingly, they have failed to state claims for defective design and failure-to-warn.  Counts I through V should be stricken.

**B.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

23.     Plaintiffs' claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiffs fail to plead their allegations with particularity, as required by Pa. R. Civ. P. 1019(b). Specifically, Plaintiffs do not allege that they received and relied upon any particular false representation from Moving Defendants. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent

Case ID: 220302583
Control No.: 24053109

misrepresentation and noting that both require a false representation upon which the plaintiff ultimately relied).

24.     Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

25.     Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561.

26.     To adequately plead a claim for fraud, Pennsylvania law requires that "(1) the pleadings must adequately explain the nature of the claim to the opposing party so as to permit the preparation of a defense, and (2) they must be sufficient to convince the court that the averments are not merely subterfuge." *Pezzano v. Mosesso*, 2014 WL 5421587, at *5 (Pa. Commw. Oct. 24, 2014) (quoting *Martin v. Lancaster Battery Co., Inc.*, 606 A.2d 444, 448 (Pa. 1992)). Plaintiffs' complaint fails on the first prong.

27.     Plaintiffs do not allege any specific representation upon which they relied. Nor do Plaintiffs identify the allegedly defective Mead Johnson product that H.S. received. Ex. A at ¶ 51 (alleging that Mead Johnson "markets and sells ***multiple products*** specifically targeting premature infants). Instead, the Amended Complaint is devoid of any allegation that H.S. received *any* Mead Johnson product at all. *See id.* ¶ 12 (alleging that "Abbott ***and/or*** Mead Johnson's products were fed" to H.S.) (emphasis added). Plaintiffs cannot claim reliance on an alleged misrepresentation when there is no

11

Case ID: 220302583
Control No.: 24053109

identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation). And, crucially, the Moving Defendants are left wondering which, if any, product they should defend and what alleged "misrepresentations" to contest. *Pezzano*, 2014 WL 5421587, at *5.

28.     Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b).  Other courts around the country have dismissed similar misrepresentation claims for lack of specificity. *E.g.*, Ex. C, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

29.     Moreover, failure to allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury means there can be no inference of proximate causation. *See Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer).  Causation is a hallmark of any tort action in Pennsylvania, including misrepresentation.  *Bortz*, 729 A.2d at 560 (citing *Gibbs*

12

Case ID: 220302583
Control No.: 24053109

*v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). *See also Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar, S.N.C.*, No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)).

30.     Thus, Plaintiffs' intentional and negligent misrepresentation claims against Moving Defendants must be dismissed.

## C.     MOTION TO STRIKE PLAINTIFFS' COMPLAINT AS TIME-BARRED

31.     Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. See 42 Pa. Cons. Stat. § 5524(2) & (7).

32.     While the statute of limitations began running on plaintiff-parent's claims on or around the date of the infant-plaintiffs' birth, September 12, 2006, plaintiff-parent did not file a complaint until March 24, 2022—almost 14 years after the statute of limitations period had expired.

33.     Plaintiff-parent's claims in this case are thus time-barred. Moreover, plaintiffs have not alleged sufficient facts in the Amended Complaint to support any application of the discovery rule.

34.     Accordingly, plaintiff-parent's claims should be dismissed, and this preliminary objection should be sustained.

13

Case ID: 220302583
Control No.: 24053109

**D.      MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

35.      Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. Plaintiffs' failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of their claims should be stricken.

36.      A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted).

37.      Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

14

Case ID: 220302583
Control No.: 24053109

38.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.").

39.     As noted above, Plaintiffs' Amended Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence:

- Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (Ex. A at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products;

- Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 50-51;

15

Case ID: 220302583
Control No.: 24053109

- Plaintiffs do not describe the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC, or what treatment was provided for that condition;

- Plaintiffs do not specify the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

40.     Furthermore, Plaintiffs' damages claim is not stated with particularity and is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

41.     These omissions are fatal defects in Plaintiffs' Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

**E.     <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>**

42.     In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in "oppressive, fraudulent, and/or malicious conduct" that allegedly justify an award of punitive damages. *See* Ex. A at ¶¶ 97(d) (Count I), 105(d) (Count II), 114(d) (Count III), 123(d) (Count IV), and 133(d) (Count V)

43.     Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)).  Punitive damages may not be awarded for

16

Case ID: 220302583
Control No.: 24053109

misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987).

44.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner, supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.")

45.     Here, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Read most generously, Plaintiffs' Amended Complaint alleges that Moving Defendants failed to warn co-defendant HUP of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which Plaintiff also alleges HUP was already aware. *See* Ex. A at ¶¶ 77-84. And with respect to H.S.'s care, Plaintiffs merely allege that "upon information and belief" H.S. may have—or may not have—been given a product sold by Moving

Case ID: 220302583
Control No.: 24053109

Defendants, absent any context to indicate that such a product was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth.

46.     For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

47.     Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate.  Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor.

48.     The facts underlying Plaintiffs' bare assertions of oppressive, fraudulent and/or malicious conduct do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Absent specific factual allegations to justify the claim that Moving Defendants' actions as they pertain to Plaintiffs' particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiffs' claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

**F.     MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS**

49.     The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of H.S.

50.     In each count of the Amended Complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er

Case ID: 220302583
Control No.: 24053109

life has been significantly affected by the Injured Infant's injuries." *See* Ex. A at ¶¶ 97 (Count I), 105 (Count II), 114 (Count III), 123 (Count IV), 133 (Count V), 147 (Count VI), and 165 (Count VII).

51.     This is insufficient. Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

52.     Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

53.     Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff). So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953 (Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

19

Case ID: 220302583
Control No.: 24053109

WHEREFORE, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  May 14, 2024                     /s/ Kenneth A. Murphy
                                                      Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,
Mead Johnson & Company, LLC and
Mead Johnson Nutrition Company**

20

Case ID: 220302583
Control No.: 24053109

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **MARCH TERM, 2022** |
| Plaintiff, | : **No. 2606** |
| v. | :<br>:<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>: |
| Defendants. | :<br>: |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFFS' FIRST AMENDED COMPLAINT**

**I.    MATTER BEFORE THE COURT**

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to Plaintiffs' First Amended Complaint ("Amended Complaint").

1

Case ID: 220302583
Control No.: 24053109

This case involves allegations that minor Plaintiff, H.S., developed a condition known as necrotizing enterocolitis ("NEC") following a hospital's decision to administer "Similac and/or Enfamil cow's milk-based products" while in the neonatal intensive care unit ("NICU"). These products are manufactured and sold by Moving Defendants and/or defendant Abbott Laboratories ("Abbott"). *See* Plaintiffs' Amended Complaint, attached as Exhibit A, at ¶ 12. Notwithstanding their having had nearly a year to correct pleading deficiencies, *see* 7/25/2023 Order Setting Amended Complaint Deadlines, Plaintiffs still fail to identify the particular product that doctors administered to H.S., and the entirety of Plaintiffs' claims rest on their unsubstantiated conclusion that the product or products consumed by H.S. are unreasonably dangerous.

Plaintiffs acknowledge that premature infants such as H.S. have an inherently high risk of developing NEC. *See* Ex. A at ¶ 16 ("Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems."). The Amended Complaint, however, is otherwise devoid of factual support for Plaintiffs' claim that Mead Johnson's product caused H.S. to develop NEC. Plaintiffs allege only that H.S. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point, developed NEC. But Plaintiffs still fail to identify which Mead Johnson product the infant received, if any; what else the infant was fed; when H.S. ingested the product; when H.S. was diagnosed with NEC; what treatment was provided for that condition; or any detail regarding what purported "long term gastrointestinal injuries" H.S., now 18 years old, allegedly sustained. Nowhere do Plaintiffs allege *how* cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly

2

Case ID: 220302583
Control No.: 24053109

*cause* NEC, or how the facts of H.S.'s case square with any mechanism of action. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiffs' Amended Complaint should be dismissed.

Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022, against Moving Defendants, Abbott, and The Pennsylvania Hospital of the University of Pennsylvania and the Trustees of the University of Pennsylvania ("HUP").

On June 15, 2023, Moving Defendants filed Preliminary Objections to Plaintiffs' Complaint arguing that, among other things, Plaintiffs failed to adequately allege information about the products Plaintiff-minor allegedly ingested, the basis for their belief that those products are unreasonably dangerous, and the injuries they allegedly sustained. At the Court's urging, Plaintiffs amended their Complaint on April 23, 2024, which was subsequently verified on May 2, 2024. *See* Ex. A (Am. Compl.); Ex. B (Praecipe to Attach Verification to Am. Compl.). None of these issues were addressed in the amended pleading.

Plaintiffs have filed 23 Amended Complaints, all essentially identical, against Moving Defendants, Abbott, HUP, and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants following their birth.

Plaintiffs allege that "upon information and belief," the Plaintiff-minors, including H.S., developed NEC, a gastrointestinal disorder that occurs in premature infants, caused by either Moving Defendants' products "and/or" the products of co-defendant Abbott. *See* Ex. A at ¶ 13.

3

Case ID: 220302583
Control No.: 24053109

In addition to asserting product liability claims against Moving Defendants and Abbott, as the infant formula manufacturers, Plaintiffs have brought claims against The Pennsylvania Hospital of the University of Pennsylvania and HUP, alleging liability on theories of failure to warn and corporate liability.

The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four (4) paragraphs in the Amended Complaint.

Plaintiffs aver that H.S. was born prematurely September 12, 2006 and that "[u]pon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id*. at ¶¶ 11-12.

Plaintiffs further allege that "upon information and belief," H.S. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id*. at ¶ 13.

Plaintiffs further allege that following a NEC diagnosis, H.S. "was forced to undergo a colonic resection, permanently removing part of the infant's colon," and that H.S. continues to suffer from unspecified "long term gastrointestinal health effects." No specific description of those alleged injuries or long-term health effects are identified. *Id*. at ¶ 14.

Since filing their original complaint, Plaintiffs have added to the factual background about their own circumstances only information about H.S.'s gestational age and birthweight. Their amendments do not include product identification or additional specific information about their injuries.

## II.   STATEMENT OF QUESTIONS PRESENTED

1.      Whether this Honorable Court should dismiss Count I of Plaintiffs' Amended Complaint "Strict Liability for Design Defect" cause of action with prejudice because

4

Plaintiffs' Amended Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Moving Defendants cannot be held liable for a defective design?

*Suggested Answer in the affirmative.*

2.      Whether this Honorable Court should dismiss Count II of Plaintiffs' Amended Complaint "Strict Liability for Failure to Warn" cause of action with prejudice because Plaintiffs' Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Moving Defendants cannot be held liable for failure-to-warn?

*Suggested Answer in the affirmative.*

3.      Whether this Honorable Court should dismiss Count III of Plaintiffs' Amended Complaint "Negligence" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product?

*Suggested Answer in the affirmative.*

4.      Whether this Honorable Court should dismiss Count IV of Plaintiffs' Amended Complaint "Intentional Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiffs?

*Suggested Answer in the affirmative.*

5.      Whether this Honorable Court should dismiss Count V of Plaintiffs' Amended Complaint "Negligent Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiffs?

Case ID: 220302583
Control No.: 24053109

*Suggested Answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiffs' Amended Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested Answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Amended Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested Answer in the affirmative.*

## III.    <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

In approximately March, 2022, Plaintiffs filed nearly 30 essentially identical lawsuits against Moving Defendants and Abbott in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1]  On September 8, 2023, Plaintiffs voluntarily amended 21 of their Complaints.  Plaintiffs allege that the Plaintiff-minors, including H.S., developed NEC, a gastrointestinal disorder that occurs in premature infants, caused by either Moving Defendants' products "and/or" the products of co-defendant Abbott. *See* Plaintiffs' Amended Complaint, attached as Exhibit A at ¶¶ 1, 12. Many of the allegations of the Amended Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors actually received infant formula or fortifier, and that they developed

---

[1]      In addition to asserting product liability claims against Moving Defendants and Co-Defendant, Abbott, Plaintiffs have alleged that Pennsylvania Hospital and Penn Medicine ("Thomas Jefferson") are liable based on claims of failure to warn and corporate liability. Lawsuits involving identical claims have been filed against Thomas Jefferson University Hospital, Pennsylvania Hospital, Temple University Hospital, and Albert Einstein Medical Center.

Case ID: 220302583
Control No.: 24053109

NEC shortly after being fed with infant formula or fortifier. As discussed in detail below, Plaintiffs' claims against Moving Defendants are legally and factually deficient.

Moving Defendants manufacture and sell products, including those under the brand name "Enfamil," to help meet the nutritional needs of infants. *Id.* at ¶ 4. Some of their products are designed to be fed to premature or low-birth-weight infants who have special nutritional needs at birth. *See id.* at ¶¶ 50, 51. These products include formulas, which are given to infants who are not fed breast milk, and fortifiers, which are used to supplement pumped breast milk with additional nutrients. *See id.* at ¶ 55 (photo of Enfamil Human Milk Fortifier: "For premature and low-birth-weight infants fed breast milk"). Some Enfamil products, particularly those intended to be fed to premature or low-birth-weight infants, are intended to be used only under the supervision of a physician. *See id.* (photo of Enfamil Human Milk Fortifier: "To be used only under the supervision of a physician"). Co-defendant Abbott also sells formulas and fortifiers meant to be fed to premature or low-birth-weight infants under the brand name "Similac." *Id.* at ¶ 50. Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells seven types of infant formulas and fortifiers using the Enfamil brand name. *Id.* at ¶¶ 50-51.

Infant formulas and fortifiers for pre-term and low-birth-weight infants are regulated by the FDA. Mead Johnson is required to submit information about its pre-term products, including their ingredients, to the FDA, 21 C.F.R. § 107.50(b)(3), and the FDA is required to review that submission. The FDA may also impose changes to such a product's composition or labeling. *Id.* at § 107(d)(1).

Case ID: 220302583
Control No.: 24053109

The formula and fortifier products identified by Plaintiffs as being manufactured by Moving Defendants are made using ingredients derived from cow's milk. *Id.* at ¶ 12. Although Plaintiffs aver that NEC is caused by cow's milk-based products, Plaintiffs make passing reference in their Amended Complaint to research studies and reports that, at best, suggest only that NEC is more common in premature and low birth weight infants fed with cow's milk-based products as compared with similar infants fed with breast milk, specifically mother's own milk.

Moreover, Plaintiffs' Amended Complaint provides little information regarding H.S.'s own circumstances. Plaintiffs aver that H.S. was born prematurely on September 12, 2006 and that "[u]pon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.* at ¶ 12. Plaintiffs further allege that "upon information and belief" H.S. developed NEC shortly after first ingesting the Moving Defendants and/or Co-Defendant Abbott's products. *Id.* at ¶ 13. Plaintiffs provide no details regarding her condition following birth other than that she developed NEC on an unidentified date. Further, Plaintiffs allege no facts as to whether Plaintiff-parent provided breast milk to H.S., whether she had the opportunity to use donor milk, and if H.S. actually received a cow's milk product, what it was, how much, and for how long. Finally, although the Amended Complaint references a colonic resection that removed part of her colon, *id*. at ¶ 14, the pleading is silent as to the nature and extent of H.S.'s alleged injuries other than a vague reference to "long term gastrointestinal health effects." *Id*.

Further, the Amended Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at

8

Case ID: 220302583
Control No.: 24053109

Pennsylvania Hospital regarding the allegations that H.S. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiffs do not provide any information regarding discussions between Plaintiff-parent and any health care providers at Pennsylvania Hospital related to breastfeeding and/or using cow's milk-based products in this case. As noted, Plaintiffs plead that Plaintiff-minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff-minor developed NEC as a result.

Each of these deficits was identified in Moving Defendants' Preliminary Objections to Plaintiffs' originally filed Complaint. None has been remedied in this Amended Complaint.

## IV. <u>ARGUMENT</u>

### A. **DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV & V**

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also, Willet v. Pennsylvania Med. Catastrophe Loss Funds,* 702 A.2d 850, 853 (Pa. 1997). In this case, Counts I, II, III, IV, and V of Plaintiffs' Amended Complaint should be stricken pursuant to this Rule, as Plaintiffs have failed to plead with sufficient detail to survive the pleading stage that Moving Defendants' cow's milk-based products were unreasonably dangerous. Moreover, because Plaintiffs have failed to cure this deficiency even after amending their complaint, the strike should be with prejudice.

9

Case ID: 220302583
Control No.: 24053109

To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015). "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

Plaintiffs allege in Counts I and II of the Amended Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiffs and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Ex. A at ¶¶ 89 (Count I), 99 (Count II). Plaintiffs similarly allege in Count III (Negligence) that Moving Defendants, owed Plaintiffs and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, *id*. at ¶ 107, .and  in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) that they owed Plaintiffs and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. *Id*. at ¶¶ 117 (Count IV), 126 (Count V).  Each count brought against Moving Defendants therefore rests on Plaintiffs' theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

Case ID: 220302583
Control No.: 24053109

In fact, the Moving Defendants' cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants. Moreover, in Plaintiffs' own Complaint they acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See id.* at ¶ 16 (emphasis added).

In support of their theories and claims, Plaintiffs offer only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Moving Defendants' cow's milk-based products cause NEC in preterm and low-birth-weight infants. *Id.* Plaintiffs neither cite specifically to any randomized trial or consensus statement nor explain the purported method of action by which cow's milk-based formula products allegedly cause NEC.

In their original complaint, Plaintiffs did specifically cite five studies comparing cow's milk-based products to breast milk, Compl. at ¶¶ 17-19, 22-23, a Surgeon General report on the subject, *id.* at ¶ 20, and a statement by the American Academy of Pediatrics. *Id.* at ¶ 21, Those studies, the report and the statement purportedly reference higher rates of NEC in preterm and low birth weight infants fed cow's milk-based diets than those fed breast milk. They do not establish or prove causation. At best, they suggest that breast milk may be protective against the risk of NEC. Having abandoned reliance on these scientific authorities, Plaintiffs' Amended Complaint is even more deficient in establishing that Defendants' cow's milk-based products are unreasonably dangerous under Pennsylvania law.

Moreover, as *Weiner* notes, Plaintiffs must aver sufficient facts demonstrating the Moving Defendants' products are unreasonably dangerous **for their intended use**, triggering Moving Defendants' duty to warn. The only factual reference Plaintiffs make

Case ID: 220302583
Control No.: 24053109

with regard to intended use is to marketing campaigns, where Defendant Manufacturers allegedly advertised that "cow's milk-based products are necessary for proper growth and development of preterm infants." *See* Ex. A at ¶ 54. They have not averred sufficient facts to demonstrate that cow's milk-based products are unreasonably dangerous for this purpose.

Consequently, Plaintiffs' Counts I through V should be stricken with prejudice or failure to state a claim.

## B. DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V

Plaintiffs' claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiffs do not allege that they received and relied upon any specific representation from Moving Defendants. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that both require a false representation upon which the plaintiff ultimately relied). The complaint not only fails to identify the allegedly defective Mead Johnson product that H.S. received, it fails even to allege that H.S. received *any* Mead Johnson product. *See* Ex. A, Am. Compl. ¶ 49 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants); ¶ 12 (alleging that "Abbott **and/or** Mead Johnson's products were fed" to H.S.) (emphasis added). Plaintiffs cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

Case ID: 220302583
Control No.: 24053109

Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b). Other courts around the country have dismissed similar misrepresentation claims for lack of specificity. *E.g.*, Ex. B, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561.

Here, Plaintiffs' misrepresentation claims fail because they fail to sufficiently allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury. *See Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming

Case ID: 220302583
Control No.: 24053109

dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania. *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar*, S.N.C., No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)). Plaintiffs' intentional and negligent misrepresentation claims against Moving Defendants must therefore be dismissed.

### C.  MOTION TO STRIKE PLAINTIFFS' COMPLAINT AS TIME-BARRED

Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. See 42 Pa. Cons. Stat. § 5524(2) & (7).

While the statute of limitations began running on plaintiff-parent's claims on or around the date of the infant-plaintiffs' birth, September 12, 2006, plaintiff-parent did not file a complaint until March 24, 2022—almost 14 years after the statute of limitations period had expired.

Plaintiff-parent's claims in this case are thus time-barred. Moreover, plaintiffs have not alleged sufficient facts in the Amended Complaint to support any application of the discovery rule.

Case ID: 220302583
Control No.: 24053109

Accordingly, plaintiff-parent's claims should be dismissed, and this preliminary objection should be sustained.

### D. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. Plaintiffs' failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of their claims should be stricken.

A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

15

Case ID: 220302583
Control No.: 24053109

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

As noted above, Plaintiffs' Amended Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence. Specifically, Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Ex.A at ¶¶ 11-14. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the

16

Case ID: 220302583
Control No.: 24053109

Similac and Enfamil brand names the infant received. *Id*. at ¶¶ 50-51. Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were administered, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

In short, Plaintiffs' Amended Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Amended Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiffs' Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

### E.   MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

As in the other infant formula cases, in the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, fraudulent, and/or malicious conduct that allegedly justify an award of punitive damages. *See* Ex.A at ¶¶ 97(d) (Count I), 1051(d) (Count II), 114(d) (Count III), 123(d) (Count IV), and 133(d) (Count V). However, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Accordingly, Plaintiffs' claims for punitive damages should be stricken.

Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa.

Case ID: 220302583
Control No.: 24053109

Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.").

Here, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Read most

18

generously, Plaintiffs' Amended Complaint alleges that Moving Defendants failed to warn co-defendant HUP of a risk of NEC associated with its legally-marketed cow's milk-based product– a risk about which Plaintiff alleges that HUP was already aware. *See* Ex. A at ¶¶ 75-80. And with respect to H.S.'s care, Plaintiffs merely allege that "upon information and belief" H.S. may have been given a product sold by Moving Defendants absent any context to indicate that such a product was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth. For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA reviews Moving Defendants' pre-term infant feeding products and has not restricted the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor. Absent specific factual allegations to justify the claim that Moving Defendants' actions as they pertain to Plaintiffs' particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiffs' claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

**F.    MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS**

Case ID: 220302583
Control No.: 24053109

The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of H.S., both because they are inadequately pled and because she has not suffered physical injury.

