# EXHIBIT A-64

# PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
|---|
| 24070946 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

### FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: 07/23/2024 |
|---|---|

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

March _____ Term, 2022
*Month*                        *Year*

No. _____ 02583

Name of Filing Party:
MEAD JOHNSON & COMPANY LLC-DFT
MEAD JOHNSON NUTRITION COMPANY-DFT

ABDULLAH ETAL VS MEAD JOHNSON & COMPANY, LLC, ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition   ☐ Response to Motion

Has another petition/motion been decided in this case?   ☐ Yes   ☐ No
Is another petition/motion pending?   ☐ Yes   ☐ No
*If the answer to either question is yes, you must identify the judge(s):*

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

**I. CASE PROGRAM**

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE LINDA CARPENTER
Applicable Petition/Motion Deadline: N/A
Has deadline been previously extended by the Court: N/A

**II. PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JAMES A YOUNG
  BURNS WHITE LLC 1835 MARKET STREET
  SUITE 2700 , PHILADELPHIA PA 19103
SEAN P FAHEY
  TROUTMAN PEPPER 3000 TWO LOGAN SQ
  18TH AND ARCH STREETS , PHILADELPHIA
  PA 19103-2799
RONNI E FUCHS
  301 CARNEGIE CENTER SUITE 400 ,
  PRINCETON NJ 08540
JOSEPH E ONEIL
  CAMPBELL CONROY & ONEIL 1205
  WESTLAKES DR SUITE 330 , BERWYN PA
  19312
MARQUES HILLMAN RICHESON
  JONES DAY 901 LAKESIDE AVENUE NORTH
  POINT , CLEVELAND OH 44114

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____   July 3, 2024   CATHERINE M. RECKER
*(Attorney Signature/Unrepresented Party)*   *(Date)*   *(Print Name)*   *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date. No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2407008107
03-JUL-24 10:02:05

THOMAS R KLINE
  KLINE & SPECTER 1525 LOCUST ST., 19TH
  FL. , PHILADELPHIA PA 19102
ASHLEY C KELLER
  KELLER POSTMAN, LLC 150 N. RIVESIDE
  PLAZA SUITE 1400 , CHICAGO IL 60606
BENJAMIN WHITING
  KELLER POSTMAN, LLC 150 N. RIVERSIDE
  PLAZA SUITE 4100 , CHICAGO IL 60606
KENNETH A MURPHY
  TUCKER LAW GROUP, LLC 1801 MARKET
  STREET SUITE 2500 , PHILADELPHIA PA
  19103-6996
EVAN GLASSMAN
  STEPTOE, LLP 1114 AVENUE OF THE
  AMERICAS , NEW YORK NY 10036

**FILED**
03 JUL 2024 10:07 am
**Civil Administration**
M. RIVERA

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| | : | |
| | : | **MARCH TERM, 2022** |
| Plaintiffs, | : | **No. 2583** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, | : | |
| | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this _____ day of _____, 2024, upon consideration of the Motion for Admission Pro Hac Vice of Sumner T. Truax, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits Sumner T. Truax, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT**:

_____
J.

Case ID: 220302583
Control No.: 24070946

**WELSH & RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **MARCH TERM, 2022**<br>: **No. 2583** |
| Plaintiffs, | : |
| v. | :<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>: |
| Defendants. | :<br>: |

### MOTION FOR ADMISSION *PRO HAC VICE* OF SUMNER T. TRUAX, TO REPRESENT MEAD JOHNSON DEFENDANTS

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), by and through their counsel, Welsh & Recker, P.C., hereby move this Court for an order pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.) admitting Sumner T. Truax, to the bar of this Court, *pro hac vice*, for the purpose of representing the Mead Johnson Defendants, and aver the following in support thereof:

1.  Mr. Truax is an associate of the law firm of Covington & Burling, LLP and a resident in its DC office, located at One CityCenter, 850 Tenth Street NW, Washington, DC, 20001. Mr. Truax has an attorney-client relationship with Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, and has special skills, knowledge and experience relating to this case. The efficient administration, prosecution and resolution of this case will be materially advanced by the admission *pro hac vice* of Mr. Truax. A Verification Statement from Mr. Truax, is attached hereto as Exhibit A.

2.  Mr. Truax is a member in good standing in the District of Columbia and the State of Illinois and has been admitted to practice since 2021. See Exhibit A.

3.  Mr. Truax's law firm serves as national trial counsel for the Mead Johnson Defendants. He is familiar with the complex, technical issues presented in this matter, and his participation in this case will help clarify the issues before the Court. See Exhibit A.

4.  The Mead Johnson Defendants have specifically requested that Mr. Truax be permitted to participate in this matter and represent its interests in this matter. See Exhibit A.

5.  Mr. Truax is not presently suspended or disbarred in any Court, nor is he currently subject to any disciplinary proceedings by any organization authorized to discipline attorneys at law. Further, Mr. Truax has never received any public discipline, including, but not limited to, suspension or disbarment by any organization with the authority to discipline attorneys at law. Exhibit A.

Case ID: 220302583
Control No.: 24070946

6.     Mr. Truax is familiar with Pennsylvania Bar Admission Rule 301 and has agreed to abide by the Rules of Professional Conduct applicable to Pennsylvania lawyers. Mr. Truax will abide by the Rules of Court, including all disciplinary rules and, if this motion is granted, he will serve as associate counsel with Catherine M. Recker, Esquire, counsel of record for the Mead Johnson Defendants in this matter.

7.     Mr. Truax has applied to the Pennsylvania Interest on Lawyers' Trust Account Board (Pennsylvania IOLTA Board) and paid the appropriate fee required under 204 Pa. Code § 81.503. to be admitted pro hac vice. Our office received a copy of the fee payment certification letter from the IOLTA Board, a copy of which is attached as Exhibit B.

8.     Mr. Truax will be associated with Catherine M. Recker, Esquire, of Welsh & Recker, P.C., at all stages of this action. Ms. Recker, after reasonable investigation, believes that Mr. Truax is a reputable and competent attorney and recommends that he be considered for admission *pro hac vice*. A true Verification Statement from Ms. Recker pursuant to Pa. R. C. P. 1012.1(d)(2) is attached hereto as Exhibit C.

9.     Catherine M. Recker, Esquire, of Welsh & Recker, P.C., is a member in good standing of the Bar of the Commonwealth of Pennsylvania. Welsh & Recker and Catherine M. Recker, Esquire will be counsel of record for the Mead Johnson Defendants and will continue to participate fully in this litigation and will sign, serve, and accept service of all papers on the Mead Johnson Defendants' behalf.

10.    All the requirements to satisfy the applicable rules of Court are met.

11.    There is no good cause for denial of this motion.

3

**WHEREFORE**, it is respectfully requested that this Court enter the attached Order granting Sumner T. Truax leave to appear as counsel *pro hac vice* for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

Respectfully submitted,

**WELSH & RECKER, P.C.**

Date: July 3, 2024

/s/ Catherine M. Recker
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel: (215) 972-6430
Fax: (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

4

<u>**CERTIFICATE OF SERVICE**</u>

I, Catherine M. Recker, Esquire certify that on this date, I caused a copy of the foregoing Motion for *Pro Hac Vice* admission of Sumner T. Truax to be electronically filed through the Court's electronic filing system and that such filing generates a notice of that constitutes service on all counsel of record.

**WELSH & RECKER, P.C.**

Date: July 3 ,2024

/s/ Catherine M. Recker
Catherine M. Recker, Esquire

Case ID: 220302583
Control No.: 24070946

# EXHIBIT A

Case ID: 220302583
Control No.: 24070946

## <u>VERIFICATION OF SUMNER T. TRUAX</u>

I, Sumner T. Truax, hereby submit this Verification Statement in support of the attached Motion for Admission *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), in this action in the Court of Common Pleas of Philadelphia County, Pennsylvania. In support of this Motion made pursuant to pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.), I swear and affirm that the following is true and correct based upon my personal knowledge:

1. I am an associate of the law firm Covington & Burling, LLP and resident in its DC office, located at One CityCenter, 850 Tenth Street NW, Washington, DC 20001. Telephone: (202) 662-5916; email address: struax@cov.com.

2. I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: State of Illinois (6346688), District of Columbia (1780596). Additionally, I have been admitted to practice in the following courts: U.S. District Court, Northern District of Illinois, U.S. District Court, District of Colorado.

3. I am a member in good standing of all Bars to which I am admitted.

4. With respect to each jurisdiction identified in Paragraph 2 above, I have never been suspended, disbarred, or otherwise disciplined by any court, nor am I the subject of any disciplinary proceedings.

5. I am involved in the following pending actions in the Philadelphia County Court of Common Pleas in which I am applying for admission *pro hac vice:*

| Case Name | Case Number |
|---|---|
| Abdullah, et al. v. Mead Johnson & Company, LLC, et al. | 220302583 |

6. If admitted, I agree to comply with and be bound by the applicable statues, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

7. I do not have any pending *pro hac vice* admissions that I have applied for in any other court jurisdictions.

8. If admitted, I agree to subject myself to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts or omissions occurring during my appearance in this matter for which admission *pro hac vice* is sought.

9. I respectfully submit that there is a good cause for my admission *pro hac vice* based upon my personal knowledge.

10. Further, I have consented to the appointment of Catherine M. Recker, Esquire, of Welsh & Recker, P.C., as the agent upon whom services of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in this matter for which admission *pro hac vice* is being sought.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information,

2

and belief.  I understand that statements herein are made subject to the penalties of 18

Pa. CS § 4904 (relating to unsworn falsification to authorities).


Date: July 3, 2024                              /s/ *Sumner T. Truax*_____
                                                Sumner T. Truax

3

Case ID: 220302583
Control No.: 24070946

# EXHIBIT B

Case ID: 220302583
Control No.: 24070946



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

June 28, 2024


SUMNER T. TRUAX, Esq.
COVINGTON & BURLING, LLP
ONE CITYCENTER, 850 10TH STREET SW
WASHINGTON, DC 20001


SENT TO SUMNER T. TRUAX VIA Email: STRUAX@COV.COM


Dear Attorney TRUAX:


This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Abdullah, et al. v. Mead Johnson & Company, LLC, et al. , no. 220302583, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

*Stephanie J. Libhart*

Stephanie S. Libhart
Executive Director


cc: CATHERINE M. RECKER, Esq.

     cmrecker@welshrecker.com


Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302583
Control No.: 24070946

# EXHIBIT C

Case ID: 220302583
Control No.: 24070946

**WELSH AND RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS** <br> : **PHILADELPHIA COUNTY** <br> : <br> : **MARCH TERM, 2022** |
| Plaintiffs, | : **No. 2583** |
| v. | : <br> : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : <br> : |
| Defendants. | : <br> : |

### VERIFICATION OF CATHERINE M. RECKER, ESQUIRE

COMMONWEALTH OF PENNSYLVANIA          )
                                                                                  ) ss:
COUNTY OF PHILADELPHIA                        )

I, Catherine M. Recker, hereby submit this Verification Statement in support of the attached Motion to Admit Sumner T. Truax *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the Mead Johnson Defendants), in this matter.

1.    I am a Partner at Welsh & Recker, P.C., located at 306 Walnut St., Philadelphia, PA 19106.

2.    I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: The Commonwealth of Pennsylvania

Case ID: 220302583
Control No.: 24070946

(#56813), the State of New Jersey (#044221989). Additionally, I have been admitted to practice in the following courts: U.S. District Court, Eastern District of Pennsylvania, U.S. District Court, Middle District of Pennsylvania, U.S. District Court, Western District of Pennsylvania, U.S. District Court, District of New Jersey, U.S. District Court, Southern District of New York, U.S. Court of Appeals, Third Circuit, U.S. Court of Appeals, Fourth Circuit, United States Supreme Court.

3.    I am a member in good standing of the Bar of the Commonwealth of Pennsylvania and the other courts to which I am admitted.

4.    I am licensed to practice law in all the jurisdictions that I have been admitted and am counsel of record representing the Mead Johnson Defendants in this matter.

5.    I hereby certify and affirm that after reasonable investigation and on personal knowledge, I believe that Sumner T. Truax, is a reputable and competent attorney, and I am in a position to recommend that this candidate be admitted *pro hac vice* for practice in the Commonwealth of Pennsylvania to represent the Mead Johnson Defendants in this matter.

6.    I currently sponsor a candidate for admission pro hac vice in the following 22 related cases:

| Case Name | Case Number |
|---|---|
| Abdullah, et al. v. Mead Johnson & Company, LLC, et al. | 220302583 |
| Carter, et al. v. Mead Johnson & Company, LLC, et al. | 220302588 |
| Goodmond, et al. v. Mead Johnson & Company, LLC, et al. | 220400208 |

Case ID: 220302583
Control No.: 24070946

| | |
|---|---|
| Goodmond, et al. v. Mead Johnson & Company, LLC, et al. | 220400212 |
| Henderson, et al. v. Mead Johnson & Company, LLC, et al. | 220400127 |
| Kajuffa, et al. v. Mead Johnson & Company, LLC, et al. | 220302978 |
| Mays, et al. v. Mead Johnson & Company, LLC, et al. | 220301963 |
| McMillian, et al. v. Mead Johnson & Company, LLC, et al. | 220400140 |
| Moment, et al. v. Mead Johnson & Company, LLC, et al. | 220400142 |
| Parker, et al. v. Mead Johnson & Company, LLC, et al. | 220302983 |
| Ross, et al. v. Mead Johnson & Company, LLC, et al. | 220302981 |
| Sanders, et al. v. Mead Johnson & Company, LLC, et al. | 220400153 |
| Short, et al. v. Mead Johnson & Company, LLC, et al. | 220400159 |
| Stills, et al. v. Mead Johnson & Company, LLC, et al. | 220302617 |
| Taylor, et al. v. Mead Johnson & Company, LLC, et al. | 220302606 |
| Thomas, et al. v. Mead Johnson & Company, LLC, et al. | 220400158 |
| Walker-Savage, et al. v. Mead Johnson & Company, LLC, et al. | 200400156 |
| Watson, et al. v. Mead Johnson & Company, LLC, et al. | 220302967 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302614 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302601 |
| Wiggins, et al. v. Mead Johnson & Company, LLC, et al. | 220302986 |
| Williams, et al. v. Mead Johnson & Company, LLC, et al. | 220400141 |

7.     If applicable, at the conclusion of this matter, I affirm that any proceeds from the settlement of this cause of action in which Mr. Truax is granted admission *pro hac vice* shall be received, held, distributed, and accounted

3

for in accordance with Rule 301 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information, and belief. I understand that statements herein are made subject to the penalties of 18 Pa. CS §4904 (relating to unsworn falsification to authorities).

**WELSH & RECKER, P.C.**

By: /s/ Catherine M. Recker
Catherine M. Recker, Esquire

Date: July 3, 2024

4

# EXHIBIT A-65

**KLINE & SPECTER, P.C.**
By:
Thomas R. Klein, Esq.
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Thomas.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.burke@klinespecter.com
Jack.oneill@klinespecter.com



*Filed and Attested by the Office of Judicial Records 17 AUG 2024 09:12 pm S. GILLIAM*

|  |  |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,<br><br>*Plaintiff*,<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL,<br><br>*Defendants*. | : IN THE COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: CIVIL TRIAL DIVISION<br>:<br>: MARCH TERM 2022<br>: NO. 02583<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**NOTICE TO DEFEND**

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lackawanna Bar Association
233 Penn Avenue
Scranton, PA 18503
 (570) 961-2714

ADVISO

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Colegio de Abogados del Lackawanna
233 Penn Avenue, Scranton, PA 18503
(570) 961-2714

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrod, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrod@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, <br><br> *Plaintiff*, <br><br> v. <br><br> MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, <br><br> *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY** <br><br> **CIVIL TRIAL DIVISION** <br><br> **MARCH TERM 2022** <br> **NO. 02583** |

## SECOND AMENDED COMPLAINT

Plaintiff brings this Second Amended Complaint and Demand for Jury Trial (the "Second Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn

1

Medicine" or "Pennsylvania Hospital"), together "Defendants."    Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1.    This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital.  Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.    This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.    As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.    Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.    Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania.  Ms. Abdullah is the parent and natural guardian of H.S., a minor.  Ms. Abdullah's address is 335 Passmore Street, Philadelphia, PA 19111.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws

Case ID: 220302583

of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants

3

Case ID: 220302583

conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *H.S.'s NEC Diagnosis*

11.     H.S. was born premature at Pennsylvania Hospital in Philadelphia, Pennsylvania on September 12, 2006.

12.     At birth, H.S.'s gestational age was approximately 25 weeks and she weighed 847 grams.

13.     Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk decreases the risk of NEC.

14.     Specifically, beginning on October 3, 2006, Dr. Thomas Mollen ordered that H.S. was to

Case ID: 220302583

be fed mother's breast milk which contained bovine-based human milk fortifier (HMF), which based upon information and belief was manufactured by Defendant Abbott Laboratories.

15.     Further, on November 8, 2006, Dr. Mollen revised his nutritional orders to start feeding infant H.S. 30ml of exclusively Mead Johnson's "Enfacare" bovine-based formula every three hours going forward.

16.     These feeds all occurred despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products, including formula and fortifier, increase the risk of NEC and that human milk can decrease the risk of NEC.

17.     On November 10, 2006, H.S. was diagnosed in the NIC-U with Stage III NEC, and immediately thereafter was forced to undergo a colonic resection surgery, permanently removing part of the infant's colon as a result of her NEC diagnosis.

18.     Infant plaintiff continues to suffer long term gastrointestinal health effects as a result of this surgical removal of part of her colon.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

19.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

20.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-

Case ID: 220302583

term health problems, and death.

*Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

21.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

22.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

23.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

24.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

25.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

26.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants

Case ID: 220302583

and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

27. Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

28. Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Wiger of those risks and alternatives to have avoided the cow's milk-based products.

### Ms. Abdullah Discovers Her Claim

29. Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Abdullah did not know, and had no reason to know or suspect, that H.S.'s NEC could have been caused by the Defendant Manufacturers' products.

### Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Abdullah

30. Despite exercising reasonable diligence, Ms. Abdullah was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of H.S.'s injuries.

Case ID: 220302583

31.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of H.S.'s NEC diagnosis, Ms. Abdullah undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

32.     The health care providers at Penn Medicine responded only that H.S. had gotten NEC because she was born premature.  Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

33.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused H.S.'s injuries.  Penn Medicine's response at the time did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of the Defendants.

34.     Ms. Abdullah is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

35.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Abdullah had no reason to doubt their word.

36.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

37.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

Case ID: 220302583

38.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

  39.   Because of the misleading information distributed by the Defendant Manufacturers, as further detailed *infra*, any research conducted by Ms. Abdullah immediately after H.S.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused H.S.'s injuries.

40.     Ms. Abdullah also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Abdullah unaware that the Defendant Manufacturers' products caused H.S.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302583

for product placement and access to the hospital staff—were also not public or knowable to Ms. Abdullah, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

41. In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

42. The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

43. Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

44. Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

Case ID: 220302583

45.     Based upon information and belief, during the relevant time period, Pennsylvania Hospital, Penn Medicine, and the Hospital of the University of Pennsylvania stocked formula products from both Abbott and Mead.

46.     Additionally, Defendant Hospital failed to inform Ms. Abdullah that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Abdullah was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Abdullah asked Plaintiff's health care providers at Defendant Hospital why a premature infant like H.S. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to H.S. could increase the risk of NEC to preterm infants, responding only that H.S. had gotten NEC solely because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

47.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Abdullah of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Abdullah that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like H.S., it was enough for Ms. Abdullah to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

Case ID: 220302583

48.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

49.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

50.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

51.     For example, upon information and belief, Mead creates information booklets for parents of premature infants to help answer some of their questions and concerns about having a premature infant in the NICU that it provides to hospitals for dissemination to parents.  While Mead's booklets explain feeding options for premature infants, including formula, they do not mention that Mead's premature formula and fortifier products increase the risk of premature infants developing necrotizing enterocolitis.  Instead, the booklets advise parents that sometimes a combination of breast milk and formula may be best and that premature infants will be happy and healthy or nourished and healthy regardless of whether they are receiving breast milk or formula.

Case ID: 220302583

52.     Similarly, upon information and belief, Abbott publishes a pediatric nutrition product guide that is available online for anyone, including parents, to access wherein Abbott advises that "human milk alone does not meet all the nutritional needs of preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU." Nowhere in its product guide does Abbott reference that its products increase the risk of necrotizing enterocolitis.

53.     Abbott also has a consumer-facing website accessible to anyone online, including parents, that specifically discusses nutrition for premature infants, wherein Abbott tells parents of premature infants that "your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." Nowhere in its discussion of preterm infant fortifiers or formulas does Abbott state that its products increase the risk of necrotizing enterocolitis or that they pose more of a risk that just providing preterm infants with breast milk only. Nor does Abbott disclose that the "human milk fortifier" is actually a cow's milk based product and not a human milk-based product, which misleads consumers.

54.     Upon information and belief, both Mead and Abbott also provide materials and programs to the hospitals and the physicians and medical staff who are treating premature infants about the manufacturers' preterm products. Upon information and belief, these materials represent that the manufacturers' preterm products are safe and necessary for preterm infants. Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care.

13

Case ID: 220302583

55.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

56.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

57.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

58.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

59.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein,

Case ID: 220302583

and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

60.     Abbott's website also contains product information and a downloadable guide for each of its products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. None of these pages or guides contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Abbott's website for "necrotizing enterocolitis" returns no hits. Instead, Abbott states that "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction." This statement is entirely misleading, as it improperly indicates that the risk of things like "spitting up" are the same for premature infants using Abbott's products and premature infants receiving breast milk or donor milk, equates formula to non-cow's milk-based feeding options like breast milk and donor milk, fails to mention NEC, and minimizes the risk of its products.

15

Case ID: 220302583

61.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

62.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

16

63. Mead's website also contains product information for each of its products specifically targeting preterm and low-birth-weight infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). None of these pages contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Mead's website for "necrotizing enterocolitis" returns no hits. Instead, Mead advertises on its website that it "has led the way in developing safe, high-quality, innovative products" – including preterm products – "to help meet the nutritional needs of infants."

64. Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

65. Here, S.P was discharged from CHOP with the recommendation to continue use of Abbott's Similac Special Care 24 formula.

66. Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

17

Case ID: 220302583

67.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:



68.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

69.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The

Case ID: 220302583

Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

70. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

71. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

72. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals'

19

most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

73.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

74.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

75.     On information and belief, prior to H.S.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like H.S. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

Case ID: 220302583

76.     On information and belief, prior to H.S.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like H.S. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

77.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like H.S.

### *The Defendant Manufacturers' Inadequate Warnings*

78.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

79.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

80.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

81.     Mead cites no medical literature or research to guide the use of its products.

82.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the

21

Case ID: 220302583

magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

83.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

84.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

85.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies. Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

86.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

87.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

Case ID: 220302583

88.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

89.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

90.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human milk decreases the risk of NEC for premature infants.  However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

91.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.  The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the

Case ID: 220302583

National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

92. Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

93. Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

94. Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

95. Given it was known since at least the early 2000s, and as far back as the 1990s, that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

96. Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

Case ID: 220302583

97.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

98.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

99.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

100.    Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.   On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted

Case ID: 220302583

their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

101. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

102. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

103. On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

### CAUSES OF ACTION
### COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

104. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

105. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to

26

Case ID: 220302583

manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

106.  Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

107.  Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.    Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

108.  The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

109.  Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

110.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

111.  Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

112.  Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or

Case ID: 220302583

increased the risk of their NEC and injuries.

113.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

Case ID: 220302583

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

114. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

115. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

116. Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

117. Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

      a. Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b. Failed to warn that cow's milk-based products are unsafe and/or contraindicated

<div align="center">29</div>

for premature infants like the Injured Infant; and/or

c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

118.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

119.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased

30

risk of their developing NEC.

120.  The unwarned-of risks are not of a kind that an ordinary consumer would expect.  Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.    Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

121.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

31

Case ID: 220302583

    f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.   For such other and further relief as the Court deems proper.

### COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

122.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

123.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

124.  At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

125.  Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

126.  Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

    a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

Case ID: 220302583

b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

127. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring,

33

Case ID: 220302583

prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

128. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

129. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

130. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e. For interest as permitted by law;

    f. For attorney's fees, expenses, and recoverable costs incurred in connection with

Case ID: 220302583

this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

131.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

132.  At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

133.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

134.  Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

135.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including patient consumers, and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were

Case ID: 220302583

not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were safe for and provided better nutrition and growth to premature infants than donor milk, a non-cow's milk-based alternative to breast milk; and/or

i.  That their products can fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and health or nourished and health on their products; and/or

j.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

k.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites..

136.  Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.

36

Case ID: 220302583

137. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent:

    a. Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

    b. Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

    c. Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    d. Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    e. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

37

Case ID: 220302583

f.   Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g.   Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h.   Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i.   Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j.   Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.   Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

Case ID: 220302583

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials,

Case ID: 220302583

and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

138.  The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.  Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

139.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

140.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained

Case ID: 220302583

as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

141.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

142.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

143.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

144. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this

information.

145.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including consumers and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

  a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

  b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

  c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

  d.  That cow's milk-based products were safe for premature infants; and/or

  e.  That cow's milk-based products were necessary for optimum growth; and/or

  f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

  g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

  h.  That their products were safe for and provided better nutrition and growth to premature infants that donor milk, a non-cow's milk-based alternative to breast milk; and/or

  i.  Thet their products can be fed with confidence to most of the preterm infants in the

42

Case ID: 220302583

NICU and/or that premature infants would be happy and healthy or nourished and health on their products; and/or

j.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

k.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

146.  In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent.

a.  Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

b.  Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

c.  Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d.  Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were

Case ID: 220302583

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

44

j.   Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.   Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l.   Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.   Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.   Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.   Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.   Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

45

Case ID: 220302583

q. Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r. Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s. Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t. Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

147. Abbott and Mead were negligent or careless in not determining those representations to be false.

148. The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

149. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

46

Case ID: 220302583

150.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

151.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

Case ID: 220302583

152. Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

153. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

154. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

155. Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

156. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

Case ID: 220302583

157.   Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

158.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

159.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e.   Failing to provide a warning in a method reasonably calculated/expected to reach

49

Case ID: 220302583

the parents of newborns; and/or

f.   Failing to provide statistical evidence showing the magnitude of increased risk of
     NEC in premature infants associated with cow's milk-based products; and/or

g.   Failing to prevent the Defendant Manufacturers' sales representatives from
     misrepresenting to Pennsylvania Hospital's healthcare professionals and medical
     staff that premature babies would not grow adequately with human milk and human
     milk products and that use of donor milk was not advised for premature infants.

160.   Reasonable hospitals under the same or similar circumstances would have warned of the
above risks, would have instructed their healthcare professionals and medical staff—as well as
patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the
ability of the Defendant Manufacturers' sales representatives to market the Defendant
Manufacturers' unreasonably dangerous products without adequate warning.

161.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its
medical professionals and the parents of premature infants, including the Plaintiff Parent, would
not have realized the risks associated with feeding cow's milk-based formula to premature infants.

162.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its
duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably
dangerous products, the Injured Infant would not have been exposed to the Defendant
Manufacturers' cow's milk-based products.

163.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to
warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-
based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based
products, which caused and/or increased the risk of developing NEC and significant injuries.

Case ID: 220302583

164.  As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

165.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth

Case ID: 220302583

herein.

166.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

167.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

168.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

169.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

Case ID: 220302583

170. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

171. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

172. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are increased risk for NEC.

173. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

174. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

175. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

176. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

177. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its

53

Case ID: 220302583

medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

178. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

     a.  Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

     b.  Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted or prevented the use of cow's milk-based products for feeding premature babies; and/or

     c.  Failing to formulae, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

     d.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

     e.  Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

     f.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

Case ID: 220302583

g.  Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h.  Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i.  Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

l.  Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits.

m.  Allowing parental preference to be the standard for feeding premature infants;

55

Case ID: 220302583

n. Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

o. Failing to follow the American Academy of Pediatrics recommendations to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p. Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q. Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

179. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

180. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

181. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

Case ID: 220302583

developing NEC and significant injuries.

182. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

183. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

184. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

185. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their

57

feeding of cow's milk-based products to premature babies; and/or

e.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.  Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.  Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.  Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

186.  A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably

Case ID: 220302583

dangerous products without adequate warning.

187. A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

188. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

189. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

190. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

Case ID: 220302583

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

<div align="center"><b>DEMAND FOR JURY TRIAL</b></div>

191. Plaintiff hereby demands a jury trial for all claims triable.

Dated: <u>July 16, 2024</u>

                Respectfully submitted,

                **KLINE & SPECTER, P.C.**

By:    <u>*/s/ Tobias L. Millrood*</u>
        Tobias L. Millrood, Esq.
        Elizabeth A. Crawford, Esq.
        Timothy A. Burke, Esq.
        John P. O'Neill, Esq.

        Benjamin Whiting, Esq. (pro hac vice)
        **KELLER POSTMAN LLC**
        150 N. Riverside Plaza, Suite 4100
        Chicago, IL 60606
        Telephone: (312) 741-5220
        Fax: (312) 971-3502
        *Attorneys for Plaintiffs*

<div align="center">60</div>

Case ID: 220302583

# EXHIBIT A-66

**FILED**
03 JUL 2024 10:07 am
**Civil Administration**
M. RIVERA

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| Plaintiffs, | : **MARCH TERM, 2022** : **No. 2583** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| Defendants. | : |

**UNCONTESTED**

### ORDER

**AND NOW**, this 25ᵀᴴ day of JULY, 2024, upon consideration of

the Motion for Admission Pro Hac Vice of Sumner T. Truax, to Represent Defendants,

Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby

**ORDERED** that the Motion is **GRANTED**. This Court hereby admits Sumner T. Truax,

pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and

Mead Johnson Nutrition Company.

BY THE COURT:

J.

ORDER-Abdullah Etal Vs Mead Johnson



22030258300124

Case ID: 220302583
Control No.: 24070946

# EXHIBIT A-67

**FILED**

03 JUL 2024 10:04 am

**Civil Administration**

M. RIVERA

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiffs, | **MARCH TERM, 2022 No. 2583** |
| v. | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | **UNCONTESTED** |
| Defendants. | |

## ORDER

**AND NOW**, this _25ᵀᴴ_ day of _July_, 2024, upon consideration of

the Motion for Admission Pro Hac Vice of Maureen F. Browne, to Represent Defendants,

Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby

**ORDERED** that the Motion is **GRANTED**. This Court hereby admits Maureen F. Browne,

pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and

Mead Johnson Nutrition Company.

**BY THE COURT:**

_____ J.

ORDER-Abdullah Etal Vs Mead Johnson

22030258300125

Case ID: 220302583
Control No.: 24070945

# EXHIBIT A-68

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL

| | | |
|---|---|---|
| **ABDULLAH, et al.** | : | **CASE NO. 220302583** |
| | : | |
| **v.** | : | **CONTROL NO. 24053109** |
| | : | |
| **MEAD JOHNSON & COMPANY,** | : | |
| **LLC, et al.** | : | |

## ORDER

**AND NOW,** this 31st day of July, 2024, upon consideration of Defendants Mead Johnson

& Company, LLC and Mead Johnson Nutrition Company's Preliminary Objections to Plaintiffs'

First Amended Complaint, and any response thereto, it is hereby **ORDERED** that the

Preliminary Objections are **MOOT** without prejudice to file renewed Preliminary Objections to

the Second Amended Complaint filed July 17, 2024, pursuant to Order of this Court dated May

20, 2024.

BY THE COURT:



CARPENTER, J.

ORDER-Abdullah Etal Vs Mead Johnson

22030258300131

# EXHIBIT A-69

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL

|  |  |  |
|---|---|---|
| **ABDULLAH, et al.** | : | **CASE NO. 220302583** |
|  | : |  |
| **v.** | : | **CONTROL NO. 24052736** |
|  | : |  |
| **MEAD JOHNSON & COMPANY,** | : |  |
| **LLC, et al.** | : |  |

## ORDER

**AND NOW,** this 31st day of July, 2024, upon consideration of Defendants Pennsylvania

Hospital of the University of Pennsylvania Health System d/b/a/ Pennsylvania Hospital and the

Trustees of the University of Pennsylvania d/b/a Penn Medicine' Preliminary Objections to

Plaintiffs' First Amended Complaint, and any response thereto, it is hereby **ORDERED** that the

Preliminary Objections are **MOOT** without prejudice to file renewed Preliminary Objections to

the Second Amended Complaint filed July 17, 2024, pursuant to Order of this Court dated May

20, 2024.

**BY THE COURT:**



CARPENTER, J.

ORDER-Abdullah Etal Vs Mead Johnson

22030258300132

# EXHIBIT A-70

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

ABDULLAH, et al.              :      **CASE NO. 220302583**

v.                       :      **CONTROL NO. 24052816**

MEAD JOHNSON & COMPANY,   :
LLC, et al.                 :

## ORDER

**AND NOW,** this 31ˢᵗ day of July, 2024, upon consideration of Defendant Abbott

Laboratories' Preliminary Objections to Plaintiffs' First Amended Complaint, and any response

thereto, it is hereby **ORDERED** that the Preliminary Objections are **MOOT** without prejudice to

file renewed Preliminary Objections to the Second Amended Complaint filed July 17, 2024,

pursuant to Order of this Court dated May 20, 2024.

**BY THE COURT:**

CARPENTER, J.

ORDER-Abdullah Etal Vs Mead Johnson

22030258300133

# EXHIBIT A-71

|  |  |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,<br><br>Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: CIVIL ACTION<br>:<br>: MARCH TERM 2022<br>: NO. 2583<br>: |

Filed and Attested by the
Office of Judicial Records
02 OCT 2024 03:11 pm
S. GILLIAM

## ORDER

**AND NOW**, this _____ day of _____ 2024, upon consideration of the

Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine to Plaintiffs' Second Amended Complaint, and any Response thereto, it is

hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED**

that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                                              J.

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | MARCH TERM 2022 |
| | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | | |

## ALTERNATIVE ORDER

**AND NOW**, this _____ day of _____ 2024, upon consideration of the

Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine to Plaintiffs' Second Amended Complaint, and any Response thereto, it is

hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED**

that:

1. Count VI of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

2. Count VII of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

3. Plaintiffs' claims for punitive damages as to Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct; and

4. Plaintiff Terraine Abdullah's claims in her own right are **DISMISSED** with prejudice.

5. Plaintiffs' Second Amended Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                              J.

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire
Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Ste. 2700
Philadelphia, PA 19103
(215) 587-1625 / 1628 / 1669
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | MARCH TERM 2022 |
| | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | | |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter "Moving Defendants") hereby preliminarily object to Plaintiffs' Second Amended Complaint, and, in support thereof, aver as follows:

**I.    FACTUAL AND PROCEDURAL HISTORY**

1.    Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott

Case ID: 220302583
Control No.: 24081569

Laboratories ("Abbott"). A true and correct copy of Plaintiffs' Complaint is attached hereto as Exhibit "A."