In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries." See Ex. A at ¶¶ 97 (Count I), 105 (Count II), 114 (Count III), 123 (Count IV), 133 (Count V), 147 (Count VI), and 165 (Count VII). This is insufficient. Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of
> each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff). So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953 (Pa. 2011) ("We

20

Case ID: 220302583
Control No.: 24053109

would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

## V.   REQUESTED RELIEF

For the foregoing reasons, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated: May 14, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,
Mead Johnson & Company, LLC and
Mead Johnson Nutrition Company**

21

Case ID: 220302583
Control No.: 24053109

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiffs' First Amended Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Keller Postman**
Ashley C. Keller, Esquire
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
ack@kellerpostman.com
*Attorneys for Plaintiffs*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com

*Counsel for Defendants, The Trustees of the University of Pennsylvania d/b/a The Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**Eckert Seamans Cherin Mellot**
Donald Brooks, Jr., Esquire
Brooke A. Scicchitano, Esquire
50 S. 16th Street, 22nd Floor
Philadelphia, PA 19102
dbrooks@eckertseamans.com
bscicchitano@eckertseamans.com
*Attorneys for Defendant, Thomas Jefferson University Hospitals, Inc. d/b/a Thomas Jefferson University Hospital and Thomas Jefferson University d/b/a Jefferson Health System*

2

By:     /s/ Kenneth A. Murphy
          Kenneth A. Murphy, Esquire

Dated: May 14, 2024

Case ID: 220302583
Control No.: 24053109

# EXHIBIT A

Case ID: 220302583
Control No.: 24053109

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com



*Filed and Attested by the Office of Judicial Records 23 APR 2024 02:41 pm B. MERCEDES*

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own** | : | **COURT OF COMMON PLEAS** |
| **Behalf and as Parent and Natural Guardian** | : | **PHILADELPHIA COUNTY** |
| **of H.S., a Minor** | : | |
| **335 Passmore Street** | : | |
| **Philadelphia, PA 19111** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO. 220902583** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

1

Case ID: 220302583
Control No.: 24053109

| | |
|---|---|
| **CT Corporation System** | : |
| **208 So. Lasalle Street, Suite 814** | : |
| **Chicago, IL 60604** | : |
| | : |
| | : |
| **THE PENNSYLVANIA HOSPITAL OF** | : |
| **THE UNIVERSITY OF PENNSYLVANIA** | : |
| **HEALTH SYSTEM d/b/a PENNSYLVANIA** | : |
| **HOSPITAL** | : |
| **3400 Civic Center Blvd.** | : |
| **Philadelphia, PA 19104** | : |
| | : |
| | : |
| **THE TRUSTEES OF THE UNIVERSITY OF** | : |
| **PENNSYLVANIA d/b/a PENN MEDICINE** | : |
| **133 South 36th Street** | : |
| **Philadelphia, PA 19104** | : |
| | : |
| **Defendants** | : **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT IN CIVIL

## <u>ACTION NOTICE TO DEFEND</u>

<table>
<tr>
<td>

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701

</td>
<td>

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701

</td>
</tr>
</table>

Case ID: 220302583
Control No.: 24053109

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com

| | |
|---|---|
| **TERRAINE ABDULLAH,** ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARDIAN OF H.S., A MINOR<br>**335 PASSMORE STREET**<br>**PHILADELPHIA, PA 19111**<br>PLAINTIFFS | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY** |
| V. | **CIVIL ACTION** |
| **MEAD JOHNSON & COMPANY, LLC**<br>ILLINOIS CORPORATION SERVICE CO.<br>**801 ADLAI STEVENSON DRIVE**<br>**SPRINGFIELD, IL 62703** | **NO. 220902583** |
| **MEAD JOHNSON NUTRITION COMPANY**<br>ILLINOIS CORPORATION SERVICE CO.<br>**801 ADLAI STEVENSON DRIVE**<br>**SPRINGFIELD, IL 62703** | |
| **ABBOTT LABORATORIES**<br>CT CORPORATION SYSTEM<br>**208 SO. LASALLE STREET, SUITE 814**<br>**CHICAGO, IL 60604** | |
| **THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA** | |

3

| | | |
|---|---|---|
| **HOSPITAL** | : | |
| **3400 CIVIC CENTER BLVD.** | : | |
| **PHILADELPHIA, PA 19104** | : | |
| | : | |
| | : | |
| **THE TRUSTEES OF THE UNIVERSITY OF** | : | |
| **PENNSYLVANIA D/B/A PENN MEDICINE** | : | |
| **133 SOUTH 36TH STREET** | : | |
| **PHILADELPHIA, PA 19104** | : | |
| | : | |
| **DEFENDANTS** | : | **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.      INTRODUCTION

1.      This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

4

Case ID: 220302583
Control No.: 24053109

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

3.      Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania.  Ms. Abdullah is the parent and natural guardian of H.S., a minor.  Ms. Abdullah's address is 335 Passmore Street, Philadelphia, Pennsylvania 19111.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware.  Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302583
Control No.: 24053109

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.  Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

6

Case ID: 220302583
Control No.: 24053109

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *H.S.'s NEC Diagnosis*

11.     H.S. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on September 12, 2006.

12.     At birth H.S.'s gestational ages was approximately 25 weeks and she weighed 847 grams. Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk decreases the risk of NEC.

13.     Upon information and belief shortly after H.S. first ingested the Defendant Manufacturers' products, she developed NEC.

14.     H.S. was diagnosed in the NIC-U with NEC on November 10, 2006, and thereafter was forced to undergo a colonic resection, permanently removing part of the infant's colon as a result of her NEC diagnosis. Infant plaintiff continues to suffer long term gastrointestinal health effects as a result of this surgical removal of part of her colon.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

Case ID: 220302583
Control No.: 24053109

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.    Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long- term health problems, and death.

### *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.    For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.    Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.    This displacement only increases infants' vulnerability to NEC.

20.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition,

8

they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

23. Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

24. Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Abdullah of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Abdullah Discovers Her Claim*

25. Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Abdullah did not know, and had no reason to know or suspect, that H.S.'s NEC could have been caused by the Defendant Manufacturers' products.

26. Once Ms. Abdullah learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

Case ID: 220302583
Control No.: 24053109

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and
Would Not Have Revealed a Factual Basis Earlier
Because Defendants Hid the Cause of NEC from Ms. Abdullah***

27.     Despite exercising reasonable diligence, Ms. Abdullah was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of H.S.'s injuries.

28.     Not one person at Penn Medicine informed Ms. Abdullah that the Defendant Manufacturers' formula products could have caused H.S.'s injuries.  Penn Medicine's response at the time did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of the Defendants.

29.     Ms. Abdullah is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

30.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Abdullah had no reason to doubt their word.

31.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

32.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

33.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the

Case ID: 220302583
Control No.: 24053109

first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

34.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Abdullah immediately after H.S.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused H.S.'s injuries.

35.     Ms. Abdullah also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to H.S.  Not only was Ms. Abdullah unaware that the Defendant Manufacturers' products caused H.S.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Abdullah, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302583
Control No.: 24053109

36.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

37.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

38.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

39.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

40.     Additionally, Defendant Hospital failed to inform Ms. Abdullah that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

41.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Abdullah of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Abdullah that it would do everything it could possibly do to keep her infant safe.  Though this

Case ID: 220302583
Control No.: 24053109

was clearly not true given the known risks of preterm formula for babies like H.S., it was enough for Ms. Abdullah to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

42.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

43.     Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

44.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

45.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

46.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

47.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing

Case ID: 220302583
Control No.: 24053109

partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

48.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

49.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

50.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC.

Case ID: 220302583
Control No.: 24053109

At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

51.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

52.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

53.     Formula manufacturers have long used their relationships with hospitals and the discharge

Case ID: 220302583
Control No.: 24053109

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

54. Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

55. Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 220302583
Control No.: 24053109





56.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

57.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left

17

the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

58.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

59.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

60.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients— the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

61.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other

Case ID: 220302583
Control No.: 24053109

staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

62.     Prior to H.S.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like H.S. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

63.     Prior to H.S.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like H.S. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

64.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like H.S.

### The Defendant Manufacturers' Inadequate Warnings

65.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

19

Case ID: 220302583
Control No.: 24053109

66.    The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

67.    Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.    Mead cites no medical literature or research to guide the use of its products.

69.    Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

70.    Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

71.    Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

72.    Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

Case ID: 220302583
Control No.: 24053109

73.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

74.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

75.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

76.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

*Penn Medicine's Failure to Warn*

77.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human link decreases the risk of NEC in premature infants. However,  instead  of  warning  of  the  dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

Case ID: 220302583
Control No.: 24053109

78.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.     The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

79.     Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

80.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.  The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers.     Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

81.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.    In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on

Case ID: 220302583
Control No.: 24053109

> investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

82.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

83.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

84.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.   This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### Safer Alternative Designs

85.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used

Case ID: 220302583
Control No.: 24053109

pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

86.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

87.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

**CAUSES OF ACTION**
**COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

88.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

89.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

90.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

91.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.    Nonetheless, they

24

continued to sell and market their defective products as appropriate for premature infants.

92.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk- based products.  The risks of feeding those products to the Injured Infant outweighed the benefits.  An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

93.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

94.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

95.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

96.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

97.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

Case ID: 220302583
Control No.: 24053109

sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

98.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

99.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

100.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation

26

Case ID: 220302583
Control No.: 24053109

unreasonably dangerous.

101.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

    a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

Case ID: 220302583
Control No.: 24053109

g.    Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.    Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

103.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

104.    The unwarned-of risks are not of a kind that an ordinary consumer would expect.  Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.    Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

105.         As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

28

Case ID: 220302583
Control No.: 24053109

sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

106.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

108.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

109.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk- based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

Case ID: 220302583
Control No.: 24053109

110.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

a.     Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.     Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.     Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.     Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.     Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.     Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.     Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.     Failing to provide statistical evidence showing the magnitude of increased risk

Case ID: 220302583
Control No.: 24053109

of NEC in premature infants associated with cow's milk-based products.

111.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

112.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

113.    Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

114.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

Case ID: 220302583
Control No.: 24053109

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

115. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

116. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

117. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

118. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

119. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

Case ID: 220302583
Control No.: 24053109

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

120.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

121.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably

Case ID: 220302583
Control No.: 24053109

relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

122. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

123. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

Case ID: 220302583
Control No.: 24053109

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

### COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

124.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

125.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

126.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

127.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

128.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.      That their cow's milk-based products were necessary to the growth and nutrition

Case ID: 220302583
Control No.: 24053109

of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

129.    Abbott and Mead were negligent or careless in not determining those representations to be false.

130.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

131.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.    Had Abbott and Mead not committed these negligent

Case ID: 220302583
Control No.: 24053109

misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

132.     As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

133.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302583
Control No.: 24053109

g.      For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

134.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

136.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

137.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

138.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

139.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.    The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.    These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous

Case ID: 220302583
Control No.: 24053109

products to consumers, such as the Plaintiff Parent.

140.    Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

141.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

142.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

> a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
> b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or
>
> c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or
>
> d.    Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or
>
> e.    Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

Case ID: 220302583
Control No.: 24053109

f.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.      Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

143.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

144.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure

Case ID: 220302583
Control No.: 24053109

to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

148. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

149. At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the

41

Case ID: 220302583
Control No.: 24053109

Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

150.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

151.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

152.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

153.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the

Case ID: 220302583
Control No.: 24053109

misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

154.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

155.    Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are at increased risk for NEC.

156.    Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

157.    Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

158.    Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

159.    By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

160.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

161.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 220302583
Control No.: 24053109

a.  Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

b.  Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

c.  Failing to formulate, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e.  Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g.  Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be

44

Case ID: 220302583
Control No.: 24053109

provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant;

l. Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits;

m. Allowing parental preference to be the standard for feeding premature infants;

n. Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

Case ID: 220302583
Control No.: 24053109

o.    Failing to follow the American Academy of Pediatrics recommendation to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.    Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.    Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

162.    A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

163.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

164.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

165.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of

46

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

166. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

167. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

168. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d.    Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 220302583
Control No.: 24053109

f. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

169. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

170. A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

171. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant

Case ID: 220302583
Control No.: 24053109

would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

172.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

173.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

Case ID: 220302583
Control No.: 24053109

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

174.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: April 23, 2024

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Tobias L. Millrood
        Tobias L. Millrood, Esq.
        Elizabeth A. Crawford, Esq.
        Timothy A. Burke, Esq.
        John P. O'Neill, Esq.

**KELLER POSTMAN**
Ben Whiting, Esq.
Zachary Clark, Esq.
*Attorneys for Plaintiffs*

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2024, I caused a true and correct copy of the

foregoing document to be served by electronic filing to all counsel of record.

/s/ Tobias L. Millrood

TOBIAS L. MILLROOD

Case ID: 220302583
Control No.: 24053109

## <u>VERIFICATION</u>

I, the undersigned, Tobias L. Millrood, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief.  I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

/s/ Tobias L. Millrood

Date:   April 23, 2024                               Tobias L. Millrood

Case ID: 220302583
Control No.: 24053109

# EXHIBIT B

Case ID: 220302583
Control No.: 24053109

**KLINE & SPECTER, P.C.**

By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com



Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARD OF H.S., A MINOR. | MARCH Term, 2022 |
|               Plaintiff, | No. 02583 |
|       v. | |
| MEAD JOHNSON & COMPANY, LLC, et al. | JURY TRIAL DEMANDED |
|          Defendants. | |

**<u>PRAECIPE TO ATTACH VERIFICATION TO AMENDED COMPLAINT</u>**

    Please attach Plaintiff's Verifications to the Amended Complaint filed of record on April

23, 2024, with regard to the above-captioned matter.

                    Respectfully submitted,

                    **KLINE & SPECTER, P.C.**

Dated:  May 2, 2024

                    /s/ Timothy A. Burke

TIMOTHY A. BURKE, ESQ.
Attorneys for Plaintiffs

Case ID: 220302583
Control No.: 24053109

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2024, I caused a true and correct copy of the foregoing document to be served by electronic filing to all counsel of record.

Dated: May 2, 2024        /s/ Timothy A. Burke
                                       TIMOTHY A. BURKE

## VERIFICATION

I, _____Terrraine Abdullah_____, verify that the statements made in Plaintiff's Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Dated: May 2, 2024          By: _____

DocuSigned by:

*Terrraine Abdullah*

SD1875818CC74B3...

Case ID: 220302583
Control No.: 24053109

# EXHIBIT C

Case ID: 220302583
Control No.: 24053109

**FILED**

San Francisco County Superior Court

JUL 1 2 2023

CLERK OF THE COURT

BY: _____
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATED PROCEEDINGS SPECIAL TITLE (RULE 3.550) | JUDICIAL COUNCIL COORDINATION PROCEEDING No. 5257 |
| | Case No. CJC-23-005257 |
| MEAD JOHNSON PRODUCT CASES | ORDER ON DEFENDANT ABBOTT LABORATORIES' DEMURRER TO AMENDED COMPLAINTS |

**This Document Relates To:**

*Benjiman Cribb v. Mead Johnson & Company, LLC, et al.*, San Joaquin Superior Court, Case No. STK-CV-UMT-2022-0002205

*Harrell v. Abbott Laboratories, et al.*, San Francisco County Superior Court, Case No. CGC-22-598976

*Hartwick, et al. v. Mead Johnson & Company, LLC, et al.*, Alameda County Superior Court, Case No. 22CV0088337

*Thomas, et al. v. Mead Johnson & Company LLC, et al.*, Alameda County Superior Court, Case No. 22CV008511

*Tracy, et al. v. Mead Johnson & Company, LLC, et al.*, San Francisco County Superior Court, Case No. CGC-22-598819

1

2

*Woods v. Mead Johnson & Company, LLC, et al.*,
San Joaquin Superior Court, Case No. STK-CV-
UMT-2022-0002209

3

4       Defendant Abbott Laboratories' Demurrer to Amended Complaints came on for hearing on July

5  10, 2023. Having considered the pleadings and papers on file in the action, and the arguments of counsel

6  presented at the hearing, the Court hereby sustains the demurrer with leave to amend.

## **BACKGROUND**

7

8       In this coordinated proceeding, Plaintiffs are parents or representatives of their minor children or

9  of the estates of their minor children ("Injured Infants"), who filed actions against Mead Johnson &

10  Company, LLC, Mead Johnson Nutrition Company ("Mead Johnson" or "Mead"), and Abbott

11  Laboratories ("Abbott") (collectively, "Defendant Manufacturers") and various hospitals and medical

12  centers.

13       Plaintiffs allege the Injured Infants consumed Defendant Manufacturers' cow's milk-based

14  products and developed necrotizing enterocolitis ("NEC"). Injured Infants sustained injuries with lifelong

15  effects or passed away. Plaintiffs seek to state causes of action for strict products liability based on design

16  defect and failure to warn, negligence, intentional misrepresentation, negligent misrepresentation,

17  survival, and wrongful death against Defendant Manufacturers.

18       Abbott demurs to the following complaints: (1) Second Amended Complaint ("SAC") in

19  *Benjiman Cribb v. Mead Johnson & Company, LLC, et al.*, San Joaquin Superior Court, Case No. STK-

20  CV-UMT-2022-0002205 ("*Cribb*"); (2) SAC in *Harrell v. Abbott Laboratories, et al.*, San Francisco

21  County Superior Court, Case No. CGC-22-598976 ("*Harrell*"); (3) First Amended Complaint ("FAC") in

22  *Hartwick, et al. v. Mead Johnson & Company, LLC, et al.*, Alameda County Superior Court, Case No.

23  22CV0088337 ("*Hartwick*"); (4) FAC in *Thomas, et al. v. Mead Johnson & Company LLC, et al.*,

24  Alameda County Superior Court, Case No. 22CV008511 ("*Thomas*"); (5) FAC in *Tracy, et al. v. Mead

25  *Johnson & Company, LLC, et al.*, San Francisco County Superior Court, Case No. CGC-22-598819

26  ("*Tracy*"); and (6) SAC in *Woods v. Mead Johnson & Company, LLC, et al.*, San Joaquin Superior Court,

27  Case No. STK-CV-UMT-2022-0002209 ("*Woods*") (collectively, "Complaints"). (Demurrer, 3.) Abbott

28  demurs on the ground that Plaintiffs' causes of action are time-barred by Code of Civil Procedure § 335.1

Case ID: 220302686
Control No.: 230961409

and Plaintiffs have not stated causes of action for intentional misrepresentation and negligent misrepresentation. (Demurrer, 3-6.)[1] Mead Johnson joins Abbott's demurrer. (Joinder, 3-4.) Plaintiffs oppose the demurrer.

### LEGAL STANDARD

A demurrer lies where "the pleading does not state facts sufficient to constitute a cause of action." (Code Civ. Proc. § 430.10(e).) A demurrer admits "all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.) The complaint is given a reasonable interpretation, reading it as a whole and its parts in their context. (*Id.*) The Court accepts as true, and liberally construes, all properly pleaded allegations of material fact, as well as those facts which may be implied or reasonably inferred from those allegations; its sole consideration is whether the plaintiff's complaint is sufficient to state a cause of action under any legal theory. (*O'Grady v. Merchant Exchange Prods., Inc.* (2019) 41 Cal.App.5th 771, 776-777.)

### DISCUSSION

**I.      Plaintiffs' Allegations Are Insufficient To Invoke The Discovery Rule.**

Abbott contends the parent Plaintiffs' direct claims are time-barred under Code of Civil Procedure § 335.1 because the statute of limitations began to run on the date of the Injured Infants' alleged NEC diagnosis and Plaintiffs filed suit long after the statute of limitations. (Opening Brief, 5.) In addition, Abbott asserts that the claims brought by Plaintiffs on behalf of deceased infants are time-barred for both the estate and Plaintiffs because these actions "were brought more than two years after the infant's alleged date of death." (Opening Brief, 5-6; see Joinder, 6.) Plaintiffs do not dispute that the applicable statute of limitations is two years. Rather, Plaintiffs assert their complaints are timely under the discovery rule. (Opposition, 4-7.)

Code of Civil Procedure "Section 335.1 provides a two-year statute of limitations for injury or wrongful death." (*Cardenas v. Horizon Senior Living, Inc.* (2022) 78 Cal.App.5th 1065, 1070; Code Civ. Proc. § 335.1 ["Within two years: An action for assault, battery, or injury to, or for the death of, an

---

[1] Abbott's Request for Judicial Notice is denied as the documents are not relevant to the Court's resolution of Abbott's demurrer.

Case ID: 220302686
Control No.: 24096709

individual caused by the wrongful act or neglect of another."].)  The two-year statute of limitations period under Code of Civil Procedure § 335.1 "begins to run when the cause of action accrues." (*Daley v. Regents of University of California* (2019) 39 Cal.App.5th 595, 602.)

"Generally speaking, a cause of action accrues at the time when the cause of action is complete with all of its elements." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806.)  For both negligence and strict liability products liability claims, "the last element to occur is generally, as a practical matter, the injury to the future plaintiff." (*Id.* at 809.)  "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Id.* at 807; *Carrillo v. County of Santa Clara* (2023) 89 Cal.App.5th 227, 234.)  The discovery rule "sets forth two alternate tests for triggering the limitations period: (1) a subjective test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; and (2) an objective test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing.  The first to occur under these two tests begins the limitations period." (*Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384, 1391.)

Under the objective test, which applies here,

> A plaintiff has reason to discover a cause of action when he or she "has reason at least to suspect a factual basis for its elements."  Under this standard, accrual does not wait until the plaintiff knows facts supporting each specific legal element of the cause of action; it occurs when the plaintiff has "reason to at least suspect that a *type of wrongdoing has injured them*."  "In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation."

(*Daley*, 39 Cal.App.5th at 603, quoting *Fox*, 35 Cal.4th at 807-808 (cleaned up).)[2]  "To rely on the discovery rule for delayed accrual of a cause of action, a plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." (*Carrillo*, 89 Cal.App.5th at 234.)  "In assessing the sufficiency of the allegations of delayed discovery, the court places the burden on the plaintiff to show diligence; conclusory allegations

---

[2] The discovery rule applies to personal injury and wrongful death claims under § 335.1.  (*Daley*, 39 Cal.App.5th at 603-606.)

Case ID: 220302686
Control No.: 23096709

1    will not withstand demurrer." (*Fox*, 35 Cal.4th at 808 (cleaned up).) "Mere conclusory assertions that

2    delay in discovery was reasonable are insufficient and will not enable the complaint to withstand general

3    demurrer.  Arguments that discovery-rule issues are necessarily factual and cannot be resolved on

4    demurrer have been rejected." (*Ventura29 LLC v. City of San Buenaventura* (2023) 87 Cal.App.5th 1028,

5    1044-1045 (cleaned up).)

6        Here, it is undisputed that the Complaints show on their face that Plaintiffs' claims would be

7    barred without the benefit of the discovery rule.  As Defendants show, ten of the infants on whose behalf

8    Plaintiffs assert claims were born between 3 to 16 years before the Complaints were filed.  (Opening

9    Brief, 3 [table].)  And the four infants as to whom Plaintiffs bring wrongful death and survival claims died

10   from 3 to 17 years before the Complaints were filed.  (*Id.* at 4 [table].)  In each case, Plaintiffs allege that

11   the infants were administered Defendant Manufacturers' products "shortly after [their] birth," and

12   developed NEC "[s]hortly after" first ingesting those products.  (E.g., *Cribb* SAC ¶¶ 11, 12.)  Thus,

13   Plaintiffs' claims would only be timely if the discovery rule delayed accrual of their causes of action.

14       The allegations regarding delayed discovery are nearly identical in each complaint.  In particular,

15   Plaintiffs allege they "did not know, and had no reason to know or suspect, that [Injured Infants] NEC

16   could have been caused by the Defendant Manufacturers' products.  [Plaintiffs] learned of the direct

17   connection between the Defendant Manufacturers' products and NEC only when [they] learned of this

18   litigation, less than one year before [they] filed suit." (*Cribb* SAC ¶ 15; *Harrell* SAC ¶ 18; *Hartwick* FAC

19   ¶¶ 16, 22; *Thomas* FAC ¶¶ 20, 26, 32, 38, 50; *Tracy* FAC ¶¶ 20, 32, 42; *Woods* FAC ¶ 15.)[3]  Plaintiffs

20   allege that "[d]espite exercising reasonable diligence, [Plaintiffs] were unable to have made the discovery

21   earlier via a reasonable investigation because the Defendant Manufacturers in this litigation concealed the

22   wrongful cause of the Injured Infants' injuries and/or death." (*Cribb* SAC ¶ 16; *Harrell* SAC ¶ 19;

23   *Hartwick* FAC ¶ 23; *Thomas* FAC ¶ 51; *Tracy* FAC ¶ 43; *Woods* FAC ¶ 16; see, e.g., *Cribb* SAC ¶ 17

24   ["risk of [NEC] was hidden and not warned about on the face of *any* of the Defendant Manufacturers'

25   products." (emphasis in original)]; *Harrell* SAC ¶ 20 [same]; *Hartwick* FAC ¶ 24 [same]; *Thomas* FAC ¶

26

---

[3] Plaintiff Parent Robneisha Johnson does not allege she did not know and that a reasonable investigation
27  did not reveal a factual basis to know R.M.B.'s NEC was caused by Defendant Manufacturers' products.
    (See *Tracy* FAC ¶¶ 33-37.)  She also does not allege when she learned of the connection between
28  Defendant Manufacturers' products and NEC.  (See *id.*)

Case ID: 220302686
Control No.: 24096749

52 [same]; *Tracy* FAC ¶ 44 [same]; *Woods* FAC ¶ 17 [same].) Plaintiffs allege "any research conducted . . . immediately after the Injured Infants' injury and/or death, or at any time prior to learning of this litigation, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused the Injured Infants' injuries and/or death" due to "misleading information distributed by the Defendant Manufacturers." (*Cribb* SAC ¶ 20; *Harrell* SAC ¶ 21; *Hartwick* FAC ¶ 27; *Thomas* FAC ¶ 55; *Tracy* ¶ 47; *Woods* FAC ¶ 20.) Plaintiffs further allege "the Defendant Manufacturers' distribution agreements with [Defendant Hospitals] were also not public or knowable to the Plaintiff Parents, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements." (*Cribb* FAC ¶ 21; *Harrell* SAC ¶ 22; *Hartwick* FAC ¶ 28; *Thomas* FAC ¶ 56; *Tracy* ¶ 48; *Woods* FAC ¶ 21.)