2.     On June 9, 2023, Moving Defendants filed preliminary objections to Plaintiffs' Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3) strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes of action, and based on the applicable statute of limitations. A true and correct copy of Preliminary Objections to Plaintiffs' Complaint is attached hereto as Exhibit "B."

3.     On March 22, 2024, the Court sustained Moving Defendants' preliminary objections, and ordered Plaintiffs to file an Amended Complaint "stating with specificity the factual bases for the professional negligence claim at issue." A true and correct copy of the Court's Order is attached hereto Exhibit "C."

4.     On April 23, 2024, Plaintiffs filed an Amended Complaint, which still contained substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary Objections.  A true and correct copy of Plaintiffs' Amended Complaint is attached hereto as Exhibit "D."

5.     Thus, on May 13, 2024, Moving Defendants filed Preliminary Objections to Plaintiffs' Amended Complaint. A true and correct copy of Moving Defendants' Preliminary Objections to Plaintiffs' Amended Complaint is attached hereto as Exhibit "E."

6.     On July 17, 2024, Plaintiffs filed a Second Amended Complaint, which includes some additional factual allegations, but the same fatal flaws are still present. A true and correct copy of Plaintiffs' Second Amended Complaint is attached hereto as Exhibit "F."

2

7. Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.[1]

8. Plaintiffs allege that the Plaintiff-minor, H.S., was diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Exhibit F, ¶¶ 17, 19. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula and fortifiers added to human milk.[2]

9. In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability.[3]

10. Plaintiffs aver that H.S. was born prematurely on September 12, 2006 and that "upon information and belief" she "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11, 13.

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center, Jefferson Abington Hospital and Thomas Jefferson University Hospital.

[2] Although Plaintiffs aver in the Second Amended Complaint that NEC is caused by cow's milk-based infant formula and fortifiers, as discussed *infra* and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Second Amended Complaint that indicates NEC is caused by cow's milk-based products.

[3] As is discussed below, infant formulas are regulated by the United States Food and Drug Administration and are required to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302583
Control No.: 24081569

11. Plaintiffs allege that on October 3, 2006, Dr. Thomas Mollen ordered that H.S. "was to be fed mother's milk which contained bovine-based human milk fortifier (HMF), which based upon information and believe was manufactured by Defendant Abbott Laboratories." *See id.*, ¶ 14.

12. Plaintiffs further allege that on November 8, 2006, Dr. Mollen "revised his nutritional orders to start feeding infant H.S. 30 ml of exclusively Mead Johnson's 'Enfacare' bovine-based formula every three hours going forward." *See id.*, ¶ 15.

13. According to Plaintiffs, H.S. was diagnosed with Stage III NEC on November 10, 2006, and immediately underwent a colonic resection surgery. *See id.*, ¶ 17.

14. Plaintiffs generally allege that H.S. "continues to suffer long term gastrointestinal health effects" as a result of the colonic resection surgery. *See id.*, ¶ 18.

15. Moving Defendants Preliminarily Object to Plaintiffs' Second Amended Complaint for the reasons stated below and as set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.   ARGUMENT

### A.   DEMURRER TO COUNT VI: FAILURE TO WARN

16. Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

17. In alleging a failure to warn claim against Moving Defendants, Plaintiffs appear to conflate a cause of action for negligent failure to warn, with a cause of action for failing to obtain informed consent. Under either theory, Count VI is legally deficient and must be dismissed.

Case ID: 220302583
Control No.: 24081569

> **i. Plaintiffs failed to state a cause of action for negligent failure to warn because Plaintiffs' baseless assertions that Moving Defendants are "suppliers" and that the cow's milk-based products at issue were unreasonably dangerous, are not support with sufficient factual allegations.**

18. Plaintiffs allege in Count VI of the Second Amended Complaint that Moving Defendants "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. *See* Exhibit F, ¶ 152.

19. Taking the facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants because they have failed to plead sufficient facts to support any assertion that Moving Defendants are "suppliers" and that the products at issue were "unreasonably dangerous."

20. Pennsylvania courts have adopted Restatement (Second) of Torts § 388 in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991).

21. Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Case ID: 220302583
Control No.: 24081569

22.     First, Moving Defendants had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.  Thus, Count VI should be dismissed for this reason alone.

23.     Additionally, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn, which Plaintiffs have failed to do.

24.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

25.     "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.

26.     At the outset of their Second Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit F at ¶ 20 (emphasis added). Following this, Plaintiffs make the core claim of their Second Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *See id.*

27.     However, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant.

Case ID: 220302583
Control No.: 24081569

28.     Plaintiffs appear to base this core claim on flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in their Amended Complaint and Second Amended Complaint.

29.     In their original Complaint, in support of their assertion that the products at issue were dangerous to H.S., Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics.  *See* Exhibit A, ¶¶ 17-23.

30.     As Moving Defendants argued in their Preliminary Objections to Plaintiffs' original Complaint (which the Court sustained on March 22, 2024), the studies cited by Plaintiffs demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See id.*, ¶¶ 17-23.

31.     Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint, and again in their Second Amended Complaint.

32.     In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Second Amended Complaint that "scientific evidence" exists demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit F, ¶¶ 25-28. However, Plaintiffs do not plead any additional facts to support their assertion that such "scientific evidence" exists.

33.     Further, Plaintiffs' baseless assertion that the cow's milk-based products at issue were "unreasonably dangerous" is incompatible with the reality that such products are carefully

Case ID: 220302583
Control No.: 24081569

regulated by the United States Food and Drug Administration ("FDA"), and Plaintiffs are not alleging that Moving Defendants did anything contrary to the applicable federal regulations.

34.    The Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." *See* Pub. L. No. 96-359, 94 Stat. 1190.

35.    The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. *See* 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07.

36.    Neither the IFA nor the regulations exclude cow's milk as an ingredient, and many infant formulas for sale include cow's milk. 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50.

37.    Plaintiffs have not alleged any facts that would justify overlooking an entire regulatory framework dedicated to ensuring the safety of infant formula in the United States.

38.    Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based products is unreasonably dangerous for its intended purpose.

39.    Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs.

> **ii.    Count VI is also deficient to the extent Plaintiffs' "failure to warn" claim is based on an alleged failure to obtain informed consent.**

40.    Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-

Case ID: 220302583
Control No.: 24081569

parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

41.     Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based products to feed her child, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

42.     Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.
>
> (b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

43.     The language of the statute above reveals two significant tenets.

9

Case ID: 220302583
Control No.: 24081569

44.     The first is that the informed consent statute does not apply to the use of cow's milk-based products in feeding premature infants, since feeding is not a "procedure."

45.     Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 497 A.2d 646, 648 (Pa. Super. 1985).

46.     The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery, and that merely prescribing an oral medication, which does not involve touching, does not amount to battery and therefore, obtaining informed consent is not required under those circumstances. *Id.* at 649.

47.     The same principles clearly apply to infant feeding because, just like when a provider administers medication, the provider is not engaged in "touching" when formula or human milk fortifiers are ordered for an infant's feeding.

48.     Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of cow's milk-based products to feed her infant, including warning her of the risks or alternatives of same.

49.     Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See* 40 P.S. § 1303.504; *see also Valles v. Albert Einstein Medical Center*, 805 A.2d 1232, 1239 (Pa. 2002) (holding that duty to obtain informed consent belongs "solely to the physician" and thus a medical facility cannot be vicariously liable for a failure to obtain informed consent); *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 930 (Pa. Super. 2007) ("Given the unique nature of the doctrine and its origins as a technical battery, hospitals

10

Case ID: 220302583
Control No.: 24081569

cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'"); *Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure).

50. For these reasons, Moving Defendants cannot be held liable for a physician's failure to obtain proper informed consent, nor can they be liable for any alleged failure to obtain informed consent related to infant feeding, which is not a "procedure" under 40 P.S. § 1303.504.

51. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI.

## B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

### i. Moving Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.

52. In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

11

Case ID: 220302583
Control No.: 24081569

53.     Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based products.

54.     Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants, as discussed *supra*.

55.     Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

56.     Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula and fortifiers are unreasonably dangerous products.

57.     Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

> ii. **Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.**

58.     Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

59.     In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

12

Case ID: 220302583
Control No.: 24081569

60.     Thus, corporate liability requires "more than individual acts of negligence." *Id*. As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "*Thompson* requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

61.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

62.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based products was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Second Amended Complaint, such evidence cannot support a finding of corporate liability.

63.     For the reasons stated above, Count VII of Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

### iii.     Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.

64.     Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

13

Case ID: 220302583
Control No.: 24081569

65.     The *Thompson* holding has been extended to HMOs and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania*, *Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

66.     However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

67.     There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

68.     Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

69.     Thus, the corporate negligence count against Trustees must be dismissed as a matter of law.

## C.     MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

70.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

71.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate

14

Case ID: 220302583
Control No.: 24081569

the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

72.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

73.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

74.     Plaintiffs' Second Amended Complaint is deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

15

Case ID: 220302583
Control No.: 24081569

75.     Of the 191 paragraphs in Plaintiffs' Second Amended Complaint, only eight paragraphs address material facts relating to the Plaintiff-minor's care and treatment, diagnosis and injuries, which are utterly insufficient to enable Moving Defendants to prepare their defenses. *See* Exhibit F, ¶¶ 11-18.

76.     Plaintiffs' allegation that "upon information and belief," the Plaintiff-minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 13) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether and when the Plaintiff-minor actually ingested cow's milk-based products.

77.     Plaintiffs included additional facts in their Second Amended Complaint, identifying the products that Plaintiff-minor, H.S., allegedly ingested and the dates when H.S.'s providers entered nutritional orders related to those products.

78.     However, Plaintiffs fail to provide a description of the material facts as to the period of time in which such products were actually *ingested*, and Plaintiffs do not allege any factual basis to support their theory that cow's milk-based products caused H.S.'s NEC diagnosis, other than vague references to unidentified "scientific studies."

79.     Plaintiffs also fail to state sufficient facts concerning the nature of the injuries and the "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection.

80.     Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

Case ID: 220302583
Control No.: 24081569

81.     These omissions are fatal defects. Therefore, Plaintiffs' Second Amended Complaint should be stricken in its entirety.

**D.     MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES**

82.     In the *Ad Damnum* clauses of Counts VI and VII of the Second Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in outrageous, oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages.

83.     However, the Second Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

84.     Rather, Plaintiffs merely allege that "upon information and belief" H.S. may have been given a cow's milk-based product following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth.

85.     For example, the Second Amended Complaint does not give any indication whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

86.     Plaintiff's allegations of oppressive, outrageous, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

87.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants

Case ID: 220302583
Control No.: 24081569

engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based products.

88.     Absent specific factual allegations to justify the claim that the use of cow's milk-based products in H.S.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

89.      Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

90.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

91.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Case ID: 220302583
Control No.: 24081569

92.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

>     (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
>     (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40 P.S. §1303.505.

93.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages.  *Id.* at 772.

94.      Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

95.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

19

Case ID: 220302583
Control No.: 24081569

96.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death.  *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

97.     Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd

Case ID: 220302583
Control No.: 24081569

Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

98.    The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

99.    Pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

(c)    Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that

21

the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

*See* 40 P.S. §1303.505(c).

100.     Plaintiffs allege in this action that H.S. was fed cow's milk-based products while she was in the NICU at Pennsylvania Hospital, and that Moving Defendants "knew or should have known" that these products increased the risk of NEC. *See* Exhibit F, ¶ 16.

101.     Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it, but they have not done so. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

102.     In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

103.     For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

## E.     MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS

### i.     Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).

104.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of H.S.

105.     Plaintiffs' Second Amended Complaint includes allegations in each count against Moving Defendants that Plaintiff-parent "suffered significant emotional distress, loss of income,

22

Case ID: 220302583
Control No.: 24081569

and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See* Exhibit F, ¶¶ 164, 190.

106.     However, no specific cause of action is asserted as to any damages sought by and on behalf of Plaintiff-parent, who is not alleged in the Second Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

107.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Second Amended Complaint to allow her to recover damages in her own right, the Second Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

108.     Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Second Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Second Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### ii.     **Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.**

109.     Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

Case ID: 220302583
Control No.: 24081569

110.     Plaintiffs allege that H.S. was born on September 12, 2006, was fed the Defendant Manufacturers' products after her birth, and developed NEC thereafter. *See* Exhibit F, ¶¶ 11-18.

111.     Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

112.     In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Second Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule.

113.     In particular, Plaintiffs allege that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims before the expiration of the limitations period, alleging that Moving Defendants "hid the cause" of H.S.'s NEC diagnosis and thus Plaintiff-parent had "no reason to know or suspect" that the products at issue in this case allegedly caused H.S.'s NEC. *See* Exhibit F, ¶¶ 29-48.

114.     The discovery rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here.

115.     The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed period, the period of limitation does not begin to run until discovery of the injury is reasonably possible.  *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds).

116.     Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. 1989).

Case ID: 220302583
Control No.: 24081569

117.    The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995).

118.    "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 195 A.3d 880, 893 (Pa. 2018) (citations omitted).

119.    Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of H.S.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC" from Plaintiff-parent (*see* Exhibit F, ¶¶ 30-40) and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products (*see id.*, ¶¶ 41-48).

120.    Plaintiffs do not allege *any* facts to support the claim that Moving Defendants "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her.

121.    The fatal flaw underlying Plaintiffs' discovery rule argument is that is presupposes that a risk existed, and Moving Defendants were aware of that risk.

122.    However, Plaintiffs have not plead sufficient facts to support this claim, which is also belied by FDA regulations and other statutory frameworks that exist for the purpose of ensuring the safety of infant formula in the United States.

123.    The FDA does not restrict the use of cow's milk-based products for premature or low birth weight infants, and any of Plaintiffs' allegations to the contrary are completely unsupported and baseless.

124.    Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

Case ID: 220302583
Control No.: 24081569

F. **MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH PA.R.C.P. 1024**

125.     Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

126.     Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

127.     In this case, no verification is attached to the Second Amended Complaint in violation of Rule 1024. *See* Exhibit F.

128.     Accordingly, the Second Amended Complaint should be stricken for lack of an appropriate verification.

**WHEREFORE**, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.


Respectfully submitted:

BURNS WHITE LLC

BY:     */s/ Meredith A. Lowry*
          JAMES A. YOUNG, ESQ.
          RICHARD S. MARGULIES, ESQ.
          MEREDITH A. LOWRY, ESQ.
          Attorneys for Defendants,
          The Pennsylvania Hospital of the University of
          Pennsylvania Health System d/b/a Pennsylvania
          Hospital and The Trustees of the University of
          Pennsylvania d/b/a Penn Medicine

Dated: August 6, 2024

26

Case ID: 220302583
Control No.: 24081569

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire
Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Ste. 2700
Philadelphia, PA 19103
(215) 587-1625 / 1628 / 1669
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | MARCH TERM 2022 |
| | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania ("Trustees") (collectively, "Moving Defendants"), by and through counsel Burns White LLC, hereby file the within Preliminary Objections to Plaintiffs' Second Amended Complaint, and in support thereof aver as follows:

## I.    <u>MATTER BEFORE THE COURT</u>

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Second Amended Complaint.

## II.    STATEMENT OF QUESTIONS PRESENTED

1.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because Plaintiffs' Second Amended Complaint does not support the claim that cow's milk-based products are unreasonably dangerous?

*Suggested answer in the affirmative.*

2.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Second Amended Complaint with prejudice because Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative.*

3.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Second Amended Complaint with prejudice because it improperly alleges that Moving Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative.*

4.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Second Amended Complaint with prejudice because Moving Defendants cannot be held liable on a corporate negligence theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative.*

Case ID: 220302583
Control No.: 24081569

5.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Second Amended Complaint with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative*.

6.      Whether this Honorable Court should strike Plaintiffs' Second Amended Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative*.

7.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Second Amended Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative*.

8.      Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020?

*Suggested answer in the affirmative*.

9.      Whether this Honorable Court should strike Plaintiff-parent's claims because they are time-barred and Plaintiff-parent has failed to allege sufficient facts to demonstrate that the limitations period should be tolled?

*Suggested answer in the affirmative*.

10.      Whether this Honorable Court should strike Plaintiffs' Second Amended Complaint for lack of an appropriate verification?

*Suggested answer in the affirmative*.

## III.    <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson

2

Case ID: 220302583
Control No.: 24081569

Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). A true and correct copy of Plaintiffs' Complaint is attached hereto as Exhibit "A."

On June 9, 2023, Moving Defendants filed preliminary objections to Plaintiffs' Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3) strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes of action, and based on the applicable statute of limitations. A true and correct copy of Preliminary Objections to Plaintiffs' Complaint is attached hereto as Exhibit "B."

On March 22, 2024, the Court sustained Moving Defendants' preliminary objections, and ordered Plaintiffs to file an Amended Complaint "stating with specificity the factual bases for the professional negligence claim at issue." A true and correct copy of the Court's Order is attached hereto Exhibit "C." On April 23, 2024, Plaintiffs filed an Amended Complaint, which still contained substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary Objections. A true and correct copy of Plaintiffs' Amended Complaint is attached hereto as Exhibit "D." Thus, on May 13, 2024, Moving Defendants filed Preliminary Objections to Plaintiffs' Amended Complaint. A true and correct copy of Moving Defendants' Preliminary Objections to Plaintiffs' Amended Complaint is attached hereto as Exhibit "E." On July 17, 2024, Plaintiffs filed a Second Amended Complaint, which includes some additional factual allegations, but the same fatal flaws are still present. A true and correct copy of Plaintiffs' Second Amended Complaint is attached hereto as Exhibit "F."

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-

Case ID: 220302583
Control No.: 24081569

based infant formula by premature infants following their birth.[1]  Plaintiffs allege that the Plaintiff-minor, H.S., was diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Exhibit F, ¶¶ 17, 19. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula and fortifiers added to human milk.[2] In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. [3]

Plaintiffs aver that H.S. was born prematurely on September 12, 2006 and that "upon information and belief" she "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11, 13. Plaintiffs allege that on October 3, 2006, Dr. Thomas Mollen ordered that H.S. "was to be fed mother's milk which contained bovine-based human milk fortifier (HMF), which based upon information and believe was manufactured by Defendant Abbott Laboratories." *See id.*, ¶ 14. Plaintiffs further allege that on November 8, 2006, Dr. Mollen "revised his nutritional orders to start feeding infant H.S. 30 ml of exclusively Mead Johnson's 'Enfacare' bovine-based formula every three hours going

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center, Jefferson Abington Hospital and Thomas Jefferson University Hospital.

[2] Although Plaintiffs aver in the Second Amended Complaint that NEC is caused by cow's milk-based infant formula and fortifiers, as discussed *infra* and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Second Amended Complaint that indicates NEC is caused by cow's milk-based products.

[3] As is discussed below, infant formulas are regulated by the United States Food and Drug Administration and are required to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302583
Control No.: 24081569

forward." *See id.*, ¶ 15. According to Plaintiffs, H.S. was diagnosed with Stage III NEC on November 10, 2006, and immediately underwent a colonic resection surgery. *See id.*, ¶ 17. Plaintiffs generally allege that H.S. "continues to suffer long term gastrointestinal health effects" as a result of the colonic resection surgery. *See id.*, ¶ 18.

Moving Defendants Preliminarily Object to Plaintiffs' Second Amended Complaint for the reasons stated below and as set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

**IV. ARGUMENT**

**A. DEMURRER TO COUNT VI: FAILURE TO WARN**

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

In alleging a failure to warn claim against Moving Defendants, Plaintiffs appear to conflate a cause of action for negligent failure to warn, with a cause of action for failing to obtain informed consent. Under either theory, Count VI is legally deficient and must be dismissed.

**i. Plaintiffs failed to state a cause of action for negligent failure to warn because Plaintiffs' baseless assertions that Moving Defendants are "suppliers" and that the cow's milk-based products at issue were unreasonably dangerous, are not support with sufficient factual allegations.**

Plaintiffs allege in Count VI of the Second Amended Complaint that Moving Defendants "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. *See id.*, ¶ 152. Taking the facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for

Case ID: 220302583
Control No.: 24081569

negligent failure to warn against Moving Defendants because they have failed to plead sufficient facts to support any assertion that Moving Defendants are "suppliers" and that the products at issue were "unreasonably dangerous."

Pennsylvania courts have adopted Restatement (Second) of Torts § 388 in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

> (d) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

> (e) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

> (f) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

First, Moving Defendants had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce. Thus, Count VI should be dismissed for this reason alone.

Additionally, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn, which Plaintiffs have failed to do. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.

Case ID: 220302583
Control No.: 24081569

At the outset of their Second Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit F at ¶ 20 (emphasis added). Following this, Plaintiffs make the core claim of their Second Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *See id.* However, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant.

Plaintiffs appear to base this core claim on flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in their Amended Complaint and Second Amended Complaint. In their original Complaint, in support of their assertion that the products at issue were dangerous to H.S., Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. *See* Exhibit A, ¶¶ 17-23. As Moving Defendants argued in their Preliminary Objections to Plaintiffs' original Complaint (which the Court sustained on March 22, 2024), the studies cited by Plaintiffs demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit A, ¶¶ 17-23. Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint, and again in their Second Amended Complaint.

In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Second Amended Complaint that "scientific evidence" exists

Case ID: 220302583
Control No.: 24081569

demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit F, ¶¶ 25-28. However, Plaintiffs do not plead any additional facts to support their assertion that such "scientific evidence" exists.

Further, Plaintiffs' baseless assertion that the cow's milk-based products at issue were "unreasonably dangerous" is incompatible with the reality that such products are carefully regulated by the United States Food and Drug Administration ("FDA"), and Plaintiffs are not alleging that Moving Defendants did anything contrary to the applicable federal regulations. The Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." *See* Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. *See* 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. Neither the IFA nor the regulations exclude cow's milk as an ingredient, and many infant formulas for sale include cow's milk. 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Plaintiffs have not alleged any facts that would justify overlooking an entire regulatory framework dedicated to ensuring the safety of infant formula in the United States.

Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based products is unreasonably dangerous for its intended purpose. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs.

Case ID: 220302583
Control No.: 24081569

### ii. Count VI is also deficient to the extent Plaintiffs' "failure to warn" claim is based on an alleged failure to obtain informed consent.

Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based products to feed her child, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.
>
> (b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

Case ID: 220302583
Control No.: 24081569

40 P.S. §1303.504 (emphasis added).

The language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of cow's milk-based products in feeding premature infants, since feeding is not a "procedure." Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 497 A.2d 646, 648 (Pa. Super. 1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery, and that merely prescribing an oral medication, which does not involve touching, does not amount to battery and therefore, obtaining informed consent is not required under those circumstances. *Id.* at 649.

The same principles clearly apply to infant feeding because, just like when a provider administers medication, the provider is not engaged in "touching" when formula or human milk fortifiers are ordered for an infant's feeding. Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of cow's milk-based products to feed her infant, including warning her of the risks or alternatives of same.

Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See* 40 P.S. § 1303.504; *see also Valles v. Albert Einstein Medical Center*, 805 A.2d 1232, 1239 (Pa. 2002) (holding that duty to obtain informed consent belongs "solely to the physician" and thus a medical facility cannot be vicariously liable for a failure to obtain informed consent); *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 930 (Pa. Super. 2007) ("Given the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be

Case ID: 220302583
Control No.: 24081569

held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'"); *Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure).

For these reasons, Moving Defendants cannot be held liable for a physician's failure to obtain proper informed consent, nor can they be liable for any alleged failure to obtain informed consent related to infant feeding, which is not a "procedure" under 40 P.S. § 1303.504. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI.

### B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

#### i. Moving Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based products. Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants, as

Case ID: 220302583
Control No.: 24081569

discussed *supra*. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula and fortifiers are unreasonably dangerous products.

Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

> ### ii. Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.

Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

Corporate liability requires "more than individual acts of negligence." *Id*. As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "*Thompson* requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill*

Case ID: 220302583
Control No.: 24081569

*Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based products was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Second Amended Complaint, such evidence cannot support a finding of corporate liability. For the reasons stated above, Count VII of Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

### iii. Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.

Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

The *Thompson* holding has been extended to HMOs and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State*

13

Case ID: 220302583
Control No.: 24081569

*Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence. Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07. Thus, the corporate negligence count against Trustees must be dismissed as a matter of law.

### C.  MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

14

Case ID: 220302583
Control No.: 24081569

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Second Amended Complaint is deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Of the 191 paragraphs in Plaintiffs' Second Amended Complaint, only eight paragraphs address material facts relating to the Plaintiff-minor's care and treatment, diagnosis and injuries, which are utterly insufficient to enable Moving Defendants to prepare their defenses. *See* Exhibit F, ¶¶ 11-18. Plaintiffs' allegation that "upon information and belief," the Plaintiff-minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 13) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether and when the Plaintiff-minor actually ingested cow's milk-based products. Plaintiffs included additional facts in their Second Amended Complaint, identifying the specific products that Plaintiff-minor, H.S., allegedly ingested and the dates when H.S.'s providers entered nutritional orders related to those products. However, Plaintiffs fail to provide a description of the material

Case ID: 220302583
Control No.: 24081569

facts as to the period of time in which such products were actually *ingested*, and Plaintiffs do not allege any factual basis to support their theory that cow's milk-based products caused H.S.'s NEC diagnosis, other than vague references to unidentified "scientific studies."

Plaintiffs also fail to state sufficient facts concerning the nature of the injuries and the "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change. These omissions are fatal defects. Therefore, Plaintiffs' Second Amended Complaint should be stricken in its entirety.

## D.    MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

In the *Ad Damnum* clauses of Counts VI and VII of the Second Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in outrageous, oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. However, Second Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" H.S. may have been given a cow's milk-based product following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth. For example, the Second Amended Complaint does not give any indication whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Case ID: 220302583
Control No.: 24081569

Plaintiff's allegations of oppressive, outrageous, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based products. Absent specific factual allegations to justify the claim that the use of cow's milk-based products in H.S.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the

Case ID: 220302583
Control No.: 24081569

mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984). Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)  Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

> (b)  Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

41  P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

18

Case ID: 220302583
Control No.: 24081569

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd

19

Case ID: 220302583
Control No.: 24081569

Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c) Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

Case ID: 220302583
Control No.: 24081569

*See* 40 P.S. §1303.505(c).

Plaintiffs allege in this action that H.S. was fed cow's milk-based products while she was in the NICU at Pennsylvania Hospital, and that Moving Defendants "knew or should have known" that these products increased the risk of NEC. *See* Exhibit F, ¶ 16. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it, but they have not done so. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue. For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

## E.  MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS

### i.  <u>Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).</u>

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of H.S. Plaintiffs' Second Amended Complaint includes allegations in each count against Moving Defendants that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See* Exhibit F, ¶¶ 164, 190. However, no specific cause of action is asserted as to any damages sought by and on behalf of Plaintiff-parent, who is not alleged in the Second Amended Complaint to have

Case ID: 220302583
Control No.: 24081569

suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

Further, even if Plaintiff-parent had properly articulated a cause of action in the Second Amended Complaint to allow her to recover damages in her own right, the Second Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Second Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Second Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### ii. Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that H.S. was born on September 12, 2006, was fed the Defendant Manufacturers' products after her birth, and developed NEC thereafter. *See* Exhibit F, ¶¶ 11-18. Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

Case ID: 220302583
Control No.: 24081569

In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Second Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule. In particular, Plaintiffs allege that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims before the expiration of the limitations period, alleging that Moving Defendants "hid the cause" of H.S.'s NEC diagnosis and thus Plaintiff-parent had "no reason to know or suspect" that the products at issue in this case allegedly caused H.S.'s NEC. *See* Exhibit F, ¶¶ 29-48.

The discovery rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here. The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds).

Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. 1989). The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995). "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 195 A.3d 880, 893 (Pa. 2018) (citations omitted).

Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of H.S.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because

Case ID: 220302583
Control No.: 24081569

"Defendants hid the cause of NEC" from Plaintiff-parent (*see* Exhibit F, ¶¶ 30-40) and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products (*see id.*, ¶¶ 41-48). Plaintiffs do not allege *any* facts to support the claim that Moving Defendants "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her.

The fatal flaw underlying Plaintiffs' discovery rule argument is that is presupposes that a risk existed, and Moving Defendants were aware of that risk. However, Plaintiffs have not plead sufficient facts to support this claim, which is also belied by FDA regulations and other statutory frameworks that exist for the purpose of ensuring the safety of infant formula in the United States. The FDA does not restrict the use of cow's milk-based products for premature or low birth weight infants, and any of Plaintiffs' allegations to the contrary are completely unsupported and baseless.

Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

### F. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH PA.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading. In this case, no verification is attached to the Second Amended Complaint in violation of Rule 1024. *See* Exhibit F. Accordingly, the Second Amended Complaint should be stricken for lack of an appropriate verification.

Case ID: 220302583
Control No.: 24081569

## V.    **REQUESTED RELIEF**

For the foregoing reasons, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.


                                  BURNS WHITE LLC



                          BY: _/s/ Meredith A. Lowry_____
                                JAMES A. YOUNG, ESQ.
                                RICHARD S. MARGULIES, ESQ.
                                MEREDITH A. LOWRY, ESQ.
                                Attorneys for Defendants,
                                The Pennsylvania Hospital of the University of
                                Pennsylvania Health System d/b/a Pennsylvania
                                Hospital and The Trustees of the University of
                                Pennsylvania d/b/a Penn Medicine

Dated:  August 6, 2024

Case ID: 220302583
Control No.: 24081569

<u>**CERTIFICATE OF SERVICE**</u>

I, Meredith A. Lowry, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Second Amended Complaint, to be served via the electronic filing system to all counsel of record.

BY: */s/ Meredith A. Lowry*
       MEREDITH A. LOWRY, ESQ.

Dated: August 6, 2024

# EXHIBIT A

Case ID: 220302583
Control No.: 24081569

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
**Identification Number: 82258**
**One Logan Square**
**130 N. 18th Street, Suite 1600**
**Philadelphia, PA 19103**
**(215) 735-0773**
tfinken@anapolweiss.com

**ATTORNEY FOR PLAINTIFFS**

**KELLER LENKNER LLC**
**BY: Ashley Keller (*pro hac vice forthcoming*)**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**
**Telephone: (312) 741-5220**
**Fax: (312) 971-3502**
**Email:** ack@kellerlenkner.com

**ATTORNEY FOR PLAINTIFFS**

**WALSH LAW PLLC**
**BY: Alex Walsh (*pro hac vice forthcoming*)**
**1050 Connecticut Ave, NW, Suite 500**
**Washington, D.C. 20036**
**Telephone: (202) 780-4127**
**Fax: (202) 780-3678**
**Email:** awalsh@alexwalshlaw.com

**ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own** | : | **COURT OF COMMON PLEAS** |
| **Behalf and as Parent and Natural Guardian** | : | **PHILADELPHIA COUNTY** |
| **of H.S., a Minor** | : | |
| **335 Passmore Street** | : | |
| **Philadelphia, PA 19111** | : | |
| **Plaintiffs** | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO.** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

*Filed and Attested by the Office of Judicial Records 24 MAR 2022 01:57 pm S. RICE*

1

CT Corporation System                     :
208 So. Lasalle Street, Suite 814         :
Chicago, IL 60604                         :
                                          :
                                          :
THE PENNSYLVANIA HOSPITAL OF              :
THE UNIVERSITY OF PENNSYLVANIA            :
HEALTH SYSTEM d/b/a PENNSYLVANIA          :
HOSPITAL                                  :
3400 Civic Center Blvd.                   :
Philadelphia, PA 19104                    :
                                          :
                                          :
THE TRUSTEES OF THE UNIVERSITY OF         :
PENNSYLVANIA d/b/a PENN MEDICINE          :
133 South 36th Street                     :
Philadelphia, PA 19104                    :
                                          :
                    Defendants            :     **JURY TRIAL DEMANDED**

## COMPLAINT IN CIVIL ACTION

### NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) días de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| PHILADELPHIA BAR ASSOCIATION LAWYER REFERRAL AND INFORMATION SERVICE ONE READING CENTER PHILADELPHIA, PA 19107 TELEPHONE: (215) 238-1701 | ASOCIACION DE LICENCIADOS DE FILADELFIA Servicio De Referencia E Información Legal One Reading Center Filadelfia, Pennsylvania 19107 Telephono: (215) 238-1701 |

2

Case ID: 220302583

Case ID: 220302583
Control No.: 24081569

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
IDENTIFICATION NUMBER: 82258
ONE LOGAN SQUARE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
(215) 735-0773
TFINKEN@ANAPOLWEISS.COM                    **ATTORNEY FOR PLAINTIFFS**

**KELLER LENKNER LLC**
**BY: ASHLEY KELLER** (*PRO HAC VICE FORTHCOMING*)
150 N. RIVERSIDE PLAZA, SUITE 4100
CHICAGO, ILLINOIS 60606
TELEPHONE: (312) 741-5220
FAX: (312) 971-3502
EMAIL: ACK@KELLERLENKNER.COM              **ATTORNEY FOR PLAINTIFFS**

**WALSH LAW PLLC**
**BY: ALEX WALSH** (*PRO HAC VICE FORTHCOMING*)
1050 CONNECTICUT AVE, NW, SUITE 500
WASHINGTON, D.C. 20036
TELEPHONE: (202) 780-4127
FAX: (202) 780-3678
EMAIL: AWALSH@ALEXWALSHLAW.COM            **ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **TERRAINE ABDULLAH,** ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARDIAN OF H.S., A MINOR<br>335 PASSMORE STREET<br>PHILADELPHIA, PA 19111<br>**PLAINTIFFS**<br><br>v.<br><br>**MEAD JOHNSON & COMPANY, LLC**<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703<br><br>**MEAD JOHNSON NUTRITION COMPANY**<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703<br><br>**ABBOTT LABORATORIES**<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604<br><br>**THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM** D/B/A **PENNSYLVANIA** | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br><br>**CIVIL ACTION**<br><br><br><br>**NO.** |

3

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

HOSPITAL                                                   :
3400 CIVIC CENTER BLVD.                                    :
PHILADELPHIA, PA 19104                                     :
                                                          :
                                                          :
THE TRUSTEES OF THE UNIVERSITY OF                          :
PENNSYLVANIA D/B/A PENN MEDICINE                           :
133 SOUTH 36TH STREET                                      :
PHILADELPHIA, PA 19104                                     :
                                                          :
_____DEFENDANTS_____ :          JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead

Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories

(collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania

d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System

d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together

"Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts

and experiences and upon information and belief, including investigation conducted by Plaintiff's

attorneys, as to all other matters.