Plaintiffs' allegations are insufficient to invoke the discovery rule because Plaintiffs do not adequately plead specific facts showing the time and manner of discovery and their inability to have made earlier discovery despite reasonable diligence. As to the first factor, each Plaintiff alleges they only "learned of the direct connection between the Defendant Manufacturers' products and NEC [] when they learned of this litigation." (*Cribb* SAC ¶ 15; *Harrell* SAC ¶ 18; *Hartwick* FAC ¶¶ 16, 22; *Thomas* FAC ¶¶ 20, 26, 32, 38, 50; *Tracy* FAC ¶¶ 20, 32, 42; *Woods* FAC ¶ 15.) However, not all Plaintiffs can allege they learned the factual bases for their causes of action from this litigation. At least one of the Plaintiffs must be the impetus for this litigation.[4]

The second factor is not met either. "In order to employ the discovery rule to delay accrual of a cause of action, a plaintiff must demonstrate that he or she conducted a reasonable investigation of all potential causes of his or her injury." (*Fox*, 35 Cal.4th at 809.)

> Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light. In order to adequately

---

[4] Plaintiffs explained at the hearing that the reference to "the litigation" signified the nationwide NEC litigation generally, not necessarily the individual complaints included in this coordinated proceeding, and that Plaintiffs discovered the cause of their injuries as a result of communications with Plaintiffs' counsel regarding such litigation. (See also Opposition, 6 [asserting that Plaintiffs "did not discover the cause of injury . . . until they became aware of others' lawsuits"].) That general explanation is insufficient; each Plaintiff must allege specific facts regarding the timing and manner of discovery.

Case ID: 220302686
Control No.: 23096709

allege facts supporting a theory of delayed discovery, the plaintiff must plead that, despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period.

(*Id.*; see *id.* at 811 [finding the plaintiff's first amended complaint was "insufficient to withstand demurrer because it failed to allege specific facts that" the plaintiff "did not discover, nor suspect, nor was there any means through which her reasonable diligence would have revealed, or through which she would have suspected the [allegedly defective product] as a cause of her injury until the deposition of" her doctor was taken.].) Even if Defendant Manufacturers allegedly failed to disclose the true facts, Plaintiffs must allege that they acted with reasonable diligence to determine the cause of their injuries and were unable to have made earlier discovery despite such diligence. (See *Eidson v. Medtronic, Inc.* (N.D. Cal. 2013) 981 F.Supp.2d 868, 893-894 [complaint filed more than six years after injury occurred failed to allege facts "establishing what steps [plaintiffs] actually took to investigate after they discovered" the injury or "demonstrating why despite their alleged 'diligence,' they were unable to discover the connection 'until a date within the applicable statute of limitations,' other than to blame Defendants for making misrepresentations and omissions. They do not explain how Defendants' alleged actions delayed their discovery."].) Accordingly, Abbott's demurrer is sustained with leave to amend on this ground.

## II. Plaintiffs Do Not Plead Misrepresentation Claims With Particularity.

Abbott argues Plaintiffs' allegations as to intentional and negligent misrepresentation lack specificity because Plaintiffs "fail to identify any specific false statements, and they fail to allege that any of the plaintiffs ever saw, heard of, or otherwise relied upon any of those allegedly false statements." (Opening Brief, 10; see *id.* at 11-14; Joinder, 6-7; Reply, 12-13; Mead Reply, 3-8.) The Court agrees.

"The essential elements of . . . intentional misrepresentation are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) actual and justifiable reliance; and (e) resulting damage." (*Berry v. Frazier* (2023) 90 Cal.App.5th 1258, 1268.) The elements of negligent misrepresentation are the same, except no scienter or intent to defraud is required. (*Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 823.) Fraud must be pled with particularity, which "necessitates pleading *facts* which show how, when, where, to whom, and by what means the false representations were made." (*State ex*

*rel. Edelweiss Fund, LLC v. JPMorgan Chase & Company* (2023) 90 Cal.App.5th 1119, 1136-1137,

quoting *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 (internal quotations omitted).) General and

conclusory allegations are insufficient. (*Amiodarone Cases* (2022) 84 Cal.App.5th 1091, 1109.)

   As to misrepresentations, Plaintiffs allege Defendant Manufacturers "aggressively marketed []

cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk."

(*Cribb* SAC ¶ 37; *Harrell* SAC ¶ 42; *Hartwick* FAC ¶ 44; *Thomas* FAC ¶ 72; *Tracy* FAC ¶ 64; *Woods*

FAC ¶ 37.) Plaintiffs allege this aggressive "marketing approach includes targeting the parents of preterm

infants before they deliver and while they are still in the hospital with messages that the Defendant

Manufacturers' [products] are safe and necessary for the growth and development of their vulnerable

children." (*Cribb* SAC ¶ 38; *Harrell* SAC ¶ 43; *Hartwick* FAC ¶ 45; *Thomas* FAC ¶ 72; *Tracy* FAC ¶ 65;

*Woods* FAC ¶ 38.) Plaintiffs allege Defendant Manufacturers made statements on their respective

websites implying their products are safe while failing to warn of the risk of NEC, ignoring the existence

of donor milk or human milk-based formula, representing their products support infant development, and

representing their products are a substitute for human breast milk. (*Cribb* SAC ¶¶ 43-46, 50; *Harrell*

SAC ¶¶ 50-51, 55; *Hartwick* FAC ¶¶ 50-53, 57; *Thomas* FAC ¶¶ 53-54, 78-81, 85; *Tracy* FAC ¶¶ 45-46,

69-73, 77; *Woods* FAC ¶¶ 44-46, 50.) Plaintiffs also allege, on information and belief, that Defendant

Manufacturers made nine false statements of material fact. (*Cribb* SAC ¶¶ 111, 121; *Harrell* SAC ¶¶ 112,

122; *Hartwick* FAC ¶¶ 120, 130; *Thomas* FAC ¶¶ 149, 159; *Tracy* FAC ¶¶ 144, 154; *Woods* FAC ¶¶ 110,

120.)[5]

   These allegations of misrepresentation are insufficient. To allege misrepresentation against a

corporation, "the plaintiff must 'allege the names of the persons who made the allegedly fraudulent

representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was

said or written.'" (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469, quoting *Tarmann v.*

*State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 157.) No specific allegations are pled in the

Complaints. Plaintiffs must plead with particularity, as required, to place Defendants on notice of "certain

---

[5] "[A] pleading made on information and belief is insufficient if it merely asserts the facts so alleged
without alleging such information that leads the plaintiff to believe that the allegations are true." (*Gomes*
*v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1158-1159 (cleaned up).) Plaintiffs'
allegations on information and belief fail to comply with this standard.

Case ID: 220302686
Control No.: 23096709

definite charges which can be intelligently met" and "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud." (*Tenet Healthsystem Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 838, quoting *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 216-217 (internal quotations omitted).)[6]

As to reliance, Plaintiffs allege they were "not aware that [Defendant Manufacturers'] misrepresentations were false and justifiably relied on them." (*Cribb* SAC ¶ 114; *Harrell* SAC ¶ 115; *Hartwick* SAC ¶ 123; *Thomas* FAC ¶ 152; *Tracy* FAC ¶ 147; *Woods* FAC ¶113.) Plaintiffs allege the "misrepresentations induced the Plaintiff Parents to allow their children to be fed [Defendant Manufacturers'] infant products, in reliance on all the messaging they received about formula feeding, including directly or indirectly, the Defendant Manufacturers' messaging." (*Cribb* SAC ¶ 114; *Harrell* SAC ¶ 115; *Hartwick* FAC ¶ 123; *Thomas* FAC ¶ 152; *Tracy* FAC ¶ 147; *Woods* FAC ¶ 113; see *Cribb* SAC ¶ 124; *Harrell* SAC ¶ 125; *Hartwick* FAC ¶ 133; *Thomas* FAC ¶ 162; *Tracy* FAC ¶ 157; *Woods* FAC ¶ 123.)

"To allege actual reliance on misrepresentations with the required specificity for a fraud count, the plaintiff must plead that he believed the representations to be true … and that in reliance thereon (or induced thereby) he entered into a transaction." (*Chapman v. Skype, Inc.* (2013) 220 Cal.App.4th 217, 231-232, quoting *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1063 (cleaned up); see *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 184 [negligent misrepresentation must also be pled with specificity].) The plaintiff must show that the reliance was reasonable by showing that (1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act and (2) it was reasonable for the plaintiff to have relied on the misrepresentation." (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1194.)

Here, Plaintiffs' general allegations are insufficient to plead reliance. None of the Plaintiffs allege they actually saw and relied on any misrepresentations. Plaintiffs do not identify the specific representations each Plaintiff relied upon and when those representations were made. In addition,

---

[6] Plaintiffs' reliance on *Morgan v. AT&T Wireless Services, Inc.* (2009) 177 Cal.App.4th 1235 (Opposition, 8-9), a class action, is misplaced.

Plaintiffs' allegations raise a fundamental issue with reliance. Specifically, Plaintiffs allege "Hospital Defendants' staff provided the Defendant Manufacturers' products to the Injured Infants directly, and concealed from the Plaintiff Parents relevant information about those feedings, including that they had the ability to request for their children other, non-cow's milk-based options." (*Cribb* SAC ¶ 74; *Harrell* SAC ¶ 76; *Hartwick* FAC ¶ 83; *Thomas* FAC ¶ 112; *Tracy* FAC ¶ 107; *Woods* FAC ¶ 73.) "A plaintiff establishes [actual] reliance when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." (*Hoffman*, 228 Cal.App.4th at 1193 (cleaned up).) Therefore, if "relevant information about [] feedings" was concealed from Plaintiff Parents, then it raises the issue of whether Plaintiffs could even have relied on any purported representations. (See also *Davis v. Abbott Labs* (C.D. Cal. 2021) 562 F.Supp.3d 585, 588 [granting motion to dismiss negligent misrepresentation claim where there were "no allegations in the FAC that indicate Plaintiff relied on any of Defendant's alleged misrepresentations. HMF [Similac Human Milk Fortifier] would have been administered by Baby Anderson's physician in the NICU, and no allegations suggest that Plaintiff specifically chose HMF to be administered to her son after relying on Defendant's representation that HMF was safe. The factual allegations do not plausibly suggest that Plaintiff relied on anything other than the doctor's judgment and assessment that HMF was a proper supplement for Baby Anderson at the time he was admitted to the NICU. If Plaintiff relied on the NICU physician to administer the HMF while Baby Anderson was in the hospital, it is unclear how Plaintiff could rely on any representations made by Defendant."]; *Ferry v. Mead Johnson & Co., LLC* (D. Conn. 2021) 514 F.Supp.3d 418, 450-451 [dismissing claims for intentional and negligent misrepresentation where, among other things, plaintiff did not allege that infant's parents or doctors ever looked at Mead Johnson's website, did not allege that parents or doctors relied on any of the defendants' representations, and did not allege facts giving rise to a strong inference of scienter]; *Hunte v. Abbott Laboratories, Inc.* (D. Conn. 2021) 556 F.Supp.3d 70, 87-88, 90-93 [same].)

Accordingly, Abbott's demurrer is sustained with leave to amend on this ground.

Case ID: 220302606
Control No.: 24096109

## CONCLUSION AND ORDER

For the foregoing reasons, Abbott Laboratories' demurrer to the amended complaints is sustained with leave to amend. Plaintiffs shall file individual amended complaints by July 31, 2023. Defendants shall have thirty days to respond to the individual complaints.

IT IS SO ORDERED.

Dated: July 12, 2023

Ethan P. Schulman
Judge of the Superior Court

*Mead Johnson Product Cases* JCCP 5257
Order on Defendant Abbott Laboratories' Demurrer to Amended Complaints

Case ID: 220302586
Control No.: 230961769

## CERTIFICATE OF ELECTRONIC SERVICE
(CCP 1010.6(6) & CRC 2.260(g))

I, Felicia Green, a Deputy Clerk of the Superior Court of the County of San Francisco, certify that I am not a party to the within action.

On July 12, 2023, I electronically served ORDER ON DEFENDANT ABBOTT LABORATORIES' DEMURRER TO AMENDED COMPLAINTS via File & ServeXpress on the recipients designated on the Transaction Receipt located on the File & ServeXpress website.

Dated: **JUL 12 2023**

Brandon E. Riley, Court Executive Officer

By: _____

Felicia Green, Deputy Clerk

# EXHIBIT A-59

FILED
03 JUN 2024 02:00 pm
Civil Administration
J. BOYD

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

TERRAINE ABDULLAH, on her behalf and
as Parent and Natural Guardian of H.S., a
minor,

         Plaintiff,

    v.

MEAD JOHNSON & COMPANY, LLC,
et al.

         Defendants.

September Term, 2022

No. 02583

JURY TRIAL DEMANDED

## ORDER

AND NOW this the _____ day of _____, 2024, upon consideration of Defendant Abbott Laboratories' Preliminary Objections to the Plaintiffs' Amended Complaint, Plaintiffs' Answer thereto, and all other appropriate considerations, it is hereby ORDERED, ADJUDGED and DECREED that Defendants' Preliminary Objections are OVERRULED.

BY THE COURT

_____
J.

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, on her behalf and as Parent and Natural Guardian of H.S., a minor, | September Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | |
| MEAD JOHNSON & COMPANY, LLC, et al. | JURY TRIAL DEMANDED |
| Defendants. | |

### PLAINTIFFS' REPSONSE TO ABBOTT LABORATORIES' PRELMINIARY OBJECTIONS TO PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendant Abbott Laboratories' Preliminary Objections and responds to Defendant's Preliminary Objections and Evidentiary Exhibits as follows:

1.       Denied as a conclusion of law to which no response is required.

1

Case ID: 220302583
Control No.: 24052816

2.      Admitted.

3.      Denied as a conclusion of law to which no response is required.

4.      This is an incorporation paragraph to which no response is required.

5.      Denied as a conclusion of law to which no response is required.

6.      Denied as a conclusion of law to which no response is required.

7.      Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

8.      Denied as a conclusion of law to which no response is required.

9.      This is an incorporation paragraph to which no response is required.

10.     Denied as a conclusion of law to which no response is required.  To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995).  By way of further response, Plaintiff has adequately pled that the product at issue is unreasonably dangerous.  Defendant's Preliminary Objections should be overruled.

11.     Denied as a conclusion of law to which no response is required.  To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995).  By way of further response, Plaintiff has adequately pled that the product at issue is unreasonably dangerous.  Defendant's Preliminary Objections should be overruled.

Case ID: 220302583
Control No.: 24052816

12.     Denied.   By way of further response, Defendant's assertion that Plaintiff's Amended Complaint is "devoid of any facts showing" Defendant's products are "unreasonably dangerous" is patently incorrect.  Plaintiff's Amended Complaint includes dozens of paragraphs explaining the dangers of Defendant's product, including an entire section of the Complaint titled "*Cow's Milk-Based Feeding Products Are Known to Cause NEC.*"  For example, Plaintiff pleads that there is an "elevated risk of NEC associated with cow's milk-based products" and that "the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death."  See Plaintiff's Amended Complaint at ¶¶ 17, 20.  Further, as relates the user's awareness of the danger, Plaintiff's Complaint details how Defendant's product labels failed to warn doctor and parents of the increased risk of NEC.  Finally, Plaintiff's Complaint details several safer alternative designs that also speak to the manufacturer's ability to eliminate the danger, including donor breast milk, pasteurized breast milk, breast milk fortifiers, and breast milk-based products designed for pre-term infants.  Id. at ¶¶ 16-20, 86-88. Accordingly, Defendant's Preliminary Objections should be denied.

13.     Denied as a conclusion of law to which no response is required.  To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995).  By way of further response, Plaintiff has adequately pled that the product at issue is unreasonably dangerous.  Defendant's Preliminary Objections should be overruled.

14.     This is an incorporation paragraph to which no response is required.

Case ID: 220302583
Control No.: 24052816

15. Denied as a conclusion of law to which no response is required. To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995). By way of further response, Plaintiff has adequately identified the product that caused the injury at issue. Defendant's Preliminary Objections should be overruled.

16. Denied as a conclusion of law to which no response is required. To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995). By way of further response, Plaintiff has adequately identified the product that caused the injury at issue. Specifically, Plaintiff has pled that the infant was fed the Defendant's products "Similac and/or Enfamil cow's milk-based products." See Plaintiff's Amended Complaint at ¶¶ 11. Absent discovery, Plaintiff is limited to the detail provided in the medical records, all of which are included in Plaintiff's Complaint. Defendant cites Cummins v. Firestone Tire & Rubber Co. in support of their position. 495 A.2d 963 (Pa. Super. Ct. 1985). In Cummins, preliminary objections were sustained because the "manufacturer or seller" could not be determined, even if the plaintiff were afforded discovery. Id. at 968. Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products. As such, Defendant's Preliminary Objections should be overruled. This is an incorporation paragraph to which no response is required.

4

Case ID: 220302583
Control No.: 24052816

17.    Denied as a conclusion of law to which no response is required.  To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995).  By way of further response, Plaintiff has adequately identified the product that caused the injury at issue.  Specifically, Plaintiff has pled that the infant was fed the Defendant's products "Similac and/or Enfamil cow's milk-based products."  See Plaintiff's Amended Complaint at ¶¶ 11.  Absent discovery, Plaintiff is limited to the detail provided in the medical records, all of which are included in Plaintiff's Complaint.  Defendant cites Cummins v. Firestone Tire & Rubber Co. in support of their position. 495 A.2d 963 (Pa. Super. Ct. 1985).  In Cummins, preliminary objections were sustained because the "manufacturer or seller" could not be determined, even if the plaintiff were afforded discovery. Id. at 968.  Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products.  As such, Defendant's Preliminary Objections should be overruled.

18.    123

19.    This is an incorporation paragraph to which no response is required.

20.    Denied as a conclusion of law to which no response is required.  To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995).  By way of further response, Plaintiff has adequately

5

Case ID: 220302583
Control No.: 24052816

identified the product that caused the injury at issue. Defendant's Preliminary Objections should be overruled.

21.     Denied as a conclusion of law to which no response is required. To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995). By way of further response, Plaintiff has adequately identified the product that caused the injury at issue. Absent discovery, Plaintiff is limited to the detail provided in the medical records, all of which are included in Plaintiff's Complaint. Defendant cites Cummins v. Firestone Tire & Rubber Co. in support of their position. 495 A.2d 963 (Pa. Super. Ct. 1985). In Cummins, preliminary objections were sustained because the "manufacturer or seller" could not be determined, even if the plaintiff were afforded discovery. Id. at 968. Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products. As such, Defendant's Preliminary Objections should be overruled.

22.     This is an incorporation paragraph to which no response is required.

23.     Denied as a conclusion of law to which no response is required. To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995). By way of further response, Plaintiff has adequately pled all required facts regarding liability and injuries claimed. Defendant's Preliminary Objections should be overruled.

Case ID: 220302583
Control No.: 24052816

24.     Denied as a conclusion of law to which no response is required.  To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995).  By way of further response, Plaintiff has adequately identified the product that caused the injury at issue. Absent discovery, Plaintiff is limited to the detail provided in the medical records, all of which are included in Plaintiff's Complaint. Defendant cites Cummins v. Firestone Tire & Rubber Co. in support of their position. 495 A.2d 963 (Pa. Super. Ct. 1985).  In Cummins, preliminary objections were sustained because the "manufacturer or seller" could not be determined, even if the plaintiff were afforded discovery. Id. at 968.  Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products. As such, Defendant's Preliminary Objections should be overruled.

25.     Denied as a conclusion of law to which no response is required.  To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995).  By way of further response, Plaintiff has adequately identified the product that caused the injury at issue. Absent discovery, Plaintiff is limited to the detail provided in the medical records, all of which are included in Plaintiff's Complaint. Defendant cites Cummins v. Firestone Tire & Rubber Co. in support of their position. 495 A.2d 963 (Pa. Super. Ct. 1985).  In Cummins, preliminary objections were sustained because the "manufacturer or seller" could not be determined, even if the plaintiff were afforded discovery.

Case ID: 220302583
Control No.: 24052816

Id. at 968. Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products. As such, Defendant's Preliminary Objections should be overruled.

26. Denied as a conclusion of law to which no response is required. To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995). By way of further response, Plaintiff has adequately identified the product that caused the injury at issue. Absent discovery, Plaintiff is limited to the detail provided in the medical records, all of which are included in Plaintiff's Complaint. Defendant cites Cummins v. Firestone Tire & Rubber Co. in support of their position. 495 A.2d 963 (Pa. Super. Ct. 1985). In Cummins, preliminary objections were sustained because the "manufacturer or seller" could not be determined, even if the plaintiff were afforded discovery. Id. at 968. Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products. As such, Defendant's Preliminary Objections should be overruled.

27. Denied as a conclusion of law to which no response is required. To the extent a response is required, Preliminary Objections may be sustained only when it appears with certainty that the law permits no recovery according to the facts averred, and any doubts in that determination must be resolved in favor of overruling the objections. Powell v. Drumheller, 539 Pa. 484, 489, 653 A.2d 619, 621 (1995). By way of further response, Plaintiff has adequately identified the product that caused the injury at issue. Absent discovery, Plaintiff is limited to the detail provided in the medical records, all of which are included in Plaintiff's Complaint.

Case ID: 220302583
Control No.: 24052816

Defendant cites <u>Cummins v. Firestone Tire & Rubber Co.</u> in support of their position. 495 A.2d 963 (Pa. Super. Ct. 1985). In <u>Cummins</u>, preliminary objections were sustained because the "manufacturer or seller" could not be determined, even if the plaintiff were afforded discovery. <u>Id.</u> at 968. Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products. As such, Defendant's Preliminary Objections should be overruled.

28.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

29.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

30.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

31.     This is an incorporation paragraph to which no response is required.

32.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

33.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

34.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

35.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

36.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiff's attached memorandum of law.

Case ID: 220302583
Control No.: 24052816

37.     Denied as a conclusion of law to which no response is required.  By way of further response, see Plaintiff's attached memorandum of law.

38.     Denied as a conclusion of law to which no response is required.  By way of further response, see Plaintiff's attached memorandum of law.

39.     Denied as a conclusion of law to which no response is required.  By way of further response, see Plaintiff's attached memorandum of law.

40.     Denied as a conclusion of law to which no response is required.  By way of further response, see Plaintiff's attached memorandum of law.

41.     Denied as a conclusion of law to which no response is required.  By way of further response, see Plaintiff's attached memorandum of law.

42.     Denied as a conclusion of law to which no response is required.  By way of further response, see Plaintiff's attached memorandum of law.

43.     Denied as a conclusion of law to which no response is required.  By way of further response, see Plaintiff's attached memorandum of law.

WHEREFORE, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendant's Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: June 3, 2024          By:     _/s/Timothy A. Burke, Esquire_

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
_Attorneys for Plaintiffs_

Case ID: 220302583
Control No.: 24052816

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (*Pro Hac Vice*)
*Attorneys for Plaintiffs*

Case ID: 220302583
Control No.: 24052816

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, on her behalf and as Parent and Natural Guardian of H.S., a minor, | September Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | JURY TRIAL DEMANDED |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR REPSONSE TO PRELMINIARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNVIERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

I.    **Matter Before the Court**

Although the instant Preliminary Objections will likely be mooted by the forthcoming

Second Amended Complaint, as ordered by the Court at the most recent Status Conference,

1

Case ID: 220302583
Control No.: 24052816

Plaintiff responds to the instant Preliminary Objections out of an abundance of caution and so as to not waive any issues raised herein. Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendant's Preliminary Objections and respond to the Defendants' Preliminary Objections and Evidentiary Exhibits as follows:

## II. <u>Counter Statement of Questions Involved</u>

1. Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' Counts I-V where Plaintiffs have adequately plead and alleged that bovine-based formula is unreasonably dangerous and substantially increases the risk for the development of NEC in preterm infants, and where Plaintiffs are not required under the pleading standard to cite to evidence (such as medical studies) in their Complaint in support of ultimate issues that will have to be proven at trial?