## I.    INTRODUCTION

1.       This action arises out of the injuries suffered by a premature infant (the "Injured Infant")

who was given the Defendant Manufacturers' cow's milk-based infant feeding products at

Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied

the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their

unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to

develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that

largely affects premature babies who are given cow's milk-based feeding products. As a result,

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.    Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.    Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania. Ms. Abdullah is the parent and natural guardian of H.S., a minor. Ms. Abdullah's address is 335 Passmore Street, Philadelphia, Pennsylvania 19111.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.    Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.   Its principal place of business is Philadelphia, Pennsylvania.   Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.   The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.   Its principal place of business is Philadelphia, Pennsylvania.   Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.   Defendants conduct authorized business in the Commonwealth of Pennsylvania.   They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *H.S.'s NEC Diagnosis*

11.     H.S. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on September 12, 2006.

12.     Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth.

13.     Upon information and belief shortly after H.S. first ingested the Defendant Manufacturers' products, she developed NEC.

14.     H.S. was forced to undergo surgery and has continued to suffer long term health effects.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.  Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

7

Case ID: 220302583
Control No.: 24081569

17.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was six to ten times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk.  For babies born at more than 30 weeks gestation, NEC was 20 times more common in those only fed cow's milk formula than in those fed breast milk.

18.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

19.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

20.     A Surgeon General report, The Surgeon General's Call to Action to Support Breastfeeding, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis."  The report also states that premature infants who are not breastfed are 138% more likely to develop NEC.

21.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk.  This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

22.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time.

23.     Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

### *Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist*

24.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

26.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

27.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.

### *The Defendant Manufacturers' False And Misleading Marketing Regarding Cow's Milk-Based Infant Products*

30.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

31.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

32.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

33.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

34.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

35.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

36.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

37.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

38.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

39.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

40. Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

41. Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

42. Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product. The packaging appears as:

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569



43.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to

deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm

infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3)

cow's milk-based products are necessary for proper growth and development of preterm infants;

and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first

choice.  This marketing scheme is employed despite all Defendants knowing of and failing to warn

of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like

the Injured Infant.

15

Case ID: 220302583

Case ID: 220302583
Control No.: 24081569

*The Defendant Manufacturers' Inadequate Warnings*

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

50.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

51.     Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

53.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

56.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients. It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. However, instead of warning of those

Case ID: 220302583

Case ID: 220302583
Control No.: 24081569

dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

57.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.   The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.  It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

58.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

59.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition. In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

60.    These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

61.    Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

62.    Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

### *Safer Alternative Designs*

63.    The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

64.    Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

65.    On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

### **CAUSES OF ACTION**

### **COUNT I: STRICT LIABILITY FOR DESIGN DEFECT**
### **(Against Abbott and Mead)**

66.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

68.    Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

69.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.  Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

70.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits.  An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

71.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

72.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

73.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

74.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

75.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.   For interest as permitted by law;

    f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.   For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

76.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

78.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

79.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

    a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

d.   Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.   Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.   Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.   Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.   Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

80.   Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

81.   As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

82.   The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

83.      As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

84.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

86.     At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

87.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

88.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

      a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

c.  Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.  Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

89.     In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

90. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

91. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

92. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e. For interest as permitted by law;

    f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

g.  For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

93.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

94.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

95.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

96.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

97.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

29

Case ID: 220302583

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

98. Abbott and Mead knew or reasonably should have known those misrepresentations to be false.

99. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

100. The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

101. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

102. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e. For interest as permitted by law;

    f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g. For such other and further relief as the Court deems proper.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

## COUNT V: NEGLIGENT MISREPRESENTATION
### (Against Abbott and Mead)

103.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

105.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

106.  In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

107.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

    a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

    c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.   That cow's milk-based products were safe for premature infants; and/or

    e.   That cow's milk-based products were necessary for optimum growth; and/or

    f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

108.    Abbott and Mead were negligent or careless in not determining those representations to be false.

109.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

110.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

111.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

112.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

113.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

114.   Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

115.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

116.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

117.   Penn Medicine and Pennsylvania Hospital negligently and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

118.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.  These interactions provided the Defendant Manufacturers' sales representatives

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

119. Penn Medicine and Pennsylvania also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

120. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

121. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

   a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

d.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.  Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

122.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

123.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

124.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

125.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

126.    As a further direct and proximate result of Penn Medicine and Pennsylvania failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

   a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

   c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

   d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, reckless, and/or malicious conduct, as permitted by law;

   e.   For interest as permitted by law;

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

127.   Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

128.   At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.  Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.  Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

129.   Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

130.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

131.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute,

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

132. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

133. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

134. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

135. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to

41

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

136. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

137. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

138. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

139. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent and reckless conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

140.   In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

141.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

142.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

   a.   Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

   b.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   c.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

   d.   Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

   e.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

143.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

144.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, , the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

148.  Plaintiff hereby demands a jury trial for all claims triable.

Dated: March 24, 2022

Respectfully submitted,

**ANAPOL WEISS**

Tracy Finken
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
Phone: (215) 735-1130
Email: tfinken@anapolweiss.com

**KELLER LENKNER LLC**
Ashley Keller (*pro hac vice forthcoming*)
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

Telephone: (312) 741-5220
Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**WALSH LAW PLLC**
Alex Walsh (*pro hac vice forthcoming*)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

*Attorneys for Plaintiffs*

47

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

Tracy Finken

48

Case ID: 220302583
Case ID: 220302583
Control No.: 24081569

## VERIFICATION

I, the undersigned, Tracy Finken, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Date:   March 24, 2022

_____
Tracy Finken

49

# EXHIBIT B

Case ID: 220302583
Control No.: 24081569

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | MARCH TERM 2022 |
| | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

Filed and Attested by the
Office of Judicial Records
09 JUN 2023 03:55 pm
C. PERRY

## ORDER

**AND NOW**, this        day of                        2023, upon consideration of the

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of

Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of

Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, and any Response thereto, it is hereby

**ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all

claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health

System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn

Medicine are hereby **DISMISSED** with prejudice.



**BY THE COURT:**



_____

                                                                J.

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>: |
| Plaintiffs, | : CIVIL ACTION<br>: |
| v. | : MARCH TERM 2022<br>: NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : |

## ALTERNATIVE ORDER

**AND NOW**, this _____ day of _____ 2023, upon consideration of the

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of

Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of

Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, and any Response thereto, it is hereby

**ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1. Count VI of Plaintiffs' Complaint is **DISMISSED** with prejudice;

2. Count VII of Plaintiffs' Complaint is **DISMISSED** with prejudice;

3. Plaintiffs' claims for punitive damages as to Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct;

4. Plaintiff Gina Wieger's claims in her own right are **DISMISSED** with prejudice; and

5. Plaintiffs' Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                                        J.

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Susan R. Engle, Esquire
Attorney ID Nos. 00213 / 62306 / 81671
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA  19103
(215) 587-1625 / 1628 / 1669
jayoung@burnswhite.com
rsmargulies@burnswhite.com
srengle@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | MARCH TERM 2022 |
| | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : | |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA
TO PLAINTIFFS' COMPLAINT**

Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System

("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter

"Moving Defendants") hereby preliminarily object to Plaintiffs' Complaint, and, in support

thereof, aver as follows:

**I.    INTRODUCTION**

1.    Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022

against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead

Case ID: 220302583
Control No.: 23083560

Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). <u>See</u> Plaintiff's Complaint, attached as Exhibit "A."[1]

2.      Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.[2]

3.      Plaintiffs allege that "upon information and belief" the Plaintiff-minors, including M.P., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Plaintiffs' Complaint, attached as Exhibit "A," ¶ 13. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula.[3]

4.      In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. [4]

---

[1] Shortly after the filing of the Complaint, this case was removed to federal court. Following briefing and a hearing, the case was remanded to this Honorable Court. There was then an effort by all Defendants to transfer these cases to this Court's Mass Tort Program. Plaintiffs opposed this request, and same was denied by this Honorable Court. These preliminary objections were timely filed after the initial filing of the Complaint, but never ruled upon.
[2] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[3] Although Plaintiffs aver in the Complaint that NEC is caused by cow's milk-based infant formula, as discussed infra and in the accompanying Memorandum of Law, the allegations in the Complaint refer to research and studies that indicate only that NEC is *more common* in premature and low birth weight infants fed with cow's milk-based products as compared with similar infants fed with breast milk. *See* Exhibit "A," ¶¶ 17-23. Plaintiffs do not cite any study or statement in the Complaint that indicates NEC is caused by cow's milk-based infant formula.

[4] As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United States Food and Drug Administration and require to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA permits does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302583
Control No.: 23083560

5.      The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four paragraphs in the Complaint.

6.      Plaintiffs aver that M.P. was born prematurely on December 13, 2013 and that "upon information and belief was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12.

7.      Plaintiffs further allege that "upon information and belief" M.P. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

8.      Plaintiffs generally allege that M.P. "suffered injuries and has continued to suffer long-term health effects," with no specific description of those alleged injuries or long-term health effects. *Id.*, ¶ 14.

9.      Moving Defendants Preliminarily Object to Plaintiffs' Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

II.     **ARGUMENT**

    A.     **DEMURRER TO COUNT VI: FAILURE TO WARN**

10.     Plaintiffs allege in Count VI of the Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm.

11.     Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

Case ID: 220302583
Control No.: 23083569

12.     In support of this theory, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. *See* Exhibit "A," ¶¶ 17-23.

13.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

14.     Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

15.     "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

16.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

Case ID: 220302583
Control No.: 23083560

17.     "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308.

18.     Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

19.     Although Plaintiffs cite in their Complaint to research studies relating to the purported risks of cow's milk-based products in premature infants, the studies demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

20.     At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." See Exhibit "A" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* However, reviewing the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.

21.     The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times *more common* in babies who received a combination of formula and breast milk." *Id.* at ¶ 17 (emphasis added). To say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants**

5

**fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based feeding products causes NEC.

22.     As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC compared to preterm babies fed a diet that included some cow's milk-based products." *Id.* at ¶ 18. To state that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet.** Thus, Plaintiffs' second study likewise does not state that cow's milk-based feeding products cause NEC.

23.     The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death compared to fortification with a breast milk-based fortifier." *Id.* at ¶ 19. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

24.     The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id.* at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

Case ID: 220302583
Control No.: 23083560

25.     According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id.* at ¶ 21. The Academy makes a recommendation that "all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id.* This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not claim that cow's milk-based feeding products cause NEC.

26.     The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast-mild-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id.* at ¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

27.     Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

28.     Further, assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

7

29.     Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

30.     The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent.

31.     Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.
>
> (b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

Case ID: 220302583
Control No.: 23083560

32.    Since the use of infant formula in feeding premature infants is not a "procedure," there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same.

33.    Further, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

34.    Thus, a hospital cannot be held liable for a physician's failure to obtain proper informed consent. *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002).

**B.    DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER**

35.    In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

36.    Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula.

37.    Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants.

38.    Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

9

Case ID: 220302583
Control No.: 23083560

39.     Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is an unreasonably dangerous product.

40.     Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

41.     Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

42.     In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the <u>Thompson</u> decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

43.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

44.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Complaint, such evidence cannot support a finding of corporate liability.

Case ID: 220302583
Control No.: 23083569

45.     Additionally, even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

46.     The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania*, *Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

47.     However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

48.     There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

49.     Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

**C.    MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

50.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

Case ID: 220302583
Control No.: 23063560

51.    A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

52.    Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

53.    Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Case ID: 220302583
Control No.: 23083569

54. Plaintiffs' Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

55. Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14.

56. Plaintiffs aver that the minor was born prematurely but do not identify the gestational age at which the child was born or her birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

57. Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 37-38.

58. Plaintiffs' Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

59. The Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

60. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

Case ID: 220302583
Control No.: 23063569

61.     These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

### D.    MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

62.     In the *Ad Damnum* clauses of Counts VI and VII of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 38, 46.

63.     However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

64.     Rather, Plaintiffs merely allege that "upon information and belief" M.P. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in M.P.'s medical care and condition following birth.

65.     For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

66.     Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

67.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants

Case ID: 220302583
Control No.: 23083568

engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

68.     Absent specific factual allegations to justify the claim that the use of infant formula in M.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

69.      Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

70.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

71.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Case ID: 220302583
Control No.: 23083560

72.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40  P.S. §1303.505.

73.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages.  *Id.* at 772.

74.      Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

75.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

16

Case ID: 220302583
Control No.: 23083560

76. Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

77. Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd

Case ID: 220302583
Control No.: 23083560

Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

78.     The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

79.     Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

(c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that

Case ID: 220302583
Control No.: 23083560

the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c).

80.     Plaintiffs allege in this action that unidentified "staff" fed M.P. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "A," ¶ 12.

81.     Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

82.     In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

83.     For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

## E.     MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS

84.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of M.P.

85.     Plaintiffs' Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 126, 139 and 147.

19

86.     However, no specific cause of action is asserted as to any damages sought by behalf of Plaintiff-parent, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

87.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

88.     Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

89.     Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

90.     Plaintiffs allege that M.P. was born on December 13, 2013, was fed the Defendant manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13.

91.     Thus, since the Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

Case ID: 220302583
Control No.: 23083569

**F.     MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024**

92.     Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

93.     Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

94.     In this case, Plaintiffs' counsel signed the verification for the Complaint, in violation of Rule 1024. *See* Exhibit "A."

95.     Accordingly, the Complaint should be stricken for lack of an appropriate verification.

**WHEREFORE**, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

21

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Susan R. Engle, Esquire
Attorney ID Nos. 00213 / 62306 / 81671
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
(215) 587-1625 / 1628 / 1669
jayoung@burnswhite.com
rsmargulies@burnswhite.com
srengle@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,<br><br>                          Plaintiffs,<br><br>       v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>                     Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>CIVIL ACTION<br><br>MARCH TERM 2022<br>NO. 2583 |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' COMPLAINT**

## I.    MATTER BEFORE THE COURT

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Complaint.

While patently obvious that Plaintiffs' Complaint must be dismissed for clear and important violations of the procedural requirements governing pleadings and verification of the accuracy of the factual averments of the Complaint (there are not separate counts identified for the causes of action of each of the Plaintiffs attempts to allege), most of which are averred "upon information and belief," the substance of Plaintiffs' allegations do not support any legally recognized cause of action against Moving Defendants, under Pennsylvania law. Our procedural

Case ID: 220302583
Control No.: 23083569

rules do not permit a plaintiff to simply identify allegedly tortious conduct by a defendant without pleading the necessary facts to satisfy the elements of the tortious conduct.

Here, Plaintiffs plead that Moving Defendants permitted Co-Defendants' cow's milk-based infant formula to be fed to prematurely born infants, which allegedly caused those infants to develop necrotizing enterocolitis ("NEC"). Plaintiffs then plead themselves out of Court by attempting to support a "failure to warn" claim by referencing various articles that, as pleaded and for purposes of these Preliminary Objections accepted as true, do not support the contention that cow's milk-based infant formulas cause NEC. Thus, distinct from the Complaint's procedural shortcomings, Plaintiffs have failed to plead facts that support the "failure to warn" and corporate liability causes of action that they attempt to assert against Moving Defendants. It is further noteworthy that there is no viable "failure to warn" cause of action that is recognized under Pennsylvania law against Moving Defendants, as explained in this submission by Moving Defendants.

## II.    <u>STATEMENT OF QUESTIONS PRESENTED</u>

1.    Whether this Honorable Court should dismiss Count VI of Plaintiffs' Complaint "Failure to Warn" cause of action with prejudice because Plaintiffs' Complaint does not support the claim that cow's milk-based products are unreasonably dangerous and Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative.*

2.    Whether this Honorable Court should dismiss Count VI of Plaintiffs' Complaint "Failure to Warn" cause of action with prejudice because it improperly alleges that Moving

2

Case ID: 220302583
Control No.: 24083569

Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative.*

3.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Complaint "Corporate Negligence" cause of action with prejudice because Moving Defendants cannot be held liable on such a theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative.*

4.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Complaint "Corporate Negligence" cause of action with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative.*

5.      Whether this Honorable Court should strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action, and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020 and based on the applicable statute of limitations?

Case ID: 220302583
Control No.: 23083569

*Suggested answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiffs' Complaint for failure to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested answer in the affirmative.*

## III.   <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1] Plaintiffs allege that the Plaintiff-minors, including M.P., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Plaintiffs' Complaint, attached as Exhibit "A" at ¶ 13. Plaintiffs aver that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based products (infant formula). Many of the allegations of the Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors received infant formula and that they developed NEC shortly after being fed with infant formula.

In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott")[2], Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. *See* Plaintiff's

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[2] Mead Johnson and Abbott have been the subject of similar lawsuits in other states, including Connecticut, Illinois and California.

4

Case ID: 220302583
Control No.: 23083568 24083560

Complaint, attached as Exhibit "A" at Counts VI and VII. As is discussed in detail below, Plaintiffs' claims against Moving Defendants are legally and factually deficient.

Although Plaintiffs aver that NEC is caused by cow's milk-based products, Plaintiffs refer in their Complaint to research studies and reports that, as alleged by Plaintiffs, indicate only that NEC is more common in premature and low birth weight infants fed with cow's milk-based products as compared with similar infants fed with breast milk. *See* Exhibit "A," ¶¶ 17-23. As discussed in detail *supra*, assuming the truth of the factual allegations stated in Plaintiffs' Complaint, the research studies cited by Plaintiffs do not support the conclusion that NEC is caused by cow's milk-based products. As such, there is no basis to contend that cow's milk-based products are dangerous for premature infants, such that Moving Defendants had a duty to warn Plaintiff-parents of any risks or alternatives related to infant formula.

Plaintiffs' Complaint provides scant information regarding the factual background of this case. Plaintiffs aver that M.P. was born prematurely on December 13, 2013 and that "upon information and belief was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12. Plaintiffs further allege that "upon information and belief" M.P. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13. No details are provided regarding the extent of her prematurity, her birth weight, or her condition following birth other than that she developed NEC on an unidentified date. Further, no facts are provided by Plaintiffs as to any medical care M.P. received **[add "other than surgery" for Abdullah, Taylor, Wieger/S.P.,]**, for what period of time M.P. allegedly ingested cow's milk-based products, and which product(s) she allegedly ingested.[3]

---

[3] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id.*, ¶¶ 37-38.

Case ID: 220302583
Control No.: 23083560

Finally, the Complaint is silent as to the nature and extent of M.P.'s alleged injuries other than a vague reference to "long term health effects." *Id.* ¶ 14.

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at Pennsylvania Hospital regarding the allegations that M.P. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiffs conceded in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id.* ¶ 41. However, Plaintiffs do not provide any information regarding discussions between Plaintiff-parent and any health care providers at Pennsylvania Hospital related to breastfeeding and/or using cow's milk-based products in this case, including whether or not she was encouraged to breastfeed and/or was unable or declined to do so. As noted, Plaintiffs plead that Plaintiff Minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff Minor developed NEC as a result.

Plaintiffs further fail to disclose in their Complaint that infant formula is regulated by the United States Food and Drug Administration (FDA) and that there is no restriction on the use of cow's milk-based products for premature infants. The federal Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas for sale include cow milk. (Exhibit "A," ¶¶ 37-38); 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21

Case ID: 220302583
Control No.: 24083560

C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA, and (2) submit a notice to the FDA at least 90 days before marketing such formula. The notice must also state that the formula contains the required vitamins and nutrients, as demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(a). For those formulas – known as "exempt" formulas because they may be exempted from certain requirements – the required 90-day notice must include "the label and other labeling of the infant formula, a complete quantitative formulation for the infant formula, and a detailed description of the medical conditions for which the infant formula is represented." 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for infant formulas intended for use by an infant with a low birth weight.

Thus, since Plaintiffs do not allege that the product did not meet federal requirements, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

Case ID: 220302583
Control No.: 23081560

IV.    **ARGUMENT**

A.    **DEMURRER TO COUNT VI: FAILURE TO WARN**

1.    **Moving Defendants Cannot Be Held Liable to Plaintiffs Based on a Theory of Failure to Warn Because the Infant Formula is Not Unreasonably Dangerous**

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

Plaintiffs allege in Count VI of the Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products manufactured by Mead Johnson and Abbott cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger. In support of this theory, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the products in question are indeed unreasonably dangerous. Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

Case ID: 220302583
Control No.: 23083560

"Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388. To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.* Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn. They have not done so as the studies they cite in their Complaint do not

9

say – based on the very allegations in the Complaint - what Plaintiffs claim they do. Therefore, Moving Defendants had no corresponding duty to warn.

At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." See Exhibit "A" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* Admittedly, if a product directly causes NEC in preterm and low birth weight infants, that product would certainly be dangerous. However, reviewing the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.[4]

The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times *more common* in babies who received a combination of formula and breast milk." *Id.* at ¶ 17 (emphasis added). To say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based feeding products causes NEC.

As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC compared to preterm babies fed a diet that included some cow's milk-based products." *Id.* at ¶ 18. To state

---

[4] To the extent Plaintiffs' claim that Defendant Manufacturers' cow's milk-based products increased the risk of NEC in preterm and low-birth-weight infants, they still fail to plead sufficient facts to support this claim. The portions of the studies relied upon by Plaintiffs, taken as true at this juncture, show only that NEC can be more common in preterm and low-birth-weight infants fed cow's milk-based products than in those fed breast or donor milk. These studies do not show the cow's milk-based products **caused** any increase in risk. To the extent Plaintiffs' state the studies do reflect an increased risk of NEC in the infants, this is a legal conclusion without factual basis, which is impermissible under Pa. R. Civ. P. 1019 (see discussion *supra* at p. 19).

Case ID: 220302583
Control No.: 23083560

that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet.** Thus, Plaintiffs' second study likewise does not state that cow's milk-based feeding products cause NEC.

The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death compared to fortification with a breast milk-based fortifier." *Id.* at ¶ 19. As Plaintiffs admitted in the Complaint, preterm and low-weight-birth infants are especially susceptible to NEC. Put another way, **these infants are already at an increased risk of NEC regardless of their diet.** This study, as described in Plaintiffs' Complaint, reflects this in explaining different rates of risk of developing NEC when using cow's milk-based or breast milk-based fortifiers. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id.* at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id.* at ¶ 21. The Academy makes a recommendation that

Case ID: 220302583
Control No.: 23081560

"all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id.* This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not state that cow's milk-based feeding products cause NEC.

The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast-mild-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id.* at ¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

Ultimately, Plaintiffs' claim that Defendant Manufacturers' cow's milk-based feeding products cause NEC and are therefore unreasonably dangerous rests upon the notion that correlation equals causation. The numerous studies and reports cited by Plaintiffs in their Complaint purportedly show higher rates of NEC in preterm and low birth weight infants fed cow's milk-based diets than those fed breast milk, but this data exists in a world where Plaintiffs admit these infants are at a high risk of developing NEC regardless of diet. All that Plaintiffs' Complaint demonstrates, as pleaded under these facts, is that breast milk may be better at reducing that already high risk of NEC in these infants than cow's milk-based alternatives. This proposition does not make the Defendant Manufacturers' cow's milk-based alternatives unreasonably dangerous within

Case ID: 220302583
Control No.: 23083560

the meaning of § 388 of the Restatement (Second) of Torts and, accordingly, does not trigger a duty to warn on the part of Moving Defendants.

### 2. Moving Defendants Are Not a "Supplier" and, Therefore, Cannot Be Held Liable for Negligent Failure to Warn

Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because they are not considered a supplier of cow's milk-based feeding products. Plaintiffs cite to no caselaw in Pennsylvania holding that a hospital is considered a supplier under § 388. Indeed, extensive research into this topic turns up no prior decisions where a Pennsylvania court has found a hospital to be a supplier in a products liability case for negligent failure to warn.

To determine a hospital may be defined as supplier of products ancillary to and following medical services within the meaning of § 388 would be to impose on the hospital a duty to warn about every conceivable object a patient may encounter in a hospital, right down to the napkins available in the hospital cafeteria. Imposing such a duty does nothing to advance the purpose of products liability law, i.e. to protect consumers from dangerous products in the stream of commerce. Moving Defendants are not in the best position to determine what products are available in the market for premature and low weight birth infants. In light of this, Plaintiffs have not sufficiently pleaded that Moving Defendants are a supplier under § 388.

For the foregoing reasons, Plaintiffs have not pleaded sufficient facts to aver the Defendant Manufacturers' products are unreasonably dangerous for their intended use and thus have not established Moving Defendants had a duty to warn. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts

Case ID: 220302583
Control No.: 23083560

that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI: Failure to Warn of Plaintiffs' Complaint.

### 3. There is no Legal Basis for Plaintiffs to Present an Informed Consent Claim Regarding the Use of Cow's milk-based products

Plaintiffs' failure to warn claim is couched in language of product liability related to Moving Defendants' alleged duty "as a purchaser, supplier and/or distributor" to provide a product (cow's milk-based infant formula) that was free of unreasonable risk of harm to consumers (parents and their premature infants). This theory fails for the reasons stated above. However, to the extent that Plaintiffs are alleging that Moving Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products, such a claim is also clearly precluded by Pennsylvania law.

Plaintiffs broadly allege that Moving Defendants failed to warn of the alleged dangers of cow's milk-based products and provide them with information necessary "to make an informed choice about whether to allow their baby to be fed the Defendant Manufacturers' products." *See* Exhibit "A" at ¶ 121. This purported failure to warn/inform allegedly led Plaintiff-minor to be fed a cow's milk-based product that Plaintiffs' contend caused and/or increased the risk of NEC. *Id.* at ¶ 125. The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based infant formula to feed her child as opposed to breastfeeding or using breast donor milk, based on the

Case ID: 220302583
Control No.: 23083560

alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.
>
> (b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

The clear language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of infant formula in feeding premature infants, since that is not a "procedure." Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same. Second, the informed consent statute only applies to

Case ID: 220302583
Control No.: 23083569

physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 345 Pa. Super. 66, 71, 497 A.2d 646, 648 (1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery and that merely prescribing an oral medication does not involve a touching so not battery can occur and no informed consent is needed. *Id.* at 649. The same principles clearly apply to administration of infant formula to a newborn.

Further, an informed consent claim is only applicable to a physician and not the hospital and/or other health care entities. *See* 40 P.S. § 1303.504; *see also Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure). The Pennsylvania Supreme Court has held that informed consent involves the relationship between a physician and the patient and that the failure to obtain proper informed consent is deemed a battery, and the institution plays no role in the communications involved in obtaining the same. *See Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002). In *Valles*, the Court decisively ruled that:

> We find that a battery which results from a lack of informed consent is not the type of action that occurs within the scope of employment. In our view, a medical facility cannot maintain control over this aspect of the physician-patient relationship. Our lower courts have recognized that the duty to obtain informed consent belongs solely to the physician. (Citations omitted). Informed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents. We decline to interject an element of a hospital's control into this highly individualized and dynamic relationship. We agree with the

16

Case ID: 220302583
Control No.: 23083568

lower court that to do so would be both improvident and unworkable. Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable.

*Id.*, 805 A.2d at 1239 (emphasis added). The *Valles* case remains the prevailing law in Pennsylvania. Pennsylvania courts have repeatedly applied this doctrine, recognizing and acknowledging that "[i]n a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort." *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (*citing Moure v. Raeuchle*, 604 A.2d 1003, 1008 (Pa. Super. 1992). Further, "[g]iven the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'" *Isaac*, 932 A.2d at 930. As such, it is clear that the instant cause of action cannot be sustained against Moving Defendants as a matter of law.

### B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

#### 1. Moving Defendants Cannot be Held Liable for Corporate Negligence Regarding a Food Product Which is Permitted for its Intended Use Pursuant to Federal Law

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

Case ID: 220302583
Control No.: 23083560

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn. Both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula. As noted above, infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is a dangerous product. Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to preclude the use of cow's milk-based products in the feeding of premature infants in the hospital.

Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the court analyzed the <u>Thompson</u> decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

<u>Id.</u> at 1386-87 (citations omitted and emphasis added). Thus, corporate liability requires "more than individual acts of negligence." *Id*. As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "<u>Thompson</u>

Case ID: 220302583
Control No.: 23083569

requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id.* at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Complaint, such evidence cannot support a finding of corporate liability.

For the reasons stated above, Count VII of Plaintiffs' Complaint should be dismissed with prejudice.

### 2. Plaintiffs Are Precluded From Pursuing Corporate Negligence Claims as to The Trustees of the University of Pennsylvania

As noted *infra*, the Pennsylvania Supreme Court set forth certain nondelegable duties of hospitals, which if violated may support a finding of corporate negligence. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D.

Case ID: 220302583
Control No.: 24083560

& C.4[th] 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4[th] 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5[th] 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital can be held liable under a theory of corporate negligence. The Trustees of the University of Pennsylvania is not a hospital and cannot be held liable under a theory of corporate liability, regardless of its relationship with Pennsylvania Hospital. Moreover, as Pennsylvania Courts have consistently held, corporate negligence duties are "non-delegable," i.e., only one entity can be held liable for a breach of these duties. The *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07. Thus, even if a corporate negligence claim were permissible as to Pennsylvania Hospital, which is denied for the reasons stated above, The Trustees of the University of Pennsylvania, which is not a hospital, cannot also be exposed to liability for an alleged breach of the same, non-delegable duties arising out of the same factual allegations. Accordingly, even accepting as true all well pled facts in Plaintiffs' Complaint, the corporate negligence claims as to the non-hospital Defendant, the Trustees of the University of Pennsylvania, are legally insufficient and must therefore be dismissed.

### C. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*). Pennsylvania Rule of Civil Procedure 1019(a) provides that

Case ID: 220302583
Control No.: 24083560

"the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiffs aver that the minor was born prematurely but do not identify the gestational age

Case ID: 220302583
Control No.: 23083569

at which the child was born or her birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 37-38. Plaintiffs' Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

The Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

In short, Plaintiffs' Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

### D. <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts VI and VII of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of

Case ID: 220302583
Control No.: 23083569

punitive damages. *See* Exhibit "A," pp. 38, 46. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" M.P. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in M.P.'s medical care and condition following birth. For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in M.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec.

Case ID: 220302583
Control No.: 23063560

LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a) Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

> (b) Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

41 P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

Case ID: 220302583
Control No.: 23083560

Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct

Case ID: 220302583
Control No.: 23083560

of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical

Case ID: 220302583
Control No.: 23083560

insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Even assuming the allegations in the Complaint were true for the purposes of this argument only, the outcome in this case was not the result of any intentional wrongdoing or deliberate misconduct on the part of Moving Defendants or any medical provider at Pennsylvania Hospital, nor does the Complaint contain any such allegations.

Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c). Plaintiffs allege in this action that unidentified "staff" fed M.P. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "A," ¶ 12. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985). In this matter, Plaintiffs have failed to plead any facts to suggest that Moving

Case ID: 220302583
Control No.: 23083560

Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

### E. **MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS**

#### 1. **Plaintiff-Parent has Failed to State a Cause of Action**

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of M.P. Plaintiffs' Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 126, 139 and 147. However, no specific cause of action is asserted as to any damages sought by Plaintiff-parent in her own right, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

#### 2. **Plaintiffs are Required to Plead Separate Claims Pursuant to Pa.R.C.P. 1020**

Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Complaint filed herein. Claims on

Case ID: 220302583
Control No.: 23083560

behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### 3. Plaintiff-Parent's Claim Is Precluded Pursuant to the Statute of Limitations

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that M.P. was born on December 13, 2013, was fed the Defendant manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13. Thus, since the Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

### F. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading. In this case, Plaintiffs' counsel signed the verification for the Complaint, in violation of Rule 1024. *See* Exhibit "A." Accordingly, the Complaint should be stricken for lack of an appropriate verification.

Case ID: 220302583
Control No.: 23081560

**V,**   <u>**REQUESTED RELIEF**</u>

For the foregoing reasons, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Case ID: 220302583
Control No.: 23083560

## <u>CERTIFICATE OF SERVICE</u>

I, Richard S. Margulies, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiff's Complaint, to be served via the electronic filing system to all counsel of record.


BY: _____
RICHARD S. MARGULIES, ESQ.


Dated: June 14, 2023

# EXHIBIT C

Case ID: 220302583
Control No.: 24081569

TERRAINE ABDULLAH, on her own behalf : COURT OF COMMON PLEAS
and as Parent and Natural Guardian of H.S., a : PHILADELPHIA COUNTY
Minor, :
            Plaintiffs, : CIVIL ACTION
    v. : MARCH TERM 2022
                                   : NO. 2583
MEAD JOHNSON & COMPANY, LLC, et al., :
            Defendants. :

Filed and Attested by the
Office of Judicial Records
03 MAR 2023 03:35 pm
C. PERRY

## ORDER

**AND NOW**, this ___ day of _March_ 2024, upon consideration of the

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of

Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of

Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, and any Response thereto, it is hereby

**ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that _all_ ___Plaintiff___

_Shall file an Amended Complaint_

~~claims~~ against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health

System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn

Medicine ~~are hereby~~ **DISMISSED** with prejudice. _Stating with specificity_
_the factual bases for the professional_
_negligence claim at issue_

BY THE COURT:

_____ J.

22030258300095

Case ID: 220302583
Control No.: 23063116

Case ID: 220302583
Control No.: 24081569

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) E. HAURIN 03/22/2024

# EXHIBIT D

Case ID: 220302583
Control No.: 24081569

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com



*Filed and Attested by the Office of Judicial Records 23 APR 2024 02:41 pm B. MERCEDES*

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own** | : | **COURT OF COMMON PLEAS** |
| **Behalf and as Parent and Natural Guardian** | : | **PHILADELPHIA COUNTY** |
| **of H.S., a Minor** | : | |
| **335 Passmore Street** | : | |
| **Philadelphia, PA 19111** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | **NO. 220902583** |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

1

Case ID: 220302583
Control No.: 24081569

CT Corporation System                          :
208 So. Lasalle Street, Suite 814              :
Chicago, IL 60604                              :
                                               :
                                               :
THE PENNSYLVANIA HOSPITAL OF                   :
THE UNIVERSITY OF PENNSYLVANIA                 :
HEALTH SYSTEM d/b/a PENNSYLVANIA               :
HOSPITAL                                       :
3400 Civic Center Blvd.                        :
Philadelphia, PA 19104                         :
                                               :
                                               :
THE TRUSTEES OF THE UNIVERSITY OF              :
PENNSYLVANIA d/b/a PENN MEDICINE               :
133 South 36th Street                          :
Philadelphia, PA 19104                         :
                                               :
             **Defendants**                    :            **JURY TRIAL DEMANDED**

## AMENDED COMPLAINT IN CIVIL
## ACTION NOTICE TO DEFEND

<div style="display:flex">

NOTICE

You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701

AVISO

Le han demandado a usted en la corte.  Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación.  Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701

</div>

2

Case ID: 220302583
Control No.: 24081569

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com

| | |
|---|---|
| **TERRAINE ABDULLAH,** ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARDIAN OF H.S., A MINOR **335 PASSMORE STREET PHILADELPHIA, PA 19111**                  **PLAINTIFFS** : : : : : : : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| **V.** : : | **CIVIL ACTION** |
| **MEAD JOHNSON & COMPANY, LLC** **ILLINOIS CORPORATION SERVICE CO. 801 ADLAI STEVENSON DRIVE SPRINGFIELD, IL 62703** : : : : : : | |
| **MEAD JOHNSON NUTRITION COMPANY** **ILLINOIS CORPORATION SERVICE CO. 801 ADLAI STEVENSON DRIVE SPRINGFIELD, IL 62703** : : : : : : : | **NO. 220902583** |
| **ABBOTT LABORATORIES** **CT CORPORATION SYSTEM 208 SO. LASALLE STREET, SUITE 814 CHICAGO, IL 60604** : : : : : : : | |
| **THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM** D/B/A **PENNSYLVANIA** : : : | |

3

Case ID: 220302583
Control No.: 24081569

HOSPITAL                                      :
3400 CIVIC CENTER BLVD.         :
PHILADELPHIA, PA 19104        :
                                           :

THE TRUSTEES OF THE UNIVERSITY OF  :
PENNSYLVANIA D/B/A PENN MEDICINE  :
133 SOUTH 36TH STREET          :
PHILADELPHIA, PA 19104        :
                                         :

DEFENDANTS              :        JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.      INTRODUCTION

1.     This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

Case ID: 220302583
Control No.: 24081569

the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.　　Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.　　PARTIES

3.　　Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania.  Ms. Abdullah is the parent and natural guardian of H.S., a minor.  Ms. Abdullah's address is 335 Passmore Street, Philadelphia, Pennsylvania 19111.