    *Suggested answer in the affirmative.*

2. Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' strict liability claims (Counts I and II) where Plaintiffs' claims are properly plead and legally sufficient?

    *Suggested answer in the affirmative.*

3. Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' negligence claim (Count III) where Plaintiffs' claim is properly plead and legally sufficient.

    *Suggested answer in the affirmative.*

4. Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' negligent misrepresentation claims (Counts IV and V) where Plaintiffs' claim is properly plead and legally sufficient?

Case ID: 220302583
Control No.: 24052816

*Suggested answer in the affirmative.*

5. Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' Complaint wherein Plaintiff does not need to differentiate between the Defendants when the tortious conduct alleged to have been perpetrated by the two manufacturing Defendants is identical in nature and actions?

*Suggested answer in the affirmative.*

6. Whether this Honorable Court should deny Defendants Preliminary Objections as to Plaintiffs' Punitive Damages claims in Counts I through V of the Complaint where Plaintiffs have adequately plead conduct which is sufficiently plead and adequate for a subsequent finding by a jury for Punitive Damages?

*Suggested answer in the affirmative.*

## III. <u>Plaintiff has Adequately Plead That Defendant's Products Are Unreasonably Dangerous</u>

Defendant asserts that Plaintiff's Complaint fails to plead that Defendant's products are "unreasonably dangerous." Defendant is incorrect in this assertion, and their Preliminary Objections should be overruled.

Defendant's Preliminary Objections on this argument seem to rely heavily on their distrust of the science cited by Plaintiff regarding the dangers of their products. This argument is inappropriate at the Preliminary Objections stage. Rather, a complaint must only give a defendant only fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). In arguing that Plaintiffs' studies cited in their complaint are somehow inadequate to show the product is unreasonably dangers, Defendants fail to realize that Pennsylvania law does require Plaintiffs to support any pleadings with evidence to pass preliminary objection. Indeed, the Superior Court has previously held that **"[e]vidence from which**

3

such facts [alleged in a complaint] may be inferred <u>not only need not but should not be alleged</u>. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense." *Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, in assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates*, P.C., 805 A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc.*, 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.*, 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co.*, 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and 3 completeness of the specific basis on which recovery is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Defendant's assertion that Plaintiffs' Complaint is "devoid of any facts showing" Defendant's products are "unreasonably dangerous" is patently incorrect. Plaintiffs' Complaint includes dozens of paragraphs explaining the dangers of Defendant's product.

In determining whether a product is "unreasonably dangerous," the Court must consider seven factors:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

4

Case ID: 220302583
Control No.: 24052816

> (2) The safety aspects of a product—the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
> (7) The feasibility on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

*Riley v. Warren Mfg., Inc.,* 688 A.2d 221, 225 (1997). The Court need not make a finding on all seven factors to determine that a product is unreasonably dangerous. *Id.*

Here, Plaintiff's Complaint has adequately pled that the products at issue are unreasonably dangerous. For example, Plaintiff's Complaint includes an entire section titled "***Cow's Milk-Based Feeding Products Are Known to Cause NEC.***" Further, Plaintiff pleads that there is an "elevated risk of NEC associated with cow's milk-based products" and that "the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death." *See* Plaintiffs' Complaint at ¶¶ 17, 20. Further, as relates the user's awareness of the danger, Plaintiff's Complaint details how Defendant, including through their product labels, failed to warn doctor and parents of the increased risk of NEC. Finally, Plaintiff's Complaint details several safer alternative designs that also speak to the manufacturer's ability to eliminate the danger, including donor breast milk, pasteurized breast milk, breast milk fortifiers, and breast milk-based products designed for pre-term infants. *Id.* at ¶¶ 16-20, 86-88.

Case ID: 220302583
Control No.: 24052816

Defendant cites *Orange Stones Co. v. City of Reading*, a case involving violation of an ordinance by a business in support of its contentions that Plaintiffs have not adequately plead that their products are unreasonably dangerous. There, the party filing preliminary objections claimed that plaintiff's complaint was deficient because it provided no facts to support its contention that the defendant acted "maliciously," "without probable cause," and "with the specific intent. *Orange Stones Co. v. City of Reading,* 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014). The trial court sustained the preliminary objections, agreeing that the plaintiff had pled <u>no facts</u> to support this contention. *Id*. at 10126. Thus, the Court reasoned, these contentions were "bald assertions." *Id.*

Here, the instant Plaintiffs' allegations are not merely bald assertions. As discussed above, Plaintiffs have pled dozens of paragraphs to support their contention that the products at issue are "unreasonably dangerous" and specifically plead that medical studies show that feeding preterm infants cow's milk-based formula, as opposed to human breast milk (donor or otherwise), substantially increases the risk of them developing NEC and possibly dying or being otherwise seriously injured. Accordingly, because Plaintiffs' Complaint adequately pleads that Defendant's products are unreasonably dangerous, Defendant's Preliminary Objections should be denied.

**IV.** **<u>Plaintiffs' Complaint Has Adequately Identified The Products At Issue For Both Their Product Liability and Negligence Claims</u>**

Defendant asserts that Plaintiffs' Complaint fails to identify the product at issue. Defendant is wrong and their Preliminary Objections should be overruled.

A complaint must give a defendant only fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). In assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates, P.C.,* 805

Case ID: 220302583
Control No.: 24052816

A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc.,* 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.,* 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co*., 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and completeness of the specific basis on which recovery is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Plaintiff has clearly and adequately identified the product that caused the injury at issue to the best of their ability at this time. Specifically, Plaintiff pled that the infant was fed the Defendants' specific "Similac and/or Enfamil cow's milk-based products." *See* Plaintiffs' Complaint at ¶ 11. Absent discovery on the supply of each particular brand to each particular hospital, Plaintiff is limited to the detail provided in the medical records and the Plaintiff parents recollection, all of which are included in Plaintiff's Complaint. As advanced previously at oral argument, Plaintiffs must be allowed to conduct full discovery to determine which of the two manufacturers' brand of cow's milk-based formula each Hospital system had a supply agreement with during certain periods of time, as that information, such as the formula brand, is not often elicited in the medical records. In fact, the hospital Defendants themselves are the ones with the best access to the information needed such as purchasing receipts and or purchasing agreements with either Abbott or Mead.

Defendant cites *Cummins v. Firestone Tire & Rubber Co.* in support of their position that Plaintiffs have not adequately identified the product at issue. 495 A.2d 963 (Pa. Super. Ct. 1985).

Case ID: 220302583
Control No.: 24052816

In *Cummins*, preliminary objections were sustained because the **"manufacturer or seller"** could not be determined, *even if the plaintiff were afforded discovery*. *Id.* at 968. Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products and which brand was fed to the Plaintiff during certain period of time, namely around the birth of each Plaintiff. As such, Defendant's Preliminary Objections should be overruled.

**V.**      <u>**Plaintiffs Have Plead Their Misrepresentation Claims With Adequate Specificity, They Therefore Should Not Be Dismissed**</u>

The requirements of Pennsylvania's rules as to the sufficiency of pleadings with relation to a misrepresentation claim are satisfied if a plaintiff pleads facts sufficient to permit defendants to prepare a defense. *Commonwealth v. National Apartment Leasing Company,* 108 Pa.Commonwealth Ct. 300, 529 A.2d 1157 (1987); *see also McGinn v. Valloti,* 363 Pa.Superior Ct. 88, 525 A.2d 732 (1987); *see also Foster v. Peat Marwick Main & Co.*, 138 Pa. Cmwlth. 147, 156, 587 A.2d 382, 387 (1991), *aff'd sub nom. Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 544 Pa. 387, 676 A.2d 652 (1996). Here, when the complaint is examined in its entirety, it clearly describes a course of conduct alleged to be fraudulent or misrepresentative sufficient to notify Abbott for purposes of defending the claim. *National Apartment Leasing.* In fact, Plaintiffs devotes several pages of their Complaint to facts describing the misrepresentation conduct of Defendant Abbott wherein they allege, inter alia, that:

> Prior to [Plaintiff's] birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. ***This information indicated that Abbott's products were safe*** to give to preterm infants like [Plaintiffs]. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. ***These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants***…

8

Case ID: 220302583
Control No.: 24052816

> Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like [Plaintiff]… ***Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC*** (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

*See* Plaintiffs' Complaint, at ¶¶ 60-62, 72 (emphasis added).

Clearly, Plaintiffs have articulated their misrepresentation claims with sufficient particularity to allow for Defendant Abbott to have adequate notice of their claim and know the material facts such that they can formulate a defense. As seen above, Plaintiffs' Complaint states 1) the misrepresentations of safety that were relayed by Abbott, 2) that those misrepresentations were made by Abbott to the Plaintiffs' healthcare providers, and thereafter to the Plaintiff Parents, 3) who then relied upon the misrepresentation of safety to decide what formula to feed their children, and finally 4) that Abbott was aware of the potential for their formula to case NEC prior to the misrepresentations being made. Defendants' arguments that Plaintiffs have failed to articulate what misrepresentations were made such that they can adequately form a defense are spurious, and their preliminary objections should be summarily denied.

### VI.    Plaintiffs Have Adequately Pleaded Facts Against Both Mead and Abbott For Conduct Which Is Sufficiently Similar Between The Two Manufacturing Defendants Such That They Are On Notice Of Plaintiffs' Claims Against Them

Defendant argues in its Preliminary Objections that Plaintiffs' Complaint fails to plead with particularity facts that differentiate between the two manufacturing Defendants, Abbott and Mead. In support of this contention, Defendant cites to *Coyne v. Holy Fam. Apartments*. *See Coyne v. Holy Fam. Apartments*, No. CV 19-4583, 2020 WL 2063475, at *4 (E.D. Pa. Apr. 29, 2020). However, when one references the case cited by Defendant, and examines the *entire* quote from

Case ID: 220302583
Control No.: 24052816

the Court, which is notably absent from Defendant's brief, one sees that the *Coyne* Court held that, "even under the most liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants[,] ***[and] [a]n allegation against multiple defendants that is bereft of specific wrongdoing by those proposed defendants is insufficient to state a claim***." *Id.*, at 4.

Here, although Plaintiffs' Complaints do often refer to both Abbott and Mead throughout their complaint in tandem, this is because Plaintiffs allege that ***both*** Abbott and Mead engaged in nearly identical conduct of concealing and misrepresenting the harmfulness of their bovine-based infant formula, and instead marketed those products to hospitals and parents as a safe formula to be fed to premature infants, despite knowing its propensity to increase the risk of development of NEC in preterm infants. *See* Plaintiffs' Complaint, generally. In a situation such as this, where both Defendants engaged in the same tortious activity, there is no pleading requirement that Plaintiff plead the conduct of each Defendant separately by "differentiating" their claims between each Defendant as Abbott suggests. Indeed, as the Court in *Coyne* noted, where a Plaintiff has pleaded allegations against multiple defendants that include specific wrongdoing attributable to each of those proposed Defendants, the Plaintiff's claims should not be dismissed as Defendants are ***both*** adequately on notice of the Claims that they ***both*** must defend, respectively.

**VII. Plaintiffs' Complaint Sufficiently Alleges that Defendant Consciously Disregarded the Risks Posed by the Products that they Manufactured, Distributed, and Sold Absent Adequate Warnings, Supporting Punitive Damages**

Punitive damages may be awarded for "'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' " *Hutchison v. Luddy*, 582 Pa. 114, 121 (2005) (quoting *Feld v. Merriam*, 506 Pa. 383, 395 (1984)). Punitive damages must be based on conduct that is "wanton," "willful," or "reckless." 582 Pa. at 121. As such, in Pennsylvania, to survive preliminary objections, a plaintiff must allege that (1) a defendant had a

10

Case ID: 220302583
Control No.: 24052816

subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. *Id*. For instance, in *Engle v. BT* Indus. AB, 41 Pa. D. & C.4th 25, 26, 33-34 (Pa.C.P. 1999), plaintiffs brought a products liability suit based on the manufacturers' negligence, strict liability claims, and breach of warranty. The defendant's motion to strike the plaintiff's punitive damages claim was denied. In denying the defendant's motion, the Court stated that the "plaintiff has alleged that the defendants introduced a defective product into the stream of commerce with the knowledge of defects and the possible harm that they would cause. Such conduct, if proven, may well be interpreted as exhibiting the type of reckless indifference that may trigger punitive damages." *Id*. Hence, when a manufacturer has a subjective appreciation of the risk of harm posed by a product, and then introduces said product into the stream of commerce regardless, this conduct may rise to the level of conscious disregard required to warrant punitive damages. Further, to the extent that there is any doubt about whether the standard for punitive damages is met, that doubt must be resolved in the Plaintiff's favor at this stage. See *Theodore v. Del. Valley Sch. Dist*., 575 Pa. 321, 333 (2003).

Plaintiffs have alleged that Abbott and Mead knowingly distributed a product that they knew posed an extreme danger to infants for profit. Abbott and Mead knew that the bovine-based products they supplied posed an increased risk of NEC, an extremely serious disease which can cause death, to premature infants, as compared to other economically and technologically feasible alternatives, such as human nutrition-based alternatives. Instead, Abbott and Mead chose to continue to produce bovine-based products, marketing them specifically towards pre-term infants, and not formulate alternatives that they knew would reduce the risk of NEC to premature infants. Hence, Abbott and Mead knowingly produced products that they knew could cause harm to infants

Case ID: 220302583
Control No.: 24052816

and chose to place them into the stream of commerce, in some cases marketing those products for use with pre-term infants, in conscious disregard of the risk posed to infants.

Abbott and Mead also knew that the ordinary consumer would not expect these products to pose an increased risk of NEC and despite this, failed to warn consumers about the increased risk of NEC posed by their bovine-based products. Plaintiff alleges that Abbott and Mead failed to provide warnings to consumers that adequately and thoroughly described the increased risk of NEC posed by their products, as demonstrated by significant scientific evidence, in a way that was reasonably calculated to communicate these risks to parents of infants. Similarly, this failure to disclose substantial risks and communicate them in a way that would adequately inform parents was knowing and intentional conduct on the part of Abbott and Mead that evinces a conscious disregard of the risk posed by their products. Therefore, these allegations rise to the level of conscious disregard required to justify the issue of punitive damages proceeding at this stage.

**VIII.  Plaintiff Parent's Claims Are Not Time Barred**

Plaintiffs have clearly plead claims sounding in negligence on behalf of all plaintiffs, not just the injured minor plaintiff. Indeed, in the complaint, Plaintiff lists under Counts VI and VII, that "As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." See Plaintiffs' Amended Complaint at ¶144, 165. Therefore, Defendants no additional specificity needs to be plead as to which claims apply which Plaintiffs, and Plaintiffs' Amended Complaint complies with Pa.R.C.P. 1020, which does not require Plaintiff Parents and Plaintiffs Minors to plead separate claims for sperate Plaintiffs as Defendant suggests.

Case ID: 220302583
Control No.: 24052816

Further, Plaintiff-parents' claims are not barred by the discovery rule on two distinct grounds. The discovery rule is an exception [to the statute of limitations] that tolls the statute of limitations when an injury or its cause is not reasonably knowable." *In re Risperdal Litig.*, 656 Pa. 649, 661 (2019). "Under the "discovery rule," the statute of limitations begins to run when a plaintiff knows, or reasonably should have known, that: (1) an injury has been sustained; and (2) the injury has been caused by another party's conduct." *Ward v. Rice*, 828 A.2d 1118, 1121 (Pa. Super. 2003) (citing *Citsay v. Reich*, 380 Pa. Super. 366, 369 (1988)). For the discovery rule to apply, the plaintiff must have exercised the due diligence that would be expected of a reasonable person in the plaintiff's position. 828 A.2d at 1121. A plaintiff must begin exercising reasonable diligence once they know the "the salient facts concerning the occurrence of his injury and *who or what caused it*." *Romah v. Hygienic Sanitation Co.*, 705 A.2d 841, 857 (Pa. Super. 1997) (emphasis added). While reasonable diligence is an objective standard, "it is also flexible […] to take into account differences between persons, their capacity to meet certain situations and circumstances confronting them at the time in question. In short, the standard of conduct required is a uniform one which takes "into account the fallibility of human beings."" 828 A.2d at 1121-22 (quoting RST 2d § 283 cmt's b-c). Whether someone has exercised reasonable diligence "may be best determined by the collective judgment, wisdom, and experience of jurors who have been selected at random from the community whose standard is to be applied." *Petri v. Smith*, 307 Pa. Super. 261, 271-72 (1982).

Under the discovery rule, if a plaintiff's delay is because the assurances of their physicians lull the patient into a false sense of security, this may toll the statute of limitations. *See Acker v. Palena*, 260 Pa. Super. 214, 222 (1978); *Barshady v. Schlosser*, 226 Pa. Super. 260, 263-64 (1973). The Pennsylvania Supreme Court has "expressly declined to hold, as a matter of law, that a

Case ID: 220302583
Control No.: 24052816

layperson may be charged with knowledge greater than that which was communicated to her by the medical professionals who provided treatment and diagnosis." *In re Risperdal Litig.*, 656 Pa. at 662 (citing *Wilson v. El-Daief*, 600 Pa. 161, 179-180 (2009)). If a plaintiff alleges that their delay was due to their reasonably relying upon the reassurances of their physicians, then, while construing the pleadings in the light most favorable to the moving party, a plaintiff's claims will not be time-barred. *Acker v. Palena*, 260 Pa. Super. 214, 223-24 (1978).

Likewise, the under the similar but distinct doctrine of fraudulent concealment, a form of equitable estoppel, the statute of limitations will be tolled if a plaintiff's delay is induced by reliance on the fraudulent concealment of the defendant. *Nesbitt v. Erie Coach Co.*, 416 Pa. 89, 95-96 (1964). If, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Romah*, 705 A.2d at 857 (internal quotations omitted). A defendant does not need to intentionally deceive a plaintiff for the doctrine of fraudulent concealment to apply; instead, fraudulent concealment encompasses "fraud in the broadest sense which includes an unintentional deception." 416 Pa. at 96 (citation omitted). It is for the factfinder to determine whether a defendant made representations that could have induced this reliance on the part of the plaintiff. *Id.* For example, in *Romah*, the Superior Court held that the issue of whether the plaintiff's claims for gross negligence and punitive damages were tolled because the defendant concealed studies and other information from the EPA and the public that showed that the defendant's product caused increased risk of blood cell depression in men was a factual issue for the jury. 705 A.2d at 861.

Plaintiffs have alleged that all of the medical providers that Plaintiff-parents interacted with at the Hospital failed to provide them with any information regarding the increased risk of NEC to

Case ID: 220302583
Control No.: 24052816

premature infants posed by the bovine-based formula that the practitioners provided. Likewise, plaintiffs have alleged that the parents were not presented with the comparative risk of NEC of these products as compared to any other alternatives. Plaintiff-parents relied upon the representations, or lack thereof, provided by the medical professionals who were treating their infant. Further, Plaintiff alleged that Plaintiff-parents had no medical background or training and therefore could not be expected to have greater medical knowledge than these providers. Plaintiff-parents thereby reasonably relied upon, and were lulled into a false sense of security by, the assurances of the physicians treating their children. Moreover, Plaintiff has alleged that Defendants made false representations, in line with their financially advantageous relationship that they possessed with codefendant manufacturers Abbott and Mead, about the relative risks of bovine-based formula, in order to induce reliance on the part of Plaintiff-parents and thereby conceal the true source and cause of their infant's injury. Defendant hospitals facilitated interactions between medical providers and codefendant manufacturers' sales personnel, who Defendant hospital knew would mislead medical providers about the risk of NEC posed by its products. Thus, under both the discovery rule and doctrine of fraudulent concealment, Plaintiff-parents' claims are not time-barred.

## IX. <u>Request In The Alternative To Amend The Complaint</u>

Although these preliminary objections will likely be mooted by a forthcoming Second Amended Complaint, as ordered by the Court at the most recent status conference, Plaintiff strenuously maintains the sufficiency of all of the Counts contained within the Complaint, and should this Court be inclined to grant any of Defendants' specific Preliminary Objections in the instant pleadings, Plaintiff respectfully requests permission to amend the pleadings.

Case ID: 220302583
Control No.: 24052816

**WHEREFORE**, for the reasons more fully set forth in Plaintiff's Memorandum of Law,

Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections,

or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: June 3, 2024              By:    _/s/Timothy A. Burke, Esquire_

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
_Attorneys for Plaintiffs_

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (_Pro Hac Vice_)
_Attorneys for Plaintiffs_

16

Case ID: 220302583
Control No.: 24052816

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2024, I caused a true and correct copy of the foregoing document to be served by electronic filing to all counsel of record.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: June 3, 2024         By:    *<u>/s/Timothy A. Burke, Esquire</u>*

TIMOTHY A. BURKE, ESQUIRE

Case ID: 220302583
Control No.: 24052816

# EXHIBIT A-60

**FILED**
03 JUN 2024 02:02 pm
Civil Administration
J. BOYD

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

TERRAINE ABDULLAH, on her behalf and
as Parent and Natural Guardian of H.S., a
minor,

               Plaintiff,

       v.

MEAD JOHNSON & COMPANY, LLC,
et al.

               Defendants.

September Term, 2022

No. 02583

JURY TRIAL DEMANDED

## **ORDER**

AND NOW this the _____ day of _____, 2024, upon consideration of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System and the Trustees of the University of Pennsylvania's Preliminary Objections to the Plaintiffs' Amended Complaint, Plaintiffs' Answer thereto, and all other appropriate considerations, it is hereby ORDERED, ADJUDGED and DECREED that Defendants' Preliminary Objections are OVERRULED.

BY THE COURT

_____ J.

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. 320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.                    Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, on her behalf and as Parent and Natural Guardian of H.S., a minor, | September Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | |
| MEAD JOHNSON & COMPANY, LLC, et al. | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFFS' REPSONSE TO PRELMINIARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNVIERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendants'

Preliminary Objections and responds to Defendants' Preliminary Objections and Evidentiary

Exhibits as follows:

1

1.      Admitted.

2.      Denied. The instant Plaintiffs have only one pending lawsuit in this Commonwealth related to Minor H.S.'s development of NEC after ingesting co-Defendants Abbot and Mead's milk-based infant formula.

3.      Admitted. By way of further response, see Plaintiffs' attached memorandum of law.

4.      Admitted only that Plaintiffs filed an Amended Complaint, the remainder is denied as a conclusion of law to which no response is required. Further, Plaintiff will again be amending this complaint, in accordance with instruction of the Court at the most recent status conference. Therefore, although these preliminary objections will likely be mooted in the future, Plaintiff responds to the same out of an abundance of caution.

5.      Admitted only that Plaintiffs have asserted Product Liability claims against Manufacturing Defendants Mead and Abbott, and theories of Failure to Warn and Corporate Liability against the Moving Hospital Defendants. Plaintiffs deny Defendants' footnote regarding supposed conclusions of the FDA. By way of further response, see Plaintiffs' attached memorandum of law.

6.      Admitted. By way of further response, see Plaintiffs' attached memorandum of law.

7.      Admitted. By way of further response, see Plaintiffs' attached memorandum of law.

8.      Denied. Plaintiff's Complaint is a written document that speaks for itself. All characterizations thereof are denied.

9.      Admitted. By way of further response, see Plaintiffs' attached memorandum of law.

10.     Admitted. By way of further response, see Plaintiffs' attached memorandum of law.

11.     Admitted. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24052736

12.     Admitted only the Moving Defendants have filed the instant Preliminary Objections.  By way of further response, see Plaintiffs' attached memorandum of law.

13.     Denied. Plaintiff's Complaint is a written document that speaks for itself. All characterizations thereof are denied.

14.     Denied. Plaintiff's Complaint is a written document that speaks for itself. All characterizations thereof are denied.

15.     Denied. Plaintiff's Complaint is a written document that speaks for itself. All characterizations thereof are denied.

16.     Denied as a conclusion of law to which no response is required. By way of further response, Plaintiff's Complaint alleges that Defendant HUP failed to warn medical professionals and parents of infants of the increased risk of a serious and potentially fatal disease posed by the infant formula they supplied.