4.　　Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware.  Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.　　Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302583
Control No.: 24081569

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.  Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

Case ID: 220302583
Control No.: 24081569

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *H.S.'s NEC Diagnosis*

11.     H.S. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on September 12, 2006.

12.     At birth H.S.'s gestational ages was approximately 25 weeks and she weighed 847 grams. Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk decreases the risk of NEC.

13.     Upon information and belief shortly after H.S. first ingested the Defendant Manufacturers' products, she developed NEC.

14.     H.S. was diagnosed in the NIC-U with NEC on November 10, 2006, and thereafter was forced to undergo a colonic resection, permanently removing part of the infant's colon as a result of her NEC diagnosis. Infant plaintiff continues to suffer long term gastrointestinal health effects as a result of this surgical removal of part of her colon.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.    NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.    Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.    Up to 30 percent of NEC-diagnosed infants die from the disease.

Case ID: 220302583
Control No.: 24081569

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long- term health problems, and death.

***Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist***

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.   Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition,

8

Case ID: 220302583
Control No.: 24081569

they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

23.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

24.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Abdullah of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Abdullah Discovers Her Claim*

25.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Abdullah did not know, and had no reason to know or suspect, that H.S.'s NEC could have been caused by the Defendant Manufacturers' products.

26.     Once Ms. Abdullah learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

Case ID: 220302583
Control No.: 24081569

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and
Would Not Have Revealed a Factual Basis Earlier
Because Defendants Hid the Cause of NEC from Ms. Abdullah***

27.     Despite exercising reasonable diligence, Ms. Abdullah was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of H.S.'s injuries.

28.     Not one person at Penn Medicine informed Ms. Abdullah that the Defendant Manufacturers' formula products could have caused H.S.'s injuries.  Penn Medicine's response at the time did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of the Defendants.

29.     Ms. Abdullah is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

30.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Abdullah had no reason to doubt their word.

31.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

32.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

33.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the

10

Case ID: 220302583
Control No.: 24081569

first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

34.    Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Abdullah immediately after H.S.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused H.S.'s injuries.

35.    Ms. Abdullah also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to H.S.  Not only was Ms. Abdullah unaware that the Defendant Manufacturers' products caused H.S.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Abdullah, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302583
Control No.: 24081569

36.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

37.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

38.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

39.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

40.     Additionally, Defendant Hospital failed to inform Ms. Abdullah that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

41.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Abdullah of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Abdullah that it would do everything it could possibly do to keep her infant safe.  Though this

Case ID: 220302583
Control No.: 24081569

was clearly not true given the known risks of preterm formula for babies like H.S., it was enough for Ms. Abdullah to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

42. Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

43. Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

44. Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

45. Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

46. Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

47. Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing

Case ID: 220302583
Control No.: 24081569

partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

48.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

49.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

50.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC.

Case ID: 220302583
Control No.: 24081569

At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

51.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

52.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

53.     Formula manufacturers have long used their relationships with hospitals and the discharge

Case ID: 220302583
Control No.: 24081569

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

54.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

55.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 220302583
Control No.: 24081569





56.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

57.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.  The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left

Case ID: 220302583
Control No.: 24081569

the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

58. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

59. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

60. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

61. On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other

Case ID: 220302583
Control No.: 24081569

staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

62. Prior to H.S.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like H.S. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

63. Prior to H.S.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like H.S. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

64. Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like H.S.

### The Defendant Manufacturers' Inadequate Warnings

65. Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

Case ID: 220302583
Control No.: 24081569

66.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

67.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead cites no medical literature or research to guide the use of its products.

69.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

70.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

71.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

72.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

20

Case ID: 220302583
Control No.: 24081569

73.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

74.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

75.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

76.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

77.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human link decreases the risk of NEC in premature infants. However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

Case ID: 220302583
Control No.: 24081569

78.    To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.    It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

79.    Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

80.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.  The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers.    Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

81.    Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.    In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on

Case ID: 220302583
Control No.: 24081569

> investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

82.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

83.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

84.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.   This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

85.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used

Case ID: 220302583
Control No.: 24081569

pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

86.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

87.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

<div align="center">

**CAUSES OF ACTION**
**COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

</div>

88.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

89.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

90.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

91.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.     Nonetheless, they

<div align="center">24</div>

continued to sell and market their defective products as appropriate for premature infants.

92.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits.  An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

93.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

94.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

95.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

96.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

97.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

Case ID: 220302583
Control No.: 24081569

sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

98.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

99.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

100.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.   By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.   The failure to warn makes the products at issue in this litigation

26

Case ID: 220302583
Control No.: 24081569

unreasonably dangerous.

101.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.   Among other risks, the Defendant Manufacturers:

a.     Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.     Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.     Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.     "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.     Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.     Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

27

Case ID: 220302583
Control No.: 24081569

g.    Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.    Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

103.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

104.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

105.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses

Case ID: 220302583
Control No.: 24081569

sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

106.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

108.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

109.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk- based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

Case ID: 220302583
Control No.: 24081569

110.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.    Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.    Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.    Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.    Failing to provide statistical evidence showing the magnitude of increased risk

Case ID: 220302583
Control No.: 24081569

of NEC in premature infants associated with cow's milk-based products.

111.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

112.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

113.    Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

114.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

31

Case ID: 220302583
Control No.: 24081569

     d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

     e.      For interest as permitted by law;

     f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

     g.      For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

115.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

116.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

117.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

118.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

119.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

     a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

Case ID: 220302583
Control No.: 24081569

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

120.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

121.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably

Case ID: 220302583
Control No.: 24081569

relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

122. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

123. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

Case ID: 220302583
Control No.: 24081569

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

124. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

125. At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

126. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

127. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

128. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b. That their cow's milk-based products were necessary to the growth and nutrition

35

Case ID: 220302583
Control No.: 24081569

of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

129.    Abbott and Mead were negligent or careless in not determining those representations to be false.

130.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

131.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.    Had Abbott and Mead not committed these negligent

36

misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

132.        As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

133.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302583
Control No.: 24081569

g.      For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

134.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

136.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

137.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

138.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

139.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous

Case ID: 220302583
Control No.: 24081569

products to consumers, such as the Plaintiff Parent.

140. Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

141. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

142. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

   a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

   d.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

   e.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

Case ID: 220302583
Control No.: 24081569

     f.     Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

     g.     Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

143.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

144.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure

Case ID: 220302583
Control No.: 24081569

to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

**COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER**
**(Against Penn Medicine and Pennsylvania Hospital)**

148. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

149. At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the

Case ID: 220302583
Control No.: 24081569

Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

150. Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

151. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

152. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

153. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the

Case ID: 220302583
Control No.: 24081569

misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

154.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

155.    Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are at increased risk for NEC.

156.    Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

157.    Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

158.    Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

159.    By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

160.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

161.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 220302583
Control No.: 24081569

a.    Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

b.    Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

c.    Failing to formulate, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d.    Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e.    Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f.    Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g.    Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be

44

Case ID: 220302583
Control No.: 24081569

provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h.    Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i.    Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.    Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.    Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant;

l.    Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits;

m.    Allowing parental preference to be the standard for feeding premature infants;

n.    Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

Case ID: 220302583
Control No.: 24081569

o.  Failing to follow the American Academy of Pediatrics recommendation to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.  Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.  Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

162.  A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

163.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

164.  As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

165.  As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302583
Control No.: 24081569

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

166. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

167. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

168. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

  a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

  b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

  c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

  d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

  e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 220302583
Control No.: 24081569

f.      Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.      Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.      Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.      Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

169.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

170.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

171.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant

48

Case ID: 220302583
Control No.: 24081569

would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

172.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

173.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

Case ID: 220302583
Control No.: 24081569

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

174.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: April 23, 2024

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Tobias L. Millrood
       Tobias L. Millrood, Esq.
       Elizabeth A. Crawford, Esq.
       Timothy A. Burke, Esq.
       John P. O'Neill, Esq.

**KELLER POSTMAN**
Ben Whiting, Esq.
Zachary Clark, Esq.
*Attorneys for Plaintiffs*

50

Case ID: 220302583
Control No.: 24081569

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 23, 2024, I caused a true and correct copy of the

foregoing document to be served by electronic filing to all counsel of record.


/s/ Tobias L. Millrood
TOBIAS L. MILLROOD

51

Case ID: 220302583
Control No.: 24081569

## **VERIFICATION**

I, the undersigned, Tobias L. Millrood, verify that the statements made in this document are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.


/s/ Tobias L. Millrood

Date: April 23, 2024          Tobias L. Millrood

Case ID: 220302583
Control No.: 24081569

# EXHIBIT E

Case ID: 220302583
Control No.: 24081569

|  |  |  |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS |
|  | : | PHILADELPHIA COUNTY |
|  | : |  |
| Plaintiffs, | : | CIVIL ACTION |
|  | : |  |
| v. | : | MARCH TERM 2022 |
|  | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| Defendants. |  |  |

Filed and Attested by the Office of Judicial Records 31 OCT 2024 03:41 pm S. GILLIAM

## <u>ORDER</u>

**AND NOW**, this _____ day of _____ 2024, upon consideration of the Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
J.

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>: |
| Plaintiffs, | : CIVIL ACTION<br>: |
| v. | : MARCH TERM 2022<br>: NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : |

## ALTERNATIVE ORDER

**AND NOW**, this          day of                    2024, upon consideration of the

Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby

**ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1.      Count VI of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

2.      Count VII of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

3.      Plaintiffs' claims for punitive damages as to Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct; and

4.      Plaintiff Terraine Abdullah's claims in her own right are **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                J.

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire
Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Suite 2700
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | | |
|---|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | MARCH TERM 2022 |
| | : | NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | | |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter "Moving Defendants") hereby preliminarily object to Plaintiffs' Amended Complaint, and, in support thereof, aver as follows:

## I.    <u>FACTUAL AND PROCEDURAL HISTORY</u>

1.    Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). *See* Plaintiff's Complaint, attached as Exhibit "A."

Case ID: 220302583
Control No.: 24082560

2.     On June 9, 2023, Moving Defendants filed preliminary objections to Plaintiffs' Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3) strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes of action, and based on the applicable statute of limitations.

3.     On March 22, 2024, the Court sustained Moving Defendants' preliminary objections, and ordered Plaintiffs to file an Amended Complaint "stating with specificity the factual bases for the professional negligence claim at issue." *See* Court Order, attached as Exhibit "B."

4.     On April 23, 2024, Plaintiffs filed an Amended Complaint, which still contains substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary Objections. *See* Plaintiff's Amended Complaint, attached as Exhibit "C."

5.     Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.[1]

6.     Plaintiffs allege that "upon information and belief" the Plaintiff-minor, H.S., was diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Plaintiffs' Amended Complaint, attached as Exhibit "C," ¶ 13, 15. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

Case ID: 220302583
Control No.: 24082560

milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula.[2]

7.    In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability.[3]

8.    The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four paragraphs in the Amended Complaint.

9.    Plaintiffs aver that H.S. was born prematurely on September 12, 2006 and that "upon information and belief" she "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12.

10.   Plaintiffs further allege that "upon information and belief" H.S. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

11.   Plaintiffs generally allege that H.S. underwent a colonic resection after being diagnosed with NEC, and that she "continues to suffer long term gastrointestinal health effects" as a result. *Id.*, ¶ 14.

12.   Moving Defendants Preliminarily Object to Plaintiffs' Amended Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

---

[2] Although Plaintiffs aver in the Amended Complaint that NEC is caused by cow's milk-based infant formula, as discussed infra and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates NEC is caused by cow's milk-based infant formula.

[3] As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United States Food and Drug Administration and require to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA permits does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302583
Control No.: 24082560

II.    **ARGUMENT**

    A.  **DEMURRER TO COUNT VI: FAILURE TO WARN**

        i.  *Plaintiffs failed to aver sufficient facts demonstrating that the Defendant Manufacturers' products are unreasonably dangerous for their intended use.*

13.    Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm.

14.    Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers caused NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

15.    In Plaintiffs' original Complaint, in support of this theory, Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics.  *See* Exhibit "A," ¶¶ 17-23.

16.    As Moving Defendants argued in their Preliminary Objections filed on June 9, 2023 (which the Court sustained on March 22, 2024), the studies cited by Plaintiffs in paragraphs 17 through 23 in their original Complaint demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

17.    Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint.

18.    In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Amended Complaint that "scientific evidence" exists

4

demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit "C," ¶¶ 21-24. However, Plaintiffs do not plead any additional facts to support their basis that such "scientific evidence" exists.

19.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

20.     To the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

21.     "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

22.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

Case ID: 220302583
Control No.: 24082560

23.     "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.

24.     Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

25.     At the outset of their Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit "C" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.*

26.     However, as stated above, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant. Indeed, Plaintiffs appear to base their core claim on the flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in the Amended Complaint.

27.     Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

Case ID: 220302583
Control No.: 24081560

> ii. *Plaintiffs' "failure to warn" theory is legally flawed because medical providers did not have a "duty to warn", Plaintiff-parent's informed consent was not required, and hospitals cannot be held liable for a physician's failure to obtain proper informed consent.*

28. Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

29. Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

30. The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent.

31. Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.

7

Case ID: 220302583
Control No.: 24082560

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

32.     Since the use of infant formula in feeding premature infants is not a "procedure," there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same.

33.     Further, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

34.     Thus, a hospital cannot be held liable for a physician's failure to obtain proper informed consent. *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002).

**B.     DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER**

> *i.     Moving Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.*

35.     In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice

8

medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

36.    Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula.

37.    Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants.

38.    Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

39.    Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is an unreasonably dangerous product.

40.    Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

>    ii.    *Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.*

41.    Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

42.    In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

>    The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires

Case ID: 220302583
Control No.: 24082560

a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

43.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

44.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Amended Complaint, such evidence cannot support a finding of corporate liability.

> ### iii.     *Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.*

45.     Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

46.     The *Thompson* holding has been extended to HMOs and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania*, *Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

47.     However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D.

Case ID: 220302583
Control No.: 24082560

& C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

48.     There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

49.     Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

### C.     MOTION TO STRIKE PLAINTIFFS' AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

50.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

51.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

52.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain**

11

Case ID: 220302583
Control No.: 24082560

> **averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

53.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

54.     Plaintiffs' Amended Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

55.     Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "C," ¶¶ 11-14.

56.     Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

Case ID: 220302583
Control No.: 24081560

57.     Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 50-51.

58.     Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, what treatment was provided after H.S. developed NEC, and where H.S. received treatment for NEC.

59.     The Amended Complaint further fails to state sufficient facts concerning the nature of the injuries and the "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection.

60.     Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

61.     These omissions are fatal defects in Plaintiff's Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

**D.     MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES**

62.     In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in outrageous, oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "C," Counts VI & VII.

63.     However, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

64.     Rather, Plaintiffs merely allege that "upon information and belief" H.S. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that

13

such an action was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth.

65. For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

66. Plaintiff's allegations of oppressive, outrageous, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

67. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

68. Absent specific factual allegations to justify the claim that the use of infant formula in H.S.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

69. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

70. Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an

Case ID: 220302583
Control No.: 24082560

'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

71.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

72.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40  P.S. §1303.505.

73.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk

15

is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

74.     Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

75.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

76.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa.

16

Case ID: 220302583
Control No.: 24082560

Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

77.     Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See, e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v.*

17

Case ID: 220302583
Control No.: 24082560

*Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

78.     The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

79.     Pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c).

80.     Plaintiffs allege in this action that unidentified "staff" fed H.S. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. *See* Exhibit "C," ¶ 12.

81.     Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

18

Case ID: 220302583
Control No.: 24082560

82.     In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

83.     For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

**E.     MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS**

*i.     Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).*

84.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of H.S.

85.     Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "C," ¶¶ 97, 105, 123, 133, 147, 165, 173.

86.     However, no specific cause of action is asserted as to any damages sought by behalf of Plaintiff-parent, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

87.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Amended Complaint to allow her to recover damages in her own right, the Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

19

88.     Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### ii. *Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.*

89.     Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

90.     Plaintiffs allege that H.S. was born on September 12, 2006, was fed the Defendant Manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "C," ¶¶ 11-13.

91.     Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

92.     In an attempt to save Plaintiff-parent's claim from being time-barred, Plaintiffs allege in their Amended Complaint that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims "until a later time." *See* Exhibit "C," ¶ 43.

93.     The discovery rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here.

94.     The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed

20

period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds).

95.     Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. Ct. 1989).

96.     The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995).

97.     "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 649 Pa. 227, 249, 195 A.3d 880, 893 (2018) (citations omitted).

98.     Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of H.S.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC" from Plaintiff-parent (*see* Exhibit "C," ¶¶ 27-35) and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products (*see* Exhibit "C," ¶¶ 36-43).

99.     Plaintiffs do not allege *any* facts to support the claim that Moving Defendant "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her.

100.     Plaintiffs allege that Moving Defendants' "response" at the time H.S. was diagnosed with NEC "did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of Defendants." *See* Exhibit "C," ¶ 28. Plaintiffs further allege that, as a layperson with no

Case ID: 220302583
Control No.: 24081560

medical background, Plaintiff-parent had no reason to doubt said "response" she received from H.S.'s health care providers at Penn Medicine. *See id.* ¶ 29-30.

101. However, Plaintiffs do not allege any facts concerning the nature of the Moving Defendants' "response" that Plaintiffs contend Plaintiff-parent relied upon.

102. Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

**WHEREFORE**, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted:

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
MEREDITH A. LOWRY, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Dated: May 13, 2024

22

BURNS WHITE LLC

By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire

Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Suite 2700
Philadelphia, PA 19103
(215) 587-1600
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | : COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>: |
| Plaintiffs, | : CIVIL ACTION<br>: |
| v. | : MARCH TERM 2022<br>: NO. 2583 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' AMENDED COMPLAINT**

## I.    <u>MATTER BEFORE THE COURT</u>

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Amended Complaint.

## II.    <u>STATEMENT OF QUESTIONS PRESENTED</u>

1.    Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because Plaintiffs' Amended Complaint does not support the claim that cow's milk-based products are unreasonably dangerous?

*Suggested answer in the affirmative.*

2.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative.*

3.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because it improperly alleges that Moving Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative.*

4.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint with prejudice because Moving Defendants cannot be held liable on a corporate negligence theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative.*

5.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiffs' Amended Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative.*

Case ID: 220302583
Control No.: 24082560

7.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Amended Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020?

*Suggested answer in the affirmative.*

9.      Whether this Honorable Court should strike Plaintiff-parent's claims because they are time-barred and Plaintiff-parent has failed to allege sufficient facts to demonstrate that the limitations period should be tolled?

*Suggested answer in the affirmative.*

## III.   <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). *See* Plaintiff's Complaint, attached as Exhibit "A."

On June 9, 2023, Moving Defendants filed preliminary objections to Plaintiffs' Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3)  strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes of action, and based on the applicable statute of limitations.  On March 22, 2024, the Court sustained Moving Defendants' preliminary objections, and ordered Plaintiffs to file an Amended Complaint "stating

3

with specificity the factual bases for the professional negligence claim at issue." *See* Court Order, attached as Exhibit "B." On April 23, 2024, Plaintiffs filed an Amended Complaint, which still contains substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary Objections. *See* Plaintiff's Amended Complaint, attached as Exhibit "C."

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1] Plaintiffs allege that the Plaintiff-minors, including H.S., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Exhibit "C" at ¶ 13. Plaintiffs aver that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based products (infant formula). Many of the allegations of the Amended Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors received infant formula and that they developed NEC shortly after being fed with infant formula.

In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott")[2], Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. *See* Exhibit "C" at Counts VI and VII. As is discussed in detail below, Plaintiffs' claims against Moving Defendants are legally and factually deficient.

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[2] Mead Johnson and Abbott have been the subject of similar lawsuits in other states, including Connecticut, Illinois and California.

Case ID: 220302583
Control No.: 24081560

Although Plaintiffs aver in the Amended Complaint that NEC is caused by cow's milk-based infant formula, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates NEC is caused by cow's milk-based infant formula. As such, there is no basis to contend that cow's milk-based products are dangerous for premature infants, such that Moving Defendants had a duty to warn Plaintiff-parents of any risks or alternatives related to infant formula.

Plaintiffs' Amended Complaint provides scant information regarding the factual background of this case. Plaintiffs aver that H.S. was born prematurely on September 12, 2006 and that "upon information and belief" she "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12. Plaintiffs further allege that "upon information and belief" H.S. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13. Plaintiffs generally allege that H.S. underwent a colonic resection after being diagnosed with NEC, and that she "continues to suffer long term gastrointestinal health effects" as a result. *Id.*, ¶ 14. Further, no facts are provided by Plaintiffs as to any medical care H.S. received, other than the colonic resection she underwent, for what period of time H.S. allegedly ingested cow's milk-based products, and which product(s) she allegedly ingested.[3] Finally, the Amended Complaint is silent as to the nature and extent of H.S.'s alleged injuries other than a vague reference to "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection. *Id.* ¶ 14. Moving Defendants Preliminarily Object to Plaintiffs' Amended Complaint for the reasons stated below.

---

[3] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id.*, ¶¶ 50-51.

Case ID: 220302583
Control No.: 24081560

IV. **ARGUMENT**

A. **DEMURRER TO COUNT VI: FAILURE TO WARN**

> 1. *Plaintiffs failed to aver sufficient facts demonstrating that the Defendant Manufacturers' products are unreasonably dangerous for their intended use.*

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers caused NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

In Plaintiffs' original Complaint, in support of this theory, Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. *See* Exhibit "A," ¶¶ 17-23. As Moving Defendants argued in their Preliminary Objections filed on June 9, 2023 (which the Court sustained on March 22, 2024), the studies cited by Plaintiffs in paragraphs 17 through 23 in their original Complaint demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

Case ID: 220302583
Control No.: 24082560

Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint. In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Amended Complaint that "scientific evidence" exists demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit "C," ¶¶ 21-24. However, Plaintiffs do not plead any additional facts to support their basis that such "scientific evidence" exists. Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

Plaintiffs further fail to disclose in their Amended Complaint that infant formula is regulated by the United States Food and Drug Administration (FDA) and that there is no restriction on the use of cow's milk-based products for premature infants. The federal Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas for sale include cow milk. 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA, and (2) submit a notice to the FDA at least 90 days before marketing such formula. The notice must also state that the formula contains the required vitamins and nutrients, as

Case ID: 220302583
Control No.: 24082560

demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(a). For those formulas – known as "exempt" formulas because they may be exempted from certain requirements – the required 90-day notice must include "the label and other labeling of the infant formula, a complete quantitative formulation for the infant formula, and a detailed description of the medical conditions for which the infant formula is represented." 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for infant formulas intended for use by an infant with a low birth weight.

Thus, since Plaintiffs do not allege that the product did not meet federal requirements, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

To the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn. "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

Case ID: 220302583
Control No.: 24082560

      (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

      (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

      (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308. Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

At the outset of their Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit "C" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* However, as stated above, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant. Indeed, Plaintiffs appear to base their core claim on the flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in the Amended Complaint. Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving

Case ID: 220302583
Control No.: 24082560

Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

> **2. Plaintiffs' "failure to warn" theory is legally flawed because medical providers did not have a "duty to warn", Plaintiff-parent's informed consent was not required, and hospitals cannot be held liable for a physician's failure to obtain proper informed consent.**

Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

Further, Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products. The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based infant formula to feed her child as opposed to breastfeeding or using breast donor milk, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law. Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

10

Case ID: 220302583
Control No.: 24082560

(1) Performing surgery, including the related administration of anesthesia.

(2) Administering radiation or chemotherapy.

(3) Administering a blood transfusion.

(4) Inserting a surgical device or appliance.

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

The clear language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of infant formula in feeding premature infants, since that is not a "procedure." Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same. Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 345 Pa. Super. 66, 71, 497 A.2d 646, 648 (1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical

Case ID: 220302583
Control No.: 24082560

procedure without a patient's informed consent constitutes a technical assault or battery and that merely prescribing an oral medication does not involve a touching so not battery can occur and no informed consent is needed. *Id.* at 649. The same principles clearly apply to administration of infant formula to a newborn.

Further, an informed consent claim is only applicable to a physician and not the hospital and/or other health care entities. *See* 40 P.S. § 1303.504; *see also Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure). The Pennsylvania Supreme Court has held that informed consent involves the relationship between a physician and the patient and that the failure to obtain proper informed consent is deemed a battery, and the institution plays no role in the communications involved in obtaining the same. *See Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002). In *Valles*, the Court decisively ruled that:

> We find that a battery which results from a lack of informed consent is not the type of action that occurs within the scope of employment. In our view, a medical facility cannot maintain control over this aspect of the physician-patient relationship. Our lower courts have recognized that the duty to obtain informed consent belongs solely to the physician. (Citations omitted). Informed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents. We decline to interject an element of a hospital's control into this highly individualized and dynamic relationship. We agree with the lower court that to do so would be both improvident and unworkable. Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable.

*Id.*, 805 A.2d at 1239 (emphasis added). The *Valles* case remains the prevailing law in Pennsylvania. Pennsylvania courts have repeatedly applied this doctrine, recognizing and acknowledging that "[i]n a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort." *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (*citing Moure v. Raeuchle*, 604 A.2d 1003, 1008 (Pa. Super. 1992). Further,

Case ID: 220302583
Control No.: 24082560

"[g]iven the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'" *Isaac*, 932 A.2d at 930. As such, it is clear that the instant cause of action cannot be sustained against Moving Defendants as a matter of law.

For the foregoing reasons, Plaintiffs have not pleaded sufficient facts to aver the Defendant Manufacturers' products are unreasonably dangerous for their intended use and thus have not established Moving Defendants had a duty to warn. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI: Failure to Warn of Plaintiffs' Amended Complaint.

### B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

#### 1. Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

13

Case ID: 220302583
Control No.: 24082560

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn. Both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula. As noted above, infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is a dangerous product. Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to preclude the use of cow's milk-based products in the feeding of premature infants in the hospital.

### 2. Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.

Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

<u>Id.</u> at 1386-87 (citations omitted and emphasis added). Thus, corporate liability requires "more than individual acts of negligence." *Id.* As noted by the court in *Edwards*, this reading of the Court's

<div align="center">14</div>

Case ID: 220302583
Control No.: 24081560

opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "Thompson requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Amended Complaint, such evidence cannot support a finding of corporate liability.

For the reasons stated above, Count VII of Plaintiffs' Amended Complaint should be dismissed with prejudice.

### 3. Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.

Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused

Case ID: 220302583
Control No.: 24082560

to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4[th] 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4[th] 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4[th] 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5[th] 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital can be held liable under a theory of corporate negligence. The Trustees of the University of Pennsylvania is not a hospital and cannot be held liable under a theory of corporate liability, regardless of its relationship with Pennsylvania Hospital. Moreover, as Pennsylvania Courts have consistently held, corporate negligence duties are "non-delegable," i.e., only one entity can be held liable for a breach of these duties. The *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07. Thus, even if a corporate negligence claim were permissible as to Pennsylvania Hospital, which is denied for the reasons stated above, The Trustees of the University of Pennsylvania, which is not a hospital, cannot also be exposed to liability for an alleged breach of the same, non-delegable duties arising out of the same factual allegations. Accordingly, even accepting as true all well pled facts in Plaintiffs' Amended Complaint, the corporate negligence claims as to the non-hospital Defendant, the Trustees of the University of Pennsylvania, are legally insufficient and must therefore be dismissed.

16

### C. MOTION TO STRIKE PLAINTIFFS' AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Amended Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa.

Case ID: 220302583
Control No.: 24082560

Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Amended Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "C," ¶¶ 11-14. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 50-51. Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, what treatment was provided after H.S. developed NEC, and where H.S. received treatment for NEC. The Amended Complaint further fails to state sufficient facts concerning the nature of the injuries and the "long-term gastrointestinal health effects" that are alleged to have resulted from the diagnosis of NEC and subsequent colonic resection. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

Case ID: 220302583
Control No.: 24081560

In short, Plaintiffs' Amended Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Amended Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

### D. <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "C," Counts VI & VII. However, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" H.S. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in H.S.'s medical care and condition following birth. For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants

Case ID: 220302583
Control No.: 24082560

engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in H.S.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

20

Case ID: 220302583
Control No.: 24081560

(a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

(b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40 P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion

Case ID: 220302583
Control No.: 24081560

surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from

Case ID: 220302583
Control No.: 24082560

neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Even assuming the allegations in the Amended Complaint were true for the purposes of this argument only, the outcome in this case was not the result of any intentional wrongdoing or deliberate misconduct on the part of Moving Defendants or any medical provider at Pennsylvania Hospital, nor does the Amended Complaint contain any such allegations.

Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that

23

the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c). Plaintiffs allege in this action that unidentified "staff" fed H.S. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. *See* Exhibit "C," ¶ 12. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985). In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

### E. MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS

> #### 1. *Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).*

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of H.S. Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "C," ¶¶ 97, 105, 123, 133, 147, 165, 173. However, no specific cause of action is asserted as to any damages sought by Plaintiff-parent in her own right, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged

Case ID: 220302583
Control No.: 24082560

negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

Further, even if Plaintiff-parent had properly articulated a cause of action in the Amended Complaint to allow her to recover damages in her own right, the Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### 2. Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that H.S. was born on September 12, 2006, was fed the Defendant Manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "C," ¶¶ 11-13. Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations. In an attempt to save Plaintiff-parent's claim from being time-barred, Plaintiffs allege in their Amended Complaint that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims "until a later time." *See* Exhibit "C," ¶ 43. However, the discovery

Case ID: 220302583
Control No.: 24081560

rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here.

The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds). Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. Ct. 1989). The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995). "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 649 Pa. 227, 249, 195 A.3d 880, 893 (2018) (citations omitted).

Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of H.S.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC" from Plaintiff-parent (*see* Exhibit "C," ¶¶ 27-35) and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products (*see* Exhibit "C," ¶¶ 36-43). Plaintiffs do not allege *any* facts to support the claim that Moving Defendant "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her. Plaintiffs allege that Moving Defendants' "response" at the time H.S. was diagnosed with NEC "did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of Defendants." *See*

Case ID: 220302583
Control No.: 24082560

Exhibit "C," ¶ 28.  Plaintiffs further allege that, as a layperson with no medical background, Plaintiff-parent had no reason to doubt said "response" she received from H.S.'s health care providers at Penn Medicine.  *See id.* at ¶ 29-30. However, Plaintiffs do not allege any facts concerning the nature of the Moving Defendants' "response" that Plaintiffs contend Plaintiff-parent relied upon. Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

## V.  **REQUESTED RELIEF**

For the foregoing reasons, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.


BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
MEREDITH A. LOWRY, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Dated: May 13, 2024

27

## <u>CERTIFICATE OF SERVICE</u>

I, Richard S. Margulies, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiff's Amended Complaint, to be served via the electronic filing system to all counsel of record.

BY: _____

RICHARD S. MARGULIES, ESQ.

Dated: May 13, 2024

# EXHIBIT F

Case ID: 220302583
Control No.: 24081569

**KLINE & SPECTER, P.C.**

By:

    Thomas R. Klein, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.

Attorney I.D. Nos.: 28895 / 77764 / 313702 / 320927 / 205677

125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000

Thomas.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.burke@klinespecter.com
Jack.oneill@klinespecter.com



*Filed and Attested by the Office of Judicial Records 17 AUG 2024 09:12 pm S. GILLIAM*

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| *Plaintiff,* | **CIVIL TRIAL DIVISION** |
| v. | **MARCH TERM 2022 NO. 02583** |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | |
| *Defendants.* | |

**NOTICE TO DEFEND**

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Lackawanna Bar Association
233 Penn Avenue
Scranton, PA 18503
 (570) 961-2714

ADVISO

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Colegio de Abogados del Lackawanna
233 Penn Avenue, Scranton, PA 18503
(570) 961-2714

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrod, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrod@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

| | |
|---|---|
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, <br><br>                  *Plaintiff*, <br><br>    v. <br><br> MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, <br><br>                  *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY** <br><br> **CIVIL TRIAL DIVISION** <br><br> **MARCH TERM 2022** <br> **NO. 02583** |

## SECOND AMENDED COMPLAINT

Plaintiff brings this Second Amended Complaint and Demand for Jury Trial (the "Second Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn

1

Case ID: 220302583
Control No.: 24081569

Medicine" or "Pennsylvania Hospital"), together "Defendants."    Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1.    This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.    This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.    As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.    Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.    Plaintiff Terraine Abdullah is a natural adult person and a resident of Pennsylvania.  Ms. Abdullah is the parent and natural guardian of H.S., a minor.  Ms. Abdullah's address is 335 Passmore Street, Philadelphia, PA 19111.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws

2

Case ID: 220302583
Control No.: 24081569

of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants

Case ID: 220302583
Control No.: 24081569

conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9. Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10. This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV. FACTUAL ALLEGATIONS

### *H.S.'s NEC Diagnosis*

11. H.S. was born premature at Pennsylvania Hospital in Philadelphia, Pennsylvania on September 12, 2006.

12. At birth, H.S.'s gestational age was approximately 25 weeks and she weighed 847 grams.

13. Upon information and belief H.S. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk decreases the risk of NEC.

14. Specifically, beginning on October 3, 2006, Dr. Thomas Mollen ordered that H.S. was to

Case ID: 220302583
Control No.: 24081569

be fed mother's breast milk which contained bovine-based human milk fortifier (HMF), which based upon information and belief was manufactured by Defendant Abbott Laboratories.

15. Further, on November 8, 2006, Dr. Mollen revised his nutritional orders to start feeding infant H.S. 30ml of exclusively Mead Johnson's "Enfacare" bovine-based formula every three hours going forward.

16. These feeds all occurred despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products, including formula and fortifier, increase the risk of NEC and that human milk can decrease the risk of NEC.