17.     Denied as a conclusion of law to which no response is required.

18.     Denied as a conclusion of law to which no response is required. By way of further response, a supplier of goods will be liable for their negligent failure to warn foreseeable users of a chattel under Section 388 of the Second Restatement of Torts, which has been incorporated into Pennsylvania law, if:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for the physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier:
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied; and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Case ID: 220302583
Control No.: 24052736

RST 2 § 388.

*See, e.g., Binder v. Jones & Laughlin Steel Corp.*, 360 Pa. Super. 390, 396 (1987) (applying RST 2 § 388 to a metal part supplier).

19.     Denied as a conclusion of law to which no response is required. By way of further response, the threshold inquiry is whether the product is unreasonably dangerous for the use for which it is supplied. RST 2 § 388; *Binder v. Jones & Laughlin Steel Corp.*, 360 Pa. Super. 390, 396 (1987). A supplier under this Section will be liable if they supply a chattel for use, which they know or should have known is dangerous, and they fail to warn the user of that danger and to advise proper precautions. *See Hopkins v. E.I. Du Pont De Nemours & Co.*, 199 F.2d 930, 932-33 (3d Cir. 1952) (applying Pennsylvania law) (citing *Maize*, 352 Pa. at 55). Under this Section, a supplier's disclosures will be insufficient if they fall below the standard of care that would be taken by a "reasonable man in a similar situation." *Binder*, 360 Pa. Super. at 398. The greater the potential danger of the instrumentality, the greater the duty to warn against foreseeable and known dangers. *See Thomas v. Arvon Prod's*, 424 Pa. 365, 369-70 (1967); 352 Pa. at 56. "[T]he care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are *reasonably* to be anticipated as a result of the conduct in question." 360 Pa. Super. at 398 (citations omitted) (emphasis in original). When another actor "acts as the nexus between the supplier and the actual user of the dangerous chattel," the supplier cannot "escape the duty to disclose by cavalierly relying on the [other actor] to somehow pass the information along to the actual user." *Id.*

20.     Denied as a conclusion of law to which no response is required.

21.     Denied as a conclusion of law to which no response is required.

22.     Denied as a conclusion of law to which no response is required. By way of further response, in reviewing whether to sustain preliminary objections in the nature of a demurrer, all

4

material facts properly pled in the complaint, as well as all inferences reasonably deducible therefrom, are to be deemed as admitted. *Kohler v. McCrory Stores*, 532 Pa. 130, 135 (1992). If a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling the demurrer. *Mahoney v. Furches*, 503 Pa. 60, 66 (1983) (citing *Birl v. Phila. Elec. Co.*, 402 Pa. 297, 302 (1960)). Plaintiff's Complaint contains properly pled material facts that numerous academic and scientific studies, which were known to Defendants, have established the link between bovine-based formula and increased risk of NEC in premature infants. These well-pled facts must be taken as true at this stage; thus, Defendant's demurrer should be denied.

23.     Denied as a conclusion of law to which no response is required. By way of further response, in reviewing whether to sustain preliminary objections in the nature of a demurrer, all material facts properly pled in the complaint, as well as all inferences reasonably deducible therefrom, are to be deemed as admitted. *Kohler v. McCrory Stores*, 532 Pa. 130, 135 (1992). If a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling the demurrer. *Mahoney v. Furches*, 503 Pa. 60, 66 (1983) (citing *Birl v. Phila. Elec. Co.*, 402 Pa. 297, 302 (1960)). Plaintiff's Complaint contains properly pled material facts that numerous academic and scientific studies, which were known to Defendants, have established the link between bovine-based formula and increased risk of NEC in premature infants. These well-pled facts must be taken as true at this stage; thus, Defendant's demurrer should be denied.

24.     Denied as a conclusion of law to which no response is required.

25.     Denied as a conclusion of law to which no response is required. By way of further response, Section 388 applies to any supplier of a chattel to another, as explained in Section 388's accompanying comment:

> c. Persons included as "suppliers." The rules stated in this Section and throughout this Topic apply to determine the liability of any person who for any purpose or in

5

any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used. These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person. They apply to all kinds of bailors, irrespective of whether the bailment is for a reward or gratuitous, and irrespective of whether the bailment is for use, transportation, safekeeping, or repair. They also apply to one who undertakes the repair of a chattel and who delivers it back with knowledge that it is defective because of the work which he is employed to do upon it. (See § 403.)

RST 2 § 388 cmt. c.

*See also Maize v. Atlantic Refin. Co.*, 352 Pa. 51, 56 (1945) ("This court has laid down the rule that any one who is responsible for the existence of any dangerous instrumentality or substance with which persons are likely to come in contact must 'impose a measure of control that is adequate to the protection of human beings' from it.").

26. Denied, Plaintiffs incorporate their response to the above paragraph.

27. Denied, Plaintiffs incorporate their response to ¶ 22.

28. Denied as a conclusion of law to which no response is required. In this case, Defendants failed to adequately communicate the facts, risks, benefits, and alternatives associated with the use of bovine-based formula to preterm infants' parents, so that could knowingly choose whether to consent on behalf of preterm infants. Defendants' duty to warn was even greater by virtue of the fact that parents could not be expected to know the risk of NEC associated with bovine-based formula and given the seriousness of NEC as a disease.

29. Denied as a conclusion of law, Plaintiffs incorporate their response to ¶ 25.

30. Denied as a conclusion of law, Plaintiffs incorporate their response to ¶ 25.

31. Denied as a conclusion of law, Plaintiffs incorporate their response to ¶ 25.

32. Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

6

Case ID: 220302583
Control No.: 24052736

33.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

34.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

35.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

36.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

37.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

38.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

39.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

40.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

41.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

42.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

43.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24052736

44.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

45.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

46.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

47.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

48.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

49.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

50.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

51.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

52.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

53.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

54.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24052736

55.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

56.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

57.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

58.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

59.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

60.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

61.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

62.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

63.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

64.     Denied. Instant Plaintiffs have one lawsuit.

65.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

66.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24052736

67.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

68.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

69.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

70.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

71.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

72.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

73.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

74.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

75.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

76.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

77.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24052736

78.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

79.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

80.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

81.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

82.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

83.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

84.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

85.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

86.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

87.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

88.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24052736

89.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

90.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

91.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

92.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

93.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

94.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

95.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

96.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

97.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

98.     Denied. Plaintiffs have filed a praecipe to supplement the necessary verification which is docked and added to Plaintiffs' Amended Complaint.

99.     Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24052736

100.   Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

101.   Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

102.   Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

WHEREFORE, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: June 3, 2024              By:     _/s/Timothy A. Burke, Esquire_

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
_Attorneys for Plaintiffs_

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (_Pro Hac Vice_)
_Attorneys for Plaintiffs_

13

Case ID: 220302583
Control No.: 24052736

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. 320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.          Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, on her behalf and as Parent and Natural Guardian of H.S., a minor, | September Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | |
| MEAD JOHNSON & COMPANY, LLC, et al. | JURY TRIAL DEMANDED |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR REPSONSE TO PRELMINIARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNVIERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

I.     **Matter Before the Court**

Case ID: 220302583
Control No.: 24052736

Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendants' Preliminary Objections to Plaintiffs' Amended Complaint and respond to the Defendants' Preliminary Objections and Evidentiary Exhibits as follows:

**II.**     <u>**Counter Statement of Questions Involved**</u>

1. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Failure to Warn" claims where Plaintiffs have adequately alleged that bovine-based formula is unreasonably dangerous and substantially increases the risk for the development of NEC in preterm infants, and where Plaintiffs are not required under the pleading standard to cite to evidence (such as medical studies) in their Complaint in support of ultimate issues that will have to be proven at trial?

   *Suggested answer in the affirmative.*

2. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Failure to Warn" claims where Plaintiffs have adequately alleged Defendants breached their duty as the hospital system and/or healthcare provider by failing to adequately communicate the facts, risks, benefits, and alternatives associated with the use of bovine-based formula to preterm infants' parents, so that the parents could knowingly choose whether to consent on behalf of preterm infants?

   *Suggested answer in the affirmative.*

3. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Corporate Negligence" cause of action where Defendant hospital systems engaged in systemic negligence by failing to enact policies and procedures to prevent bovine-milk based formula from being fed to pre-term infants.

   *Suggested answer in the affirmative.*

Case ID: 220302583
Control No.: 24052736

4. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Corporate Negligence" cause of action where Defendant Trustees of the University of Pennsylvania are a governing body and overseer of the Hospital of the University of Pennsylvania ("HUP"), who are in charge of enacting the HUP policies and procedures at issue in Plaintiffs' Amended Complaint, subjecting them to Plaintiffs' Corporate Negligence claims.

*Suggested answer in the affirmative.*

5. Whether this Honorable Court should deny Defendants Preliminary Objections as to sufficiency of the pleadings where Plaintiffs have sufficient and adequately summarized material facts that inform and notify the Defendants of the claims which they must defendant?

*Suggested answer in the affirmative.*

6. Whether this Honorable Court should deny Defendants Preliminary Objections as to punitive damages where Plaintiffs have adequately plead facts providing a basis for punitive damages?

*Suggested answer in the affirmative.*

7. Whether this Honorable Court should deny Defendants Preliminary Objections for Plaintiff Parents claims where the Plaintiff parents have sufficient plead counts for individual harm as well as the harm on behalf of the Minor Plaintiff in the Amended Complaint and where those claims are not barred by the statute of limitations?

*Suggested answer in the affirmative.*

Case ID: 220302583
Control No.: 24052736

8. Whether this Honorable Court should deny Defendants Preliminary Objections where Plaintiff's necessary verification has been filed by way of a praecipe to attach to Plaintiffs' Amended Complaint?

*Suggested answer in the affirmative.*


### III. Plaintiffs Have Sufficiently Alleged that Pennsylvania Hospital and HUP Failed to Warn Healthcare Professionals and Parents of the Unreasonable Risk of NEC Posed by Bovine-Based Formula to Premature Infants under Count VI.

The moving Hospital Defendants failed to warn parents of premature infants, and their guardian parents, of the risk associated with goods they were supplying to those infants while under their care. A supplier of goods will be liable for their negligent failure to warn foreseeable users of that chattel under Section 388 of the Second Restatement of Torts, which has been incorporated into Pennsylvania law, if:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for the physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied; and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

RST 2 § 388.

*See, e.g.*, *Binder v. Jones & Laughlin Steel Corp.*, 360 Pa. Super. 390, 396 (1987) (applying RST 2 § 388 to a metal part supplier). Section 388 applies to any supplier of a chattel to another, as explained in Section 388's accompanying comment:

> c. Persons included as "suppliers." The rules stated in this Section and throughout this Topic apply to determine the liability of any person who for any purpose or in

4

Case ID: 220302583
Control No.: 24052736

> any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used. These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person. They apply to all kinds of bailors, irrespective of whether the bailment is for a reward or gratuitous, and irrespective of whether the bailment is for use, transportation, safekeeping, or repair. They also apply to one who undertakes the repair of a chattel and who delivers it back with knowledge that it is defective because of the work which he is employed to do upon it.

See § 403 RST 2 § 388 cmt. C; *see also Maize v. Atlantic Refin. Co.*, 352 Pa. 51, 56 (1945) ("This court has laid down the rule that anyone who is responsible for the existence of any dangerous instrumentality or substance with which persons are likely to come in contact must 'impose a measure of control that is adequate to the protection of human beings' from it.").

A supplier under this Section will be liable if they supply a chattel for use, which they know or should have known is dangerous, and they fail to warn the user of that danger and to advise proper precautions. *See Hopkins v. E.I. Du Pont De Nemours & Co.*, 199 F.2d 930, 932-33 (3d Cir. 1952) (applying Pennsylvania law) (citing *Maize*, 352 Pa. at 55). Under this Section, a supplier's disclosures will be insufficient if they fall below the standard of care that would be taken by a "reasonable man in a similar situation." *Binder*, 360 Pa. Super. at 398. The greater the potential danger of the instrumentality, the greater the duty to warn against foreseeable and known dangers. *See Thomas v. Arvon Prod's*, 424 Pa. 365, 369-70 (1967); 352 Pa. at 56. "[T]he care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are *reasonably* to be anticipated as a result of the conduct in question." 360 Pa. Super. at 398 (citations omitted) (emphasis in original). When another actor "acts as the nexus between the supplier and the actual user of the dangerous chattel," the supplier cannot "escape the duty to disclose by cavalierly relying on the [other actor] to somehow pass the information along to the actual user." *Id.*

5

Case ID: 220302583
Control No.: 24052736

In this case, Defendants failed to adequately communicate the facts, risks, benefits, and alternatives associated with the use of bovine-based formula to preterm infants' parents, so that could knowingly choose whether to consent on behalf of preterm infants. Defendants' duty to warn was even greater by virtue of the fact that parents could not be expected to know the risk of NEC associated with bovine-based formula and given the seriousness of NEC as a disease.

Defendants Pennsylvania Hospital and Hospital of the University of Pennsylvania argue that Plaintiff cannot state a claim for failure to warn because they were not a manufacturer of formula. However, since Plaintiffs' claims sounds in negligence, Defendant does not need to be a commercial manufacturer. Here, Defendants were responsible for providing the infant formula to medical practitioners and the NICU at their hospitals and by extension, to patients, and were therefore, suppliers for purposes of Section 388. Moreover, Plaintiff has alleged that the formula caused an increased risk when fed to infants, in other words, when it was used for its intended usage. Plaintiffs' Amended Complaint alleges that hospitals, including HUP, entered into financially advantageous relationships with codefendant manufacturers Abbott and Mead at various times to purchase, supply, and distribute bovine-based formula to their medical professionals, knowing that these products would then be provided to infants being treated by these providers in their facilities. Hence, Defendants knowingly supplied these instrumentalities to end users, who were not merely foreseeable, but the intended recipients of the formula. Further, the Hospitals' liability is not negated by the fact that others acted as intermediaries when they negligently failed to warn their own providers of these risks and facilitated their providers receiving inaccurate information, which inaccurately downplayed the risk of NEC, from the manufacturers' sales personnel. Moreover, as shown by their own internal correspondence and the relevant academic and medical literature surrounding NEC and bovine-formula in pre-term infants,

Case ID: 220302583
Control No.: 24052736

Defendants knew or should have known that bovine-based formula posed an increased risk of NEC to premature infants. Since NEC is a dangerous and potentially fatal disease, there was an even greater duty on Defendants to adequately warn foreseeable users of this known risk or take steps to make sure that the intermediaries they controlled, namely medical professionals, reliably communicated these risks to parents. Hence, the Hospitals failed to warn parents of the dangerous conditions associated with the formula, which parents had no reason to suspect, while supplying this formula for purposes of Section 388.

### IV. Plaintiffs' Complaint Sufficiently Alleges Facts That Support Their Claims of Corporate Liability of The Moving Health Care Provers, Thus These Claims Should not Be Dismissed

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet any of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

> The Thompson theory of corporate liability will not be triggered every time something goes wrong in a hospital which harms a patient . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, *Thompson* requires a plaintiff to show that **the hospital itself is breaching a duty and is somehow substandard**…Thompson contemplates a **kind of 'systemic negligence'**…

*Id*. at 1386-87 (citations omitted and emphasis added).

Case ID: 220302583
Control No.: 24052736

The facts and allegations in Plaintiffs' complaint clearly and succinctly articulate claims of a "systemic negligence" taking place at Penn and HUP, namely that the hospital engaged in a practice of entering into financially advantageous relationships with codefendant manufacturers Abbott and Mead at various times to purchase, supply, and distribute bovine-based formula to their medical professionals, knowing that these products would then be provided to infants being treated by these providers in their facilities. Hence, Defendants knowingly supplied these instrumentalities to end users, who were not merely foreseeable, but the intended recipients of the formula. Further, the Hospitals' liability is not negated by the fact that others acted as intermediaries when they negligently failed to warn their own providers of these risks and facilitated their providers receiving inaccurate information, which inaccurately downplayed the risk of NEC, from the manufacturers' sales personnel, because it is alleged that the hospitals themselves decided which formula product would be stocked and supplied in their respective NICU's and pre-term infant hospital facilities.

Further, Plaintiffs allege in their Amended Complaint that:

A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

See Plaintiffs' Amended Complaint, at ¶¶162-164.

Case ID: 220302583
Control No.: 24052736

Moreover, as shown by their own internal correspondence and the relevant academic and medical literature surrounding NEC and bovine-formula in pre-term infants, Defendants knew or should have known that bovine-based formula posed an increased risk of NEC to premature infants.

Finally, corporate liability can attach to a hospital system when there is a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients. Here Moving Defendants are the responsible corporate entities of Pennsylvania Hospital and Hospital of the University of Pennsylvania (HUP). Defendants had the duty to formulate, adopt, and enforce adequate rules and policies regarding the administration of certain formulations of baby formulas to pre-term infants in their care, and to not supply and/or have a policy of not administering bovine based formula to preterm infants which is shown in the literature to increase risk of developing NEC to those patients. Therefore, Plaintiffs' Corporate Liability claims should not be dismissed.

V. **Plaintiffs' Complaint Sufficiently Alleges that Defendant Colluded to Distribute and Sell Dangerous Products, and Failed to Warn Medical Practitioners of these Risks. Plaintiffs' Claims for Punitive Damages Should Therefore Not be Dismissed.**

Punitive damages may be awarded for "'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' " *Hutchison v. Luddy*, 582 Pa. 114, 121 (2005) (quoting *Feld v. Merriam*, 506 Pa. 383, 395 (1984)). Punitive damages must be based on conduct that is "wanton," "willful," or "reckless." 582 Pa. at 121. As such, in Pennsylvania, to withstand preliminary objections, a plaintiff must allege that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. *Id.* Pennsylvania courts have repeatedly held that a jury should determine whether punitive damages are warranted. *SHV Coal, Inc. v. Cont'l Grain Co.*, 526 Pa. 489, 495 (1991) ("The determination of whether a

Case ID: 220302583
Control No.: 24052736

person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused."). Furthermore, to the extent that there is any doubt about whether the standard for punitive damages has been met, that doubt must be resolved in the Plaintiff's favor at this stage. *See Theodore v. Del. Valley Sch. Dist.*, 575 Pa. 321, 333 (2003).

For example, in *Hall v. Episcopal Long Term Care*, plaintiffs alleged that the neglect of a nursing home's staff led to the plaintiff-decedent's death. 54 A.3d 381, 394-95 (Pa. Super. 2012). The plaintiff argued that the "evidence of understaffing, falsification of records, substandard facility conditions, and improper treatment of the deceased' s pain, all of which Episcopal failed to correct despite knowledge of such" demonstrated sufficiently knowing conduct to underly punitive damages. *Id.* at 394-95. The trial court concluded that punitive damages were not warranted because the nursing home's negligence "did not rise to the level of reckless disregard." *Id.* at 397 (quoting the trial court opinion). The Superior court reversed the trial court's directed verdict on the issue of punitive damages and held that the issue of punitive damages should have proceeded to the jury as "the Estate presented evidence establishing Episcopal acted in an outrageous fashion in reckless disregard to the rights of others and created an unreasonable risk of physical harm to the residents of the nursing home." *Id.* at 396-97. In so holding, the Court discussed *Scampone*, where the Superior Court likewise held that the issue of punitive damages against one defendant should have proceeded to a jury, since they jointly engaged in conduct with a codefendant that warranted punitive damages against that defendant. *Scampone v. Grane Healthcare Co.*, 169 A.3d 600, 627 (Pa. Super. 2017) ("the punitive damages trial must include Highland since, according to Mr. Scampone's evidence, its employees colluded with Grane

10

Case ID: 220302583
Control No.: 24052736

employees in some of the actions that warranted imposition of punitive damages, i.e., the alteration of patient records.").

In this case, Plaintiff has alleged that Penn Medicine and HUP purchased, supplied, and distributed bovine-based products, manufactured by codefendants Abbott and Mead, which they knew posed an increased risk of a serious and deadly disease to infants, in order to cut costs. The Hospital Defendants colluded with codefendants to supply Abbott and Mead's products to medical professionals at HUP and failed to warn these professionals about the known risks of these products. Defendants failed to warn healthcare professionals of the known risks of NEC posed by these products, and failed to establish a practice or policy of ensuring that these products were not fed to premature infants, as established in scientific literature, and instead arranged for these treaters to interact with Abbott and Mead salespersons. They then failed to prevent codefendants' sales representatives from making misrepresentations about the increased risk of NEC posed by bovine, instead of human-nutrition based products, and failed to correct these misrepresentations. As a result, Defendants knowingly distributed codefendants' products to practitioners who they knew would provide them to patients, in order to save costs to the Hospitals. Hence, Defendants colluded to pose an unreasonable risk of harm to minor Plaintiff and other infants.

### VI.    **Plaintiff Has Adequately Pled the Facts and Damages at Issue**

Defendant asserts that Plaintiffs' Amended Complaint fails to adequately plead facts regarding liability and injuries claimed. Defendant is wrong and their Preliminary Objections should be overruled. A complaint must give a defendant fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). As the Superior Court has noted:

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts **sufficient to enable the adverse party to prepare**

11

Case ID: 220302583
Control No.: 24052736

**his case**. A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. **Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

In assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates*, P.C., 805 A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc.*, 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.,* 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co.*, 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and 3 completeness of the specific basis on which recovery is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Defendants advance several arguments regarding the alleged deficiencies of facts and injuries, all of which are incorrect:

- Defendants assert that Plaintiffs' Amended Complaint does not state whether the infant actually ingested the product at issue. In contrast, Plaintiffs have pled that the infant "was fed Similac and/or Enfamil cow's milk-based products" and developed NEC "after ingesting Defendant Manufacturers' products." *See* Plaintiff's Second Amended Complaint at ¶¶ 11-12.

12

Case ID: 220302583
Control No.: 24052736

- Defendants assert that Plaintiffs' Amended Complaint does not indicate which product was ingested. However, Plaintiff has pled that the infant was fed the Defendant's products "Similac and/or Enfamil cow's milk-based products." Id. at ¶ 11. Absent discovery, Plaintiff is limited to the detail provided in the medical records, the details of which are included in Plaintiff's Complaint. As advanced previously at oral argument, Plaintiff must be allowed to conduct full discovery to determine which manufacturer and brand each Hospital system had a distribution agreement with during certain periods of time, as that information, such as brand, is not often elicited in the medical records. Further, the Defendants themselves are the ones with the information such as purchasing receipts and or purchasing agreements with either Abbott or Mead.

- Defendants argue that Plaintiffs have not met their burden under fact pleading to show that the product was unreasonably dangerous because allegedly plaintiffs' claims are "unsupported by any specific studies or trials in the Amended Complaint." See Def. Preliminary Objections, at 8. However, as noted above, the Superior Court has ruled that in relation to pleading facts, "evidence from which such facts may be inferred not only need not but should not be alleged," which is entirely contrary to Defendants' arguments herein. See *Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974)

- Defendants assert that Plaintiff has not pled the period of time during which the product at issue was ingested. However, Plaintiff alleged in the Complaint that the infant "was fed Similac and/or Enfamil cow's milk-based products by [hospital staff] after her birth." Id. Plaintiff's birth date is included in the Complaint.

- Defendants assert that Plaintiff failed to plead when the minor was diagnosed with NEC. However, Plaintiff pled that the infant's "diagnosis of NEC occurred during [the infant's] course of treatment at Defendant Hospital's NICU." *Id*. at ¶ 13. Plaintiffs averments adequately summarize the material facts necessary such that the Defendants are on notice of the claim of which they must defend, and notably the moving Defendants are the exact hospitals where the Plaintiff was initially treated for NEC, thus they have access to the exact same medical as the Plaintiffs which show the exact dates of treatment which are summarily referred to in Plaintiffs' Amended Complaint.

- Defendants assert that Plaintiffs did not plead the treatment the infant received following the ingestion of the NEC and resulting injuries. Defendant cites no authority for the proposition that a plaintiff must describe the specific treatment an injured party underwent following injuries resulting from the tortious conduct of a defendant.

- Defendants assert that Plaintiffs have not adequately pled the injuries suffered as a result of the product. Plaintiff has adequately pled the injuries suffered by the infant who ingested Defendant's product, specifically "a diagnosis of NEC, treatment

Case ID: 220302583
Control No.: 24052736

with antibiotics, blood transfusions and surgery, feeding difficulties, developmental delays, neurological issues, gastrointestinal issues, growth issues, short bowel syndrome, heart/lung/liver/kidney issues, mobility and walking difficulties, learning disabilities." Id. at ¶ 13.