17. On November 10, 2006, H.S. was diagnosed in the NIC-U with Stage III NEC, and immediately thereafter was forced to undergo a colonic resection surgery, permanently removing part of the infant's colon as a result of her NEC diagnosis.

18. Infant plaintiff continues to suffer long term gastrointestinal health effects as a result of this surgical removal of part of her colon.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

19. NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants. NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die. Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis. Up to 30 percent of NEC-diagnosed infants die from the disease.

20. Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-

Case ID: 220302583
Control No.: 24081569

term health problems, and death.

***Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist***

21.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

22.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

23.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

24.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

25.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

26.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants

Case ID: 220302583
Control No.: 24081569

and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

27.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

28.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Wiger of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Abdullah Discovers Her Claim*

29.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Abdullah did not know, and had no reason to know or suspect, that H.S.'s NEC could have been caused by the Defendant Manufacturers' products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Abdullah*

30.     Despite exercising reasonable diligence, Ms. Abdullah was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of H.S.'s injuries.

Case ID: 220302583
Control No.: 24081569

31.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of H.S.'s NEC diagnosis, Ms. Abdullah undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

32.     The health care providers at Penn Medicine responded only that H.S. had gotten NEC because she was born premature.  Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

33.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused H.S.'s injuries.  Penn Medicine's response at the time did not give Ms. Abdullah any reason to suspect any wrongdoing on the part of the Defendants.

34.     Ms. Abdullah is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

35.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Abdullah had no reason to doubt their word.

36.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

37.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

8

Case ID: 220302583
Control No.: 24081569

38.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

39.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed *infra*, any research conducted by Ms. Abdullah immediately after H.S.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused H.S.'s injuries.

40.     Ms. Abdullah also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her. Not only was Ms. Abdullah unaware that the Defendant Manufacturers' products caused H.S.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302583
Control No.: 24081569

for product placement and access to the hospital staff—were also not public or knowable to Ms. Abdullah, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

41.    In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

42.    The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

43.    Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

44.    Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

10

Case ID: 220302583
Control No.: 24081569

45.    Based upon information and belief, during the relevant time period, Pennsylvania Hospital, Penn Medicine, and the Hospital of the University of Pennsylvania stocked formula products from both Abbott and Mead.

46.    Additionally, Defendant Hospital failed to inform Ms. Abdullah that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Abdullah was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Abdullah asked Plaintiff's health care providers at Defendant Hospital why a premature infant like H.S. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to H.S. could increase the risk of NEC to preterm infants, responding only that H.S. had gotten NEC solely because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

47.    Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Abdullah of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Abdullah that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like H.S., it was enough for Ms. Abdullah to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

Case ID: 220302583
Control No.: 24081569

48.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

***The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products***

49.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

50.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

51.     For example, upon information and belief, Mead creates information booklets for parents of premature infants to help answer some of their questions and concerns about having a premature infant in the NICU that it provides to hospitals for dissemination to parents.  While Mead's booklets explain feeding options for premature infants, including formula, they do not mention that Mead's premature formula and fortifier products increase the risk of premature infants developing necrotizing enterocolitis.  Instead, the booklets advise parents that sometimes a combination of breast milk and formula may be best and that premature infants will be happy and healthy or nourished and healthy regardless of whether they are receiving breast milk or formula.

Case ID: 220302583
Control No.: 24081569

52.     Similarly, upon information and belief, Abbott publishes a pediatric nutrition product guide that is available online for anyone, including parents, to access wherein Abbott advises that "human milk alone does not meet all the nutritional needs of preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU." Nowhere in its product guide does Abbott reference that its products increase the risk of necrotizing enterocolitis.

53.     Abbott also has a consumer-facing website accessible to anyone online, including parents, that specifically discusses nutrition for premature infants, wherein Abbott tells parents of premature infants that "your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." Nowhere in its discussion of preterm infant fortifiers or formulas does Abbott state that its products increase the risk of necrotizing enterocolitis or that they pose more of a risk that just providing preterm infants with breast milk only. Nor does Abbott disclose that the "human milk fortifier" is actually a cow's milk based product and not a human milk-based product, which misleads consumers.

54.     Upon information and belief, both Mead and Abbott also provide materials and programs to the hospitals and the physicians and medical staff who are treating premature infants about the manufacturers' preterm products. Upon information and belief, these materials represent that the manufacturers' preterm products are safe and necessary for preterm infants. Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care.

13

Case ID: 220302583
Control No.: 24081569

55.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

56.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

57.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

58.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

59.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein,

Case ID: 220302583
Control No.: 24081569

and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

60.     Abbott's website also contains product information and a downloadable guide for each of its products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30.  None of these pages or guides contain any mention of NEC or that the products specifically increase the risk of NEC.  Indeed, a search of Abbott's website for "necrotizing enterocolitis" returns no hits. Instead, Abbott states that "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction."  This statement is entirely misleading, as it improperly indicates that the risk of things like "spitting up" are the same for premature infants using Abbott's products and premature infants receiving breast milk or donor milk, equates formula to non-cow's milk-based feeding options like breast milk and donor milk, fails to mention NEC, and minimizes the risk of its products.

15

Case ID: 220302583
Control No.: 24081569

61.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

62.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

Case ID: 220302583
Control No.: 24081569

63.     Mead's website also contains product information for each of its products specifically targeting preterm and low-birth-weight infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). None of these pages contain any mention of NEC or that the products specifically increase the risk of NEC.  Indeed, a search of Mead's website for "necrotizing enterocolitis" returns no hits. Instead, Mead advertises on its website that it "has led the way in developing safe, high-quality, innovative products" – including preterm products – "to help meet the nutritional needs of infants."

64.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk.  They offer free or reduced-cost formula to hospitals for use with infants before discharge.  And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

65.     Here, S.P was discharged from CHOP with the recommendation to continue use of Abbott's Similac Special Care 24 formula.

66.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

Case ID: 220302583
Control No.: 24081569

67.    Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.  The packaging appears as:



68.    The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.  This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

69.    The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.  The

18

Case ID: 220302583
Control No.: 24081569

Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

70. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

71. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

72. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals'

19

Case ID: 220302583
Control No.: 24081569

most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

73.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

74.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

75.     On information and belief, prior to H.S.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like H.S.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

Case ID: 220302583
Control No.: 24081569

76.     On information and belief, prior to H.S.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like H.S.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

77.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like H.S.

### *The Defendant Manufacturers' Inadequate Warnings*

78.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.   Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

79.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

80.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

81.     Mead cites no medical literature or research to guide the use of its products.

82.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the

Case ID: 220302583
Control No.: 24081569

magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

83. Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

84. Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

85. Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies. Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

86. The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

87. Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

Case ID: 220302583
Control No.: 24081569

88.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

89.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

90.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human milk decreases the risk of NEC for premature infants.  However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

91.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.  The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the

Case ID: 220302583
Control No.: 24081569

National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

92.    Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

93.    Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

94.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

95.    Given it was known since at least the early 2000s, and as far back as the 1990s, that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

96.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

Case ID: 220302583
Control No.: 24081569

97. Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition. In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

98. These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

99. Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

100. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted

25

their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

101. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

102. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

103. On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

### <u>CAUSES OF ACTION</u>
### COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

104. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

105. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to

Case ID: 220302583
Control No.: 24081569

manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

106. Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

107. Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

108. The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

109. Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

110. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

111. Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

112. Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or

27

Case ID: 220302583
Control No.: 24081569

increased the risk of their NEC and injuries.

113.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

28

Case ID: 220302583
Control No.: 24081569

## COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

114.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

115.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

116.  Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.   By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.   The failure to warn makes the products at issue in this litigation unreasonably dangerous.

117.        Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.   Among other risks, the Defendant Manufacturers:

  a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

  b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated

29

Case ID: 220302583
Control No.: 24081569

for premature infants like the Injured Infant; and/or

c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

118.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

119.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased

Case ID: 220302583
Control No.: 24081569

risk of their developing NEC.

120. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

121. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e. For interest as permitted by law;

Case ID: 220302583
Control No.: 24081569

    f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.   For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

122. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

123. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

124. At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

125. Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

126. Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

    a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

<div align="center">32</div>

Case ID: 220302583
Control No.: 24081569

b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.  Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.  Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

127.  In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring,

33

Case ID: 220302583
Control No.: 24081569

prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

128. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

129. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

130. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with

Case ID: 220302583
Control No.: 24081569

this action; and

g.   For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

131.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

132.  At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

133.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

134.  Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

135.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including patient consumers, and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

a.   That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.   That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were

35

Case ID: 220302583
Control No.: 24081569

not necessary to achieve adequate growth; and/or

c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.   That cow's milk-based products were safe for premature infants; and/or

e.   That cow's milk-based products were necessary for optimum growth; and/or

f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.   That their products were safe for and provided better nutrition and growth to premature infants than donor milk, a non-cow's milk-based alternative to breast milk; and/or

i.   That their products can fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and health or nourished and health on their products; and/or

j.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

k.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites..

136.  Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.

Case ID: 220302583
Control No.: 24081569

137. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent:

    a.   Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

    b.   Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

    c.   Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    d.   Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    e.   Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

Case ID: 220302583
Control No.: 24081569

f.   Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g.   Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h.   Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i.   Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j.   Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.   Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

38

Case ID: 220302583
Control No.: 24081569

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials,

Case ID: 220302583
Control No.: 24081569

and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

138.  The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.    Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

139.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

140.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained

Case ID: 220302583
Control No.: 24081569

as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

141.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

142.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

143.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

144. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this

41

information.

145. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including consumers and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

     a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

     b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

     c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

     d.  That cow's milk-based products were safe for premature infants; and/or

     e.  That cow's milk-based products were necessary for optimum growth; and/or

     f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

     g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

     h.  That their products were safe for and provided better nutrition and growth to premature infants that donor milk, a non-cow's milk-based alternative to breast milk; and/or

     i.  Thet their products can be fed with confidence to most of the preterm infants in the

42

NICU and/or that premature infants would be happy and healthy or nourished and health on their products; and/or

    j.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    k.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

146. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent.

    a.   Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

    b.   Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

    c.   Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    d.   Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were

43

Case ID: 220302583
Control No.: 24081569

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

Case ID: 220302583
Control No.: 24081569

j.   Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.   Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l.   Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.   Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.   Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.   Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.   Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

Case ID: 220302583
Control No.: 24081569

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

147.  Abbott and Mead were negligent or careless in not determining those representations to be false.

148.  The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

149.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

46

Case ID: 220302583
Control No.: 24081569

150. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

151. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

Case ID: 220302583
Control No.: 24081569

152.  Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

153.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

154.  Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

155.  Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

156.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

48

Case ID: 220302583
Control No.: 24081569

157. Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

158. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

159. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e.   Failing to provide a warning in a method reasonably calculated/expected to reach

Case ID: 220302583
Control No.: 24081569

the parents of newborns; and/or

f.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.  Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

160.  Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

161.  Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

162.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

163.  As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

Case ID: 220302583
Control No.: 24081569

164. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

165. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth

Case ID: 220302583
Control No.: 24081569

herein.

166.   At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

167.   Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

168.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

169.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

Case ID: 220302583
Control No.: 24081569

170. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

171. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

172. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are increased risk for NEC.

173. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

174. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

175. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

176. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

177. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its

53

Case ID: 220302583
Control No.: 24081569

medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

178. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a.  Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

    b.  Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted or prevented the use of cow's milk-based products for feeding premature babies; and/or

    c.  Failing to formulae, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

    d.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

    e.  Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

    f.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

Case ID: 220302583
Control No.: 24081569

g. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

l. Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits.

m. Allowing parental preference to be the standard for feeding premature infants;

55

Case ID: 220302583
Control No.: 24081569

n. Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

o. Failing to follow the American Academy of Pediatrics recommendations to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p. Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q. Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

179. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

180. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

181. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

56

Case ID: 220302583
Control No.: 24081569

developing NEC and significant injuries.

182. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

183. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

184. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

185. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their

57

Case ID: 220302583
Control No.: 24081569

feeding of cow's milk-based products to premature babies; and/or

e.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.  Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.  Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.  Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

186.  A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably

Case ID: 220302583
Control No.: 24081569

dangerous products without adequate warning.

187. A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

188. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

189. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

190. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

Case ID: 220302583
Control No.: 24081569

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

191. Plaintiff hereby demands a jury trial for all claims triable.

Dated: <u>July 16, 2024</u>

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:     <u>/s/ Tobias L. Millrood</u>
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
*Attorneys for Plaintiffs*

60

Case ID: 220302583
Control No.: 24081569

# EXHIBIT A-72

# PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

**CONTROL NUMBER:**

24083947

**(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)**

### FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: 09/09/2024 |
|---|---|

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

March Term, 2022
*Month* *Year*

No. _____ 02583

Name of Filing Party:
MEAD JOHNSON & COMPANY LLC-DFT
MEAD JOHNSON NUTRITION COMPANY-DFT

ABDULLAH ETAL VS MEAD JOHNSON &
COMPANY, LLC, ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition   ☐ Response to Motion

Has another petition/motion been decided in this case?   ☐ Yes  ☐ No
Is another petition/motion pending?   ☐ Yes  ☐ No

*If the answer to either question is yes, you must identify the judge(s):*

_____

| TYPE OF PETITION/MOTION *(see list on reverse side)* | PETITION/MOTION CODE *(see list on reverse side)* |
|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

### I. CASE PROGRAM

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE LINDA CARPENTER

Applicable Petition/Motion Deadline: N/A

Has deadline been previously extended by the Court: N/A

### II. PARTIES *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JAMES A YOUNG
  BURNS WHITE LLC 1835 MARKET STREET
  SUITE 2700 , PHILADELPHIA PA 19103
SEAN P FAHEY
  TROUTMAN PEPPER 3000 TWO LOGAN SQ
  18TH AND ARCH STREETS , PHILADELPHIA
  PA 19103-2799
RONNI E FUCHS
  301 CARNEGIE CENTER SUITE 400 ,
  PRINCETON NJ 08540
JOSEPH E ONEIL
  CAMPBELL CONROY & ONEIL 1205
  WESTLAKES DR SUITE 330 , BERWYN PA
  19312
MARQUES HILLMAN RICHESON
  JONES DAY 901 LAKESIDE AVENUE NORTH
  POINT , CLEVELAND OH 44114

### III. OTHER

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____   August 19, 2024   RICHARD D. WALK
*(Attorney Signature/Unrepresented Party)*   *(Date)*   *(Print Name)*   *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date. No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2408039270
19-AUG-24 11:21:45

THOMAS R KLINE
  KLINE & SPECTER 1525 LOCUST ST., 19TH
  FL. , PHILADELPHIA PA 19102

ASHLEY C KELLER
  KELLER POSTMAN, LLC 150 N. RIVESIDE
  PLAZA SUITE 1400 , CHICAGO IL 60606

BENJAMIN WHITING
  KELLER POSTMAN, LLC 150 N. RIVERSIDE
  PLAZA SUITE 4100 , CHICAGO IL 60606

KENNETH A MURPHY
  TUCKER LAW GROUP, LLC 1801 MARKET
  STREET SUITE 2500 , PHILADELPHIA PA
  19103-6996

EVAN GLASSMAN
  STEPTOE, LLP 1114 AVENUE OF THE
  AMERICAS , NEW YORK NY 10036

SUMNER GT TRUAX
  COVINGTON & BURLING, LLP ONE
  CITYCENTER 850 10TH STREET SW ,
  WASHINGTON DC 20001
MAUREEN BROWNE
  COVINGTON & BURLING ONE CITYCENTER
  850 10TH STREET, NW , WASHINGTON DC
  20001

FILED
19 AUG 2024 11:27 am
Civil Administration
A. MALONIS

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| | : | |
| | : | |
| | : | **MARCH TERM, 2022** |
| Plaintiffs, | : | **No. 2583** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, | : | |
| | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2024, upon consideration of the Motion for Admission Pro Hac Vice of Joshua E. Bidzinski, Esquire, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits Joshua E. Bidzinski, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT**:

_____
J.

**WELSH & RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| | : | |
| | : | **MARCH TERM, 2022** |
| Plaintiffs, | : | **No. 2583** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| | : | |
| Defendants. | : | |

**MOTION FOR ADMISSION *PRO HAC VICE* OF JOSHUA E. BIDZINSKI, ESQUIRE, TO REPRESENT MEAD JOHNSON DEFENDANTS**

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), by and through their counsel, Welsh & Recker, P.C., hereby move this Court for an order pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.) admitting Joshua E. Bidzinski, Esquire, to the bar of this Court, *pro hac vice*, for the purpose of representing the Mead Johnson Defendants, and aver the following in support thereof:

1.     Mr. Bidzinski is a partner of the law firm of Swanson, Martin, & Bell, LLP and a resident in its Chicago office, located at 330 N. Wabash Avenue Suite 3300, Chicago, IL 60611. Mr. Bidzinski has an attorney-client relationship with Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, and has special skills, knowledge and experience relating to this case. The efficient administration, prosecution and resolution of this case will be materially advanced by the admission *pro hac vice* of Mr. Bidzinski. A Verification Statement from Mr. Bidzinski, is attached hereto as Exhibit A.

2.     Mr. Bidzinski is a member in good standing in the state of Illinois and has been admitted to practice since 2010.  See Exhibit A.

3.     Mr. Bidzinski's law firm serves as national trial counsel for the Mead Johnson Defendants. He is familiar with the complex, technical issues presented in this matter, and his participation in this case will help clarify the issues before the Court. See Exhibit A.

4.     The Mead Johnson Defendants have specifically requested that Mr. Bidzinski be permitted to participate in this matter and represent their interests in this matter. See Exhibit A.

5.     Mr. Bidzinski is not presently suspended or disbarred in any Court, nor is he currently subject to any disciplinary proceedings by any organization authorized to discipline attorneys at law. Further, Mr. Bidzinski has never received any public discipline, including, but not limited to, suspension or disbarment by any organization with the authority to discipline attorneys at law. Exhibit A.

Case ID: 220302583
Control No.: 24083947

6.      Mr. Bidzinski is familiar with Pennsylvania Bar Admission Rule 301 and has agreed to abide by the Rules of Professional Conduct applicable to Pennsylvania lawyers. Mr. Bidzinski will abide by the Rules of Court, including all disciplinary rules and, if this motion is granted, he will serve as associate counsel with Richard D. Walk, III, Esquire, counsel of record for the Mead Johnson Defendants in this matter.

7.      Mr. Bidzinski has applied to the Pennsylvania Interest on Lawyers' Trust Account Board (Pennsylvania IOLTA Board) and paid the appropriate fee required under 204 Pa. Code § 81.503. to be admitted pro hac vice. Our office received a copy of the fee payment certification letter from the IOLTA Board, a copy of which is attached as Exhibit B.

8.      Mr. Bidzinski will be associated with Richard D. Walk, III, Esquire, of Welsh & Recker, P.C., at all stages of this action. Mr. Walk, after reasonable investigation, believes that Mr. Bidzinski is a reputable and competent attorney and recommends that he be considered for admission *pro hac vice*. A true Verification Statement from Mr. Walk pursuant to Pa. R. C. P. 1012.1(d)(2) is attached hereto as Exhibit C.

9.      Richard D. Walk, III, Esquire, of Welsh & Recker, P.C., is a member in good standing of the Bar of the Commonwealth of Pennsylvania. Welsh & Recker and Richard D. Walk, III, Esquire will be counsel of record for the Mead Johnson Defendants and will continue to participate fully in this litigation and will sign, serve, and accept service of all papers on the Mead Johnson Defendants' behalf.

10.     All the requirements to satisfy the applicable rules of Court are met.

11.     There is no good cause for denial of this motion.

Case ID: 220302583
Control No.: 24083947

**WHEREFORE**, it is respectfully requested that this Court enter the attached Order granting Joshua E. Bidzinski, Esquire leave to appear as counsel *pro hac vice* for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

Respectfully submitted,

**WELSH & RECKER, P.C.**

Date: August 19, 2024

/s/ Richard D. Walk, III
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:   (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

4

Case ID: 220302583
Control No.: 24083947

## <u>CERTIFICATE OF SERVICE</u>

I, Richard D. Walk, III, Esquire certify that on this date, I caused a copy of the foregoing motion and attachments to be electronically filed through the Court's electronic filing system and that such filing generates a notice of that constitutes service on all counsel of record.


**WELSH & RECKER, P.C.**


Date: August 19, 2024                    /s/ Richard D. Walk, III
                                         Richard D. Walk, III, Esquire

Case ID: 220302583
Control No.: 24083947

**FILED**
19 AUG 2024 11:27 am
Civil Administration
A. MALONIS

# EXHIBIT A

Case ID: 220302583
Control No.: 24083947

## <u>VERIFICATION OF JOSHUA E. BIDZINSKI, ESQUIRE</u>

I, Joshua E. Bidzinski, Esquire, hereby submit this Verification Statement in support of the attached Motion for Admission *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), in this action in the Court of Common Pleas of Philadelphia County, Pennsylvania. In support of this Motion made pursuant to pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.), I swear and affirm that the following is true and correct based upon my personal knowledge:

1. I am a partner of the law firm Swanson, Martin & Bell, LLP and resident in its Chicago office, located at 330 N. Wabash Avenue Suite 3300, Chicago, IL 60611. Telephone: (312) 321-9100; email address: jbidzinski@smbtrials.com.

2. I have been licensed to practice law in the following jurisdiction with the corresponding bar license number: State of Illinois (#6302408). Additionally, I have been admitted to practice in the following courts: U.S. District Court, Northern District of Illinois, U.S. District Court, Central District of Illinois, U.S. District Court, Southern District of Illinois, U.S. District Court, Western District of Michigan, U.S. District Court, Eastern District of Wisconsin.

3. I am a member in good standing of all Bars to which I am admitted.

4. With respect to each jurisdiction identified in Paragraph 2 above, I have never been suspended, disbarred, or otherwise disciplined by any court, nor am I the subject of any disciplinary proceedings.

5. I am involved in the following pending actions in the Philadelphia County Court of Common Pleas in which I am applying for admission *pro hac vice: Abdullah v. Mead Johnson & Company, LLC*, et al., No. 220302583.

6. If admitted, I agree to comply with and be bound by the applicable statues, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

7. I do not have any pending *pro hac vice* admissions that I have applied for in any other court jurisdictions.

8. If admitted, I agree to subject myself to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts or omissions occurring during my appearance in this matter for which admission *pro hac vice* is sought.

9. I respectfully submit that there is a good cause for my admission *pro hac vice* based upon my personal knowledge.

10. Further, I have consented to the appointment of Richard D. Walk, III, Esquire, of Welsh & Recker, P.C., as the agent upon whom services of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in this matter for which admission *pro hac vice* is being sought.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information, and belief. I understand that statements herein are made subject to the penalties of 18 Pa. CS § 4904 (relating to unsworn falsification to authorities).

Case ID: 220302583
Control No.: 24083947

Date: August 16, 2024               /s/ Joshua E. Bidzinski
                                    Joshua E. Bidzinski, Esquire

Case ID: 220302583
Control No.: 24083947

**FILED**

19 AUG 2024 11:27 am

Civil Administration

A. MALONIS

# EXHIBIT B

Case ID: 220302583
Control No.: 24083947



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

August 16, 2024

JOSHUA   BIDZINSKI, Esq.
SWANSON, MARTIN & BELL, LLP
330 N. WABASH AVENUE, SUITE 3300
CHICAGO, IL 60611

SENT TO JOSHUA BIDZINSKI VIA Email: JBIDZINSKI@SMBTRIALS.COM

Dear Attorney BIDZINSKI:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Abdullah v. Mead Johnson & Company, no. 220302583, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc:  RICHARD DAVID WALK, Esq.

    Rwalk@welshrecker.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302583
Control No.: 24083947

FILED
19 AUG 2024 11:27 am
Civil Administration
A. MALONIS

# EXHIBIT C

Case ID: 220302583
Control No.: 24083947

**WELSH AND RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS** <br> : **PHILADELPHIA COUNTY** <br> : <br> : **MARCH TERM, 2022** |
| Plaintiffs, | : **No. 2583** |
| v. | : <br> : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : <br> : <br> : |
| Defendants. | : |

## VERIFICATION OF RICHARD D. WALK, III, ESQUIRE

COMMONWEALTH OF PENNSYLVANIA    )
                                        ) ss:
COUNTY OF PHILADELPHIA              )

      I, Richard D. Walk, III, hereby submit this Verification Statement in support of the attached Motion to Admit Joshua E. Bidzinski, Esquire *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the Mead Johnson Defendants), in this matter.

      1.     I am an associate at Welsh & Recker, P.C., located at 306 Walnut St., Philadelphia, PA 19106.

      2.     I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: The Commonwealth of Pennsylvania

Case ID: 220302583
Control No.: 24083947

(#329420). Additionally, I have been admitted to practice in the following courts: U.S. District Court, Eastern District of Pennsylvania, U.S. District Court, Middle District of Pennsylvania, U.S. Court of Appeals, Third Circuit.

3. I am a member in good standing of the Bar of the Commonwealth of Pennsylvania and the other courts to which I am admitted.

4. I am licensed to practice law in all the jurisdictions that I have been admitted and am counsel of record representing the Mead Johnson Defendants in this matter.

5. I hereby certify and affirm that after reasonable investigation and on personal knowledge, I believe that Joshua E. Bidzinski, is a reputable and competent attorney, and I am in a position to recommend that this candidate be admitted *pro hac vice* for practice in the Commonwealth of Pennsylvania to represent the Mead Johnson Defendants in this matter.

6. I am not currently acting as the sponsor of any other candidate for admission *pro hac vice* in Pennsylvania.

7. If applicable, at the conclusion of this matter, I affirm that any proceeds from the settlement of this cause of action in which Mr. Bidzinski is granted admission *pro hac vice* shall be received, held, distributed, and accounted for in accordance with Rule 301 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information,

2

and belief. I understand that statements herein are made subject to the penalties of 18

Pa. CS §4904 (relating to unsworn falsification to authorities).


                              **WELSH & RECKER, P.C.**


                    By:    /s/ Richard D. Walk, III
                           Richard D. Walk, III, Esquire

Date: August 19, 2024

3

# EXHIBIT A-73

# PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
| --- |
| 24084166 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

### FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: 09/09/2024 |
| --- | --- |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

March Term, 2022
*Month*                            *Year*
No. _____ 02583

Name of Filing Party:
ABBOTT LABORATORIES-DFT

ABDULLAH ETAL VS MEAD JOHNSON & COMPANY, LLC, ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition   ☐ Response to Motion

Has another petition/motion been decided in this case?   ☒ Yes   ☐ No
Is another petition/motion pending?   ☒ Yes   ☐ No
*If the answer to either question is yes, you must identify the judge(s):*
CARPENTER

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
| --- | --- |
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

**I.   CASE PROGRAM**

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE LINDA CARPENTER
Applicable Petition/Motion Deadline: N/A
Has deadline been previously extended by the Court: N/A

**II.   PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JAMES A YOUNG
  BURNS WHITE LLC 1835 MARKET STREET
  SUITE 2700 , PHILADELPHIA PA 19103
SEAN P FAHEY
  TROUTMAN PEPPER 3000 TWO LOGAN SQ
  18TH AND ARCH STREETS , PHILADELPHIA
  PA 19103-2799
RONNI E FUCHS
  301 CARNEGIE CENTER SUITE 400 ,
  PRINCETON NJ 08540
JOSEPH E ONEIL
  CAMPBELL CONROY & ONEIL 1205
  WESTLAKES DR SUITE 330 , BERWYN PA
  19312
MARQUES HILLMAN RICHESON
  JONES DAY 901 LAKESIDE AVENUE NORTH
  POINT , CLEVELAND OH 44114

**III.   OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____        August 19, 2024        SEAN P. FAHEY        _____
*(Attorney Signature/Unrepresented Party)*        *(Date)*        *(Print Name)*        *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date. No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-Filing E-File# 2408041406
20-AUG-24 09:13:54

THOMAS R KLINE
  KLINE & SPECTER 1525 LOCUST ST., 19TH
  FL. , PHILADELPHIA PA 19102
ASHLEY C KELLER
  KELLER POSTMAN, LLC 150 N. RIVESIDE
  PLAZA SUITE 1400 , CHICAGO IL 60606
BENJAMIN WHITING
  KELLER POSTMAN, LLC 150 N. RIVERSIDE
  PLAZA SUITE 4100 , CHICAGO IL 60606
KENNETH A MURPHY
  TUCKER LAW GROUP, LLC 1801 MARKET
  STREET SUITE 2500 , PHILADELPHIA PA
  19103-6996
EVAN GLASSMAN
  STEPTOE, LLP 1114 AVENUE OF THE
  AMERICAS , NEW YORK NY 10036

MAUREEN BROWNE
  COVINGTON & BURLING ONE CITYCENTER
  850 10TH STREET, NW , WASHINGTON DC
  20001
SUMNER GT TRUAX
  COVINGTON & BURLING, LLP ONE
  CITYCENTER 850 10TH STREET SW ,
  WASHINGTON DC 20001

**FILED**
19 AUG 2024 05:04 pm
**Civil Administration**
**A. MALONIS**

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## TRIAL DIVISION – CIVIL SECTION

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*, | PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION |
| Plaintiffs, | |
| v. | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | MARCH TERM 2022 NO. 220302583 |
| Defendants. | |

### ORDER

     **AND NOW,** this _____ day of _____, 2024, upon consideration of the Motion for Admission of Attorney Catherine T. Zeng *Pro Hac Vice*, it is hereby **ORDERED** and **DECREED** that the Motion for Admission *Pro Hac Vice* is hereby **GRANTED,** and Catherine T. Zeng, of Jones Day, is hereby admitted *Pro Hac Vice* for the purpose of representing Defendant Abbott Laboratories in the above-captioned action after obtaining the appropriate City of Philadelphia Business Privilege Tax License pursuant to 19-2602 of the Philadelphia Code. *Pro Hac Vice* Counsel shall pay all City Business and Wage Tax as required.

                                                 **BY THE COURT:**

                                                 _____

                                                         J.

Case ID: 220302583
Control No.: 24084166

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*, | PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION |
| Plaintiffs, | |
| v. | MARCH TERM 2022 NO. 220302583 |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | |
| Defendants. | |

**DEFENDANT ABBOTT LABORATORIES' MOTION FOR THE
ADMISSION *PRO HAC VICE* OF CATHERINE T. ZENG, ESQUIRE**

AND NOW COMES the Defendant, Abbott Laboratories, by and through its undersigned counsel and sponsoring attorney, Sean P. Fahey, to file the instant Motion for Admission *Pro Hac Vice* of Catherine T. Zeng, and in support thereof, avers as follows:

1.      Undersigned counsel, primary counsel, and attorney of record on the case moves this Honorable Court for the Admission *Pro Hac Vice* of Catherine T. Zeng, pursuant to Pa. R. Civ. P. 1012.1.

2.      All information that is required under Section 81.504 of the IOLTA regulations has been provided to the IOLTA Board.

3.      The fee required by Section 81.505(a) of the IOLTA regulations has been paid, and true and correct copies of the receipts are attached as Exhibit A.

4.  Attorney Zeng, an attorney with Jones Day, is currently licensed to practice law in the State of California (admitted in 2007, bar number 251231). *See* Candidate Verification in Support of Motion for Admission of Attorney Catherine T. Zeng *Pro Hac Vice*, attached as Exhibit B.

5.  Attorney Zeng has never been suspended, disbarred, or otherwise disciplined in any jurisdiction. *See* Exhibit B.

6.  Attorney Zeng agrees to comply with and be bound by the applicable statutes, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct. *See* Exhibit B.

7.  Attorney Zeng submits to the jurisdiction of the Pennsylvania Courts and the Pennsylvania Disciplinary Board with respect to acts and omissions occurring during the appearance in the above-captioned matters. *See* Exhibit B.

8.  Attorney Zeng consents to the appointment of Sean P. Fahey as the agent upon whom service of process shall be made for all actions, including disciplinary actions. *See* Exhibit B.

9.  The undersigned counsel submits that Attorney Zeng is a reputable and competent attorney, and highly recommends the candidate's admission. *See* Sponsor Verification in Support of Motion for Admission of Catherine T. Zeng *Pro Hac Vice*, attached as Exhibit C.

10.  The undersigned counsel is acting as the sponsor of Attorney Zeng in the Courts of this Commonwealth for this case, and cases involving Defendant Abbott Laboratories' formula products currently pending in the Philadelphia Court of Common Pleas. *See* Exhibit B.

Case ID: 220302583
Control No.: 24084166

WHEREFORE, Defendant Abbott Laboratories and sponsoring attorney, Sean P. Fahey, respectfully request that this Honorable Court grant Defendant's Motion for Admission *Pro Hac Vice* of Attorney Zeng.

Dated: August 19, 2024              Respectfully submitted,

                                    */s/ Sean P. Fahey*
                                    Sean P. Fahey (PA 73305)
                                    TROUTMAN PEPPER
                                    HAMILTON SANDERS LLP
                                    3000 Two Logan Square
                                    Eighteenth and Arch Streets
                                    Philadelphia, PA 19103
                                    Telephone: (215) 981-4296
                                    Sean.Fahey@Troutman.com

                                    *Attorney for Defendant*
                                    *Abbott Laboratories*

Case ID: 220302583
Control No.: 24084166

# EXHIBIT A

Case ID: 220302583
Control No.: 24084166



SUPREME COURT OF PENNSYLVANIA
PENNSYLVANIA INTEREST ON
LAWYERS TRUST ACCOUNT BOARD

August 16, 2024

CATHERINE TARA ZENG, Esq.
JONES DAY
1755 EMBARCADERO ROAD
PALO ALTO, CA 94303

SENT TO CATHERINE ZENG VIA Email: CZENG@JONESDAY.COM

Dear Attorney ZENG:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as ABDULLAH ET AL VS MEAD JOHNSON & COMPANY LLC, ET AL, no. 220302583, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc: SEAN P. FAHEY, Esq.

Sean.fahey@troutman.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302583
Control No.: 24084166

# EXHIBIT B

Case ID: 220302583
Control No.: 24084166

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*,<br><br>Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE,<br><br>Defendants. | PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION<br><br><br>MARCH TERM 2022 NO. 220302583 |

## CANDIDATE VERIFICATION IN SUPPORT OF MOTION FOR ADMISSION OF ATTORNEY CATHERINE T. ZENG *PRO HAC VICE*

I, Catherine T. Zeng, do hereby verify that the following statements are true and correct:

1.      I am currently licensed to practice law in the State of California (admitted in 2007, bar number 251231).

2.      I am a member in good standing and eligible to practice before the State Bar of California.  I am not currently suspended or disbarred by that Bar.

3.      I am admitted to practice before the U.S. Courts of Appeals for the Ninth Circuit (admitted 2009), the U.S. Court of Appeals for the Federal Circuit (admitted 2022), the U.S. District Court for the Northern District of California (admitted 2008), the U.S. District Court for the Central District of California (admitted 2007), the U.S. District Court for the Eastern

Case ID: 220302583
Control No.: 24084166

District of California (admitted 2008), and the U.S. District Court for the Southern District of California (admitted 2008).[1]

      4.    I have never been suspended, disbarred, or otherwise disciplined in any jurisdiction nor am I subject to any disciplinary proceedings.