Accordingly, Defendant's Preliminary Objections should be overruled as Plaintiffs Allegations should withstand challenge under 1019(a) because they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and they are sufficiently specific so as to enable Defendants to prepare their defense.

### VII.    Plaintiff-Parents' Claims Against Penn Medicine and HUP Are Not Time-Barred And Should Not Be Dismissed

Plaintiffs have clearly plead claims sounding in negligence on behalf of all plaintiffs, not just the injured minor plaintiff. Indeed, in the complaint, Plaintiff lists under Counts VI and VII, that "As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." See Plaintiffs' Amended Complaint at ¶144, 165. Therefore, Defendants no additional specificity needs to be plead as to which claims apply which Plaintiffs, and Plaintiffs' Amended Complaint complies with Pa.R.C.P. 1020, which does not require Plaintiff Parents and Plaintiffs Minors to plead separate claims for sperate Plaintiffs as Defendant suggests.

Further, Plaintiff-parents' claims are not barred by the discovery rule on two distinct grounds. The discovery rule is an exception [to the statute of limitations] that tolls the statute of limitations when an injury or its cause is not reasonably knowable." *In re Risperdal Litig.*, 656 Pa. 649, 661 (2019). "Under the "discovery rule," the statute of limitations begins to run when a plaintiff knows, or reasonably should have known, that: (1) an injury has been sustained; and (2) the injury has been caused by another party's conduct." *Ward v. Rice*, 828 A.2d 1118, 1121 (Pa. Super. 2003) (citing *Citsay v. Reich*, 380 Pa. Super. 366, 369 (1988)). For the discovery rule to

Case ID: 220302583
Control No.: 24052736

apply, the plaintiff must have exercised the due diligence that would be expected of a reasonable person in the plaintiff's position. 828 A.2d at 1121. A plaintiff must begin exercising reasonable diligence once they know the "the salient facts concerning the occurrence of his injury and *who or what caused it*." *Romah v. Hygienic Sanitation Co.*, 705 A.2d 841, 857 (Pa. Super. 1997) (emphasis added). While reasonable diligence is an objective standard, "it is also flexible […] to take into account differences between persons, their capacity to meet certain situations and circumstances confronting them at the time in question. In short, the standard of conduct required is a uniform one which takes "into account the fallibility of human beings."" 828 A.2d at 1121-22 (quoting RST 2d § 283 cmt's b-c). Whether someone has exercised reasonable diligence "may be best determined by the collective judgment, wisdom, and experience of jurors who have been selected at random from the community whose standard is to be applied." *Petri v. Smith*, 307 Pa. Super. 261, 271-72 (1982).

Under the discovery rule, if a plaintiff's delay is because the assurances of their physicians lull the patient into a false sense of security, this may toll the statute of limitations. *See Acker v. Palena*, 260 Pa. Super. 214, 222 (1978); *Barshady v. Schlosser*, 226 Pa. Super. 260, 263-64 (1973). The Pennsylvania Supreme Court has "expressly declined to hold, as a matter of law, that a layperson may be charged with knowledge greater than that which was communicated to her by the medical professionals who provided treatment and diagnosis." *In re Risperdal Litig.*, 656 Pa. at 662 (citing *Wilson v. El-Daief*, 600 Pa. 161, 179-180 (2009)). If a plaintiff alleges that their delay was due to their reasonably relying upon the reassurances of their physicians, then, while construing the pleadings in the light most favorable to the moving party, a plaintiff's claims will not be time-barred. *Acker v. Palena*, 260 Pa. Super. 214, 223-24 (1978).

Case ID: 220302583
Control No.: 24052736

Likewise, the under the similar but distinct doctrine of fraudulent concealment, a form of equitable estoppel, the statute of limitations will be tolled if a plaintiff's delay is induced by reliance on the fraudulent concealment of the defendant. *Nesbitt v. Erie Coach Co.*, 416 Pa. 89, 95-96 (1964). If, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Romah*, 705 A.2d at 857 (internal quotations omitted). A defendant does not need to intentionally deceive a plaintiff for the doctrine of fraudulent concealment to apply; instead, fraudulent concealment encompasses "fraud in the broadest sense which includes an unintentional deception." 416 Pa. at 96 (citation omitted). It is for the factfinder to determine whether a defendant made representations that could have induced this reliance on the part of the plaintiff. *Id.* For example, in *Romah*, the Superior Court held that the issue of whether the plaintiff's claims for gross negligence and punitive damages were tolled because the defendant concealed studies and other information from the EPA and the public that showed that the defendant's product caused increased risk of blood cell depression in men was a factual issue for the jury. 705 A.2d at 861.

Plaintiffs have alleged that all of the medical providers that Plaintiff-parents interacted with at the Hospital failed to provide them with any information regarding the increased risk of NEC to premature infants posed by the bovine-based formula that the practitioners provided. Likewise, plaintiffs have alleged that the parents were not presented with the comparative risk of NEC of these products as compared to any other alternatives. Plaintiff-parents relied upon the representations, or lack thereof, provided by the medical professionals who were treating their infant. Further, Plaintiff alleged that Plaintiff-parents had no medical background or training and therefore could not be expected to have greater medical knowledge than these providers. Plaintiff-

Case ID: 220302583
Control No.: 24052736

parents thereby reasonably relied upon, and were lulled into a false sense of security by, the assurances of the physicians treating their children. Moreover, Plaintiff has alleged that Defendants made false representations, in line with their financially advantageous relationship that they possessed with codefendant manufacturers Abbott and Mead, about the relative risks of bovine-based formula, in order to induce reliance on the part of Plaintiff-parents and thereby conceal the true source and cause of their infant's injury. Defendant hospitals facilitated interactions between medical providers and codefendant manufacturers' sales personnel, who Defendant hospital knew would mislead medical providers about the risk of NEC posed by its products. Thus, under both the discovery rule and doctrine of fraudulent concealment, Plaintiff-parents' claims are not time-barred.

## VIII. <u>Request In The Alternative To Amend The Complaint</u>

Although these preliminary objections will likely be mooted by a forthcoming second amended complaint, as ordered by the Court at the most recent status conference, Plaintiff strenuously maintains the sufficiency of all of the Counts contained within the Complaint, and should this Court be inclined to grant any of Defendants' specific Preliminary Objections in the instant pleadings, Plaintiff respectfully requests permission to amend the pleadings.

**WHEREFORE**, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

Case ID: 220302583
Control No.: 24052736

**KLINE & SPECTER**,
A Professional Corporation

Date: June 3, 2024      By:    */s/Timothy A. Burke, Esquire*

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
*Attorneys for Plaintiffs*

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (*Pro Hac Vice*)
MARK WEINSTEIN, ESQURIE
*Attorneys for Plaintiffs*

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 3, 2024, I caused a true and correct copy of the foregoing document to be served by electronic filing to all counsel of record.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: June 3, 2024               By:     <u>*/s/Timothy A. Burke, Esquire*</u>

TIMOTHY A. BURKE, ESQUIRE

19

Case ID: 220302583
Control No.: 24052736

# EXHIBIT A-61

FILED
04 JUN 2024 02:02 pm
Civil Administration
T. BARRETT

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, on her behalf and as Parent and Natural Guardian of H.S., a minor, | September Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | |
| MEAD JOHNSON & COMPANY, LLC, et al. | JURY TRIAL DEMANDED |
| Defendants. | |

## __ORDER__

AND NOW this the _____ day of _____, 2024, upon consideration of Defendant Mead Johnson & Company, LLC and Mead Johnson Nutrition Company's (collectively referred to as, "Mead Johnson" or "Moving Defendants") Preliminary Objections to the Plaintiff's Amended Complaint, Plaintiffs' Answer thereto, and all other appropriate considerations, it is hereby ORDERED, ADJUDGED and DECREED that Moving Defendants' Preliminary Objections are OVERRULED.

BY THE COURT

_____
J.

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, on her behalf and as Parent and Natural Guardian of H.S., a minor, | September Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | |
| | JURY TRIAL DEMANDED |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

**PLAINTIFFS' REPSONSE TO MEAD JOHNSON'S PRELMINIARY OBJECTIONS TO PLAINTIFFS' AMENDED COMPLAINT**

Although the instant Preliminary Objections will likely be mooted by the forthcoming

Second Amended Complaint, as ordered by the Court at the most recent Status Conference,

Plaintiff responds to the instant Preliminary Objections out of an abundance of caution and so as

to not waive any issues raised herein. Plaintiffs, by and through their counsel, Kline & Specter,

1

P.C., hereby oppose Defendant's Preliminary Objections and respond to the Defendants' Preliminary Objections and Evidentiary Exhibits as follows:

1.      Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

2.      Admitted.

3.      Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs'' attached memorandum of law.

4.      Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs'' attached memorandum of law.

5.      Denied as a conclusion of law to which no response is required. By way of further response, see Plaintiffs'' attached memorandum of law. Plaintiffs amended complaints contain additional factual pleadings that were not contained in the initially filed Complaints.

6.      Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

7.      Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

8.      Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24053109

9.     Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

10.     Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

11.     Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

12.     Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

13.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

14.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

15.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

16.     Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24053109

17.     Denied as Plaintiffs' Amended Complaint is a written document that speaks for itself, and therefore no response is required. By way of further response, see Plaintiffs' attached memorandum of law.

18.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

19.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

20.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

21.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

22.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

23.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

24.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

25.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

26.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

27.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24053109

28.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

29.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

30.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

31.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

32.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

33.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

34.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

35.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

36.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

37.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

38.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24053109

39.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

40.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

41.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

42.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

43.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

44.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

45.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

46.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

47.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

48.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

49.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

Case ID: 220302583
Control No.: 24053109

50.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

51.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

52.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

53.     Denied as a conclusion of law to which no response, is required. By way of further response, see Plaintiffs' attached memorandum of law.

WHEREFORE, for the reasons more fully set forth in Plaintiffs' accompanying Memorandum of Law, Plaintiffs respectfully request that this Honorable Court deny Defendant's Preliminary Objections, or, in the alternative, Order that Plaintiffs are permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: June 4, 2024          By:     _/s/Timothy A. Burke, Esquire_

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
*Attorneys for Plaintiffs*


**KELLER POSTMAN**
BEN WHITING, ESQUIRE (*Pro Hac Vice*)
*Attorneys for Plaintiffs*

7

Case ID: 220302583
Control No.: 24053109

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, on her behalf and as Parent and Natural Guardian of H.S., a minor, | September Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | JURY TRIAL DEMANDED |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR REPSONSE TO MEAD JOHNSON'S PRELMINIARY OBJECTIONS TO PLAINTIFFS' AMENDED COMPLAINT**

I.    **Matter Before the Court**

Although the instant Preliminary Objections will likely be mooted by the forthcoming

Second Amended Complaint, as ordered by the Court at the most recent Status Conference,

1

Plaintiff responds to the instant Preliminary Objections out of an abundance of caution and so as to not waive any issues raised herein. Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendant's Preliminary Objections and respond to the Defendants' Preliminary Objections and Evidentiary Exhibits as follows:

## II.   <u>Counter Statement of Questions Involved</u>

1.   Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' Counts I-V where Plaintiffs have adequately plead and alleged that bovine-based formula is unreasonably dangerous and substantially increases the risk for the development of NEC in preterm infants, and where Plaintiffs are not required under the pleading standard to cite to evidence (such as any medical studies) in their Complaint in support of ultimate issues that will have to be proven at trial?

*Suggested answer in the affirmative.*

2.   Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' strict liability claims (Counts I and II) where Plaintiffs' claims are properly plead and legally sufficient?

*Suggested answer in the affirmative.*

3.   Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' negligence claim (Count III) where Plaintiffs' claim is properly plead and legally sufficient.

*Suggested answer in the affirmative.*

4.   Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' negligent misrepresentation claims (Counts IV and V) where Plaintiffs' claim is properly plead and legally sufficient?

Case ID: 220302583
Control No.: 24053109

*Suggested answer in the affirmative.*

5. Whether this Honorable Court should deny Defendant's Preliminary Objections as to Plaintiffs' Amended Complaint where Plaintiff has adequately pleaded all necessary facts and damages to allow for Defendants to prepare their defense to Plaintiffs' claims?

*Suggested answer in the affirmative.*

6. Whether this Honorable Court should deny Defendants Preliminary Objections as to the Plaintiff Parents claims for Negligent Infliction of Emotional Distress where those claims are tolled and therefore not barred by the statute of limitations?

*Suggested answer in the affirmative.*

7. Whether this Honorable Court should deny Defendants Preliminary Objections as to Plaintiffs' Punitive Damages claims in Counts I through V of the Amended Complaint where Plaintiffs have adequately plead conduct which is sufficiently plead and adequate for a subsequent finding by a jury for Punitive Damages?

*Suggested answer in the affirmative.*

8. Whether this Honorable Court should deny Defendants Preliminary Objections where Plaintiffs' necessary verifications have been filed by way of a praecipe to attach to Plaintiffs' Amended Complaints?

*Suggested answer in the affirmative.*

III. **Plaintiff has Adequately Plead That Defendant's Products Are Unreasonably Dangerous**

Defendant asserts that Plaintiff's Amended Complaint fails to plead that Defendant's products are "unreasonably dangerous." Defendant is incorrect in this assertion, and their Preliminary Objections should be overruled.

Case ID: 220302583
Control No.: 24053109

Defendant's Preliminary Objections on this argument seem to rely heavily on their distrust of the science cited by Plaintiff regarding the dangers of their products. This argument is inappropriate at the Preliminary Objections stage. Rather, a complaint must only give a defendant only fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). In arguing that Plaintiffs' studies cited in their amended complaint are somehow inadequate to show the product is unreasonably dangers, Defendants fail to realize that Pennsylvania law does require Plaintiffs to support any pleadings with evidence to pass preliminary objection. Indeed, the Superior Court has previously held that **"**[e]vidence from which such facts [alleged in a complaint] may be inferred <u>not only need not but should not be alleged</u>. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense." *Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, in assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates*, P.C., 805 A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc.*, 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.*, 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co.,* 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and 3 completeness of the specific basis on which recovery

4

Case ID: 220302583
Control No.: 24053109

is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Defendant's assertion that Plaintiffs' Amended Complaint is "devoid of any facts showing" Defendant's products are "unreasonably dangerous" is patently incorrect. Plaintiffs' Amended Complaint includes dozens of paragraphs explaining the dangers of Defendant's product.

In determining whether a product is "unreasonably dangerous," the Court must consider seven factors:

> (1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.
> (2) The safety aspects of a product—the likelihood that it will cause injury, and the probable seriousness of the injury.
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.
> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
> (7) The feasibility on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

*Riley v. Warren Mfg., Inc.,* 688 A.2d 221, 225 (1997). The Court need not make a finding on all seven factors to determine that a product is unreasonably dangerous. *Id*.

Here, Plaintiff's Second Amended Complaint has adequately pled that the products at issue are unreasonably dangerous. For example, Plaintiff's Second Amended Complaint includes an entire section titled "***Cow's Milk-Based Feeding Products Are Known to Cause NEC.***" Further, Plaintiff pleads that there is an "elevated risk of NEC associated with cow's milk-based products" and that "the science clearly demonstrated to Defendants that these products cause NEC and

Case ID: 220302583
Control No.: 24053109

greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death." *See* Plaintiffs' Amended Complaint at ¶¶ 17, 20. Further, as relates the user's awareness of the danger, Plaintiff's Complaint details how Defendant, including through their product labels, failed to warn doctor and parents of the increased risk of NEC. Finally, Plaintiff's Complaint details several safer alternative designs that also speak to the manufacturer's ability to eliminate the danger, including donor breast milk, pasteurized breast milk, breast milk fortifiers, and breast milk-based products designed for pre-term infants. *Id*. at ¶¶ 16-20, 86-88.

Defendant cites *Orange Stones Co. v. City of Reading*, a case involving violation of an ordinance by a business in support of its contentions that Plaintiffs have not adequately plead that their products are unreasonably dangerous. There, the party filing preliminary objections claimed that plaintiff's complaint was deficient because it provided no facts to support its contention that the defendant acted "maliciously," "without probable cause," and "with the specific intent. *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014). The trial court sustained the preliminary objections, agreeing that the plaintiff had pled <u>no facts</u> to support this contention. *Id*. at 10126. Thus, the Court reasoned, these contentions were "bald assertions." *Id*.

Here, the instant Plaintiffs' allegations are not merely bald assertions. As discussed above, Plaintiffs have pled dozens of paragraphs to support their contention that the products at issue are "unreasonably dangerous" and specifically plead that medical studies show that feeding preterm infants cow's milk-based formula, as opposed to human breast milk (donor or otherwise), substantially increases the risk of them developing NEC and possibly dying or being otherwise seriously injured. Accordingly, because Plaintiffs' Amended Complaint adequately pleads that Defendant's products are unreasonably dangerous, Defendant's Preliminary Objections should be denied.

Case ID: 220302583
Control No.: 24053109

**IV.**   **Plaintiffs' Amended Complaints Have Adequately Identified The Products At Issue For Both Their Product Liability and Negligence Claims**

Defendant asserts that Plaintiff's Second Amended Complaint fails to identify the product at issue.  Defendant is wrong and their Preliminary Objections should be overruled.

A complaint must give a defendant only fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). In assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates, P.C.,* 805 A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc.,* 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.,* 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co*., 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and completeness of the specific basis on which recovery is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Plaintiff has clearly and adequately identified the product that caused the injury at issue to the best of their ability at this time. Specifically, Plaintiff pled that the infant was fed the Defendants' specific "Similac and/or Enfamil cow's milk-based products." *See* Plaintiffs' Amended Complaint at ¶ 11. Absent discovery on the supply of each particular brand to each particular hospital, Plaintiff is limited to the detail provided in the medical records and the Plaintiff parents recollection, all of which are included in Plaintiff's Complaint. As advanced previously at

Case ID: 220302583
Control No.: 24053109

oral argument, Plaintiffs must be allowed to conduct full discovery to determine which of the two manufacturers' brand of cow's milk-based formula each Hospital system had a supply agreement with during certain periods of time, as that information, such as the formula brand, is not often elicited in the medical records. In fact, the hospital Defendants themselves are the ones with the best access to the information needed such as purchasing receipts and or purchasing agreements with either Abbott or Mead.

Defendant cites *Cummins v. Firestone Tire & Rubber Co.* in support of their position that Plaintiffs have not adequately identified the product at issue. 495 A.2d 963 (Pa. Super. Ct. 1985). In *Cummins*, preliminary objections were sustained because the **"manufacturer or seller"** could not be determined, *even if the plaintiff were afforded discovery*. *Id.* at 968. Here, the manufacturer or seller is identified in Plaintiff's Complaint, the products at issue are also identified, and discovery will likely reveal even further detail about those products and which brand was fed to the Plaintiff during certain period of time, namely around the birth of each Plaintiff. As such, Defendant's Preliminary Objections should be overruled.

## V.      Plaintiff Has Adequately Pled the Facts and Damages at Issue

Defendant asserts that Plaintiffs' Amended Complaint fails to adequately plead facts regarding liability and injuries claimed. Defendant is wrong and their Preliminary Objections should be overruled. A complaint must give a defendant fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). As the Superior Court has noted:

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts **sufficient to enable the adverse party to prepare his case**. A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. **Evidence from which such facts**

8

Case ID: 220302583
Control No.: 24053109

**may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

In assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates*, P.C., 805 A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc.*, 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.,* 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co.*, 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and 3 completeness of the specific basis on which recovery is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Defendants advance several arguments regarding the alleged deficiencies of facts and injuries, all of which are incorrect:

- Defendants assert that Plaintiffs' Amended Complaint does not state whether the infant actually ingested the product at issue. In contrast, Plaintiffs have pled that the infant "was fed Similac and/or Enfamil cow's milk-based products" and developed NEC "after ingesting Defendant Manufacturers' products." See Plaintiff's Second Amended Complaint at ¶¶ 11-12.

- Defendants assert that Plaintiffs' Amended Complaint does not indicate which product was ingested. However, Plaintiff has pled that the infant was fed the Defendant's products "Similac and/or Enfamil cow's milk-based products." *Id.* at

Case ID: 220302583
Control No.: 24053109

¶ 11.  Absent discovery, Plaintiff is limited to the detail provided in the medical records, the details of which are included in Plaintiff's Complaint. As advanced previously at oral argument, Plaintiff must be allowed to conduct full discovery to determine which manufacturer and brand each Hospital system had a distribution agreement with during certain periods of time, as that information, such as brand, is not often elicited in the medical records. Further, the Defendants themselves are the ones with the information such as purchasing receipts and or purchasing agreements with either Abbott or Mead.

- Defendants argue that Plaintiffs have not met their burden under fact pleading to show that the product was unreasonably dangerous because allegedly plaintiffs' claims are "unsupported by any specific studies or trials in the Amended Complaint." See Def. Preliminary Objections, at 8. However, as noted above, the Superior Court has ruled that in relation to pleading facts, "evidence from which such facts may be inferred not only need not but should not be alleged," which is entirely contrary to Defendants' arguments herein. See *Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974)

- Defendants assert that Plaintiff has not pled the period of time during which the product at issue was ingested.  However, Plaintiff alleged in the Complaint that the infant "was fed Similac and/or Enfamil cow's milk-based products by [hospital staff] after her birth."  *Id.*  Plaintiff's birth date is included in the Complaint.

- Defendants assert that Plaintiff failed to plead when the minor was diagnosed with NEC. However, Plaintiff pled that the infant's "diagnosis of NEC occurred during [the infant's] course of treatment at Defendant Hospital's NICU."  *Id*. at ¶ 13. Plaintiffs' averments adequately summarize the material facts necessary such that the Defendants are on notice of the claim of which they must defend, and notably the moving Defendants are the exact hospitals where the Plaintiff was initially treated for NEC, thus they have access to the exact same medical as the Plaintiffs which show the exact dates of treatment which are summarily referred to in Plaintiffs' Amended Complaint.

- Defendants assert that Plaintiffs did not plead the treatment the infant received following the ingestion of the NEC and resulting injuries. Defendant cites no authority for the proposition that a plaintiff must describe the specific treatment an injured party underwent following injuries resulting from the tortious conduct of a defendant.

- Defendants assert that Plaintiffs have not adequately pled the injuries suffered as a result of the product.  Plaintiff has adequately pled the injuries suffered by the infant who ingested Defendant's product, specifically "a diagnosis of NEC, treatment with antibiotics, blood transfusions and surgery, feeding difficulties, developmental delays, neurological issues, gastrointestinal issues, growth issues, short bowel syndrome, heart/lung/liver/kidney issues, mobility and walking difficulties, learning disabilities."  Id. at ¶ 13.

10

Case ID: 220302583
Control No.: 24053109

Accordingly, Defendant's Preliminary Objections should be overruled as Plaintiffs Allegations should withstand challenge under 1019(a) because they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and they are sufficiently specific so as to enable Defendants to prepare their defense.

## VI. Plaintiffs Have Plead Their Intentional and Negligent Misrepresentation Claims With Adequate Specificity, They Therefore Should Not Be Dismissed

The requirements of Pennsylvania's rules as to the sufficiency of pleadings with relation to a misrepresentation claim are satisfied if a plaintiff pleads facts sufficient to permit defendants to prepare a defense. *Commonwealth v. National Apartment Leasing Company,* 108 Pa.Commonwealth Ct. 300, 529 A.2d 1157 (1987); *see also McGinn v. Valloti,* 363 Pa.Superior Ct. 88, 525 A.2d 732 (1987); *see also Foster v. Peat Marwick Main & Co.*, 138 Pa. Cmwlth. 147, 156, 587 A.2d 382, 387 (1991), *aff'd sub nom. Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 544 Pa. 387, 676 A.2d 652 (1996). Here, when the complaint is examined in its entirety, it clearly describes a course of conduct alleged to be fraudulent or misrepresentative sufficient to notify Mead for purposes of defending the claim. *National Apartment Leasing.* In fact, Plaintiffs devotes several pages of their Amended Complaint to facts describing the misrepresentation conduct of Defendant Mead wherein they allege, inter alia, that:

> Prior to [Plaintiff's] birth, Mead sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. ***This information indicated that Mead's products were safe*** to give to preterm infants like [Plaintiffs]. Mead maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. ***These sales representatives did not disclose that Mead's products could cause NEC in preterm infants***… Mead Johnson and Mead believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like [Plaintiff]… ***Despite knowing of the risk of NEC, Mead did not warn of the significantly***

11

Case ID: 220302583
Control No.: 24053109

> **_increased risk of NEC_** (and resulting medical conditions, and/or death)
> associated with its products, or of the magnitude of this increased risk. Mead
> likewise did not provide instructions or guidance for how to avoid NEC.