      5.    I also am involved in the following pending action in the Philadelphia Court of Common Pleas in which I am applying for admission *pro hac vice*: *Stills, et al. v. Mead Johnson & Company, LLC, et al.* (Case No. 220302617).

      6.    I agree to comply with and be bound by the applicable statutes, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

      7.    I agree to submit to the jurisdiction of the Pennsylvania Courts and the Pennsylvania Disciplinary Board with respect to the acts and omissions occurring during appearance in the above-captioned matter.

      8.    I consent to the appointment of my sponsoring attorney, Sean P. Fahey, as the agent upon whom service of process shall be made for all actions, including disciplinary actions that may arise during the above-captioned matter.

      9.    I verify that the above statements are true and correct.

Dated: August 19, 2024               Respectfully submitted,

                                 */s/ Catherine T. Zeng*
                                 Catherine T. Zeng
                                 JONES DAY
                                 1755 Embarcadero Road
                                 Palo Alto, CA 94303

---

[1] Attorney Zeng practiced under her maiden name, Catherine Tara Broderick, in all jurisdictions in which she was admitted prior to 2011.

Case ID: 220302583
Control No.: 24084166

650.687.4132
czeng@jonesday.com

3

Case ID: 220302583
Control No.: 24084166

# EXHIBIT C

Case ID: 220302583
Control No.: 24084166

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*, | PHILADELPHIA COUNTY |
| | COURT OF COMMON PLEAS |
| | TRIAL DIVISION |
| Plaintiffs, | |
| | |
| v. | |
| | MARCH TERM 2022 |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | NO. 220302583 |
| Defendants. | |

**SPONSOR VERIFICATION IN SUPPORT OF MOTION FOR ADMISSION**
**OF CATHERINE T. ZENG *PRO HAC VICE***

I, Sean P. Fahey, do hereby verify that the following statements are true and correct:

1.     I am currently licensed to practice law in Pennsylvania (Bar No. 73305), and I am the attorney of record in the above-captioned action.

2.     After reasonable investigation, I reasonably believe Attorney Catherine T. Zeng to be a reputable and competent attorney, and I am in a position to recommend Attorney Zeng's admission.

3.     I verify that the above statements are true and correct.

Dated: August 19, 2024  Respectfully submitted,

         /s/ Sean P. Fahey
         Sean P. Fahey (PA 73305)
         TROUTMAN PEPPER
         HAMILTON SANDERS LLP
         3000 Two Logan Square
         Eighteenth and Arch Streets
         Philadelphia, PA 19103
         Telephone: (215) 981-4296
         Sean.Fahey@Troutman.com

Case ID: 220302583
Control No.: 24084166

## **CERTIFICATE OF COMPLIANCE**

I, Sean P. Fahey, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Dated:  August 19, 2024

/s/ Sean P. Fahey
Sean P. Fahey (PA 73305)
TROUTMAN PEPPER
HAMILTON SANDERS LLP

## CERTIFICATE OF SERVICE

I, Sean P. Fahey, hereby certify that this 19th day of August 2024, I served a true and correct copy of the foregoing MOTION FOR ADMISSION OF ATTORNEY CATHERINE T. ZENG *PRO HAC VICE* via the Court's Electronic Filing System and by email on all counsel of record.

*/s/ Sean P. Fahey*
Sean P. Fahey (PA 73305)
TROUTMAN PEPPER
HAMILTON SANDERS LLP

# EXHIBIT A-74

FILED
03 SEP 2024 04:00 pm
Civil Administration
M. RIVERA

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| CHRISTINA TAYLOR, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | MARCH TERM, 2022<br>No. 220302606 |
| TERRAINE ABDULLAH, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | MARCH TERM, 2022<br>No. 02583 |
| HOLLI CARTER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | MARCH TERM, 2022<br>No. 220302588 |
| SHONDERA DRAYTON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | MARCH TERM, 2022<br>No. 02594 |
| CATHERINE McMILLIAN, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | APRIL TERM, 2022<br>No. 220400140 |
| LOREN SANDERS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | APRIL TERM, 2022<br>No. 220400153 |
| SAMAYA SHORT, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | APRIL TERM, 2022<br>No. 220400159 |

Case ID: 220302583
Control No.: 24081569

| | |
|---|---|
| ALICE STILLS, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |
| GINA WIEGER, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |
| STEPHANIE WILKERSON, et al., | : |
| Plaintiff, | : SEPTEMBER TERM, 2023 |
| v. | : No. 230900730 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |
| MELVENIA WILLIAMS, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

## <u>ORDER</u>

AND NOW this the _____ day of _____, 2024, upon consideration of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System and the Trustees of the University of Pennsylvania's Preliminary Objections to the Plaintiffs' Complaint, Plaintiffs' Answer thereto, and all other appropriate considerations, it is hereby ORDERED, ADJUDGED and DECREED that Defendants' Preliminary Objections are OVERRULED.

BY THE COURT

_____
J.

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. 320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.                    Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| CHRISTINA TAYLOR, et al., <br>     Plaintiff, <br>   v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>     Defendants. | MARCH TERM, 2022 <br> No. 220302606 |
| TERRAINE ABDULLAH, et al., <br>     Plaintiff, <br>   v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | MARCH TERM, 2022 <br> No. 02583 |
| HOLLI CARTER, et al., <br>     Plaintiff, <br>   v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | MARCH TERM, 2022 <br> No. 220302588 |
| SHONDERA DRAYTON, et al., <br>     Plaintiff, <br>   v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | MARCH TERM, 2022 <br> No. 02594 |

1

Case ID: 220302583
Control No.: 24081569

| | |
|---|---|
| CATHERINE McMILLIAN, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : APRIL TERM, 2022<br>: No. 220400140<br>:<br>:<br>: |
| LOREN SANDERS, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : APRIL TERM, 2022<br>: No. 220400153<br>:<br>:<br>: |
| SAMAYA SHORT, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : APRIL TERM, 2022<br>: No. 220400159<br>:<br>: |
| ALICE STILLS, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : MARCH TERM, 2022<br>: No. 220302617<br>:<br>: |
| GINA WIEGER, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : MARCH TERM, 2022<br>: No. 220302601<br>:<br>: |
| STEPHANIE WILKERSON, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　Defendants. | : SEPTEMBER TERM, 2023<br>: No. 230900730<br>:<br>: |
| MELVENIA WILLIAMS, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　Defendants. | : APRIL TERM, 2022<br>: No. 220400141<br>:<br>: |

## PLAINTIFFS' REPSONSE TO PRELMINIARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNVIERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINTS

2

Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendants' Preliminary Objections and responds to Defendants' Preliminary Objections and Evidentiary Exhibits as follows:[1]

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

7.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

---

[1] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023 conference, Plaintiffs file this opposition on the instant docket and incorporate by reference the arguments herein in each of the following actions in which plaintiffs filed second amended complaints: *Abdullah v. Mead Johnson & Company, LLC, et al*., No. 220302583; *Carter v. Mead Johnson & Company, LLC, et al.,* No. 220302588; *Drayton v. Mead Johnson & Company, LLC, et al.,* No. 220302594; *Gray v. Mead Johnson & Company, LLC, et al.,* No. 220400216; *Hollingsworth v. Mead Johnson & Company, LLC, et al.,* No. 230900791; *Kajuffa v. Mead Johnson & Company, LLC, et al.,* No. 220302978; *Mays v. Mead Johnson & Company, LLC, et al.,* No. 220302963; *McMillian v. Mead Johnson & Company, LLC, et al.,* No. 220400140; *Parker v. Mead Johnson & Company, LLC, et al.,* No. 220302983; *Ross v. Mead Johnson & Company, LLC, et al.,* No. 220302981; *Sanders v. Mead Johnson & Company, LLC, et al.,* No. 220400153; *Short v. Mead Johnson & Company, LLC, et al.,* No. 220400159; *Stills v. Mead Johnson & Company, LLC, et al.,* No. 220302617; *Taylor v. Mead Johnson & Company, LLC, et al.,* No. 220302606*; Thomas v. Mead Johnson & Company, LLC, et al.,* No. 220400158; *Tucker v. Mead Johnson & Company, LLC, et al.,* No. 230900867; *Wieger v. Mead Johnson & Company, LLC, et al.,* No. 220302601; *Wilkerson v. Mead Johnson & Company, LLC, et al.,* No. 230900730; and *Williams v. Mead Johnson & Company, LLC, et al.,* No. 220400141.

Case ID: 220302583
Control No.: 24081569

12.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

13.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

14.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

15.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

16.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

17.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

18.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

19.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

20.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

21.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

22.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

23.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

24.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

25.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

26.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

27.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

28.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

29.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

30.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

31.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

32.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

33.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

34.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

35.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

36.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

37.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

38.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

39.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

40.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

41.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

42.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

43.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

44.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

45.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

46.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

47.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

48.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

49.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

50.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

51.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

52.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

53.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

54.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

55.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

56.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

57.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

58.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

59.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

60.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

61.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

62.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

63.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

64.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

65.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

66.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

67.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

68.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

69.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

70.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

71.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

72.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

73.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

74.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

75.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

76.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

77.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

78.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

79.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

80.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

81.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

82.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

83.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

84.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

85.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

86.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

87.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

88.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

89.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

90.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

91.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

92.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

93.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

94.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

95.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

96.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

97.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

98.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

99.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

100.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

101.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

102.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

103.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

104.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

105.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

106.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

107.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

108.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

109.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

110.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

111.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

112.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

113.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

114.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

115.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

116.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

117.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

118.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

119.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

120.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

121.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302583
Control No.: 24081569

122.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

123.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

124.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

125.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

126.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

WHEREFORE, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 3, 2024          By:     _/s/Timothy A. Burke, Esquire_

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
_Attorneys for Plaintiffs_

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (_Pro Hac Vice_)
AMELIA FRENKEL, ESQURIE
_Attorneys for Plaintiffs_

Case ID: 220302583
Control No.: 24081569

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. 320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.          Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| CHRISTINA TAYLOR, et al.,     : <br>     Plaintiff,     : <br>   v.     : <br> MEAD JOHNSON & COMPANY, LLC, et al.,   : <br>     Defendants.     : | MARCH TERM, 2022 <br> No. 220302606 |
| TERRAINE ABDULLAH, et al.,     : <br>     Plaintiff,     : <br>   v.     : <br> MEAD JOHNSON & COMPANY, LLC, et al.,   : <br> Defendants.     : | MARCH TERM, 2022 <br> No. 02583 |
| HOLLI CARTER, et al.,     : <br>     Plaintiff,     : <br>   v.     : <br> MEAD JOHNSON & COMPANY, LLC, et al.,   : <br> Defendants.     : | MARCH TERM, 2022 <br> No. 220302588 |
| SHONDERA DRAYTON, et al.,     : <br>     Plaintiff,     : <br>   v.     : <br> MEAD JOHNSON & COMPANY, LLC, et al.,   : <br> Defendants.     : | MARCH TERM, 2022 <br> No. 02594 |

Case ID: 220302583
Control No.: 24081569

| | |
|---|---|
| CATHERINE McMILLIAN, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400140<br>:<br>:<br>: |
| LOREN SANDERS, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400153<br>:<br>:<br>: |
| SAMAYA SHORT, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400159<br>:<br>: |
| ALICE STILLS, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:　MARCH TERM, 2022<br>:　No. 220302617<br>:<br>: |
| GINA WIEGER, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:　MARCH TERM, 2022<br>:　No. 220302601<br>:<br>: |
| STEPHANIE WILKERSON, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　Defendants. | :<br>:　SEPTEMBER TERM, 2023<br>:　No. 230900730<br>:<br>:<br>: |
| MELVENIA WILLIAMS, et al.,<br>　　　　　Plaintiff,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400141<br>:<br>: |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR REPSONSE TO PRELMINIARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNVIERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINTS**

2

Case ID: 220302583<br>Control No.: 24081569

## I.     <u>Matter Before the Court</u>

Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendants' Preliminary Objections and respond to the Defendants' Preliminary Objections and Evidentiary Exhibits as follows: [2]

## II.     <u>Counter Statement of Questions Involved</u>

1.    Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Failure to Warn" claims where Plaintiffs have adequately alleged that bovine-based formula is unreasonably dangerous and substantially increases the risk for the development of NEC in preterm infants, and where Plaintiffs are not required under the pleading standard to cite to evidence (such as medical studies) in their Complaint in support of ultimate issues that will have to be proven at trial?

*Suggested answer in the affirmative.*

2.    Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Failure to Warn" claims where Plaintiffs have adequately alleged Defendants breached their duty as the hospital system and/or healthcare provider by failing to adequately communicate the facts, risks, benefits, and alternatives associated

---

[2] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023 conference, Plaintiffs file this opposition on the instant docket and incorporate by reference the arguments herein in each of the following actions in which plaintiffs filed second amended complaints: *Abdullah v. Mead Johnson & Company, LLC, et al.*, No. 220302583; *Carter v. Mead Johnson & Company, LLC, et al.*, No. 220302588; *Drayton v. Mead Johnson & Company, LLC, et al.*, No. 220302594; *Gray v. Mead Johnson & Company, LLC, et al.*, No. 220400216; *Hollingsworth v. Mead Johnson & Company, LLC, et al.*, No. 230900791; *Kajuffa v. Mead Johnson & Company, LLC, et al.*, No. 220302978; *Mays v. Mead Johnson & Company, LLC, et al.*, No. 220302963; *McMillian v. Mead Johnson & Company, LLC, et al.*, No. 220400140; *Parker v. Mead Johnson & Company, LLC, et al.*, No. 220302983; *Ross v. Mead Johnson & Company, LLC, et al.*, No. 220302981; *Sanders v. Mead Johnson & Company, LLC, et al.*, No. 220400153; *Short v. Mead Johnson & Company, LLC, et al.*, No. 220400159; *Stills v. Mead Johnson & Company, LLC, et al.*, No. 220302617; *Taylor v. Mead Johnson & Company, LLC, et al.*, No. 220302606; *Thomas v. Mead Johnson & Company, LLC, et al.*, No. 220400158; *Tucker v. Mead Johnson & Company, LLC, et al.*, No. 230900867; *Wieger v. Mead Johnson & Company, LLC, et al.*, No. 220302601; *Wilkerson v. Mead Johnson & Company, LLC, et al.*, No. 230900730; and *Williams v. Mead Johnson & Company, LLC, et al.*, No. 220400141.

Case ID: 220302583
Control No.: 24081569

with the use of bovine-based formula to preterm infants' parents, so that the parents could knowingly choose whether to consent on behalf of preterm infants?

*Suggested answer in the affirmative.*

3. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Corporate Negligence" cause of action where Defendant hospital systems engaged in systemic negligence by failing to enact policies and procedures to prevent bovine-milk based formula from being fed to pre-term infants.

*Suggested answer in the affirmative.*

4. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Corporate Negligence" cause of action where Defendant Trustees of the University of Pennsylvania are a governing body and overseer of the Hospital of the University of Pennsylvania ("HUP"), who are in charge of enacting the HUP policies and procedures at issue in Plaintiffs' Complaint, subjecting them to Plaintiffs' Corporate Negligence claims.

*Suggested answer in the affirmative.*

5. Whether this Honorable Court should deny Defendants Preliminary Objections as to sufficiency of the pleadings where Plaintiffs have sufficient and adequately summarized material facts that inform and notify the Defendants of the claims which they must defendant?

*Suggested answer in the affirmative.*

6. Whether this Honorable Court should deny Defendants Preliminary Objections as to punitive damages where Plaintiffs have adequately plead facts providing a basis for punitive damages?

Case ID: 220302583
Control No.: 24081569

*Suggested answer in the affirmative.*

7. Whether this Honorable Court should deny Defendants Preliminary Objections for Plaintiff Parents claims where the Plaintiff parents have sufficient plead counts for individual harm as well as the harm on behalf of the Minor Plaintiff in the Complaint and where those claims are not barred by the statute of limitations?

*Suggested answer in the affirmative.*

8. Whether this Honorable Court should deny Defendants Preliminary Objections where Plaintiff's necessary verification has been filed by way of a praecipe to attach to Plaintiffs' Complaint?

*Suggested answer in the affirmative.*

### III. Plaintiffs Have Sufficiently Alleged that Pennsylvania Hospital and HUP Failed to Warn Healthcare Professionals and Parents of the Unreasonable Risk of NEC Posed by Bovine-Based Formula to Premature Infants under Count VI.

The moving Hospital Defendants failed to warn parents of premature infants, and their guardian parents, of the risk associated with goods they were supplying to those infants while under their care. A supplier of goods will be liable for their negligent failure to warn foreseeable users of that chattel under Section 388 of the Second Restatement of Torts, which has been incorporated into Pennsylvania law, if:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for the physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied; and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

5

Case ID: 220302583
Control No.: 24081569

RST 2 § 388.

*See, e.g.*, *Binder v. Jones & Laughlin Steel Corp.*, 360 Pa. Super. 390, 396 (1987) (applying RST 2 § 388 to a metal part supplier). Section 388 applies to any supplier of a chattel to another, as explained in Section 388's accompanying comment:

> c. Persons included as "suppliers." The rules stated in this Section and throughout this Topic apply to determine the liability of any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used. These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person. They apply to all kinds of bailors, irrespective of whether the bailment is for a reward or gratuitous, and irrespective of whether the bailment is for use, transportation, safekeeping, or repair. They also apply to one who undertakes the repair of a chattel and who delivers it back with knowledge that it is defective because of the work which he is employed to do upon it.

*See* § 403 RST 2 § 388 cmt. C; *see also Maize v. Atlantic Refin. Co.*, 352 Pa. 51, 56 (1945) ("This court has laid down the rule that anyone who is responsible for the existence of any dangerous instrumentality or substance with which persons are likely to come in contact must 'impose a measure of control that is adequate to the protection of human beings' from it.").

A supplier under this Section will be liable if they supply a chattel for use, which they know or should have known is dangerous, and they fail to warn the user of that danger and to advise proper precautions. *See Hopkins v. E.I. Du Pont De Nemours & Co.*, 199 F.2d 930, 932-33 (3d Cir. 1952) (applying Pennsylvania law) (citing *Maize*, 352 Pa. at 55). Under this Section, a supplier's disclosures will be insufficient if they fall below the standard of care that would be taken by a "reasonable man in a similar situation." *Binder*, 360 Pa. Super. at 398. The greater the potential danger of the instrumentality, the greater the duty to warn against foreseeable and known dangers. *See Thomas v. Arvon Prod's*, 424 Pa. 365, 369-70 (1967); 352 Pa. at 56. "[T]he care to be exercised in a particular case must always be proportionate to the seriousness of the

6

Case ID: 220302583
Control No.: 24081569

consequences which are *reasonably* to be anticipated as a result of the conduct in question." 360 Pa. Super. at 398 (citations omitted) (emphasis in original). When another actor "acts as the nexus between the supplier and the actual user of the dangerous chattel," the supplier cannot "escape the duty to disclose by cavalierly relying on the [other actor] to somehow pass the information along to the actual user." *Id.*

In this case, Defendants failed to adequately communicate the facts, risks, benefits, and alternatives associated with the use of bovine-based formula to preterm infants' parents, so that could knowingly choose whether to consent on behalf of preterm infants. Defendants' duty to warn was even greater by virtue of the fact that parents could not be expected to know the risk of NEC associated with bovine-based formula and given the seriousness of NEC as a disease.

Defendants Pennsylvania Hospital and Hospital of the University of Pennsylvania argue that Plaintiff cannot state a claim for failure to warn because they were not a manufacturer of formula. However, since Plaintiffs' claims sounds in negligence, Defendant does not need to be a commercial manufacturer. Here, Defendants were responsible for providing the infant formula to medical practitioners and the NICU at their hospitals and by extension, to patients, and were therefore, suppliers for purposes of Section 388. Moreover, Plaintiff has alleged that the formula caused an increased risk when fed to infants, in other words, when it was used for its intended usage. Plaintiffs' Complaint alleges that hospitals, including HUP, entered into financially advantageous relationships with codefendant manufacturers Abbott and Mead at various times to purchase, supply, and distribute bovine-based formula to their medical professionals, knowing that these products would then be provided to infants being treated by these providers in their facilities. Hence, Defendants knowingly supplied these instrumentalities to end users, who were not merely foreseeable, but the intended recipients of the formula. Further, the Hospitals' liability is not

Case ID: 220302583
Control No.: 24081569

negated by the fact that others acted as intermediaries when they negligently failed to warn their own providers of these risks and facilitated their providers receiving inaccurate information, which inaccurately downplayed the risk of NEC, from the manufacturers' sales personnel. Moreover, as shown by their own internal correspondence and the relevant academic and medical literature surrounding NEC and bovine-formula in pre-term infants, Defendants knew or should have known that bovine-based formula posed an increased risk of NEC to premature infants. Since NEC is a dangerous and potentially fatal disease, there was an even greater duty on Defendants to adequately warn foreseeable users of this known risk or take steps to make sure that the intermediaries they controlled, namely medical professionals, reliably communicated these risks to parents. Hence, the Hospitals failed to warn parents of the dangerous conditions associated with the formula, which parents had no reason to suspect, while supplying this formula for purposes of Section 388.

## IV. Plaintiffs' Complaint Sufficiently Alleges Facts That Support Their Claims of Corporate Liability of The Moving Health Care Provers, Thus These Claims Should not Be Dismissed

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet any of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

Case ID: 220302583
Control No.: 24081569

The Thompson theory of corporate liability will not be triggered every time something goes wrong in a hospital which harms a patient . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, *Thompson* requires a plaintiff to show that **the hospital itself is breaching a duty and is somehow substandard**…Thompson contemplates a **kind of 'systemic negligence'**…

*Id*. at 1386-87 (citations omitted and emphasis added).

The facts and allegations in Plaintiffs' complaint clearly and succinctly articulate claims of a "systemic negligence" taking place at Penn and HUP, namely that the hospital engaged in a practice of entering into financially advantageous relationships with codefendant manufacturers Abbott and Mead at various times to purchase, supply, and distribute bovine-based formula to their medical professionals, knowing that these products would then be provided to infants being treated by these providers in their facilities. Hence, Defendants knowingly supplied these instrumentalities to end users, who were not merely foreseeable, but the intended recipients of the formula. Further, the Hospitals' liability is not negated by the fact that others acted as intermediaries when they negligently failed to warn their own providers of these risks and facilitated their providers receiving inaccurate information, which inaccurately downplayed the risk of NEC, from the manufacturers' sales personnel, because it is alleged that the hospitals themselves decided which formula product would be stocked and supplied in their respective NICU's and pre-term infant hospital facilities.

Further, Plaintiffs allege in their Complaint that:

A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the

Case ID: 220302583
Control No.: 24081569

danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

*See* Plaintiffs' Complaint, at ¶¶190-192.

Moreover, as shown by their own internal correspondence and the relevant academic and medical literature surrounding NEC and bovine-formula in pre-term infants, Defendants knew or should have known that bovine-based formula posed an increased risk of NEC to premature infants. *See* Ex. A, *Taylor v. Abbott Laboratories, et al.* Second Amended Complaint, at ¶¶168-193.

Finally, corporate liability can attach to a hospital system when there is a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients. Here Moving Defendants are the responsible corporate entities of Pennsylvania Hospital and Hospital of the University of Pennsylvania (HUP). Defendants had the duty to formulate, adopt, and enforce adequate rules and policies regarding the administration of certain formulations of baby formulas to pre-term infants in their care, and to not supply and/or have a policy of not administering bovine based formula to preterm infants which is shown in the literature to increase risk of developing NEC to those patients. *Id*. Therefore, Plaintiffs' Corporate Liability claims should not be dismissed.

## V. Plaintiffs' Complaint Sufficiently Alleges that Defendant Colluded to Distribute and Sell Dangerous Products, and Failed to Warn Medical Practitioners of these Risks. Plaintiffs' Claims for Punitive Damages Should Therefore Not be Dismissed.

Punitive damages may be awarded for "'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' " *Hutchison v. Luddy*, 582 Pa. 114, 121 (2005) (quoting *Feld v. Merriam*, 506 Pa. 383, 395 (1984)). Punitive damages must be based on conduct that is "wanton," "willful," or "reckless." 582 Pa. at 121. As such, in

Case ID: 220302583
Control No.: 24081569

Pennsylvania, to withstand preliminary objections, a plaintiff must allege that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. *Id.* Pennsylvania courts have repeatedly held that a jury should determine whether punitive damages are warranted. *SHV Coal, Inc. v. Cont'l Grain Co.*, 526 Pa. 489, 495 (1991) ("The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused."). Furthermore, to the extent that there is any doubt about whether the standard for punitive damages has been met, that doubt must be resolved in the Plaintiff's favor at this stage. *See Theodore v. Del. Valley Sch. Dist.*, 575 Pa. 321, 333 (2003).

For example, in *Hall v. Episcopal Long Term Care*, plaintiffs alleged that the neglect of a nursing home's staff led to the plaintiff-decedent's death. 54 A.3d 381, 394-95 (Pa. Super. 2012). The plaintiff argued that the "evidence of understaffing, falsification of records, substandard facility conditions, and improper treatment of the deceased's pain, all of which Episcopal failed to correct despite knowledge of such" demonstrated sufficiently knowing conduct to underly punitive damages. *Id.* at 394-95. The trial court concluded that punitive damages were not warranted because the nursing home's negligence "did not rise to the level of reckless disregard." *Id.* at 397 (quoting the trial court opinion). The Superior court reversed the trial court's directed verdict on the issue of punitive damages and held that the issue of punitive damages should have proceeded to the jury as "the Estate presented evidence establishing Episcopal acted in an outrageous fashion in reckless disregard to the rights of others and created an unreasonable risk of physical harm to the residents of the nursing home." *Id.* at 396-97. In so holding, the Court discussed *Scampone*, where the Superior Court likewise held that the issue of punitive damages

Case ID: 220302583
Control No.: 24081569

against one defendant should have proceeded to a jury, since they jointly engaged in conduct with a codefendant that warranted punitive damages against that defendant. *Scampone v. Grane Healthcare Co.*, 169 A.3d 600, 627 (Pa. Super. 2017) ("the punitive damages trial must include Highland since, according to Mr. Scampone's evidence, its employees colluded with Grane employees in some of the actions that warranted imposition of punitive damages, i.e., the alteration of patient records.").

In this case, Plaintiff has alleged that Penn Medicine and HUP purchased, supplied, and distributed bovine-based products, manufactured by codefendants Abbott and Mead, which they knew posed an increased risk of a serious and deadly disease to infants, in order to cut costs. The Hospital Defendants colluded with codefendants to supply Abbott and Mead's products to medical professionals at HUP and failed to warn these professionals about the known risks of these products. Defendants failed to warn healthcare professionals of the known risks of NEC posed by these products, and failed to establish a practice or policy of ensuring that these products were not fed to premature infants, as established in scientific literature, and instead arranged for these treaters to interact with Abbott and Mead salespersons. They then failed to prevent codefendants' sales representatives from making misrepresentations about the increased risk of NEC posed by bovine, instead of human-nutrition based products, and failed to correct these misrepresentations. As a result, Defendants knowingly distributed codefendants' products to practitioners who they knew would provide them to patients, in order to save costs to the Hospitals. Hence, Defendants colluded to pose an unreasonable risk of harm to minor Plaintiff and other infants.

## VI. Plaintiff Has Adequately Pled the Facts and Damages at Issue

Defendant asserts that Plaintiffs' Complaint fails to adequately plead facts regarding liability and injuries claimed. Defendant is wrong and their Preliminary Objections should be

Case ID: 220302583
Control No.: 24081569

overruled. A complaint must give a defendant fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). As the Superior Court has noted:

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts **sufficient to enable the adverse party to prepare his case**. A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. <u>**Evidence from which such facts may be inferred not only need not but should not be alleged.**</u> **Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

In assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates*, P.C., 805 A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc*., 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.,* 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co.*, 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and 3 completeness of the specific basis on which recovery is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Defendants advance several arguments regarding the alleged deficiencies of facts and injuries, all of which are incorrect:

Case ID: 220302583
Control No.: 24081569

- Defendants assert that Plaintiffs' Complaint does not state whether the infant actually ingested the product at issue. In contrast, Plaintiffs have pled that the infant "was fed Similac and/or Enfamil cow's milk-based products" and developed NEC "after ingesting Defendant Manufacturers' products." *See* Ex. A Plaintiff's Second Complaint at ¶¶ 11-12.

- Defendants assert that Plaintiffs' Complaint does not indicate which product was ingested. However, Plaintiff has pled that the infant was fed the Defendant's products "Similac and/or Enfamil cow's milk-based products." Id. at ¶ 11. Absent discovery, Plaintiff is limited to the detail provided in the medical records, the details of which are included in Plaintiff's Complaint. As advanced previously at oral argument, Plaintiff must be allowed to conduct full discovery to determine which manufacturer and brand each Hospital system had a distribution agreement with during certain periods of time, as that information, such as brand, is not often elicited in the medical records. Further, the Defendants themselves are the ones with the information such as purchasing receipts and or purchasing agreements with either Abbott or Mead.

- Defendants argue that Plaintiffs have not met their burden under fact pleading to show that the product was unreasonably dangerous because allegedly plaintiffs' claims are "unsupported by any specific studies or trials in the Complaint." See Def. Preliminary Objections, at 8. However, as noted above, the Superior Court has ruled that in relation to pleading facts, "evidence from which such facts may be inferred not only need not but should not be alleged," which is entirely contrary to Defendants' arguments herein. See *Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974)

- Defendants assert that Plaintiff has not pled the period of time during which the product at issue was ingested. However, Plaintiff alleged in the Complaint that the infant "was fed Similac and/or Enfamil cow's milk-based products by [hospital staff] after her birth." *Id.* Plaintiff's birth date is included in the Complaint.

- Defendants assert that Plaintiff failed to plead when the minor was diagnosed with NEC. However, Plaintiff pled that the infant's "These feeds occurred despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk can decrease the risk of NEC." *Id*. at ¶ 15. Plaintiffs averments adequately summarize the material facts necessary such that the Defendants are on notice of the claim of which they must defend, and notably the moving Defendants are the exact hospitals where the Plaintiff was initially treated for NEC, thus they have access to the exact same medical as the Plaintiffs which show the exact dates of treatment which are summarily referred to in Plaintiffs' Complaint.

- Defendants assert that Plaintiffs did not plead the treatment the infant received following the ingestion of the NEC and resulting injuries. Defendant cites no authority for the proposition that a plaintiff must describe the specific treatment an

14

injured party underwent following injuries resulting from the tortious conduct of a defendant.

- Defendants assert that Plaintiffs have not adequately pled the injuries suffered as a result of the product. Plaintiff has adequately pled the injuries suffered by the infant who ingested Defendant's product, specifically "As a result of Defendants' actions described infra, I.H. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery and resection of a portion of her bowels, short gut syndrome secondary to NEC, intestinal and feeding difficulties, neurological injuries, left lower extremity amputation at the forearm, and she continues to suffer developmental delays and feeding difficulties secondary to bowel resection and short gut syndrome." *Id*. at ¶ 22.

Accordingly, Defendant's Preliminary Objections should be overruled as Plaintiffs Allegations should withstand challenge under 1019(a) because they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and they are sufficiently specific so as to enable Defendants to prepare their defense.

## VII.   Plaintiff-Parents' Claims Against Penn Medicine and HUP Are Not Time-Barred And Should Not Be Dismissed

Plaintiffs have clearly plead claims sounding in negligence on behalf of all plaintiffs, not just the injured minor plaintiff. Indeed, in the complaint, Plaintiff lists under Counts VI and VII, that "As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." See Plaintiffs' Complaint at ¶167, 185, 193. Therefore, Defendants no additional specificity needs to be plead as to which claims apply which Plaintiffs, and Plaintiffs' Complaint complies with Pa.R.C.P. 1020, which does not require Plaintiff Parents and Plaintiffs Minors to plead separate claims for sperate Plaintiffs as Defendant suggests.

Further, Plaintiff-parents' claims are not barred by the discovery rule on two distinct grounds. The discovery rule is an exception [to the statute of limitations] that tolls the statute of limitations when an injury or its cause is not reasonably knowable." *In re Risperdal Litig.*, 656 Pa.

15

649, 661 (2019). "Under the "discovery rule," the statute of limitations begins to run when a plaintiff knows, or reasonably should have known, that: (1) an injury has been sustained; and (2) the injury has been caused by another party's conduct." *Ward v. Rice*, 828 A.2d 1118, 1121 (Pa. Super. 2003) (citing *Citsay v. Reich*, 380 Pa. Super. 366, 369 (1988)). For the discovery rule to apply, the plaintiff must have exercised the due diligence that would be expected of a reasonable person in the plaintiff's position. 828 A.2d at 1121. A plaintiff must begin exercising reasonable diligence once they know the "the salient facts concerning the occurrence of his injury and *who or what caused it*." *Romah v. Hygienic Sanitation Co.*, 705 A.2d 841, 857 (Pa. Super. 1997) (emphasis added). While reasonable diligence is an objective standard, "it is also flexible [...] to take into account differences between persons, their capacity to meet certain situations and circumstances confronting them at the time in question. In short, the standard of conduct required is a uniform one which takes "into account the fallibility of human beings."" 828 A.2d at 1121-22 (quoting RST 2d § 283 cmt's b-c). Whether someone has exercised reasonable diligence "may be best determined by the collective judgment, wisdom, and experience of jurors who have been selected at random from the community whose standard is to be applied." *Petri v. Smith*, 307 Pa. Super. 261, 271-72 (1982).

Under the discovery rule, if a plaintiff's delay is because the assurances of their physicians lull the patient into a false sense of security, this may toll the statute of limitations. *See Acker v. Palena*, 260 Pa. Super. 214, 222 (1978); *Barshady v. Schlosser*, 226 Pa. Super. 260, 263-64 (1973). The Pennsylvania Supreme Court has "expressly declined to hold, as a matter of law, that a layperson may be charged with knowledge greater than that which was communicated to her by the medical professionals who provided treatment and diagnosis." *In re Risperdal Litig.*, 656 Pa. at 662 (citing *Wilson v. El-Daief*, 600 Pa. 161, 179-180 (2009)). If a plaintiff alleges that their

Case ID: 220302583
Control No.: 24081569

delay was due to their reasonably relying upon the reassurances of their physicians, then, while construing the pleadings in the light most favorable to the moving party, a plaintiff's claims will not be time-barred. *Acker v. Palena*, 260 Pa. Super. 214, 223-24 (1978).