*See* Plaintiffs' Amended Complaint, at ¶¶ 60-62, 72 (emphasis added).

Clearly, Plaintiffs have articulated their misrepresentation claims with sufficient particularity to allow for Defendant Mead to have adequate notice of their claim and know the material facts such that they can formulate a defense. As seen above, Plaintiffs' Amended Complaint states 1) the misrepresentations of safety that were relayed by Mead, 2) that those misrepresentations were made by Mead to the Plaintiffs' healthcare providers, and thereafter to the Plaintiff Parents, 3) who then relied upon the misrepresentation of safety to decide what formula to feed their children, and finally 4) that Mead was aware of the potential for their formula to case NEC prior to the misrepresentations being made. Defendants' arguments that Plaintiffs have failed to articulate what misrepresentations were made such that they can adequately form a defense are spurious, and their preliminary objections should be summarily denied.

**VII.** **Plaintiffs' Complaint Sufficiently Alleges that Defendant Consciously Disregarded the Risks Posed by the Products that they Manufactured, Distributed, and Sold Absent Adequate Warnings, Supporting Punitive Damages**

Punitive damages may be awarded for "'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' " *Hutchison v. Luddy*, 582 Pa. 114, 121 (2005) (quoting *Feld v. Merriam*, 506 Pa. 383, 395 (1984)). Punitive damages must be based on conduct that is "wanton," "willful," or "reckless." 582 Pa. at 121. As such, in Pennsylvania, to survive preliminary objections, a plaintiff must allege that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. *Id*. For instance, in *Engle v. BT* Indus. AB, 41 Pa. D. & C.4th 25, 26, 33-34 (Pa.C.P. 1999), plaintiffs brought a products liability suit based on the manufacturers' negligence, strict liability claims, and breach of warranty.

Case ID: 220302583
Control No.: 24053109

The defendant's motion to strike the plaintiff's punitive damages claim was denied. In denying the defendant's motion, the Court stated that the "plaintiff has alleged that the defendants introduced a defective product into the stream of commerce with the knowledge of defects and the possible harm that they would cause. Such conduct, if proven, may well be interpreted as exhibiting the type of reckless indifference that may trigger punitive damages." *Id*. Hence, when a manufacturer has a subjective appreciation of the risk of harm posed by a product, and then introduces said product into the stream of commerce regardless, this conduct may rise to the level of conscious disregard required to warrant punitive damages. Further, to the extent that there is any doubt about whether the standard for punitive damages is met, that doubt must be resolved in the Plaintiff's favor at this stage. See *Theodore v. Del. Valley Sch. Dist*., 575 Pa. 321, 333 (2003).

Plaintiffs have alleged that Abbott and Mead knowingly distributed a product that they knew posed an extreme danger to infants for profit. Abbott and Mead knew that the bovine-based products they supplied posed an increased risk of NEC, an extremely serious disease which can cause death, to premature infants, as compared to other economically and technologically feasible alternatives, such as human nutrition-based alternatives. Instead, Abbott and Mead chose to continue to produce bovine-based products, marketing them specifically towards pre-term infants, and not formulate alternatives that they knew would reduce the risk of NEC to premature infants. Hence, Abbott and Mead knowingly produced products that they knew could cause harm to infants and chose to place them into the stream of commerce, in some cases marketing those products for use with pre-term infants, in conscious disregard of the risk posed to infants.

Abbott and Mead also knew that the ordinary consumer would not expect these products to pose an increased risk of NEC and despite this, failed to warn consumers about the increased risk of NEC posed by their bovine-based products. Plaintiff alleges that Abbott and Mead failed

Case ID: 220302583
Control No.: 24053109

to provide warnings to consumers that adequately and thoroughly described the increased risk of NEC posed by their products, as demonstrated by significant scientific evidence, in a way that was reasonably calculated to communicate these risks to parents of infants. Similarly, this failure to disclose substantial risks and communicate them in a way that would adequately inform parents was knowing and intentional conduct on the part of Abbott and Mead that evinces a conscious disregard of the risk posed by their products. Therefore, these allegations rise to the level of conscious disregard required to justify the issue of punitive damages proceeding at this stage.

## VIII. Plaintiff-Parents' Claims Against Defendants Are Not Time-Barred And Should Not Be Dismissed

Defendants' Preliminary Objections should be denied because Plaintiff's negligent infliction of emotional distress ("NIED") claim, brought under the bystander theory of liability, conforms with Pennsylvania legal precedent. Plaintiff-Parents contemporaneously observed a traumatic event injuring their child which satisfies the requisite element of an NIED claim.

Under Pennsylvania law, a plaintiff may pursue a claim for NIED in four different situations: "(1) where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) where the plaintiff was subjected to a physical impact; (3) where the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) where the plaintiff observed a tortious injury to a close relative." *Toney v. Chester County Hosp.*, 961 A.2d 192, 197–98 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011). The fourth scenario—the "bystander" theory of liability—arises where the plaintiff's distress is a foreseeable result of witnessing a loved one's injury. *See Sinn v. Burd*, 404 A.2d 672, 686 (Pa. 1979).

Based on the precedent set forth in *Sinn v. Burd*, Pennsylvania courts permit a plaintiff to recover for NIED as a "bystander" if the plaintiff's injury was reasonably foreseeable in light of three factors: "(1) whether plaintiff was located near the scene of the accident as contrasted with

Case ID: 220302583
Control No.: 24053109

one who was a distance away from it, (2) whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence, and (3) whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." *Sinn*, 404 A.2d at 685 (quoting *Dillon v. Legg*, 441 P.2d 912, 920 (Cal. 1968)). To prevail, the plaintiff must show some form of "discrete and identifiable traumatic event" which caused the plaintiff's distress. *Turner v. Med. Ctr., Beaver, PA, Inc.*, 686 A.2d 830, 832–33 (Pa. Super. 1996) (quoting *Love v. Cramer*, 606 A.2d 1175, 1177 (Pa. Super. 1992)). While interpreting *Sinn*, the Pennsylvania Superior Court has held the definition of "sensory and contemporaneous observance" depends on "whether the emotional shock was immediate and direct rather than distant and indirect, and not upon the sense employed in seeing the accident." *Krysmalski by Krysmalski v. Tarasovich*, 622 A.2d 298, 303 (Pa. Super. 1993). The plaintiff alleging NIED must also assert a physical manifestation of the emotional harm. *See Banyas v. Lower Bucks County Hospital*, 437 A.2d 1236, 1239–40 (Pa. Super. 1981).

Here, Plaintiff has satisfied all prongs of the "bystander" theory of NIED. First, they were physically present to witness the severely deteriorated and near-death state of their child resulting from Defendants' negligence. Second, Plaintiffs' shock was a direct emotional impact from their contemporaneous observance of their child in the hospital. Finally, Plaintiffs and their child are obviously closely related. Plaintiffs' emotional distress from this negligence was completely foreseeable and has resulted in physical manifestations including depression and other harms.

In their Preliminary Objections, Defendants argue that Plaintiff did not assert a specific cause of action. However, Defendants fail to recognize it is well-settled Pennsylvania law that a complaint that contains facts that support a specific cause of action does, in fact, assert said action.

Case ID: 220302583
Control No.: 24053109

*Bartanus v. Lis*, 480 A.2d 1178, 1182 (Pa. Super. 1984) (ruling that "[e]ven though appellant did not separate his factual allegations into separate counts specifying the legal theories underlying the complaint, the trial court was obligated to consider what causes of action were supported by the facts alleged" because "the complainant need only state the material facts upon which a cause of action is based").

Pennsylvania is a fact pleading state whereby the Complaint must provide defendants with notice of the basis of the claim and a summary of the facts essential to support that claim. *Alpha Tau Omega Fraternity*, 464 A.2d at 1352. Under the Pennsylvania Rules of Civil Procedure, a complainant must list the material facts underlying his claim "in a concise and summary form." Pa.R.C.P. 1019(a); *see Thompson Coal Co. v. Pike Cole Co.*, 412 A.2d 466, 468 (Pa. 1979).

When read in the context of the Complaint as a whole, as required by law, Plaintiff clearly asserts an NIED claim. Notably, Plaintiff includes extensive factual allegations in paragraphs eleven (11) through eighty-two (82), the entirety of which must be considered when interpreting every other paragraph of the Complaint. *See* Plaintiff's Complaint at 11–82. Within those extensive factual allegations, the "bystander" theory of liability is clearly asserted as the plaintiff-parents' distress is a foreseeable result of witnessing the injury of their child resulting from Defendants' negligence. *See Sinn v. Burd*, 404 A.2d 672, 686 (Pa. 1979).

In sum, Plaintiff's NIED claim under a "bystander" theory of liability is sufficiently pled. Plaintiffs were physically present to witness the severely deteriorated and near-death state of their child resulting from Defendants' negligence. There was a direct emotional impact from this contemporaneous observance of their child in the hospital.

Further, Plaintiff-parents' claims are not time-barred because Defendant Mead prevented Plaintiff-parents from learning the true cause of their infant's injury. The discovery rule is an

16

Case ID: 220302583
Control No.: 24053109

exception [to the statute of limitations] that tolls the statute of limitations when an injury or its cause is not reasonably knowable." In re Risperdal Litig., 656 Pa. 649, 661 (2019). "Under the "discovery rule," the statute of limitations begins to run when a plaintiff knows, or reasonably should have known, that: (1) an injury has been sustained; and (2) the injury has been caused by another party's conduct." *Ward v. Rice*, 828 A.2d 1118, 1121 (Pa. Super. 2003) (citing *Citsay v. Reich*, 380 Pa. Super. 366, 369 (1988)). For the discovery rule to apply, the plaintiff must have exercised the due diligence that would be expected of a reasonable person in the plaintiff's position. 828 A.2d at 1121. A plaintiff must begin exercising reasonable diligence once they know the "the salient facts concerning the occurrence of his injury and who or what caused it." *Romah v. Hygienic Sanitation Co.,* 705 A.2d 841, 857 (Pa. Super. 1997) (emphasis added). While reasonable diligence is an objective standard, "it is also flexible [...] to take into account differences between persons, their capacity to meet certain situations and circumstances confronting them at the time in question. In short, the standard of conduct required is a uniform one which takes "into account the fallibility of human beings."" 828 A.2d at 1121-22 (quoting RST 2d § 283 cmt's b-c). Whether someone has exercised reasonable diligence "may be best determined by the collective judgment, wisdom, and experience of jurors who have been selected at random from the community whose standard is to be applied." *Petri v. Smith*, 307 Pa. Super. 261, 271-72 (1982).

Under the discovery rule, if a plaintiff's delay is because the assurances of their physicians lull the patient into a false sense of security, this may toll the statute of limitations. *See Acker v. Palena*, 260 Pa. Super. 214, 222 (1978); *Barshady v. Schlosser*, 226 Pa. Super. 260, 263-64 (1973). The Pennsylvania Supreme Court has "expressly declined to hold, as a matter of law, that a layperson may be charged with knowledge greater than that which was communicated to her by

Case ID: 220302583
Control No.: 24053109

the medical professionals who provided treatment and diagnosis." In re Risperdal Litig., 656 Pa. at 662 (citing *Wilson v. El-Daief*, 600 Pa. 161, 179-180 (2009)).  If a plaintiff alleges that their delay was due to their reasonably relying upon the reassurances of their physicians, then, while construing the pleadings in the light most favorable to the moving party, a plaintiff's claims will not be time-barred. *Acker v. Palena*, 260 Pa. Super. 214, 223-24 (1978).

Likewise, the under the similar but distinct doctrine of fraudulent concealment, a form of equitable estoppel, the statute of limitations will be tolled if a plaintiff's delay is induced by reliance on the fraudulent concealment of the defendant. *Nesbitt v. Erie Coach Co*., 416 Pa. 89, 95-96 (1964). If, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Romah*, 705 A.2d at 857 (internal quotations omitted). A defendant does not need to intentionally deceive a plaintiff for the doctrine of fraudulent concealment to apply; instead, fraudulent concealment encompasses "fraud in the broadest sense which includes an unintentional deception." *Nesbitt, supra*, 416 Pa. at 96 (citation omitted). It is for the factfinder to determine whether a defendant made representations that could have induced this reliance on the part of the plaintiff. Id. For example, in Romah, the Superior Court held that the issue of whether the plaintiff's claims for gross negligence and punitive damages were tolled because the defendant concealed studies and other information from the EPA and the public that showed that the defendant's product caused increased risk of blood cell depression in men was a factual issue for the jury. *Romah, supra*, 705 A.2d at 861.

Plaintiffs have alleged that manufacturers Abbott and Mead took numerous steps to prevent Plaintiff-parents from learning the cause of their infant's injuries. Defendants disseminated materials to the public that intentionally misled parents about the risk of NEC posed by their

Case ID: 220302583
Control No.: 24053109

products, which affirmatively stated, and still state, that their products do not cause the disease, or worse still, may reduce the risk of NEC. For instance, Mead published numerous misleading statements on its publicly available website that misrepresented the link between its bovine-based formula and the risk of NEC in premature infants. In addition, Defendant manufacturers trained and directed its sales personnel to mislead medical providers about the risk of NEC posed by its products. Further, Defendant manufacturers did not provide warnings on their packaging or products, thereby also concealing the known risk of NEC from parents. Thus, under both the discovery rule and doctrine of fraudulent concealment, Plaintiff-parents' claims are not time-barred.

### IX.     **Plaintiffs Have Filed the Proper Verifications For Their Amended Complaints**

Pennsylvania Rule of Civil Procedure 1024 requires that pleadings containing averments of fact not appearing of record in the action shall state that the averment is true upon the signer's personal knowledge or information and belief and shall be verified. *See* Pa.R.C.P. 1024. Plaintiff has obtained and produced proper verification as required by the Rules. Accordingly, Defendants' objection should be overruled. All such verifications have been and/or will immediately be attached by way of a praecipe to attach filed to Plaintiffs' Amended Complaint.

### X.     **Request In The Alternative To Amend The Complaint**

Although these preliminary objections will likely be mooted by a forthcoming Second Amended Complaint, as ordered by the Court at the most recent status conference, Plaintiff strenuously maintains the sufficiency of all of the Counts contained within the Complaint, and should this Court be inclined to grant any of Defendants' specific Preliminary Objections in the instant pleadings, Plaintiff respectfully requests permission to amend the pleadings.

Case ID: 220302583
Control No.: 24053109

**WHEREFORE**, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: June 4, 2024                By:      /s/Timothy A. Burke, Esquire

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
*Attorneys for Plaintiffs*

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (*Pro Hac Vice*)
MARK WEINSTEIN, ESQURIE
*Attorneys for Plaintiffs*

20

Case ID: 220302583
Control No.: 24053109

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2023, I caused a true and correct copy of the foregoing

document to be served by electronic filing to all counsel of record.


Respectfully submitted,


**KLINE & SPECTER**,
A Professional Corporation

Date: October 19, 2023      By:      <u>*/s/Timothy A. Burke, Esquire*</u>

TIMOTHY A. BURKE, ESQUIRE

Case ID: 220302583
Control No.: 24053109

# EXHIBIT A-62

**FILED**
11 JUN 2024 04:51 pm
**Civil Administration**
A. CLARKE

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY LLC AND MEAD JOHNSON NUTRITION COMPANY**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor**<br><br>                    Plaintiff,<br><br>        v.<br><br>**MEAD JOHNSON & COMPANY, LLC, et al.**,<br><br>                    Defendants. | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**MARCH TERM, 2022**<br>**No. 220302583** |

**MEAD JOHNSON'S REPLY IN SUPPORT OF PRELIMINARY OBJECTIONS TO PLAINTIFFS' FIRST AMENDED COMPLAINT**

On May 20, 2024, this Court ordered Plaintiffs to file, within sixty days, a revised Amended Complaint. *See* May 20 Order, attached as Exhibit A. While that complaint may moot the Preliminary Objections and the Parties' responses, including this reply, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (hereinafter "Moving Defendants" or "Mead Johnson") respond to preserve their

1

Case ID: 220302583
Control No.: 24053109

objections. Plaintiffs' response to Mead Johnson's Preliminary Objections confirms that their claims must be dismissed.

Plaintiffs and other similarly situated plaintiffs in these cases have filed dozens of nearly identical complaints alleging that their children were given "Similac and/or Enfamil" branded formula and/or fortifier, which caused them to develop necrotizing enterocolitis ("NEC").[1]  Pennsylvania is a fact-pleading state, and Plaintiff's First Amended Complaint does not plead sufficient facts.  In this product liability case, Plaintiffs have failed to plead even the product that they claim caused the alleged injury.  Nor have Plaintiffs adequately pled that this *class of products* is causally associated with NEC.  While plaintiffs have provided "general notice" that they believe *some product*—from either Mead Johnson "and/or" Abbott Laboratories ("Abbott")— caused H.S. to develop NEC, they have wholly failed to meet their burden to put Mead Johnson on notice about which of its many products is the alleged culprit.  Further, Plaintiffs have failed to plead the basic elements of the causes of action they claim to assert.   Plaintiffs' claims should therefore be dismissed.

## I.    Plaintiffs' Claims Should Be Dismissed Because They Fail To Allege That A Specific Product Caused The Injury

Pennsylvania law gives plaintiffs the burden of "summariz[ing] the essential facts to support the claim." *McShea v. City of Phila.*, 606 Pa. 88, 96, 995 A.2d 334 (2010).  In a case alleging that plaintiff was injured by ingesting a specific product, the identity of that product undoubtedly qualifies as an essential fact. *Baker v. Rangos*, 324 A,2d 498, 505– 06 (Pa. Super. 1974) (requiring plaintiff to allege "all of the facts a plaintiff will eventually

---

[1] Necrotizing enterocolitis or NEC is a tragic syndrome that affects 2-5% of premature infants. It affects approximately 10% of all babies weighing less than 3½ pounds.  See https://www.cincinnatichildrens.org/health/n/nec.

2

Case ID: 220302583
Control No.: 24053109

have to prove in order to recover"). Numerous courts have held as much. *E.g.*, *Gay v. A. O. Smith Corp.*, 545 F. Supp. 3d 255, 262 (W.D. Pa. 2021) (granting summary judgment in asbestos case where plaintiff "never cited a specific instance when he could recall working with an asbestos-containing GE product"); *In re McNeil Consumer Healthcare, Mktg. & and Sales Pracs. Litig.*, 2011 WL 2802854, at **9–10 (E.D. Pa. July 15, 2011) ("[P]laintiffs fail to allege any personal harm arising [from Defendant's alleged wrongs]. This deficiency follows from the plaintiffs' failure to allege which particular products they purchased.").

But instead of identifying a specific product by its name, Plaintiffs merely identify "Similac and/or Enfamil," two different trademarks from two different companies. *See* Plaintiffs' First Amended Compl. at ¶ 12. Similac is a trademark for a line of products sold by Defendant Abbott, while Enfamil is a trademark for a line of products sold by Defendant Mead Johnson. By using the intentionally ambiguous phrase "and/or," Plaintiffs fail even to identify which Defendant manufactured the product at issue, and therefore fail to allege sufficient facts to state a claim against either Defendant.

"Similac and/or Enfamil" are not product names. They are *brand umbrellas* that contain a variety of *product lines*, which themselves contain multiple *products*. Plaintiffs' own complaint admits that "Mead markets and sells multiple products." *Id.* at ¶ 51. They then identify *seven separate* products. *Id.* Likewise, Plaintiffs acknowledge that "Abbott markets and sells multiple products" and then identify *seven different* products. *Id.* at ¶ 50. All told, Plaintiffs' "product identification" spans *fourteen unique products* across two different manufacturers. And these are not even all of the products under the "Similac

Case ID: 220302583
Control No.: 24053109

and/or Enfamil" brand names.[2]  Moreover, some of these products are formulas, which are fed to infants as substitutes for breastmilk, and some are fortifiers, which are used to *supplement* breastmilk.  According to Plaintiffs' allegations, H.S. may have received any one "and/or" a combination of these products.  As is the case with virtually every product liability action, it is not enough to merely allege the brand name of a product line.  Plaintiff must allege the actual product.  The suggestion that merely identifying the umbrella brand of fourteen separate products manufactured by two different companies is sufficient identification is wholly unfounded.

Plaintiffs' allegations are boilerplate.  This is all the more clear because each of the twenty-seven NEC-based complaints currently pending in the Philadelphia County Court of Common Pleas in connection with this litigation uses *identical* language when referring to the products plaintiffs were allegedly given: "Similac and/or Enfamil." Plaintiffs' failure to identify with specificity the products that H.S. was fed is fundamental and is fatal to each of their claims.

## II.    Plaintiffs Do Not Adequately Plead That Cow-Based Feeding Products Cause NEC.

Plaintiffs claim in reply that the section of the First Amended Complaint titled "***Cow's Milk-Based Feeding Products Are Known to Cause NEC***" pleads adequate facts to establish the products at issue are unreasonably dangerous. Pls.' Response at 5 (emphasis in original). That section in the First Amended Complaint spans *six sentences*, none of which contain a citation or reference.  First Amended Compl. at ¶¶ 15–16.  The first four sentences describe NEC generally, the fifth sentence provides that preterm

---

[2] *See*
https://hcp.meadjohnson.com/s/products/category/a4K4J000001uk3DUAQ/hospital-feeding-system (listing nine different hospital feeding products).

Case ID: 220302583
Control No.: 24053109

infants are "especially susceptible to NEC because of their underdeveloped digestive systems." *Id.* at ¶ 16. It is only in the sixth and final sentence where Plaintiffs say, with no supporting allegation, that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants." *Id.* Plaintiffs cite no studies for this proposition—unsurprisingly, given that to Mead Johnson's knowledge, there are no studies showing that cow's milk-based feeding products cause NEC.

These bald assertions are insufficient to withstand a preliminary objection. *See* Pa. R. Civ. P. 1019(b); *Weiner v. Am. Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998) ("The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous."). Plaintiffs have provided no study definitively showing that any of defendants' products *cause* NEC because there is no such study. At best, Plaintiffs can offer studies showing that breastmilk has a protective effect against NEC. This information is uncontroversial, well-known, and actively promoted by defendant. *See* Promoting Breast Milk, MeadJohnson.com, https://hcp.meadjohnson.com/s/hcpm-subpage/a4b4J000000JFeAQAW/human-milk (last visited Oct. 23, 2023) ("Breast milk is naturally perfect for infants, providing unique benefits to mother and baby" and listing some "key components and benefits" of breast milk). Plaintiffs' claims should be dismissed for these reasons and the reasons more fully articulated in Mead Johnson's preliminary objections.

## III. Parent-Plaintiff's NIED Claims Should Be Dismissed.

In her response, Plaintiff-Parent, for the first time, alleges negligent infliction of emotional distress. Pls. Resp. Mem. at 14. As Plaintiff-Parent herself admits, any plaintiff

Case ID: 220302583
Control No.: 24053109

"alleging NIED must also assert a physical manifestation of the emotional harm." *Id.* at 15. She is not wrong. "Physical injury must be averred to sustain a cause of action for negligent infliction of emotional distress." *Armstrong v. Paoli Memorial Hosp.*, 633 A.2d 605, 609 (Pa. Super. Ct. 1993) (collecting cases); *see also* Restatement (Second) of Torts § 463A. Indeed, as Mead Johnson argued in its preliminary objections, "[n]o cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." Prelim. Obj. at 19 (quoting *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009)); *see also Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff).