Likewise, the under the similar but distinct doctrine of fraudulent concealment, a form of equitable estoppel, the statute of limitations will be tolled if a plaintiff's delay is induced by reliance on the fraudulent concealment of the defendant. *Nesbitt v. Erie Coach Co.*, 416 Pa. 89, 95-96 (1964). If, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Romah*, 705 A.2d at 857 (internal quotations omitted). A defendant does not need to intentionally deceive a plaintiff for the doctrine of fraudulent concealment to apply; instead, fraudulent concealment encompasses "fraud in the broadest sense which includes an unintentional deception." 416 Pa. at 96 (citation omitted). It is for the factfinder to determine whether a defendant made representations that could have induced this reliance on the part of the plaintiff. *Id.* For example, in *Romah*, the Superior Court held that the issue of whether the plaintiff's claims for gross negligence and punitive damages were tolled because the defendant concealed studies and other information from the EPA and the public that showed that the defendant's product caused increased risk of blood cell depression in men was a factual issue for the jury. 705 A.2d at 861.

Plaintiffs have alleged that all of the medical providers that Plaintiff-parents interacted with at the Hospital failed to provide them with any information regarding the increased risk of NEC to premature infants posed by the bovine-based formula that the practitioners provided. Likewise, plaintiffs have alleged that the parents were not presented with the comparative risk of NEC of these products as compared to any other alternatives. Plaintiff-parents relied upon the

Case ID: 220302583
Control No.: 24081569

representations, or lack thereof, provided by the medical professionals who were treating their infant. Further, Plaintiff alleged that Plaintiff-parents had no medical background or training and therefore could not be expected to have greater medical knowledge than these providers. Plaintiff-parents thereby reasonably relied upon, and were lulled into a false sense of security by, the assurances of the physicians treating their children. Moreover, Plaintiff has alleged that Defendants made false representations, in line with their financially advantageous relationship that they possessed with codefendant manufacturers Abbott and Mead, about the relative risks of bovine-based formula, in order to induce reliance on the part of Plaintiff-parents and thereby conceal the true source and cause of their infant's injury. Defendant hospitals facilitated interactions between medical providers and codefendant manufacturers' sales personnel, who Defendant hospital knew would mislead medical providers about the risk of NEC posed by its products. Thus, under both the discovery rule and doctrine of fraudulent concealment, Plaintiff-parents' claims are not time-barred.

## VIII.   <u>Plaintiffs Have Filed the Proper Verifications For Their Complaint</u>

Pennsylvania Rule of Civil Procedure 1024 requires that pleadings containing averments of fact not appearing of record in the action shall state that the averment is true upon the signer's personal knowledge or information and belief and shall be verified. *See* Pa.R.C.P. 1024. Plaintiff has obtained and produced proper verification as required by the Rules. Accordingly, Defendants' objection should be overruled. All such verifications have been or will be attached by way of a praecipe to attach filed to Plaintiffs' Complaint.

## IX.   <u>Request In The Alternative To Amend The Complaint</u>

Case ID: 220302583
Control No.: 24081569

Although Plaintiff strenuously maintains the sufficiency of all of the Counts contained within the Complaint, should this Court be inclined to grant any of Defendants' specific Preliminary Objections, Plaintiff respectfully requests permission to amend the pleadings.

**WHEREFORE**, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 3, 2024          By:     _/s/Timothy A. Burke, Esquire_

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
_Attorneys for Plaintiffs_

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (_Pro Hac Vice_)
AMELIA FRENKEL, ESQURIE
_Attorneys for Plaintiffs_

Case ID: 220302583
Control No.: 24081569

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, I caused a true and correct copy of the foregoing document to be served by electronic filing to all counsel of record.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 3, 2024          By:     */s/Timothy A. Burke, Esquire*

TIMOTHY A. BURKE, ESQUIRE

20

FILED

03 SEP 2024 04:00 pm

Civil Administration

M. RIVERA

**KLINE & SPECTER, P.C.**

By:

Thomas R. Klein, Esq.

Tobias L. Millrood, Esq.

Elizabeth A. Crawford, Esq.

Timothy A. Burke, Esq.

John P. O'Neill, Esq.

Attorney I.D. Nos.: 28895 / 77764 / 313702 / 320927 / 205677

125 Locust Street, 19th Floor

Philadelphia, PA 19102

Telephone: (215) 772-1000

Thomas.kline@klinespecter.com

Tobi.millrood@klinespecter.com

Elizabeth.crawford@klinespecter.com

Timothy.burke@klinespecter.com

Jack.oneill@klinespecter.com



Filed and Attested by the
Office of Judicial Records
18 AUG 2024 04:10 pm
S. RICE

|  |  |
|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor, | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| *Plaintiff,* | **CIVIL TRIAL DIVISION** |
| v. | **MARCH TERM 2022** |
|  | **NO. 02606** |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENNSYLVANIA HOSPITAL, |  |
| *Defendants.* |  |

**NOTICE TO DEFEND**

| NOTICE | ADVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | |
| Lackawanna Bar Association 233 Penn Avenue Scranton, PA 18503 (570) 961-2714 | Colegio de Abogados del Lackawanna 233 Penn Avenue, Scranton, PA 18503 (570) 961-2714 |

Case ID: 220302586
Control No.: 24081569

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

|  |  |
|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor,<br><br>              *Plaintiff,*<br><br>   v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL,<br><br>              *Defendants.* | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO. 02606** |

## SECOND AMENDED COMPLAINT

Plaintiff brings this Second Amended Complaint and Demand for Jury Trial (the "Second Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn

1

Case ID: 220302606
Control No.: 24081569

Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.     INTRODUCTION

1.     This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.     Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.     PARTIES

3.     Plaintiff Christina Taylor is a natural adult person and a resident of Delaware. Ms. Taylor is the parent and natural guardian of I.H., a minor. Ms. Taylor's address is 9 Aidone Drive, New Castle, Delaware 19720.

4.     Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws

2

of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

## III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants

Case ID: 220302588
Control No.: 24081569

conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *I.H.'s NEC Diagnosis*

11.     Infant plaintiff I.H. was born premature at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 9, 2010.

12.     At birth, I.H.'s gestational age was approximately 25 weeks and she weighed 879 grams.

13.     Starting on October 9, 2010 until November 2, 2010, I.H. was fed mother's breast milk fortified with bovine-based Human Milk Fortifier (HMF), which upon information and belief was manufactured by Defendants Abbott and/or Mead.

14.     Subsequently, between November 2, 2010 and November 19, 2010 I.H. was fed full formula feeds of Abbott's Special Care 20 cal/oz or Special Care 24 cal/oz bovine-based formula.

4

15.     These feeds occurred despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk can decrease the risk of NEC.

16.     On November 20, 2010, Dr. Kelly Wade of the NICU diagnosed I.H. with stage II Medical NEC after noticing I.H.'s severely distended stomach and other symptoms consistent with NEC.

17.      Between November 20 and November 23, Dr. Wade attempted to treat I.H.'s NEC using antibiotics without success, and on November 23 ordered for I.H. to be emergently transferred to St. Christopher's hospital for immediate surgical evaluation.

18.     Upon arrival to the St. Christopher's NICU, I.H. was diagnosed with Stage IIIB Medical NEC, the most advanced and life-threatening stage of NEC, which indicates a perforation of the infant's intestinal track.

19.     On Nov 23, 2010 I.H. underwent surgical intervention at St. Christopher's, undergoing an intestinal resection of the jejunum and distal ileum, removing part of her small intestines, as well as a primary anastomosis procedure to attach the two ends of the resected bowels together. At the end of the surgery, I.H. was placed on a wound VAC to assist in healing and blood clotting.

20.     Subsequent, and secondary to the surgery and wound VAC placement, necrosis spread to I.H.'s left hand and forearm, and the NICU physicians amputated I.H.'s lower left extremity from the forearm down on December 8, 2010.

21.     I.H. was in patient at the St. Christopher's NICU until her discharge home on February 15, 2011.

22.     As a result of Defendants' actions described *infra*, I.H. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery and resection of a portion of her bowels, short gut syndrome secondary to NEC, intestinal and feeding difficulties, neurological injuries,

Case ID: 220302586
Control No.: 24081569

left lower extremity amputation at the forearm, and she continues to suffer developmental delays and feeding difficulties secondary to bowel resection and short gut syndrome.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

23.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

24.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

25.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

26.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

27.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants'

Case ID: 220302586
Control No.: 24081569

vulnerability to NEC.

28.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

29.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

30.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

31.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed  Similac and/or  Enfamil  cow's  milk-based products after her birth instead of mother's human milk and/or donor human milk.

32.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania

Case ID: 220302586
Control No.: 24081569

Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Wiger of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Taylor Discovers Her Claim*

33.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Taylor did not know, and had no reason to know or suspect, that I.H.'s NEC could have been caused by the Defendant Manufacturers' products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Taylor*

34.     Despite exercising reasonable diligence, Ms. Taylor was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of I.H.'s injuries.

35.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of I.H.'s NEC diagnosis, Ms. Taylor undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

36.     The health care providers at Penn Medicine responded only that I.H. had gotten NEC because she was born premature.  Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

37.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused I.H.'s injuries.  Penn Medicine's response at the time did not give Ms. Taylor any reason to suspect any wrongdoing on the part of the Defendants.

38.     Ms. Taylor is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

Case ID: 220302586
Control No.: 24081569

39.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Taylor had no reason to doubt their word.

40.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

41.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

42.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

Case ID: 220302508
Control No.: 24081569

from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

43.    Because of the misleading information distributed by the Defendant Manufacturers, as further detailed *infra*, any research conducted by Ms. Taylor immediately after I.H.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused I.H.'s injuries.

44.    Ms. Taylor also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Taylor unaware that the Defendant Manufacturers' products caused I.H.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Taylor, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

45.    In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

46.    The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would

---

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302588
Control No.: 24081569

rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

47.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

48.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

49.     Based upon information and belief, during the relevant time period, Pennsylvania Hospital, Penn Medicine, and the Hospital of the University of Pennsylvania stocked formula products from both Abbott and Mead.

50.     Additionally, Defendant Hospital failed to inform Ms. Taylor that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Taylor was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Taylor asked Plaintiff's health care providers at Defendant Hospital why a premature infant like I.H. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to I.H. could increase the risk of NEC to preterm infants, responding only that I.H. had gotten NEC solely

Case ID: 220302588
Control No.: 24081569

because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

51.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Taylor of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Taylor that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like I.H., it was enough for Ms. Taylor to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

52.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

53.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

54.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their

12

promotional websites, reference the science showing how significantly their products increase the risk of NEC.

55.     For example, upon information and belief, Mead creates information booklets for parents of premature infants to help answer some of their questions and concerns about having a premature infant in the NICU that it provides to hospitals for dissemination to parents.  While Mead's booklets explain feeding options for premature infants, including formula, they do not mention that Mead's premature formula and fortifier products increase the risk of premature infants developing necrotizing enterocolitis.  Instead, the booklets advise parents that sometimes a combination of breast milk and formula may be best and that premature infants will be happy and healthy or nourished and healthy regardless of whether they are receiving breast milk or formula.

56.     Similarly, upon information and belief, Abbott publishes a pediatric nutrition product guide that is available online for anyone, including parents, to access wherein Abbott advises that "human milk alone does not meet all the nutritional needs of preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU."  Nowhere in its product guide does Abbott reference that its products increase the risk of necrotizing enterocolitis.

57.     Abbott also has a consumer-facing website accessible to anyone online, including parents, that specifically discusses nutrition for premature infants, wherein Abbott tells parents of premature infants that "your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." Nowhere in its discussion of preterm infant fortifiers or formulas does Abbott state that its products

Case ID: 220302586
Control No.: 24081569

increase the risk of necrotizing enterocolitis or that they pose more of a risk that just providing preterm infants with breast milk only. Nor does Abbott disclose that the "human milk fortifier" is actually a cow's milk based product and not a human milk-based product, which misleads consumers.

58. Upon information and belief, both Mead and Abbott also provide materials and programs to the hospitals and the physicians and medical staff who are treating premature infants about the manufacturers' preterm products. Upon information and belief, these materials represent that the manufacturers' preterm products are safe and necessary for preterm infants. Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care.

59. Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

60. Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

61. While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

Case ID: 220302588
Control No.: 24081569

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

62.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

63.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

64.     Abbott's website also contains product information and a downloadable guide for each of its products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac

Case ID: 220302586
Control No.: 24081569

Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. None of these pages or guides contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Abbott's website for "necrotizing enterocolitis" returns no hits. Instead, Abbott states that "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction." This statement is entirely misleading, as it improperly indicates that the risk of things like "spitting up" are the same for premature infants using Abbott's products and premature infants receiving breast milk or donor milk, equates formula to non-cow's milk-based feeding options like breast milk and donor milk, fails to mention NEC, and minimizes the risk of its products.

65.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

Case ID: 220302586
Control No.: 24081569

66.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

67.     Mead's website also contains product information for each of its products specifically targeting preterm and low-birth-weight infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). None of these pages contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Mead's website for "necrotizing enterocolitis" returns no hits. Instead, Mead advertises on its website that it "has led the way in developing safe, high-quality, innovative products" – including preterm products – "to help meet the nutritional needs of infants."

68.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons,

Case ID: 220302586
Control No.: 24081569

and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

69.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

70.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:



71.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm

Case ID: 220302586
Control No.: 24081569

infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

72.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

73.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

Case ID: 220302588
Control No.: 24081569

74.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products.  For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

75.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant.  And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

76.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

77.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that

20

Case ID: 220302586
Control No.: 24081569

the preterm infant formula products were safe and without risk, even though that is not what the science said.

78.     On information and belief, prior to I.H.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like I.H.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

79.     On information and belief, prior to I.H.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like I.H.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

80.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like I.H.

### The Defendant Manufacturers' Inadequate Warnings

81.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

Case ID: 220302586
Control No.: 24081569

82.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

83.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

84.     Mead cites no medical literature or research to guide the use of its products.

85.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

86.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

87.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

88.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants.

Case ID: 220302588
Control No.: 24081569

Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

89.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

90.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

91.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

92.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

93.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that

Case ID: 220302588
Control No.: 24081569

human milk decreases the risk of NEC for premature infants. However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning. Further, the Defendant Hospital created a study putting infants, such as I.H. at great risk by providing them with bovine based formula instead of exclusive human milk-based products.

94.    To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates. The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants. It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

95.    Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

96.    Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

97.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has

24

Case ID: 220302588
Control No.: 24081569

not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

98.   Given it was known since at least the early 2000s, and as far back as the 1990s, that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

99.   Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

100.  Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

101.  These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

102.  Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these

Case ID: 220302586
Control No.: 24081569

products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

103. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

104. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

105. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

26

Case ID: 220302586
Control No.: 24081569

106.   On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
## COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

107.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.   Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

109.   Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

110.   Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

111.   The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury

27

and death from NEC.

112. Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

113. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

114. Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

115. Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

116. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost

28

revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

117.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

118.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

119.  Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the

29

Case ID: 220302586
Control No.: 24081569

products at issue in this litigation unreasonably dangerous.

120.　　　　Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.　Among other risks, the Defendant Manufacturers:

    a.　Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.　Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.　Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.　"Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e.　Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.　Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the

Case ID: 220302586
Control No.: 24081569

Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

121.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

122.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

123.  The unwarned-of risks are not of a kind that an ordinary consumer would expect.  Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.    Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

124.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

Case ID: 220302586
Control No.: 24081569

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

125. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

127. At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

32

Case ID: 220302586
Control No.: 24081569

128.   Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

129.   Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

  a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

  b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

  c.  Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

  d.  Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

  e.  Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

  f.  Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary

Case ID: 220302588
Control No.: 24081569

to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

130.  In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

131.  As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

132.  Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

133.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of

Case ID: 220302586
Control No.: 24081569

life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

134.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.  At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

136.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

137.  Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated

Case ID: 220302586
Control No.: 24081569

herein, each of whom were foreseeable and intended recipients of this information.

138. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including patient consumers and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

    a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d. That cow's milk-based products were safe for premature infants; and/or

    e. That cow's milk-based products were necessary for optimum growth; and/or

    f. That cow's milk-based products were similar or equivalent to breast milk; and/or

    g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h. That their products were safe for and provided better nutrition and growth to premature infants than donor milk, a non-cow's milk-based alternative to breast milk; and/or

36

Case ID: 220302586
Control No.: 24081569

    i.    That their products can fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and health or nourished and health on their products; and/or

    j.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

    k.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

139.  Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.

140.  In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent:

    a.    Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

    b.    Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

    c.    Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

Case ID: 220302586
Control No.: 24081569

d.  Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons,

38

Case ID: 220302586
Control No.: 24081569

gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k. Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l. Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o. Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

39

p.   Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.   Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.   Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.   Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.   Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

141.   The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

142.   As a direct and proximate result, Abbott's and Mead's products were fed to the Injured

Case ID: 220302566
Control No.: 24081569

Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

143.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

  a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

  b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

  c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

  d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

  e.   For interest as permitted by law;

  f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

  g.   For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

144.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

41

herein.

145.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

146.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

147.  In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

148.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including consumers, and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

    a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.  That cow's milk-based products were safe for premature infants; and/or

Case ID: 220302586
Control No.: 24081569

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were safe for and provided better nutrition and growth to premature infants that donor milk, a non-cow's milk-based alternative to breast milk; and/or

i.  Thet their products can be fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and healthy or nourished and health on their products; and/or

j.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

k.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

149.  In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent.

a.  Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

Case ID: 220302686
Control No.: 24081569

b.  Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

c.  Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d.  Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

44

Case ID: 220302586
Control No.: 24081569

g.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.  Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

45

Case ID: 220302586
Control No.: 24081569

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

46

t. Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

150. Abbott and Mead were negligent or careless in not determining those representations to be false.

151. The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

152. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

153. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

Case ID: 220302586
Control No.: 24081569

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

154. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

155. Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

156. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

157. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their

Case ID: 220302586
Control No.: 24081569

treatment of the Injured Infant.

158. Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

159. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

160. Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

161. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

162. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously,

Case ID: 220302586
Control No.: 24081569

and recklessly, and breached its duty by:

    a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

    f.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

    g.  Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

163.  Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the

Case ID: 220302586
Control No.: 24081569

ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

164. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

165. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

166. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

167. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained

Case ID: 220302508
Control No.: 24081569

as a result of Penn Medicine's conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

168.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

169.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

170.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply,

52

distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

171.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

172.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

173.  Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

174.  Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

Case ID: 220302586
Control No.: 24081569

175. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably have known that premature babies are increased risk for NEC.

176. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

177. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

178. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

179. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

180. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

181. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

  a. Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

  b. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted or prevented the use of cow's milk-based products for feeding premature babies; and/or

54

c. Failing to formulae, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a

55

Case ID: 220302586
Control No.: 24081569

warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

l.  Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits.

m.  Allowing parental preference to be the standard for feeding premature infants;

n.  Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

o.  Failing to follow the American Academy of Pediatrics recommendations to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.  Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.  Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

182.  A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based

Case ID: 220302586
Control No.: 24081569

products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

183.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

184.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

185.   As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

186.   In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

187.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare

Case ID: 220302586
Control No.: 24081569

professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

188.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

a.   Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

b.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

c.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.   Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

e.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.   Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method

58

Case ID: 220302586
Control No.: 24081569

reasonably calculated/expected to reach the parents of newborns; and/or

h.  Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.  Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

189.  A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

190.  A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

191.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

192.  As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the

Case ID: 220302586
Control No.: 24081569

Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

193.  As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

60

Case ID: 220302566
Control No.: 24081569

## DEMAND FOR JURY TRIAL

194.  Plaintiff hereby demands a jury trial for all claims triable.


Dated: <u>July 16, 2024</u>

<div style="margin-left:40%">

Respectfully submitted,

**KLINE & SPECTER, P.C.**


By:     <u>*/s/ Tobias L. Millrood*</u>
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

*Attorneys for Plaintiffs*

</div>

Case ID: 220302506
Control No.: 24081569

# EXHIBIT A-75

**KLINE & SPECTER, P.C.**

By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com



                             Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARD OF H.S., A MINOR. | MARCH Term, 2022 |
| Plaintiff, | No. 02583 |
| v. | |
| MEAD JOHNSON & COMPANY, LLC, et al. | JURY TRIAL DEMANDED |
| Defendants. | |

### PRAECIPE TO ATTACH VERIFICATION TO AMENDED COMPLAINT

    Please attach Plaintiff's Verifications to the Amended Complaint filed of record on July 17, 2024, with regard to the above-captioned matter.

                             Respectfully submitted,

                             **KLINE & SPECTER, P.C.**

Dated: September 9, 2024

                           /s/ Timothy A. Burke

TIMOTHY A. BURKE, ESQ.
Attorneys for Plaintiffs

Case ID: 220302583

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2024, I caused a true and correct copy of the

foregoing document to be served by electronic filing to all counsel of record.


Dated: September 9, 2024   /s/ Timothy A. Burke
           TIMOTHY A. BURKE

VERIFICATION

I, <u>Terraine Abdullah</u>, verify that the statements made in Plaintiff's Second

Amended Complaint are true and correct to the best of my knowledge, information, and belief. I

understand that false statements made herein are subject to the penalties of 18 Pa. C.S. § 4904,

relating to unsworn falsification to authorities.


Date: <u>07/23/2024</u>                    By: <u>_____</u>

# EXHIBIT A-76



NOTICE TO PLEAD:

TO PLAINTIFFS:  YOU ARE HEREBY NOTIFIED
TO FILE A WRITTEN RESPONSE TO THE
ENCLOSED NEW MATTER WITHIN TWENTY
(TWENTY) DAYS FROM SERVICE HEREOF OR
A JUDGMENT MAY BE ENTERED AGAINST
YOU.

_/s/ Kenneth A. Murphy_____

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esq. (PA Bar No. 58162)
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esq. (PA Bar No. 56813)
Amy B. Carver, Esq. (PA Bar No. 84819)
Richard D. Walk, III, Esq. (PA Bar No. 329420)
306 Walnut Street
Philadelphia, PA  19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

---

TERRAINE ABDULLAH, on her own behalf and
as Parent and Natural Guardian of H.S., a Minor,

*Plaintiffs,*

v.

MEAD JOHNSON & COMPANY, LLC, MEAD
JOHNSON NUTRITION COMPANY, ABBOTT
LABORATORIES, THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA d/b/a
PENN MEDICINE, and PENNSYLVANIA
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA HEALTH SYSTEM d/b/a
PENNSYLVANIA HOSPITAL,

*Defendants.*

**PHILADELPHIA COUNTY
COURT OF COMMON PLEAS**

**MARCH TERM, 2022
No. 02583**

**ANSWER OF DEFENDANTS, MEAD JOHNSON & COMPANY, LLC AND MEAD
JOHNSON NUTRITION COMPANY'S, WITH NEW MATTER TO
PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants Mead Johnson Nutrition Company ("MJNC") and Mead Johnson & Company,
LLC, ("MJC") (collectively "Defendants" or "Mead Johnson"), by and through the undersigned
counsel, answer Plaintiffs' Second Amended Complaint (hereinafter "the Complaint") and assert
New Matter as follows:

Mead Johnson denies any allegations or characterizations in headings or the preamble of
the Complaint. Any and all allegations not expressly and specifically admitted in this Answer are
denied.

## I.   INTRODUCTION

1.   **ANSWER:**   Mead Johnson admits that NEC is a serious, sometimes fatal
condition, and that it involves necrosis of the intestinal wall. It admits that Plaintiff Abdullah
purports to bring this action against Mead Johnson for alleged injuries to H.S. and that Plaintiff
Abdullah, the mother of the named infant, has also brought her own claims. Mead Johnson
expressly declines to adopt Plaintiffs' use of the phrase "cow's-milk-based infant formula
products" and will refer to Mead Johnson products as "Enfamil Premature Nutrition Products"
unless specifically stated otherwise. Except as expressly admitted, Mead Johnson denies each and
every remaining allegation regarding Mead Johnson in Paragraph 1. The remaining allegations of
Paragraph 1 are not directed at Mead Johnson and therefore no response is required. To the extent
a response is required, Mead Johnson denies those allegations.

2.   **ANSWER:**   Mead Johnson admits that Plaintiff Abdullah purports to bring this
action to seek recovery against Mead Johnson, Abbott Laboratories, Penn Medicine, and

Case ID: 220302583

Pennsylvania Hospital. Mead Johnson denies each and every remaining allegation of Paragraph 2.

## II. PARTIES

3. **ANSWER:** Mead Johnson states that it lacks sufficient knowledge or information to form a belief as to the truth as to the allegations of Paragraph 3 and on that basis denies them.

4. **ANSWER:** Mead Johnson admits the allegations of the first sentence of Paragraph 4. Mead Johnson denies the allegations of the second sentence of Paragraph 4. Mead Johnson admits the third sentence of Paragraph 4. The fourth sentence of Paragraph 4 is a legal conclusion to which no response is required. To the extent a response is required, Mead Johnson admits that Mead Johnson Nutrition Company is the sole member of Mead Johnson & Company, LLC. Mead Johnson further admits that Mead Johnson & Company, LLC manufactures infant formula, including products marketed under the Enfamil brand name. Mead Johnson denies each and every remaining allegation of Paragraph 4.

5. **ANSWER:** The allegations of Paragraph 5 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson admits on information and belief that Abbott is a corporation, and has its corporate headquarters in Lake County. It admits that Abbott products are sold under the Similac brand name, and that some of its products contain cow's milk. Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations of Paragraph 5, and on that basis denies them.

6. **ANSWER:** The allegations of Paragraph 6 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks

Case ID: 220302583

knowledge or information sufficient to form a belief as to the truth as to the allegations, and therefore denies them.

7.      **<u>ANSWER:</u>**     The allegations of Paragraph 7 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required,  Mead Johnson  lacks knowledge or information sufficient to form a belief as to the truth as to the allegations, and therefore denies them.

### III.     <u>JURISDICTION AND VENUE</u>

8.      **<u>ANSWER:</u>**     The allegations of Paragraph 8 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 8, insofar as they relate to Mead Johnson.

9.      **<u>ANSWER:</u>**     The allegations of Paragraph 9 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 9, insofar as they relate to Mead Johnson.

10.      **<u>ANSWER:</u>**     The allegations of Paragraph 10 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 10, insofar as they relate to Mead Johnson.

### IV.     <u>FACTUAL ALLEGATIONS</u>

*A.     H.S.'s NEC Diagnosis*

11.      **<u>ANSWER:</u>**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 11, and on that basis denies the same.

Case ID: 220302583

12.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 12, and on that basis denies the same.

13.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 13, and on that basis denies the same.

14.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 14, and on that basis denies the same.

15.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 15, and on that basis denies the same.

16.    **ANSWER:**    The allegations of Paragraph 16 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required,  Mead Johnson denies each and every allegation of Paragraph 16.

17.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 17, and on that basis denies the same.

18.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 18, and on that basis denies the same.

### B.    *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

19.    **ANSWER:**    Mead Johnson admits that NEC can be a very serious condition, and can lead to morbidity and mortality.  Paragraph 19 purports to summarize the development of necrotizing enterocolitis ("NEC") and how it affects the gastrointestinal track of premature infants. Mead Johnson states that the pathology of NEC is complex, as is the structure, composition and

Case ID: 220302583

function of a premature infants' gastrointestinal tract. Plaintiff's summary grossly oversimplifies complex anatomical structure and physiological processes, the development of NEC, and its mortality risks, so as to be incomplete and inaccurate, and on that basis the allegations of Paragraph 19 are denied. Mead Johnson denies the remaining allegations of Paragraph 19.

20. **ANSWER:** Mead Johnson admits that preterm and low-birth-weight infants face risks of developing NEC, with the highest risks in the smallest and most premature infants, and the least risks in those who are closest to term and normal birthweight. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 20.

### C. *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

21. **ANSWER:** Mead Johnson admits that preterm and low birth-weight infants may receive nutrition including maternal breast milk, donor breast milk, maternal or donor breast milk fortified with a human milk fortifier, specialty formulas and/or other medical foods. The nutritional value and availability of these alternatives varies, and the selection of appropriate nutrition for individual infants is made by expert medical personnel. Mead Johnson admits that the allegations of Paragraph 21 purport to provide broad, generalized information regarding the sources of nutrition for premature and/or low birthweight infants. Mead Johnson states that the allegations of Paragraph 21 are grossly oversimplified so as to be misleading, but admits that physicians may, in their medical judgment, choose to administer human donor milk to preterm infants whose mothers do not supply their own breast milk or for whom maternal milk is contraindicated. Mead Johnson denies the remaining allegations of Paragraph 21.

Case ID: 220302583

22.     **ANSWER:**    Mead Johnson admits that human milk and human milk fortifiers based on human milk can furnish adequate nutrition in some circumstances. Mead Johnson denies all remaining allegations and innuendo of Paragraph 22.

23.     **ANSWER:**    Mead Johnson denies each and every allegation and innuendo of Paragraph 23.

24.     **ANSWER:**    Mead Johnson states that breast milk is often unavailable and, even when available, will not always meet the preterm or low birth-weight infant's extraordinary nutritional needs.  Mead Johnson admits that human milk and human milk fortifiers based on human milk are capable of furnishing adequate nutrition in some circumstances. Mead Johnson further admits that maternal milk is known to have immunologic properties that protect against the risk of NEC. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 24.

25.     **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 25.

26.     **ANSWER:**    Mead Johnson denies each and every allegation and innuendo of Paragraph 26.

27.     **ANSWER:**    Mead Johnson denies the allegations of Paragraph 27 to the extent they are directed at Mead Johnson. The remaining allegations of Paragraph 27 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required,  Mead Johnson denies each and every allegation of Paragraph 27.

28.     **ANSWER:**    Mead Johnson denies the allegations of Paragraph 28 to the extent they are directed at Mead Johnson. The remaining allegations of Paragraph 28 are not directed at

Case ID: 220302583

Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 28.

###### D.     Ms. Abdullah Discovers Her Claim

29.     **ANSWER:**     Mead Johnson denies each and every allegation and innuendo of Paragraph 29.

###### E.     Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Abdullah

30.     **ANSWER:**     The allegations of Paragraph 30 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson denies the allegations of Paragraph 30.

31.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 31, and on that basis denies the same.

32.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 32, and on that basis denies the same.

33.     **ANSWER:**     The allegations of Paragraph 33 are not directed at Mead Johnson, and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 33.

34.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 34, and on that basis denies the same.

Case ID: 220302583

35. **ANSWER:** The allegations of Paragraph 35 are not directed at Mead Johnson, and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 35.

36. **ANSWER:** Mead Johnson denies each and every allegation of Paragraph 36.

37. **ANSWER:** Mead Johnson admits that necrotizing enterocolitis can and does occur in preterm infants regardless of the nutrition they receive. Mead Johnson further admits that its products are safe and do not cause NEC. Mead Johnson and denies each and every remaining allegation of Paragraph 37.

38. **ANSWER:** Mead Johnson's website speaks for itself. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 38 to the extent they are directed at Mead Johnson. The remaining allegations of Paragraph 38 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 38.

39. **ANSWER:** The allegations of Paragraph 39 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson denies the allegations of Paragraph 39.

40. **ANSWER:** The allegations of Paragraph 40 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson denies the allegations of Paragraph 40.

## F. *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to*

Case ID: 220302583

***Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

41.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 41.

42.    **ANSWER:**    The allegations of Paragraph 42 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 42.

43.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 43.

44.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 44.

45.    **ANSWER:**    The allegations of Paragraph 45 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required,  Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 45, and on that basis denies the same.

46.    **ANSWER:**    The allegations of Paragraph 46 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required,  Mead Johnson denies each and every allegation of Paragraph 46.

47.    **ANSWER:**    The allegations of Paragraph 47 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required,  Mead Johnson denies each and every allegation of Paragraph 47.

48.    **ANSWER:**    The allegations of Paragraph 48 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 48.

Case ID: 220302583

### G. The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products

49.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 49.

50.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 50.

51.    **ANSWER:**    Mead Johnson & Company, LLC admits that it creates material that it disseminates to hospitals and physicians who then, in their medical judgment, may choose to provide that material to parents of premature infants. Mead Johnson denies each and every allegation of Paragraph 51.

52.    **ANSWER:**    The allegations of Paragraph 52 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 52.

53.    **ANSWER:**    The allegations of Paragraph 53 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 53.

54.    **ANSWER:**    Mead Johnson & Company, LLC admits that it makes available materials and programs relating to its products to hospitals and the physicians and medical staff who administer Mead Johnson products for the purpose of ensuring proper product use. Mead Johnson denies each and every allegation of Paragraph 54.

Case ID: 220302583

55.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 55.

56.    **ANSWER:**    Paragraph 56 purports to summarize information and documents relating to the World Health Assembly ("WHA") described therein. Mead Johnson states that the documents speak for themselves. Mead Johnson denies Plaintiffs' characterization of the documents, and denies the relevance of the documents to this case. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 56.

57.    **ANSWER:**    Mead Johnson states that it supports the International Code of Marketing of Breast-milk Substitutes ("Code"). Mead Johnson expressly denies that the medical and scientific community has confirmed any link between NEC and any infant nutritional products containing cow's milk, including but not limited to Enfamil Premature Nutrition Products. Mead Johnson denies each and every allegation and innuendo of Paragraph 57, insofar as they relate to Mead Johnson. The remaining allegations of Paragraph 57 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them.

58.    **ANSWER:**    The allegations of Paragraph 58 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson further states that commercial infant formulas are the only safe alternative to human breast milk. Mead Johnson denies each and every remaining allegation of Paragraph 58.

Case ID: 220302583

59.     **ANSWER:**     The allegations of Paragraph 59 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 59.

60.     **ANSWER:**     The allegations of Paragraph 60 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 60.

61.     **ANSWER:**     Mead Johnson admits that MJC sells a number of nutrition products specially designed to meet the nutritional needs of premature infants, including the products listed in Paragraph 61.  It states that they are intended to meet their nutritional needs and are to be used under the direction of a physician. Mead Johnson's website speaks for itself.  Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 61.

62.     **ANSWER:**     Mead Johnson admits that Enfamil products are designed to meet the nutritional needs of premature infants, including but not limited to Enfamil NeuroPro EnfaCare Infant Formula ("Enfamil NeuroPro").  Mead Johnson admits that Paragraph 62 purports to quote a portion of an advertisement and a webpage for Enfamil NeuroPro, which speak for themselves. Mead Johnson & Company, LLC's advertising is truthful, non-misleading, and constitutionally protected speech. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 62.

Case ID: 220302583

63.  **ANSWER:**   Mead Johnson admits that Mead Johnson & Company, LLC sells a number of nutrition products designed to meet the nutritional needs of premature infants, including the products listed in Paragraph 63.  It states that they are intended to meet their nutritional needs and are to be used under the direction of a physician. Mead Johnson's website speaks for itself. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 63.

64.  **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 64, insofar as they relate to Mead Johnson.  The remaining allegations of Paragraph 64 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations relating to Defendant Abbott, and on that basis denies them.