Plaintiff-Parent here alleges *no physical injury*. She states for the first time only in her response that H.S.'s injuries caused her to suffer "physical manifestations including depression and other harms." Pls. Resp. Mem. at 15. Arguments are not allegations, and parent-plaintiff's claims must therefore be dismissed. *Armstrong*, 633 A.2d at 609 (Pa. Super. Ct. 1993); *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236, 1239–40 (Pa. Super. 1981) ("[G]iven the restrictions that our courts have consistently imposed on recovery for this tort, we would err in finding a cause of action without an allegation of bodily harm.").

## IV. Plaintiffs' Misrepresentation Claim Should Be Dismissed For Failure To Allege Specificity And Reliance (Counts IV and V).

Any claim for misrepresentation, whether negligent or intentional, requires plaintiff to plead the alleged fraud with specificity. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999). And as Pennsylvania's supreme court has explained, "[a]verments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference

6

Case ID: 220302583
Control No.: 24053109

that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Phila.*, 224 A.2d 174, 179 (Pa. 1966); *see also* Pa. R. Civ. P. 1019(b) ("Averments of fraud . . . shall be averred with particularity.").

In their response, Plaintiffs point to bald, generic assertions that Mead Johnson representatives did not warn of the risk of NEC—a risk for which Plaintiffs offer no evidence other than *ipse dixit*. This is a far cry from the "exact statements or actions plaintiff alleges constitute the fraudulent misrepresentation." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005). And nothing that Plaintiffs point to in their opposition comes remotely close to meeting this threshold. Plaintiffs do not—and cannot—quote any Mead Johnson representative, as they did not hear any Mead Johnson representative make any kind of representation. Nor do Plaintiffs point to any specific misrepresentation that Mead Johnson allegedly made. And, finally, Plaintiffs do not even identify any allegations in their response supporting the proposition that Plaintiffs' healthcare providers relied on Mead Johnson's purported misrepresentation. These failures doom their claims of misrepresentation. *See, e.g.*, Prelim. Obj. Ex. B *In re Mead Johnson Product Cases*, CJC-23-005257, at 5–13 (Cal. Sup. Ct. February 16, 2024); *Scott v. Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing misrepresentation claim for failing to "allege when these alleged misrepresentations were made, who made them, or how they were communicated"); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.")

7

Case ID: 220302583
Control No.: 24053109

(internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, A22-0398, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (dismissing fraud claims for lack of specificity).

**V.      Plaintiff-Parent's Claims Are Time-Barred and Should Be Dismissed.**

Pennsylvania law establishes a two-year statute of limitations for any suit alleging "personal injury." *See* 42 Pa. Cons. Stat. § 5524(2) & (7); *Pulli v. Ustin*, 2011 Pa. Super. LEXIS 1733, 24 A.3d 421, 421 n.4 (Pa. Super. Ct. Jul. 5, 2010).  A cause of action for personal injury "accrues, and thus the applicable limitations period begins to run, when an injury is inflicted." *Wilson v. El-Daief*, 600 Pa. 161, 173, 964 A.2d 354, 361 (Pa. 2009).

Plaintiffs allege that H.S. was born on September 12, 2006, was fed the Defendant Manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* First Amended Compl. at ¶¶ 11-13. But Plaintiffs did not file a complaint until March 24, 2022—almost 14 years after the statute of limitations period had expired. Thus, absent tolling of the limitations period, Plaintiff-Parent's claims are clearly time-barred.

In an attempt to save Plaintiff-Parent's claims, Plaintiffs allege in their Amended Complaint that Plaintiff-Parent did not discover a factual basis for Plaintiffs' negligence claims "until a later time." *Id.* at ¶ 43. This attempt to call upon the discovery rule is ineffective.

Pennsylvania's discovery rule is a "narrow approach to determining accrual for limitations purposes and places a ***greater burden*** upon Pennsylvania plaintiffs vis-à-vis the discovery rule than most other jurisdictions." *Gleason v. Borough of Moosic*, 609 Pa.

Case ID: 220302583
Control No.: 24053109

353, 362-63, 15 A.3d 479, 484 (Pa. 2011) (emphasis added) (quotations and citation omitted); *see also Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995) ("The party asserting the discovery rule bears the burden of establishing that he or she falls within it.").

Plaintiffs' claims relate to a disease—necrotizing enterocolitis—that has been known to the medical community for decades and involves a product that has similarly been the standard of care in neonatal intensive care units for decades. The entirety of Plaintiffs' complaint rests on ***publicly available literature*** of which the scientific and medical community has been aware. "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 649 Pa. 227, 249, 195 A.3d 880, 893 (2018) (citations omitted). Here, Plaintiffs could have known the alleged risk by exercising reasonable diligence. This is not the type of situation where a plaintiff "was unable to discover the operative facts for [the] cause of action [any] sooner" despite exercising reasonable diligence. *Dreischalick v. Dalkon Shield Claimants Tr.*, 845 F. Supp. 310, 315–15 (W.D. Pa. 1994); *see also Dalrymple v. Brown*, 549 Pa. 217, 223, 701 A.2d 164, 167 (Pa. 1997).

Moreover, Plaintiffs allege boilerplate accusations that Plaintiff-Parent was unable to discover the cause of H.S.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC," First Amended Compl. at ¶¶ 27-35, and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products. *Id.* at ¶¶ 36-43. Notably, Plaintiffs do not allege a single fact to support their claim that Mead Johnson "hid" information or "fraudulently concealed" any

Case ID: 220302583
Control No.: 24053109

risks. These bald, unsupported allegations are insufficient to establish the application of the discovery rule, and Plaintiff-Parent's claims must be dismissed as time-barred.

**VI.     Plaintiffs' Punitive Damages Claims Should Be Struck.**

Merely pleading outrageous conduct is insufficient to maintain a claim for punitive damages.  *See Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985). ("The mere pleading of outrageous conduct does not, of course, satisfy the requirement of stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award for punitive damages was warranted.") "Punitive damages are an extreme remedy available in only the most exceptional matters."  *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)).

For the reasons stated above and in Mead Johnson's Preliminary Objections, Plaintiffs' First Amended Complaint is devoid of any allegation or evidence that would enable Plaintiffs to maintain a claim for punitive damages.  At best, Plaintiffs allege that Mead Johnson failed to warn physicians of a risk Plaintiffs also allege the physicians already knew. First Amended Compl. at ¶¶ 139-147 & 153.  This is insufficient to maintain a claim for punitive damages.

Respectfully submitted,

**WELSH & RECKER, P.C.**

Dated:  June 11, 2024

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**TUCKER LAW GROUP, LLC**

/s/ Kenneth A. Murphy

10

Case ID: 220302583
Control No.: 24053109

Kenneth A. Murphy, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

11

Case ID: 220302583
Control No.: 24053109

## <u>CERTIFICATE OF SERVICE</u>

I, Richard Walk, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Reply in Support of Preliminary Objections to Plaintiffs' First Amended Complaint to be served via the court's electronic filing system, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com
*Counsel for Defendants, The Trustees of the University of Pennsylvania d/b/a The Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312

joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**Eckert Seamans Cherin Mellot**
Donald Brooks, Jr., Esquire
Brooke A. Scicchitano, Esquire
50 S. 16th Street, 22nd Floor
Philadelphia, PA 19102
dbrooks@eckertseamans.com
bscicchitano@eckertseamans.com
*Attorneys for Defendant, Thomas Jefferson University Hospitals, Inc d/b/a Thomas Jefferson University Hospital and Thomas Jefferson University d/b/a Jefferson Health System*

By:    /s/ Richard Walk
         Richard Walk, Esquire

Dated: June 11, 2024

2

Case ID: 220302583
Control No.: 24053109

FILED
11 JUN 2024 04:51 pm
Civil Administration
A. CLARKE

# EXHIBIT A

Case ID: 220302583
Control No.: 24053109

*Filed and Attested by the Office of Judicial Records 15 JUN 2023 06:37 pm A. STAMATO*

**HOLLI CARTER, on her own behalf and as Parent and Natural Guardian of J.C., a Minor**

                       Plaintiff,

    v.

**MEAD JOHNSON & COMPANY, LLC, et al.,**

                    Defendants.

**PHILADELPHIA COUNTY COURT OF COMMON PLEAS**

**MARCH TERM, 2022**
**No. 220302588**

## ORDER

**AND NOW**, this 20th day of May, 2024, upon consideration of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company's Preliminary Objections to Plaintiffs' Complaint, is hereby **ORDERED** that the Motion is **MOOT** without prejudice to Defendant to file renewed Preliminary Objections to the Amended Complaint. Plaintiff shall have sixty (60) days from the date of this Order to file an Amended Complaint.

BY THE COURT:

CARPENTER, J.

ORDER-Carter Etal Vs Mead Johnson

22030258800154

Case ID: 220302588
Control No.: 23063373

Case ID: 220302583
Control No.: 24053109

# EXHIBIT A-63

# PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
| --- |
| 24070945 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

### FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: 07/23/2024 |
| --- | --- |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response.*
*Status may be obtained online at http://courts.phila.gov*

March _____ Term, 2022
*Month*            *Year*
No. _____ 02583

Name of Filing Party:
MEAD JOHNSON & COMPANY LLC-DFT
MEAD JOHNSON NUTRITION COMPANY-DFT

ABDULLAH ETAL VS MEAD JOHNSON &
COMPANY, LLC, ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*  ☒ Motion
☐ Answer to Petition  ☐ Response to Motion

**Has another petition/motion been decided in this case?** ☐ Yes ☐ No
**Is another petition/motion pending?** ☐ Yes ☐ No
*If the answer to either question is yes, you must identify the judge(s):*

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
| --- | --- |
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

### I. CASE PROGRAM

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE LINDA CARPENTER
Applicable Petition/Motion Deadline: N/A
Has deadline been previously extended by the Court: N/A

### II. PARTIES *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JAMES A YOUNG
  BURNS WHITE LLC 1835 MARKET STREET
  SUITE 2700 , PHILADELPHIA PA 19103
SEAN P FAHEY
  TROUTMAN PEPPER 3000 TWO LOGAN SQ
  18TH AND ARCH STREETS , PHILADELPHIA
  PA 19103-2799
RONNI E FUCHS
  301 CARNEGIE CENTER SUITE 400 ,
  PRINCETON NJ 08540
JOSEPH E ONEIL
  CAMPBELL CONROY & ONEIL 1205
  WESTLAKES DR SUITE 330 , BERWYN PA
  19312
MARQUES HILLMAN RICHESON
  JONES DAY 901 LAKESIDE AVENUE NORTH
  POINT , CLEVELAND OH 44114

### III. OTHER

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____  July 3, 2024  CATHERINE M. RECKER
*(Attorney Signature/Unrepresented Party)*  *(Date)*  *(Print Name)*  *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2407008068
03-JUL-24 10:00:42

THOMAS R KLINE
  KLINE & SPECTER 1525 LOCUST ST., 19TH
  FL. , PHILADELPHIA PA 19102
ASHLEY C KELLER
  KELLER POSTMAN, LLC 150 N. RIVESIDE
  PLAZA SUITE 1400 , CHICAGO IL 60606
BENJAMIN WHITING
  KELLER POSTMAN, LLC 150 N. RIVERSIDE
  PLAZA SUITE 4100 , CHICAGO IL 60606
KENNETH A MURPHY
  TUCKER LAW GROUP, LLC 1801 MARKET
  STREET SUITE 2500 , PHILADELPHIA PA
  19103-6996
EVAN GLASSMAN
  STEPTOE, LLP 1114 AVENUE OF THE
  AMERICAS , NEW YORK NY 10036

**FILED**
03 JUL 2024 10:04 am
Civil Administration
M. RIVERA

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY** |
| | : |
| | : **MARCH TERM, 2022** |
| Plaintiffs, | : **No. 2583** |
| v. | : |
| | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, | : |
| | : |
| | : |
| Defendants. | : |

## ORDER

      **AND NOW**, this _____ day of _____, 2024, upon consideration of the Motion for Admission Pro Hac Vice of Maureen F. Browne, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**.  This Court hereby admits Maureen F. Browne, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

                                  **BY THE COURT**:

                                   _____

                                        J.

**WELSH & RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **MARCH TERM, 2022** |
| Plaintiffs, | : **No. 2583** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>: |
| Defendants. | : |

## MOTION FOR ADMISSION *PRO HAC VICE* OF MAUREEN F. BROWNE, TO REPRESENT MEAD JOHNSON DEFENDANTS

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), by and through their counsel, Welsh & Recker, P.C., hereby move this Court for an order pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.) admitting Maureen F. Browne, to the bar of this Court, *pro hac vice*, for the purpose of representing the Mead Johnson Defendants, and aver the following in support thereof:

Case ID: 220302583
Control No.: 24070945

1.   Ms. Browne is a partner of the law firm of Covington & Burling, LLP and a resident in its DC office, located at One CityCenter, 850 Tenth Street NW, Washington, DC, 20001. Ms. Browne has an attorney-client relationship with Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, and has special skills, knowledge and experience relating to this case. The efficient administration, prosecution and resolution of this case will be materially advanced by the admission *pro hac vice* of Ms. Browne.  A Verification Statement from Ms. Browne, is attached hereto as Exhibit A.

2.   Ms. Browne is a member in good standing in the state of DC and has been admitted to practice since 1994.  See Exhibit A.

3.   Ms. Browne's law firm serves as national trial counsel for the Mead Johnson Defendants.  She is familiar with the complex, technical issues presented in this matter, and her participation in this case will help clarify the issues before the Court.  See Exhibit A.

4.   The Mead Johnson Defendants have specifically requested that Ms. Browne be permitted to participate in this matter and represent its interests in this matter.  See Exhibit A.

5.   Ms. Browne is not presently suspended or disbarred in any Court, nor is she currently subject to any disciplinary proceedings by any organization authorized to discipline attorneys at law. Further, Ms. Browne has never received any public discipline, including, but not limited to, suspension or disbarment by any organization with the authority to discipline attorneys at law.  Exhibit A.

Case ID: 220302583
Control No.: 24070945

6.      Ms. Browne is familiar with Pennsylvania Bar Admission Rule 301 and has agreed
to abide by the Rules of Professional Conduct applicable to Pennsylvania lawyers.
Ms. Browne will abide by the Rules of Court, including all disciplinary rules and, if
this motion is granted, she will serve as associate counsel with Catherine M.
Recker, Esquire, counsel of record for the Mead Johnson Defendants in this
matter.

7.      Ms. Browne has applied to the Pennsylvania Interest on Lawyers' Trust Account
Board (Pennsylvania IOLTA Board) and paid the appropriate fee required under
204 Pa. Code § 81.503. to be admitted pro hac vice.  Our office received a copy
of the fee payment certification letter from the IOLTA Board, a copy of which is
attached as Exhibit B.

8.      Ms. Browne will be associated with Catherine M. Recker, Esquire, of Welsh &
Recker, P.C., at all stages of this action.   Ms. Recker, after reasonable
investigation, believes that Ms. Browne is a reputable and competent attorney and
recommends that she be considered for admission *pro hac vice*. A true Verification
Statement from Ms. Recker pursuant to Pa. R. C. P. 1012.1(d)(2) is attached
hereto as Exhibit C.

9.      Catherine M. Recker, Esquire, of Welsh & Recker, P.C., is a member in good
standing of the Bar of the Commonwealth of Pennsylvania. Welsh & Recker and
Catherine M. Recker, Esquire will be counsel of record for the Mead Johnson
Defendants and will continue to participate fully in this litigation and will sign, serve,
and accept service of all papers on the Mead Johnson Defendants' behalf.

10.     All the requirements to satisfy the applicable rules of Court are met.

Case ID: 220302583
Control No.: 24070945

11.     There is no good cause for denial of this motion.


        **WHEREFORE**, it is respectfully requested that this Court enter the attached Order

granting Maureen F. Browne leave to appear as counsel *pro hac vice* for Defendants,

Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.


                                        Respectfully submitted,

                                        **WELSH & RECKER, P.C.**


Date: July 3, 2024                      /s/ Catherine M. Recker
                                        Catherine M. Recker (PA Bar No. 56813)
                                        Amy B. Carver (PA Bar No. 84819)
                                        Richard D. Walk, III (PA Bar No. 329420)
                                        306 Walnut St.
                                        Philadelphia, PA 19106
                                        Tel:    (215) 972-6430
                                        Fax:    (985) 617-1021
                                        cmrecker@welshrecker.com
                                        abcarver@welshrecker.com
                                        rwalk@welshrecker.com

Case ID: 220302583
Control No.: 24070945

## <u>CERTIFICATE OF SERVICE</u>

I, Catherine M. Recker, Esquire certify that on this date, I caused a copy of the foregoing Motion for *Pro Hac Vice* admission of Maureen F. Browne to be electronically filed through the Court's electronic filing system and that such filing generates a notice of that constitutes service on all counsel of record.

**WELSH & RECKER, P.C.**

Date: July 3, 2024                    /s/ Catherine M. Recker____
                                      Catherine M. Recker, Esquire

# EXHIBIT A

Case ID: 220302583
Control No.: 24070945

## <u>VERIFICATION OF MAUREEN F. BROWNE</u>

I, Maureen F. Browne, hereby submit this Verification Statement in support of the attached Motion for Admission *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), in this action in the Court of Common Pleas of Philadelphia County, Pennsylvania. In support of this Motion made pursuant to pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.), I swear and affirm that the following is true and correct based upon my personal knowledge:

1. I am a partner of the law firm Covington & Burling, LLP and resident in its DC office, located at One CityCenter, 850 Tenth Street NW, Washington, DC 20001. Telephone: (202) 662-5038; email address: mbrowne@cov.com.

2. I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: District of Columbia (441440). Additionally, I have been admitted to practice in the following courts: U.S. District Court for the District of Columbia, Court of Appeals of Maryland, U.S. District Court for the District of Maryland, U.S. Court of Appeals for the Fourth Circuit, U.S. Supreme Court, Court of International Trade.

3. I am a member in good standing of all Bars to which I am admitted.

4. With respect to each jurisdiction identified in Paragraph 2 above, I have never been suspended, disbarred, or otherwise disciplined by any court, nor am I the subject of any disciplinary proceedings.

5. I am involved in the following pending actions in the Philadelphia County Court of Common Pleas in which I am applying for admission *pro hac vice:*

| Case Name | Case Number |
|---|---|
| Abdullah, et al. v. Mead Johnson & Company, LLC, et al. | 220302583 |

6. If admitted, I agree to comply with and be bound by the applicable statues, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

7. I do not have any pending *pro hac vice* admissions that I have applied for in any other court jurisdictions.

8. If admitted, I agree to subject myself to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts or omissions occurring during my appearance in this matter for which admission *pro hac vice* is sought.

9. I respectfully submit that there is a good cause for my admission *pro hac vice* based upon my personal knowledge.

10. Further, I have consented to the appointment of Catherine M. Recker, Esquire, of Welsh & Recker, P.C., as the agent upon whom services of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in this matter for which admission *pro hac vice* is being sought.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information,

Case ID: 220302583
Control No.: 24070945

and belief.  I understand that statements herein are made subject to the penalties of 18

Pa. CS § 4904 (relating to unsworn falsification to authorities).


Date: July 3, 2024 /s/ *Maureen F. Browne*

Maureen F. Browne

Case ID: 220302583
Control No.: 24070945

# EXHIBIT B

Case ID: 220302583
Control No.: 24070945



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

June 26, 2024

MAUREEN F BROWNE, Esq.
COVINGTON & BURLING, LLP
ONE CITYCENTER, 850 10TH STREET NW
WASHINGTON, DC 20001

SENT TO MAUREEN F. BROWNE VIA Email: MBROWNE@COV.COM

Dear Attorney BROWNE:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Abdullah, et al. v. Mead Johnson & Company, LLC, et al., no. 220302583, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc: CATHERINE M. RECKER, Esq.

cmrecker@welshrecker.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302583
Control No.: 24070945

# EXHIBIT C

Case ID: 220302583
Control No.: 24070945

**WELSH AND RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **MARCH TERM, 2022** |
| Plaintiffs, | : **No. 2583**<br>: |
| v. | :<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>: |
| Defendants. | :<br>: |

<u>**VERIFICATION OF CATHERINE M. RECKER, ESQUIRE**</u>

COMMONWEALTH OF PENNSYLVANIA )
                                      ) ss:
COUNTY OF PHILADELPHIA )

      I, Catherine M. Recker, hereby submit this Verification Statement in support of the attached Motion to Admit Maureen F. Browne *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the Mead Johnson Defendants), in this matter.

      1.    I am a Partner at Welsh & Recker, P.C., located at 306 Walnut St., Philadelphia, PA 19106.

      2.    I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: The Commonwealth of Pennsylvania

(#56813), the State of New Jersey (#044221989). Additionally, I have been admitted to practice in the following courts: U.S. District Court, Eastern District of Pennsylvania, U.S. District Court, Middle District of Pennsylvania, U.S. District Court, Western District of Pennsylvania, U.S. District Court, District of New Jersey, U.S. District Court, Southern District of New York, U.S. Court of Appeals, Third Circuit, U.S. Court of Appeals, Fourth Circuit, United States Supreme Court.

3.     I am a member in good standing of the Bar of the Commonwealth of Pennsylvania and the other courts to which I am admitted.

4.     I am licensed to practice law in all the jurisdictions that I have been admitted and am counsel of record representing the Mead Johnson Defendants in this matter.

5.     I hereby certify and affirm that after reasonable investigation and on personal knowledge, I believe that Maureen F. Browne, is a reputable and competent attorney, and I am in a position to recommend that this candidate be admitted *pro hac vice* for practice in the Commonwealth of Pennsylvania to represent the Mead Johnson Defendants in this matter.

6.     I currently sponsor a candidate for admission pro hac vice in the following 22 related cases:

| Case Name | Case Number |
| --- | --- |
| Abdullah, et al. v. Mead Johnson & Company, LLC, et al. | 220302583 |
| Carter, et al. v. Mead Johnson & Company, LLC, et al. | 220302588 |
| Goodmond, et al. v. Mead Johnson & Company, LLC, et al. | 220400208 |

2

Case ID: 220302583
Control No.: 24070945

| | |
|---|---|
| Goodmond, et al. v. Mead Johnson & Company, LLC, et al. | 220400212 |
| Henderson, et al. v. Mead Johnson & Company, LLC, et al. | 220400127 |
| Kajuffa, et al. v. Mead Johnson & Company, LLC, et al. | 220302978 |
| Mays, et al. v. Mead Johnson & Company, LLC, et al. | 220301963 |
| McMillian, et al. v. Mead Johnson & Company, LLC, et al. | 220400140 |
| Moment, et al. v. Mead Johnson & Company, LLC, et al. | 220400142 |
| Parker, et al. v. Mead Johnson & Company, LLC, et al. | 220302983 |
| Ross, et al. v. Mead Johnson & Company, LLC, et al. | 220302981 |
| Sanders, et al. v. Mead Johnson & Company, LLC, et al. | 220400153 |
| Short, et al. v. Mead Johnson & Company, LLC, et al. | 220400159 |
| Stills, et al. v. Mead Johnson & Company, LLC, et al. | 220302617 |
| Taylor, et al. v. Mead Johnson & Company, LLC, et al. | 220302606 |
| Thomas, et al. v. Mead Johnson & Company, LLC, et al. | 220400158 |
| Walker-Savage, et al. v. Mead Johnson & Company, LLC, et al. | 200400156 |
| Watson, et al. v. Mead Johnson & Company, LLC, et al. | 220302967 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302614 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302601 |
| Wiggins, et al. v. Mead Johnson & Company, LLC, et al. | 220302986 |
| Williams, et al. v. Mead Johnson & Company, LLC, et al. | 220400141 |

7.    If applicable, at the conclusion of this matter, I affirm that any proceeds from the settlement of this cause of action in which Ms. Browne is granted admission *pro hac vice* shall be received, held, distributed, and accounted

3

for in accordance with Rule 301 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information, and belief. I understand that statements herein are made subject to the penalties of 18 Pa. CS §4904 (relating to unsworn falsification to authorities).

**WELSH & RECKER, P.C.**

By:    /s/ Catherine M. Recker
       Catherine M. Recker, Esquire

Date: July 3, 2024

4

Case ID: 220302583
Control No.: 24070945