65.  **ANSWER:**   Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations of Paragraph 65, and on that basis denies them.

66.  **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 66, insofar as they relate to Mead Johnson.  The remaining allegations of Paragraph 66 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations relating to Defendant Abbott, and on that basis denies them.

67.  **ANSWER:**   Mead Johnson admits that the images of Enfamil Human Milk Fortifier packaging contained in Paragraph 67 are FDA-reviewed marketing assets that have been employed with Enfamil Human Milk Fortifier.  It admits that Enfamil Premature Nutrition Products, including Enfamil Human Milk Fortifier, are designed to meet the nutritional needs of premature infants.  Paragraph 67 purports to quote and to summarize an unspecified study that

Case ID: 220302583

Plaintiff has not identified or attached. Mead Johnson states that the report of the study speaks for itself. It denies Plaintiffs' characterization and interpretation of the study, and denies the relevance of the study to this case. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 67, insofar as they relate to Mead Johnson. The allegations relating to Defendant Abbott of Paragraph 68 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief. Except as expressly admitted, Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 67.

68.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 68 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 68 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

69.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 69 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 69 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

70.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 70 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 70 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

71.    **ANSWER:**    Mead Johnson admits that it provides samples of some premature infant nutritional products to some NICUs at no-charge, and denies each and every remaining

Case ID: 220302583

allegation of Paragraph 71 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 71 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

72.     **ANSWER:**     Mead Johnson admits that it offers a variety of contract options which relate to the amount of product purchased by the hospitals, and denies each and every remaining allegation of Paragraph 72 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 72 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

73.     **ANSWER:**     Mead Johnson denies each and every allegation of Paragraph 73 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 73 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

74.     **ANSWER:**     Mead Johnson denies each and every allegation of Paragraph 73 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 72 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

75.     **ANSWER:**     The allegations of Paragraph 75 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 75.

Case ID: 220302583

76.　**ANSWER:**　Mead Johnson admits that MJC uses a sales team to call on healthcare providers and states that it complies with applicable laws.　Mead Johnson states that it provides information through a variety of media, including those alleged, to healthcare providers, who are also experts in infant nutrition, about the ingredients and indications for use of its premature nutritional products.　Mead Johnson denies that it markets its product as "safe."　It denies that its products cause NEC.　Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegation of Paragraph 76, and on that basis denies them.

77.　**ANSWER:**　Mead Johnson denies each and every allegation of Paragraph 77 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 77 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

### H.　*The Defendant Manufacturers' Inadequate Warnings*

78.　**ANSWER:**　Mead Johnson denies each and every allegation of Paragraph 78.

79.　**ANSWER:**　Mead Johnson admits that one product, Enfamil EnfaCare®, can be purchased at retail locations.　　However, with the exception of EnfaCare, Mead Johnson's premature formula products are not generally available for sale at retail locations in compliance with applicable regulations.　There is no market for Enfamil Human Milk Fortifier or Enfamil Premature (in its various calorie counts) outside of a hospital or healthcare system, and Mead Johnson does not market these products to consumers. Selection and administration of these products in NICU settings is mediated by learned intermediaries, and post-discharge, caregivers

Case ID: 220302583

are instructed to consult with a physician about formula usage. Mead Johnson denies each and every remaining allegation of Paragraph 79.

80. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 80.

81. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 81.

82. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 82.

83. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 83.

84. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 84.

85. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 85.

86. **ANSWER:** The allegations of Paragraph 86 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 86.

Case ID: 220302583

87.     **ANSWER:**     The allegations of Paragraph 87 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 87.

88.     **ANSWER:**     The allegations of Paragraph 88 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 88.

89.     **ANSWER:**     The allegations of Paragraph 89 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 89.

**I.      *Penn Medicine's Failure to Warn***

90.     **ANSWER:**     The allegations of Paragraph 90 are not directed atMead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 90.

91.     **ANSWER:**     The allegations of Paragraph 91 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 91.

92.     **ANSWER:**     The allegations of Paragraph 92 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to

Case ID: 220302583

Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 92.

93. **ANSWER:** The allegations of Paragraph 93 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 93.

94. **ANSWER:** The allegations of Paragraph 94 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 94.

95. **ANSWER:** Mead Johnson denies each and every allegation of Paragraph 95.

96. **ANSWER:** The allegations of Paragraph 96 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 96.

97. **ANSWER:** The allegations of Paragraph 97 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to

Case ID: 220302583

Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 97.

98. **ANSWER:** The allegations of Paragraph 98 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 98.

99. **ANSWER:** The allegations of Paragraph 99 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 99.

100. **ANSWER:** The allegations of Paragraph 100 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 100.

**J.      *Safer Alternative Designs***

101. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 101, insofar as they relate to Mead Johnson. The remaining allegations of Paragraph 101 are not directed at Mead Johnson and therefore no response is required. To the extent a

Case ID: 220302583

response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations relating to Defendant Abbott, and on that basis denies them.

102.    **ANSWER:**    Mead Johnson admits that Prolacta Bioscience sells infant nutrition products containing breast milk.  Mead Johnson denies each and every remaining allegation of Paragraph 102.

103.    **ANSWER:**    Mead Johnson denies each and every allegation and innuendo of Paragraph 103, insofar as they relate to Mead Johnson.  The remaining allegations of Paragraph 103 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them.

## CAUSES OF ACTION

### COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

104.    **ANSWER:**    For its response to Paragraph 104, Mead Johnson incorporates by reference its response to Paragraphs 1 through 103 as though fully set forth herein.

105.    **ANSWER:**    Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products.  Mead Johnson states that the remaining allegations and innuendo of Paragraph 105 are a legal conclusion to which no response is required.  To the extent a response is required, Mead Johnson complied with any duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 105.

Case ID: 220302583

106.  **ANSWER:**  Mead Johnson states that the allegations and innuendo of Paragraph 106 are legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, states that Enfamil products were merchantable and reasonably fit for their intended use, and denies each and every remaining allegation and innuendo of Paragraph 106.

107.  **ANSWER:**  Mead Johnson admits Enfamil Premature Nutrition Products are intended to feed premature infants, and are used by physicians and other medical professionals for that purpose. It denies each and every remaining allegation and innuendo of Paragraph 107.

108.  **ANSWER:**  Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations that the infant ingested Enfamil products "and/or" Abbott's products and on that basis denies such allegations.  It denies each and every remaining allegation and innuendo of Paragraph 108.

109.  **ANSWER:**  Mead Johnson denies each and every allegation and innuendo of Paragraph 109.

110.  **ANSWER:**  Mead Johnson admits that its Enfamil products contained cow's milk at the time they left the manufacturing facility.  Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 110.

111.  **ANSWER:**  Mead Johnson admits that it does not sell human milk containing products.  It denies each and every remaining allegation of Paragraph 111.

112.  **ANSWER:**  Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations that the infant was fed Mead Johnson products. The

Case ID: 220302583

remaining allegations of Paragraph 112 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 112.

113.    **ANSWER:**    The allegations of Paragraph 113 state a legal conclusion, to which no response is required.  To the extent an answer is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 113.

**ANSWER TO DEMAND FOR RELIEF:** Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

114.    **ANSWER:**    For its response to Paragraph 114, Mead Johnson incorporates by reference its response to Paragraphs 1 through 113 as though fully set forth herein.

115.    **ANSWER:**    Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products, and denies each and every remaining allegation and innuendo. Mead Johnson states that the remaining allegations of Paragraph 115 state legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 115.

116.    **ANSWER:**    Mead Johnson states that the allegations and innuendo of Paragraph 116 are legal conclusions to which no response is required.  To the extent a response is required,

Case ID: 220302583

Mead Johnson states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 116.

117. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 117, including all subparts.

118. **ANSWER:** Mead Johnson admits that its premature Enfamil products contained ingredients derived from cow's milk at the time they left the manufacturing facility. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 118.

119. **ANSWER:** The allegations of Paragraph 119 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations that the infant was fed Mead Johnson products. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 119.

120. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 120.

121. **ANSWER:** The allegations of Paragraph 121 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 121.

**ANSWER TO DEMAND FOR RELIEF:** Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

Case ID: 220302583

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

122. **ANSWER:** For its response to Paragraph 122, Mead Johnson incorporates by reference its response to Paragraphs 1 through 121 as though fully set forth herein.

123. **ANSWER:** Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products. Mead Johnson states that the remaining allegations in Paragraph 123 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with all duties imposed by law, and denies each and every remaining allegation and innuendo in Paragraph 123.

124. **ANSWER:** Mead Johnson lacks sufficient knowledge or information to form a belief as to the truth as to the allegations in Paragraph 124, and on that basis denies them.

125. **ANSWER:** Mead Johnson admits that MJC manufactures, distributes, and sells Enfamil Premature Nutrition Products. Mead Johnson states that the remaining allegations in Paragraph 125 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with all duties imposed by law, and denies each and every remaining allegation and innuendo in Paragraph 125.

126. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 126, including all subparts.

127. **ANSWER:** The allegations in Paragraph 127 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with all duties imposed by law, and denies each and every remaining allegation and innuendo in Paragraph 127.

Case ID: 220302583

128.    **ANSWER:**    The allegations of Paragraph 128 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 128.

129.    **ANSWER:**    The allegations of Paragraph 128 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations, and on that basis denies them.

130.    **ANSWER:**    The allegations of Paragraph 130 state a legal conclusion, to which no answer is required.  To the extent an answer is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 130.

**ANSWER TO DEMAND FOR RELIEF:** Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

**COUNT IV: INTENTIONAL MISREPRESENTATION**
**(Against Abbott and Mead)**

131.    **ANSWER:**    For its response to Paragraph 131, Mead Johnson incorporates by reference its response to Paragraphs 1 through 130 as if fully set forth herein.

132.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief as to the truth as to the allegations in Paragraph 132, and on that basis denies them

133.    **ANSWER:**    Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products, and denies each and every remaining allegation and innuendo of Paragraph 133. Mead Johnson states that the remaining allegations of Paragraph 133 state legal

Case ID: 220302583

conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 133.

134. **ANSWER:** Mead Johnson states that the allegations of Paragraph 134 state legal conclusions to which no response is required. To the extent a response is required, Mead Johnson denies that it engaged in misrepresentations, states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 134.

135. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 135, including all subparts.

136. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 136.

137. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 137, including all subparts.

138. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 138.

139. **ANSWER:** The allegations of Paragraph 139 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 139.

Case ID: 220302583

140.    **ANSWER:**    The allegations of Paragraph 140 state a legal conclusion, to which no answer is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 140.

**ANSWER TO DEMAND FOR RELIEF:**  Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

### COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

141.    **ANSWER:**    For its response to Paragraph 141, Mead Johnson incorporates by reference its response to Paragraphs 1 through 140 as if fully set forth herein.

142.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief as to the truth as to the allegations in Paragraph 142, and on that basis denies them

143.    **ANSWER:**    Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products, and denies each and every remaining allegation and innuendo of Paragraph 143. Mead Johnson states that the remaining allegations of Paragraph 143 state legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 143.

144.    **ANSWER:**    Mead Johnson states that the allegations of Paragraph 144 state legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson denies that it engaged in misrepresentations, states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 144.

Case ID: 220302583

145.   **ANSWER:**   Mead Johnson denies that it engaged in misrepresentations, and denies each and every allegation and innuendo of Paragraph 145, including all subparts.

146.   **ANSWER:**   Mead Johnson denies that it engaged in misrepresentations, and denies each and every allegation and innuendo of Paragraph 146, including all subparts.

147.   **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 147.

148.   **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 148.

149.   **ANSWER:**   Mead Johnson states that the allegations of Paragraph 149 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 149.

150.   **ANSWER:**   Mead Johnson states that the allegations of Paragraph 150 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 150.

**ANSWER TO DEMAND FOR RELIEF:**  Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

Case ID: 220302583

## COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

151.    **ANSWER:**    The allegations of Paragraph 151 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 151.

152.    **ANSWER:**    The allegations of Paragraph 152 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 152.

153.    **ANSWER:**    The allegations of Paragraph 153 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 153.

154.    **ANSWER:**    The allegations of Paragraph 154 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 154.

155.    **ANSWER:**    The allegations of Paragraph 155 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 155.

156.    **ANSWER:**    The allegations of Paragraph 156 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 156.

Case ID: 220302583

157. **ANSWER:** The allegations of Paragraph 157 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 157.

158. **ANSWER:** The allegations of Paragraph 158 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 158.

159. **ANSWER:** The allegations of Paragraph 159 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 151, including all subparts.

160. **ANSWER:** The allegations of Paragraph 160 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 160.

161. **ANSWER:** The allegations of Paragraph 161 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 161.

162. **ANSWER:** The allegations of Paragraph 162 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 162.

163. **ANSWER:** The allegations of Paragraph 163 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 163.

Case ID: 220302583

164. **ANSWER:** The allegations of Paragraph 164 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 164.

**ANSWER TO DEMAND FOR RELIEF:** The allegations of Count VI are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Count VI.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

165. **ANSWER:** The allegations of Paragraph 165 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 165.

166. **ANSWER:** The allegations of Paragraph 166 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 166.

167. **ANSWER:** The allegations of Paragraph 167 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 167.

168. **ANSWER:** The allegations of Paragraph 168 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 168.

Case ID: 220302583

169. **ANSWER:** The allegations of Paragraph 169 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 169.

170. **ANSWER:** The allegations of Paragraph 170 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 170.

171. **ANSWER:** The allegations of Paragraph 171 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 171.

172. **ANSWER:** The allegations of Paragraph 172 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 172.

173. **ANSWER:** The allegations of Paragraph 173 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 173.

174. **ANSWER:** The allegations of Paragraph 174 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 174.

175. **ANSWER:** The allegations of Paragraph 175 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 175.

Case ID: 220302583

176.  **ANSWER:**  The allegations of Paragraph 176 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 176.

177.  **ANSWER:**  The allegations of Paragraph 177 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 176.

178.  **ANSWER:**  The allegations of Paragraph 178 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 178, including all subparts.

179.  **ANSWER:**  The allegations of Paragraph 179 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 179.

180.  **ANSWER:**  The allegations of Paragraph 180 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 180.

181.  **ANSWER:**  The allegations of Paragraph 181 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 181.

182.  **ANSWER:**  The allegations of Paragraph 182 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 182.

Case ID: 220302583

183. **ANSWER:** The allegations of Paragraph 183 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 183.

184. **ANSWER:** The allegations of Paragraph 184 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 184.

185. **ANSWER:** The allegations of Paragraph 185 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 185, including all subparts.

186. **ANSWER:** The allegations of Paragraph 186 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 186.

187. **ANSWER:** The allegations of Paragraph 187 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 187.

188. **ANSWER:** The allegations of Paragraph 188 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 188.

189. **ANSWER:** The allegations of Paragraph 189 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 189.

Case ID: 220302583

190.   **ANSWER:**   The allegations of Paragraph 190 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 190.

**ANSWER TO DEMAND FOR RELIEF:**  The allegations of Count VII are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph Count VII.

Case ID: 220302583

## NEW MATTER

1.      Mead Johnson hereby incorporates the preceding Paragraphs of the within Answer by reference as if set forth fully herein.

2.      Plaintiff's claims are barred, in whole or in part, by the learned intermediary doctrine.

3.      If Enfamil products were fed to H.S., Enfamil products fed to H.S. were selected and administered by doctors and other medical professionals, including registered dieticians, in accordance with their clinical judgment as to what feeding regimens would give H.S. the best possible outcome.

4.      These learned intermediaries are knowledgeable about the scientific rationale for the Enfamil products, and about the open medical literature relating to various feeding alternatives.

5.      These intermediaries provide advice to parents and caregivers in accordance with their best judgment, including relevant warnings relating to product risks.

6.      Under such circumstances, Mead Johnson's duty to inform, warn, and educate about the Enfamil products ran to the learned intermediaries, not directly to the parents and infant caregivers.

7.      Mead Johnson provided sufficient information about the Enfamil products, including their cow's milk ingredient, to permit these learned intermediaries to make informed determinations as to the use of the products, and to decide what warnings to convey to parents and caregivers.

8.      On information and belief, Plaintiff Abdullah has already recovered for the alleged harm by virtue of payment by the health care providers who cared for H.S., and any recovery in this case would allow double recovery. For any harm, there can be but one recovery. Therefore,

Case ID: 220302583

Plaintiff Abdullah's entitlement to damages, if any, is barred, in whole or part, by virtue of the doctrine of res judicata, and/or by virtue of release, and/or by virtue of payment by the health care providers who cared for H.S.

9.     Plaintiffs' claims are barred, in whole or in part, because the injuries allegedly suffered by H.S. may be determined to have resulted from the act, omission, negligence, or fault of other persons or entities for whom Mead Johnson is not responsible.

10.    To the extent the alleged injuries were caused not solely, but in whole or in part by the act, omission, negligence, or fault of other persons or entities for whom Mead Johnson is not responsible, then Mead Johnson is entitled to an apportionment of all such causal fault and a reduction of any award against it.

11.    Plaintiffs' claims are barred, in whole or in part, because the injuries allegedly suffered by H.S. may be caused by several alternative causes. Alternative causes of NEC include the immaturity and under-development of the infant's gastro-intestinal tract; the growth of dangerous bacteria or the growth of bacteria in parts of the intestine in which such dangerous bacteria do not ordinarily live; an inability to properly digest food; inadequate blood supply to the intestines; an inability the immature gastrointestinal tract to secrete its normal biological defenses; and/or the inability of the intestinal tract to provide an adequate structural barrier to bacteria.

12.    Accordingly, all or part of the injuries, damages, and/or losses sustained by Plaintiff Abdullah and/or H.S. (which injuries, damages and losses are denied) were a direct, proximate, and sole result of H.S.'s physical and bodily condition on, prior to, and subsequent to events alleged in the Complaint, and Plaintiff Abdullah is thus barred from any recovery in this action under the doctrine of no liability for any idiosyncratic reaction.  To the extent any injury alleged

Case ID: 220302583

by Plaintiff Abdullah has been caused solely by one or more of these conditions, such serves as a complete bar to Plaintiff Abdullah's recovery against Mead Johnson.

13.     Plaintiffs' claims are barred, in whole or in part, because Plaintiff does not affirmatively allege that Mead Johnson products, or any act or omission of Mead Johnson or anyone acting on its behalf, were a substantial factor or proximate cause in bringing about the injuries allegedly sustained by H.S.

14.     Plaintiffs' claims are barred, in whole or in part, because the utility of its products outweighed any alleged risk they posed, by virtue of the lack of a feasible alternative safer design at the time of manufacture.

15.     Plaintiffs' claims are barred, in whole or in part, by the doctrine(s) contained in the Restatement (Second) of Torts § 402A, Comments *j* and *k*; and/or any similarly applicable doctrine contained in the Restatement (Third) of Torts: Products Liability.

16.     Specifically, Mead Johnson products are not "unreasonably dangerous" when put to their reasonably foreseeable use. Indeed, the benefits of the products outweigh their foreseeable risks when used in a reasonably foreseeable manner.

17.     Moreover, the lack of any safer, feasible alternative design for Mead Johnson's products precludes recovery by Plaintiff Abdullah for any claim based on allegations that such products are unreasonably dangerous. Each of the Enfamil products intended for premature infants supports growth and development in such infants.

18.     Each of these products has features that allow physicians and hospital dieticians to provide precise calorie counts, and other nutritional components, that enable premature infants to grow and develop commensurately with what premature infants would experience *in utero*.

Case ID: 220302583

19.     Certain Enfamil products can be used to enhance the nutritional profile of breast milk, including donor breast milk, which by itself does not provide sufficient calories, protein, and certain nutrients to meet growth and development objectives.

20.     Liquid human milk fortifiers, such as those manufactured by Prolacta, displace volume of donor and mother's breast milk, are associated with poor growth, and clinicians may have other good reasons not to use them.

21.     The Enfamil products can also be used when breast milk is not available, is too expensive, or is otherwise not warranted in the judgment of the physicians and hospital dieticians.

22.     The Enfamil products thus have many benefits and great utility in managing the growth and development of premature/low birth-weight infants in NICU settings.

23.     These benefits outweigh any alleged risks, which risks are denied.

24.     The Enfamil product of which Plaintiff Abdullah complains contains derivatives of cow's milk, which has certain unavoidable, inherent characteristics that cannot be altered or obviated under the state of scientific knowledge existing at the time such product(s) were manufactured.

25.     While denying that such characteristics are dangerous or defective, if H.S. sustained any injuries as a result of using or exposure to the product(s) at issue, those injuries were the result of properties necessarily associated with the products that were unavoidable and for which Mead Johnson cannot be held responsible.

26.     Adequate and complete warnings and instructions were provided with the subject product(s) and the subject product(s) were neither defective nor unreasonably dangerous when used according to label instruction.  Accordingly, to the extent that Mead Johnson had any duty

Case ID: 220302583

with respect to the manufacture and/or sale of its product(s), Mead Johnson fully discharged such duty by giving adequate instructions and warnings concerning the product's use.

27.     Mead Johnson alleges that Plaintiff Abdullah's claims are expressly and impliedly preempted, in whole or in part, by federal statutes and regulations.  In the alternative, Plaintiff Abdullah's claims are barred by the doctrine of primary jurisdiction.  The Enfamil products at issue in this case were either exempt formulas, or medical foods, or routine formulas, and all were regulated by the United States Food and Drug Administration ("FDA").

28.     In fact, infant formulas are the most regulated food products sold in the United States, and comprehensive federal regulations control the content, labeling, and instructions relating to the products.

29.     The conduct of Mead Johnson in all activities with respect to the subject products has been and is under the supervision of the FDA, which has supreme regulatory authority to ensure that products fed to infants are safe, and not adulterated or misbranded.

30.     At no time has FDA disapproved any of the Enfamil products at issue in this case, nor has it endorsed any of the scientific and medical opinions set forth in Plaintiff Abdullah's Complaint.

31.     Plaintiff Abdullah's claims would thwart and undermine the implementation of important federal policies, including those relating to the availability of safe alternatives to human breast milk.

32.     Moreover, to the extent that Plaintiff Abdullah's claims are based on alleged misrepresentations made to the FDA, or upon non-compliance with, or violations of, the Food Drug and Cosmetic Act ("FDCA"), Plaintiff Abdullah's claims are preempted, and Plaintiff Abdullah lacks standing to enforce any alleged violations.  *Buckman Co. v. Plaintiff's Legal*

Case ID: 220302583

*Comm*, 531 U.S. 341 (2001).

33.     Mead Johnson's compliance with applicable regulations is legally sufficient evidence that they complied with all legal duties under the laws of Pennsylvania as applicable to this action.

34.     This compliance proves that the products were not unreasonably dangerous, inadequately labeled, negligently designed or manufactured, and were fully merchantable and suitable for their intended use.

35.     The compliance is also legally sufficient evidence that Mead Johnson did not mislead physicians or anyone else with respect to these products, and proves lack of "scienter."

36.     Plaintiff Abdullah's claims are barred, in whole or in part, because Mead Johnson's speech was not false or misleading, and is protected under the First Amendment of the United States Constitution and comparable provisions of applicable Pennsylvania law.

37.     Mead Johnson's products offer many benefits, and the types of warnings alleged by Plaintiff Abdullah to be required, would be false, misleading, or at best controversial. Moreover, to the extent that Plaintiff Abdullah asserts that state law required Mead Johnson to provide additional or different warnings and/or instructions, or additional and/or different product labeling, such construction of state law would violate the First Amendment, including its prohibition against compelled speech.

38.     Plaintiff Abdullah knowingly and voluntarily assumed any and all risks associated with the matters alleged in the Complaint. Pursuant to the doctrines of assumption of the risk, informed consent, and/or comparative fault, this conduct bars, in whole or in part, the damages and other relief that Plaintiff Abdullah seeks to recover herein.

39.     In addition, on information and belief, Plaintiff Abdullah used the products in

Case ID: 220302583

contravention of the warnings provided with them, and /or used the products in a manner or for a purpose which was neither intended nor foreseeable by Mead Johnson.

40.     Plaintiff Abdullah's claims are barred by the statute of limitations and/or repose set forth under Pennsylvania law.

41.     H.S. allegedly consumed Enfamil products and in 2006, beyond the timeframe set forth under Pennsylvania law for the initiation of the claims Plaintiff Abdullah has asserted.

42.     Plaintiff Abdullah has not pled any basis for tolling or delaying accrual of the statute of limitations and statute of repose. Her claims are therefore barred by the statute of limitations and repose.

43.     Mead Johnson will rely upon any and all other further defenses which become available or appear during discovery proceedings in this action and hereby specifically reserve the right to amend its answer for the purpose of asserting any such additional defenses.

44.     On information and belief, Plaintiff's claims are barred, in whole or in part, by the doctrines of informed consent, release, and waiver.

45.     Plaintiffs' Second Amended Complaint fails to state a claim for punitive damages.

46.     By raising these defenses, Mead Johnson does not concede that it has the burden of proof as to any such defense.

47.     Mead Johnson reserves the right to supplement or amend its defenses as may be proper based on the pleadings filed, the outcome of its pending motion to dismiss, and discovery taken in this action.

Case ID: 220302583

## **PRAYER FOR RELIEF**

WHEREFORE, Mead Johnson prays for judgment as follows on Plaintiff Abdullah's Second Amended Complaint and Mead Johnson's Answer:

A.    Plaintiff Abdullah's Second Amended Complaint be dismissed with prejudice and that Plaintiff Abdullah take nothing;

B.    That judgement be entered in favor of Mead Johnson and against Plaintiff Abdullah;

C.    Awarding Mead Johnson all reasonable expenses, including court costs and attorneys' fees, incurred by it in connection with this action; and

D.    Awarding Mead Johnson such other and further relied as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Mead Johnson hereby requests a jury on all issues triable by jury.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  September 9, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead  Johnson Nutrition Company**

Case ID: 220302583

**<u>CERTIFICATE OF COMPLIANCE</u>**

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Dated: September 9, 2024

/s/ *Kenneth A. Murphy*
Kenneth A. Murphy, Esquire

Case ID: 220302583

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, do hereby certify that a true and correct copy of the foregoing document was served via the Philadelphia Courts Civil E-Filing System pursuant to Pa. R.C.P.205.4(g)(2)(ii) upon all counsel of record, and in accordance with Pa. R. Civ. P. 440 on all parties not served electronically.

Dated: September 9, 2024            /s/ *Kenneth A. Murphy*
                                            Kenneth A. Murphy, Esquire

Case ID: 220302583

# EXHIBIT A-77

**FILED**
19 AUG 2024 05:04 pm
Civil Administration
A. MALONIS

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## TRIAL DIVISION – CIVIL SECTION

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*, | : PHILADELPHIA COUNTY<br>: COURT OF COMMON PLEAS<br>: TRIAL DIVISION<br>: |
| Plaintiffs, | : |
| | : |
| v. | : MARCH TERM 2022 |
| | : NO. 220302583 |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : <br>: <br>: <br>: <br>: <br>: <br>: <br>: |
| Defendants. | : |

### ORDER

**AND NOW**, this 11TH day of September, 2024, upon consideration of the Motion for Admission of Attorney Catherine T. Zeng *Pro Hac Vice*, it is hereby **ORDERED** and **DECREED** that the Motion for Admission *Pro Hac Vice* is hereby **GRANTED,** and Catherine T. Zeng, of Jones Day, is hereby admitted *Pro Hac Vice* for the purpose of representing Defendant Abbott Laboratories in the above-captioned action after obtaining the appropriate City of Philadelphia Business Privilege Tax License pursuant to 19-2602 of the Philadelphia Code. *Pro Hac Vice* Counsel shall pay all City Business and Wage Tax as required.

**BY THE COURT:**

_____ J.

ORDER-Abdullah Etal Vs Mead Johnson

Case ID: 220302583
Control No.: 24084166

# EXHIBIT A-78

**FILED**
19 AUG 2024 11:27 am
Civil Administration
A. MALONIS

| | |
|---|---|
| **TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **MARCH TERM, 2022** |
| Plaintiffs, | : **No. 2583** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| Defendants. | : |

## ORDER

**AND NOW**, this ____ day of _September_, 2024, upon consideration of the Motion for Admission Pro Hac Vice of Joshua E. Bidzinski, Esquire, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits Joshua E. Bidzinski, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT:**

_____, J.

ORDER-Abdullah Etal Vs Mead Johnson

22030258300152

Case ID: 220302583
Control No.: 24083947

# EXHIBIT A-79

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs



Filed and Attested by the
Office of Judicial Records
27 SEP 2024 03:59 pm
G. IMPERATO

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | MARCH TERM, 2022 <br> No. 02583 |
| TONYA GRAY, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | APRIL TERM, 2022 <br> No. 220400216 |
| ROCHELLE HOLLINGSWORTH, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | SEPTEMBER TERM, 2023 <br> No. 230900791 |
| CATHERINE McMILLIAN, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | APRIL TERM, 2022 <br> No. 220400140 |

1

| | |
|---|---|
| SAMAYA SHORT, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:    APRIL TERM, 2022<br>  No. 220400159 |
| NIKIA TUCKER, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:    SEPTEMBER TERM, 2023<br>  No. 230900867 |
| GINA WIEGER, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>  No. 220302601 |
| MELVENIA WILLIAMS, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　Defendants. | :<br>:<br>:<br>:<br>:<br>:    APRIL TERM, 2022<br>  No. 220400141 |

## PLAINTIFFS' REPLY TO DEFENDANT MEAD JOHNSON'S NEW MATTER

Plaintiffs, by and through their attorneys, Kline & Specter, P.C., file the within Response to New Matter of Defendant Mead Johnson, and, in opposition thereto, aver as follows:

1.　　This is an incorporation paragraph to which no response is required.

2.　　Denied, as this paragraph contains a conclusion of law to which no response is required.

3.　　Denied, as this paragraph contains a conclusion of law to which no response is required.

4.　　Denied, as this paragraph contains a conclusion of law to which no response is required.

2

5.      Denied, as this paragraph contains a conclusion of law to which no response is required.

6.      Denied, as this paragraph contains a conclusion of law to which no response is required.

7.      Denied, as this paragraph contains a conclusion of law to which no response is required.

8.      Denied, as this paragraph contains a conclusion of law to which no response is required.

9.      Denied, as this paragraph contains a conclusion of law to which no response is required.

10.     Denied, as this paragraph contains a conclusion of law to which no response is required.

11.     Denied, as this paragraph contains a conclusion of law to which no response is required.

12.     Denied, as this paragraph contains a conclusion of law to which no response is required.

13.     Denied, as this paragraph contains a conclusion of law to which no response is required.

14.     Denied, as this paragraph contains a conclusion of law to which no response is required.

15.     Denied, as this paragraph contains a conclusion of law to which no response is required.

Case ID: 220302583

16.     Denied, as this paragraph contains a conclusion of law to which no response is required.

17.     Denied, as this paragraph contains a conclusion of law to which no response is required.

18.     Denied, as this paragraph contains a conclusion of law to which no response is required.

19.     Denied, as this paragraph contains a conclusion of law to which no response is required.

20.     Denied, as this paragraph contains a conclusion of law to which no response is required.

21.     Denied, as this paragraph contains a conclusion of law to which no response is required.

22.     Denied, as this paragraph contains a conclusion of law to which no response is required.

23.     Denied, as this paragraph contains a conclusion of law to which no response is required.

24.     Denied, as this paragraph contains a conclusion of law to which no response is required.

25.     Denied, as this paragraph contains a conclusion of law to which no response is required.

26.     Denied, as this paragraph contains a conclusion of law to which no response is required.

Case ID: 220302583

27.     Denied, as this paragraph contains a conclusion of law to which no response is required.

28.     Denied, as this paragraph contains a conclusion of law to which no response is required.

29.     Denied, as this paragraph contains a conclusion of law to which no response is required.

30.     Denied, as this paragraph contains a conclusion of law to which no response is required.

31.     Denied, as this paragraph contains a conclusion of law to which no response is required.

32.     Denied, as this paragraph contains a conclusion of law to which no response is required.

33.     Denied, as this paragraph contains a conclusion of law to which no response is required.

34.     Denied, as this paragraph contains a conclusion of law to which no response is required.

35.     Denied, as this paragraph contains a conclusion of law to which no response is required.

36.     Denied, as this paragraph contains a conclusion of law to which no response is required.

37.     Denied, as this paragraph contains a conclusion of law to which no response is required.

Case ID: 220302583

38.     Denied, as this paragraph contains a conclusion of law to which no response is required.

39.     Denied, as this paragraph contains a conclusion of law to which no response is required.

40.     Denied, as this paragraph contains a conclusion of law to which no response is required.

41.     Denied, as this paragraph contains a conclusion of law to which no response is required.

42.     Denied, as this paragraph contains a conclusion of law to which no response is required.

43.     Denied, as this paragraph contains a conclusion of law to which no response is required.

44.     Denied, as this paragraph contains a conclusion of law to which no response is required.

45.     Denied, as this paragraph contains a conclusion of law to which no response is required.

46.     Denied, as this paragraph contains a conclusion of law to which no response is required.

47.     Denied, as this paragraph contains a conclusion of law to which no response is required.

WHEREFORE, Plaintiff respectfully demands damages against Defendants, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages and costs.

Case ID: 220302583

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 27, 2024     By:     <u>*/s/Timothy A. Burke, Esquire*</u>

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
*Attorneys for Plaintiffs*


**KELLER POSTMAN**
BEN WHITING, ESQUIRE (*Pro Hac Vice*)
*Attorneys for Plaintiffs*

Case ID: 220302583

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 27, 2024, I caused a true and correct copy of the foregoing document to be served by electronic filing to all counsel of record.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 27, 2024          By:     <u>*/s/Timothy A. Burke, Esquire*</u>

TIMOTHY A. BURKE, ESQUIRE

8

Case ID: 220302583

# EXHIBIT A-80

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CIVIL

TERRAINE ABDULLAH, on her own behalf :
and as Parent and Natural Guardian of H.S., :
a minor :
　　　　　　　　　　　　　　　　　　　:
　　　　　vs.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
MEAD JOHNSON & COMPANY, LLC, et al :

**CASE ID. NO.: 220302583**

**CONTROL NO.: 24081569**

## ORDER

**AND NOW**, this 21st day of October 2024, upon consideration of the above Preliminary

Objections of Defendants, and any response thereto, it is hereby **ORDERED** that the Preliminary

Objections are **SUSTAINED**.  It is further **ORDERED** that all claims against Defendants the

Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania

Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine are hereby

**DISMISSED** with prejudice.[1]

BY THE COURT,

J.



ORDER-Abdullah Etal Vs Mead Johnson

22030258300157

---

[1] This Court has reviewed the Complaint and taken as true the scant factual averments plead therein and agrees with the defendant hospital system that the claims plead by plaintiff against the hospital based on the facts alleged, are not recognized under Pennsylvania law and do not set forth a prima facie case under any recognized claim against the hospital system.